IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TODD RICHARDSON,                    :
    Petitioner,                     :
                                    :    CASE NO.: 00-6185-CIV-FERGUSON
vs.                                 :    MAGISTRATE JUDGE SORRENTINO
                                    :
MICHAEL MOORE,                      :
    Respondent(s).                  :

_____

## RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS/ MEMORANDUM OF LAW

COMES NOW Respondent, Michael Moore, by and through the under signed counsel, pursuant to Rule 5, Rules Governing Section 2254 Cases in the United States District Court, and this Court's order dated March 2, 2000, hereby files this response to the petition for writ of habeas corpus, respectfully requests that all relief be denied, and as grounds states:

## I. CUSTODY

Petitioner, Todd Richardson, is currently subject to the lawful custody of the State of Florida pursuant to a valid judgment of guilt entered by the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida, on January 15, 1997 (See Exhibit 2).  According to the petition, Todd Richardson is incarcerated in Glades Correctional Institution, Belle Glade, Florida.

## II. PROCEDURAL HISTORY

F:\USERS\APPEALS\ROBERT\HABEAS\Richardson - Response to Federal Habeas.wpd



On March 13, 1996, Petitioner was charged with two counts of robbery with a firearm, armed kidnaping, and aggravated fleeing and eluding (Exhibit 1). On January 15, 1997, a jury found Petitioner guilty of strong arm robbery (a lesser included offense of armed robbery with a firearm) and armed robbery with a firearm (Exhibit 2). On February 25, 1997, Petitioner was sentenced to a term of thirty (30) years imprisonment as a habitual violent felony offender (Exhibit 3).

On March 6, 1997, Petitioner filed a Notice of Appeal in the Fourth District Court of Appeal appealing his conviction and sentence (Exhibit 4). Petitioner filed his Initial Brief on August 15, 1997, alleging four grounds: (1) that the trial court erred in denying a motion for judgment of acquittal; (2) that the trial court erred in instructing the jury on principals; (3) that the trial court erred in instructing the jury on robbery with a firearm; and (4) that the verdicts on Counts I and II were inconsistent (Exhibit 4). The State filed its Answer Brief on September 2, 1997 (Exhibit 4). The Fourth District Court of Appeal affirmed Petitioner's conviction and sentence, per curiam, on February 4, 1998 (Exhibit 4). Petitioner moved for a rehearing on February 25, 1998 which was denied by the appellate court on March 23, 1998 (Exhibit 4). Mandate issued on April 13, 1998 (Exhibit 4).

On May 15, 1998, Petitioner filed a Motion for Post Conviction

Relief, pursuant to Florida Rule of Criminal Procedure 3.850, alleging two claims of ineffective assistance of counsel: (1) that counsel was ineffective by conceding Petitioner's guilt to the jury; and (2) that counsel was ineffective by failing to object to improper closing argument about the value of petit theft (Exhibit 5). The trial court denied this motion on October 30, 1998 (Exhibit 5).

On November 3, 1998, Petitioner filed a Notice of Appeal in the Fourth District Court of Appeal appealing the trial court's denial of his 3.850 motion for post-conviction relief (Exhibit 6). Petitioner filed his Initial Brief on April 28, 1999 alleging the same two claims of ineffective assistance of counsel that he alleged in his 3.850 motion (Exhibit 6). The State filed its Answer Brief on June 28, 1999 (Exhibit 6). The Fourth District Court of Appeal affirmed the trial court's denial of Petitioner's 3.850 motion, per curiam, on October 6, 1999 (Exhibit 6). Mandate issued on October 22, 1999 (Exhibit 6).

On December 17, 1999, Petitioner filed a Petition for Writ of Habeas Corpus in the Fourth District Court of Appeal alleging ineffective assistance of appellate counsel (Exhibit 7). The Fourth District Court of Appeal denied the petition on March 9, 2000 (Exhibit 7).

III.  **STATUTE OF LIMITATIONS**

The time limit provision of 28 U.S.C. §2244(d) provides:

(d)(1) A 1-year time period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214, codified as amended at 28 U.S.C. §2244.

The amendments of this Act are presumed effective on April 24, 1996, the date on which the law was enacted. Hatch v. Oklahoma, 92 F.3d 1012, 1014 n.2, citing Bradshaw v. Story, 86 F.3d 164, 166 (10th Cir. 1996). The United States Supreme Court addressed the AEDPA's constitutionality as applied to pending habeas cases and held that the AEDPA may be applied to habeas cases filed after its effective date. Lindh v. Murphy, ___ U.S. ___, 117 S.Ct. 2059, 138

L.Ed.2d 481 (1997).

Petitioner filed his habeas petition on February 2, 2000, almost four years after the AEDPA's effective date. The requirements and limitations of the AEDPA apply in this case. See Lindh v. Murphy, supra.; Neelley v. Nagle, Case No. 97-6162 (11th Cir. April 9, 1998).

Petitioner was convicted on January 15, 1997 and sentenced on February 25, 1997. He had one year from March 25, 1997 (the date his right to file a notice of appeal expired) to file his petition -- on or before March 24, 1998. However, the one year statute of limitations is tolled while post-conviction or collateral proceedings are pending. Lovasz v. Vaughn, 134 F. 3d 146, 149 (3rd Cir. 1998). Time elapsing while post-conviction proceedings are pending shall not count toward the one year period of limitation. 28 U.S.C. §2244 (d)(2). In the same vein, time elapsing while post-conviction proceedings are not pending, counts toward Petitioner's one year time period in which to file this petition.

Before Petitioner's one year time period was to begin (March 25, 1997), Petitioner filed a Notice of Appeal to directly appeal his conviction and sentence. Consequently, the time for filing this petition was tolled. Mandate issued on the direct appeal on April 13, 1998 (Exhibit 4), at which time the time period for filing this petition began to run.

The statute of limitations time period ran for 31 days until

Petitioner filed his 3.850 post-conviction motion on May 15, 1998 (Exhibit 5). Petitioner timely appealed the denial of his 3.850, and mandate issued on October 22, 1999 (Exhibit 6).

After the mandate issued, the statue of limitations period again began and ran for 55 days, until Petitioner filed his Petitioner for Writ of Habeas Corpus in the Fourth District Court of Appeal which again tolled the time for filing this petition (Exhibit 7). While that petition was pending, Petitioner filed this Petition.

Petitioner filed this petition on February 2, 2000, using only 86 days of the one-year statute of limitations time period. This petition appears timely pursuant to 28 U.S.C. §2244(d).

IV.  <u>EXHAUSTION</u>

An application for a writ of habeas corpus cannot be granted, unless the applicant has exhausted his or her remedies available in the courts of the state.  28 U.S.C. § 2254(b)(1)(A).  Exhaustion of state remedies requires that petitioner fairly present federal claims first to a state court. <u>Duncan v. Henry,</u> 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); <u>Atkins v. Att'y Gen. of Alabama</u>, 932 F.2d 1430 (11th Cir. 1991).

Exhaustion also requires that a claim be pursued in the state courts through the appellate process. <u>Leonard v. Wainwright</u>, 601 F.2d 807 (5th Cir. 1979). Exhaustion is ordinarily accomplished on direct appeal. If not, it may be accomplished by the filing of

a Rule 3.850 motion, and an appeal from its denial.  <u>Id</u>. at 808.

   This court cannot entertain a claim in a petition for writ of
habeas corpus unless Petitioner has first exhausted all of his
state remedies in relation to that claim.  <u>Rose v. Lundy</u>, 455 U.S.
509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); <u>Thomas v. Dugger</u>, 846
F.2d 669 (11th Cir. 1988)(per curiam), <u>cert. denied</u>, 493 U.S. 921
(1989); 28 U.S.C. §2254 (b)(1988).  Petitioner has the burden of
proof on the exhaustion requirement.  <u>See</u> <u>Delaney v. Giarrussol</u>,
633 F. 2d 1126 (5th Cir. 1981); <u>Donovan v. Delgado</u>, 339 F.Supp.
446, 454 (D. Puerto Rico 1971); <u>Garcia v. Ramirez</u>, 337 F.Supp. 39
(D. Puerto Rico 1971).

   Petitioner has raised four grounds in his petition, all of which
were raised either in his Motion for Post Conviction Relief, and
the appeal, or on direct appeal.  Consequently, it appears that
Petitioner has exhausted his state remedies in regard to these
claims.

V.   <u>ARGUMENTS ON THE MERITS</u>

<u>GROUND 1: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR ADMITTING
PETITIONER'S GUILT.</u>

   Before a court can make a finding of ineffective assistance of
counsel, Petitioner must satisfy the two-pronged test established
in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80
L.Ed.2d 674 (1984).  First, Petitioner must prove that counsel's
performance was deficient and fell below an objective standard of

reasonableness considering all the circumstances. 104 S.Ct. at 2064-65. Judicial scrutiny must be "highly deferential" and "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 2065. Strategic decisions are immune from attack. Id. at 2066.

Second, actual prejudice must be attributable to counsel and directly impact on the overall result obtained. It is not sufficient to show that counsel's error had some "conceivable effect on the outcome", but rather it must be proven with reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2068. There must be a "probability sufficient to undermine confidence in the outcome." Id. Prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. Lockhart v. Fretwell, 506 U.S. ___ , 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

In evaluating prejudice, the court must be mindful that effective assistance does not mean error free assistance. Green v. Zant, 738 F. 2d 1529, 1536 (11th Cir. 1984). Counsel's actions need not be error free, just reasonable. Lancaster v. Newsome, 880 F. 2d 362, 375 (11th Cir. 1989).

It is well settled that the burden of proof for showing ineffective assistance of counsel is, and remains, on the defendant. Roberts v. Wainwright, 666 F. 2d 517, 519 n.3 (11th Cir.

1982). <u>See also</u> <u>Jones v. Kemp</u>, 678 F. 2d 929, 932 (11th Cir. 1982). Thus, the burden is on petitioner to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the case would have been different. It is a burden which petitioner cannot meet.

In general, scrutiny of an attorney's performance is highly deferential. Reviewing courts will not second-guess strategic decisions; rather, the attorney's performance is evaluated in light of all the circumstances as they existed at the time of the conduct, and is presumed to have been adequate. <u>Strickland</u>, <u>supra</u>. 466 U.S. at 689-90. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. <u>Strickland</u>, at 690-91. <u>Cf</u>. <u>Poyck v. State</u>, 694 So. 2d 686 (Fla. 1997)(defense counsel was not ineffective because he had adequate tactical reasons for limiting use of prison record during trial), <u>cert. denied</u>, 118 S. Ct. 559.

In the case at hand, there is undoubtedly competent, substantial evidence that proves that Petitioner's trial counsel was not ineffective. Under the first prong of the <u>Strickland</u> test, trial counsel's performance was not deficient. There is overwhelming evidence that trial counsel communicated with Petitioner about the trial strategy of admitting to the lesser offense of petty theft to possibly avoid a conviction on the greater offenses and a harsher sentence.

Petitioner's trial counsel had been practicing criminal defense law for over twenty-five years (T 13). He had discussions with Petitioner about trial strategy (T 13-4). He discussed with Petitioner that the strategy should be that only Petitioner's co-perpetrator, the driver of the car, should be responsible for the kidnaping, and that Petitioner's actions did not amount to robbery but to petty theft (T 15). Trial counsel confirmed that Petitioner was aware that he was not going to argue for guilt, but that the best strategy was to offer the alternative of petty theft to the jury (T 15). This strategy was based on counsel's years of experience (T 15). Petitioner agreed with counsel's theories (T 16). Counsel recalled having specific conversations with Petitioner about this trial strategy (T 17). They discussed it on more than one occasion (T 17).

Petitioner admitted in his testimony, that he and his trial counsel had conversations regarding trying to get the lesser charge of petty theft (T 6). Petitioner admitted that he never questioned the trial strategy of his counsel to his counsel or the trial judge (T 10).

Certainly, the evidence proves that trial counsel discussed with Petitioner the strategy of admitting guilt to petty theft in order to avoid greater charges and a harsher sentence. Trial counsel's and Petitioner's's testimony provides that trial counsel discussed this strategy with Petitioner. Competent, substantial evidence

proves that trial counsel's performance was not deficient because he informed Petitioner of the strategy.

Trial counsel's performance was also not deficient because he employed a sound trial strategy.

> We do not think courts should review any specific discretionary or judgmental act or position of trial counsel, whether tactical or strategic, on an inquiry as to effectiveness of counsel.
> When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing without the remotest legal justification or excuse, it is commonly considered a good trial strategy for a defense counsel to make some halfway concessions to the truth in order to give the appearance of reasonableness and candor and to thereby gain credibility and jury acceptance of some more important position. To be effectual, trial counsel should be able to do this without express approval of his client and without risk of being branded as being professionally ineffective because others may have different judgment or less experience.

McNeal v. State, 409 So.2d 528, 529 (Fla. 5th DCA 1982)(citations and footnote omitted). Although counsel did communicate this strategy to Petitioner, even if he did not, it was effective trial strategy to concede guilt to a lesser offense (especially when the evidence of Petitioner's guilt was overwhelming) in order to avoid a conviction on a greater offense and a harsher sentence. Trial counsel cannot be deficient for employing effective trial strategy.

Petitioner's allegations can not meet the second prong of the Strickland test -- that he suffered prejudice as a result of counsel's actions. First, trial counsel employed well-recognized, effective trial strategy. Petitioner could not have suffered prejudice because of trial counsel's use of a constructive and

practical strategy.

Second, notwithstanding trial counsel's strategy, there is no reasonable probability that the verdict would have been any different because the evidence against Petitioner was overwhelming. Both of the victims testified to Petitioner's participation in these crimes (TT 130-62,181-200). Erica Outridge specifically testified that Petitioner asked for her chain and her bag, and that she gave it to him because she was afraid (TT 189). Petitioner had his foot over her so she could not get out of the car (TT 189).

She also testified that a co-perpetrator pointed a gun at her while she gave her items to Appellant (TT 189). Linda Butler testified that Appellant was present the entire time (TT 148) when a co-perpetrator put a gun in her side and asked for her money and jewelry (TT 136-37). Certainly, the evidence overwhelming proved Appellant's crimes, and the outcome of the proceedings would have been the same regardless of the whether trial counsel inappropriately employed this trial strategy.

Without any doubt, Petitioner's trial counsel was effective by discussing the trial strategy with Petitioner and by employing a sound trial strategy (T 22). Petitioner's ineffective assistance of counsel claim does not meet either prong of the <u>Strickland</u> test and must fail.

GROUND 2: INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO OBJECT TO IMPROPER CLOSING ARGUMENT.

Wide latitude is permitted in arguing to a jury during closing


much money is involved.  Obviously, you all could tell there
is value to all the things these girls had.  The law doesn't
even say that.
    The law doesn't say it has some value.  Todd Richardson thought
it was some value because he went in like a shark after the tongue.
The actions of the individual speak loudest of all.

(TT 300-01).  This statement was a fair comment on the law -- the
jury instruction regarding robbery -- and certainly was not
egregious.  Element three of the robbery jury instruction stated
that the property taken be of some value (TT 316).  This statement
was not in regard to the petit theft charge so it could not have
been improper argument, as alleged by Petitioner.  The prosecutor
was clearly referring to element three of the robbery instruction
in regards to value of the property taken.

Additionally, this statement in regard to value was a fair
comment on the law.  The prosecutor was not arguing that this
element of "some value" did not exist.  He was aware of this
element of robbery and knew that the jury would be instructed on
it.  The prosecutor was making this statement in relation to the
value of the property taken -- that the property taken need not
have a particular or certain value for this element to be met.  The
prosecutor was referring to "some" value as the equivalent to a
"certain" value.  This is patently apparent considering that his
argument prior to this statement was specifically about the value
of the item stolen.  Certainly, this was a fair and truthful
comment on the law.

In a separate part of his closing argument, the prosecutor does

comment on the offense of petit theft.

    Then, you will have Petit Theft under an Armed Robbery.
What is Petit Theft?  You will hear about it.  Petit theft is
what the word tells you.  It's insignificant.  Its value is
pennies.  That's not what happened.  Todd Richardson didn't
walk somewhere and see some worthless item on the floor and
take it.
    Not when he pinned that young girl back there with his leg.  Not
when he kept that girl against her will, obviously, when they drove
away from the initial manifestation.  Not when he took her property
and put it in his pocket and stole it.
    It wasn't a Petit Theft.  It was an Armed Robbery.  It was made
possible by the use of force and intimidation.  That's the best
words I think that applies in this case.

(TT 302-03).  This argument was a fair comment on the law and not

prejudicial.  He was explaining that this was not a petit theft,

but an armed robbery, because of Petitioner's use of force and

intimidation -- an element of robbery stated in the jury

instructions (TT 316).  The prosecutor's comparison of petit theft

to armed robbery was not improper comment, but a fair comparison to

show how Petitioner's use of force, an element of robbery,

justified a conviction for that offense.

    Because the prosecutor's remarks were proper as a fair comment

on the law, Petitioner's trial counsel had no basis for an

objection.  With no basis for an objection by counsel, Petitioner

has no claim for ineffective assistance of counsel for not

objecting.  Under the Strickland analysis, Petitioner cannot meet

the first prong because trial counsel's performance was not

deficient.

    Notwithstanding trial counsel's performance, Petitioner cannot

meet the second prong of the <u>Strickland</u> analysis because there was no reasonable probability that the outcome of the trial would have been different had trial counsel objected. The jury was instructed to follow the law as set out in the instructions (TT 324) and was given the proper jury instructions concerning robbery and petit theft (TT 316-320). This allegedly improper comment was certainly overridden by the court's instructions.

Additionally, the evidence of Petitioner's crime was overwhelming. Both of the victims testified to Petitioner's participation in these crimes (TT 130-62,181-200). Erica Outridge specifically testified that Petitioner asked for her chain and her bag, and that she gave it to him because she was afraid (TT 189). Petitioner had his foot over her so she could not get out of the car (TT 189). She also testified that a co-perpetrator pointed a gun at her while she gave her items to Petitioner (TT 189). Linda Butler testified that Petitioner was present the entire time (TT 148) when a co-perpetrator put a gun in her side and asked for her money and jewelry (TT 136-37). Certainly, the evidence overwhelming proved Petitioner's crimes, and the outcome of the proceedings would have been the same regardless of the allegedly improper comments by the prosecutor.

Petitioner's claim of ineffective assistance of counsel for failure to object to improper closing argument fails to meet either prong of the <u>Strickland</u> test. This claim must fail.

GROUND 3: VERDICTS ON COUNTS I AND II WERE INCONSISTENT.

Based on the facts, a firearm was clearly used in the robbery of both victims and Petitioner was responsible for both robberies as a principal. It would seem inconsistent for the jury to convict Petitioner to a lesser included offense on Count I. However, this inconsistency is not a legal or "true" inconsistency.

Inconsistent verdicts which require reversal are interlocking verdicts in which a jury's acquittal on one count negates a specific element necessary for conviction on another count. Gonzalez v. State, 440 So. 2d 514, 515 (Fla. 4th DCA 1983). Such was the case in Mahaun v. State, 377 So. 2d 1158 (Fla. 1979) where the conviction for felony murder had to be vacated because the jury had acquitted the defendant of the underlying felony. Thus, no felony to support the felony murder conviction existed. Likewise, in Redondo v. State, 403 So. 2d 954 (Fla. 1981), the court held the defendant's conviction for possessing a firearm during the commission of a felony had to be vacated because on the underlying offense the jury found him guilty of only a lesser included misdemeanor.

In the case at hand, Petitioner's conviction for armed robbery of one victim was not contingent on the jury also finding Petitioner guilty of armed robbery of the other victim. The counts are legally independent. The jury could have legally returned verdicts of guilty to armed robbery on one victim and acquitted

Petitioner of all other charges.  The finding of guilt to the lesser included offense of strong armed robbery was clearly an expression of the jury's pardoning power.  The jury may have felt that Petitioner's actions made him more culpable in the armed robbery of one victim than in the robbery of the other.

The jury pardon is a well accepted principle.  <u>Bufford v. State</u>, 473 So. 2d 795 (Fla. 5th DCA 1985).  A case similar to the case at hand is <u>Marshall v. State</u>, 421 So. 2d 714 (Fla. 3d DCA 1982).  In that case, the defendant was convicted of armed robbery and armed sexual battery, but was acquitted of the possession of a firearm during the commission of felonies count.  <u>Id</u>. at 715.  Although the defendant argued that the verdicts were inconsistent, the appellate court pointed out that juries may return inconsistent verdicts and use their pardoning power.  <u>Id</u>.  The verdicts were not "true" inconsistent verdicts on interlocking counts, but an expression of the jury's pardoning power.

In the case at hand, Petitioner was not convicted of "true" inconsistent verdicts.  He was not denied any due process rights and this claim must fail.

<u>GROUND 4: THE TRIAL COURT PROPERLY DENIED PETITIONER'S JUDGMENT OF ACQUITTAL.</u>

The record is clear that Petitioner was not an innocent bystander to the armed robbery, but an active participant in the common scheme or plan to rob both of the victims.  Undoubtedly, there was sufficient evidence to allow a reasonable jury to conclude that

Petitioner was involved in the robbery of the victims.

Petitioner made the initial contact with the two victims in a shopping mall by calling them over (T 131,182). Petitioner spotted the victims later standing at a bus stop outside and offered to give them a ride home (T 133,185). The victims accepted the offer and the two women got into a car with Petitioner and three codefendants (T 135). Petitioner along with the codefendants drove the victims to behind a restaurant where they robbed the victims at gunpoint (T 135-44, 188-97). One codefendant pulled out a gun and stuck it into the side of one of he victims, who was in the front seat, and demanded her money and gold (T 134-35,188). A struggle ensued over that victim's chain (T 138). At the sane time, another codefendant in the back seat with Petitioner and a second victim, grabbed at that victim's gold chain (T 188). The victim said she would take it off herself (T 188). During the course of the robberies, the codefendant in the front seat pointed the gun at both victims (T 189).

Petitioner asked one victim to give him the gold chain and her purse (T 189). That victim testified that she was unable to move during the course of the robbery as both a codefendant and Petitioner had place their feet over her rendering her immobile (T 189). During the struggle, the victim in the front seat was able to escape from the vehicle (T 138). The victim in the back seat with Petitioner was taken to a motel where she was threatened and

ultimately released (T 193).

The police were notified and chased the vehicle (T 263). The vehicle stopped and all four men jumped out and ran (T 215). Jewelry, the purse, and the firearm were all recovered from the vehicle (T 217-19). Two dollars from the victim's purse and her gold chain and medallion were recovered from Petitioner (T 255).

The facts are clear, Petitioner acted in concert with his codefendants to rob these two victims after luring them into the vehicle. Petitioner's claims that he did not intend to participate in his codefendant's acts or that he did not know about the gun so he cannot be convicted of robbery are without merit. Petitioner actively participated in the common scheme to rob these two victims. "It is sufficient for the jury to find that appellant aided and abetted the codefendant to find him also guilty of any crime committed by the codefendant in pursuance of the common scheme." Jones v. State, 648 So. 2d 1210 (Fla. 4th DCA 1995).

Petitioner's participation in the common plan was guided by his placement in the back seat with one of the victims. The fact that one victim was in the front seat while the other was in the back seat, did not render separate plans. It was one common plan to rob both of the victims for which Petitioner was liable. Thus, there was sufficient evidence to support a finding by the jury of Petitioner's guilt to the charged crimes. The trial court did not err in denying the motion for judgment of acquittal. This claim is

without merit.

VI.    <u>CONCLUSION</u>

WHEREFORE, Respondent respectfully requests that this Court dismiss this petition and deny any and all relief requested since this petition is without merit.

                              Respectfully submitted,

                              ROBERT A. BUTTERWORTH
                              ATTORNEY GENERAL

                              ROBERT R. WHEELER
                              ASSISTANT ATTORNEY GENERAL
                              Florida Bar # 0796409
                              1655 Palm Beach Lakes Blvd
                              Third Floor
                              West Palm Beach, FL 33401

                              COUNSEL FOR RESPONDENT


                    CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Response to Petition for Writ of Habeas Corpus has been furnished by U.S. mail to Todd Richardson, DC# 961139, Glades Correctional Institution, 500 Orange Avenue, Belle Glade, FL 33430-5221 on April 19, 2000.

                              ROBERT R. WHEELER

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


TODD RICHARDSON,                      :
   Petitioner,                       :
                                      : CASE NO.: 00-6185-CIV-FERGUSON
vs.                                   : MAGISTRATE JUDGE SORRENTINO
                                      :
MICHAEL MOORE,                        :
   Respondent(s).                    :
_____

**APPENDIX**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

```
TODD RICHARDSON,            :
   Petitioner,             :
                           :  CASE NO.: 00-6185-CIV-FERGUSON
vs.                        :  MAGISTRATE JUDGE SORRENTINO
                           :
MICHAEL MOORE,             :
   Respondent(s).          :
                           :
_____
```

## INDEX TO APPENDIX

| | |
|---|---|
| Exhibit 1 | 3/13/96 Information |
| Exhibit 2 | 1/15/97 Jury Verdict |
| Exhibit 3 | 1/25/97 Sentencing Documents |
| Exhibit 4 | Direct Appeal<br>3/6/97 Notice of Appeal<br>8/15/97 Initial Brief<br>9/2/97 Answer Brief<br>2/4/98 Opinion: PCA Affirmed<br>2/25/98 Motion for Rehearing<br>3/23/98 Order denying rehearing<br>8/8/97 Mandate |
| Exhibit 5 | Motion for Post Conviction Relief<br>5/15/98 Motion<br>10/30/98 Order denying motion |
| Exhibit 6 | Appeal of Denial of Motion for Post Conviction Relief<br>11/3/98 Notice of Appeal<br>4/28/99 Initial Brief<br>6/28/99 Answer Brief<br>10/6/99 Opinion: PCA Affirmed<br>10/22/99 Mandate |
| Exhibit 7 | State Habeas Petition<br><br>12/17/99 Petition<br>3/9/00 Order Denying Petition |

Exhibit 8                          Trial      Transcript  and
                                   Evidentiary hearing Transcript

# EXHIBIT  1

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT**
**IN AND FOR BROWARD COUNTY, STATE OF FLORIDA**

| | |
|---|---|
| **THE STATE OF FLORIDA** | **INFORMATION FOR** |
| **vs.** | |
| **TRAVIS RUSSELL** | **I.-II. ROBBERY (FIREARM)** |
| **JUVONAL ALLEN** | **III. ARMED KIDNAPPING (DEADLY** |
| **TODD RICHARDSON** | **WEAPON OR FIREARM)** |
| | **IV. AGGRAVATED FLEEING AND** |
| | **ELUDING** |

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

**MICHAEL J. SATZ**, State Attorney of the Seventeenth Judicial Circuit of Florida, as Prosecuting Attorney for the State of Florida in the County of Broward, by and through his undersigned Assistant State Attorney, charges that **TRAVIS RUSSELL, JUVONAL ALLEN and TODD RICHARDSON on the 19th day of February, A.D. 1996**, in the County and State aforesaid, did unlawfully take from the person or custody of Linda Butler, certain property of value, to-wit: jewelry, with the intent to permanently or temporarily deprive Linda Butler of a right to the property or a benefit therefrom, by the use of force, violence, assault or putting the said Linda Butler in fear, and in the course thereof, there was carried a firearm, said firearm being in the possession of Travis Russell, contrary to F.S. 812.13(2)(a) and F.S. 775.087(2),(L9),

**COUNT II**

**MICHAEL J. SATZ**, State Attorney of the Seventeenth Judicial Circuit of Florida, as Prosecuting Attorney for the State of Florida in the County of Broward, by and through his undersigned Assistant State Attorney, charges that **TRAVIS RUSSELL, JUVONAL ALLEN and TODD RICHARDSON on the 19th day of February, A.D. 1996**, in the County and State aforesaid, did unlawfully take from the person or custody of Erica Outridge, certain property of value, to-wit: jewelry and money, with the intent to permanently or temporarily deprive Erica Outridge of a right to the property or a benefit therefrom, by the use of force, violence, assault or putting the said Erica Outridge in fear, and in the course thereof, there was carried a firearm, said firearm being in the possession of Travis Russell, contrary to F.S. 812.13(2)(a) and F.S. 775.087(2),(L9),

**COUNT III**

**MICHAEL J. SATZ**, State Attorney of the Seventeenth Judicial Circuit of Florida, as Prosecuting Attorney for the State of Florida in the County of Broward, by and through his undersigned Assistant State Attorney, charges that **TRAVIS RUSSELL, JUVONAL ALLEN and TODD RICHARDSON on the 19th day of February, A.D. 1996**, in the County and State aforesaid, did unlawfully and forcibly, secretly, or by threat, confine, abduct or imprison Erica Outridge against her will and without lawful authority with intent to commit or facilitate commission of a felony, to-wit: Robbery, and in the course thereof, there was carried a firearm or other deadly weapon, to-wit: a firearm, said firearm or other deadly weapon being in the possession of Travis Russell, contrary to F.S. 787.01, F.S. 775.087(1) and F.S. 775.087(2), (L10),

3

INFORMATION, Page 2

IDENTIFYING DATA
B/M, 10/1/75, 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
JUVONAL ALLEN
IDENTIFYING DATA
B/M, 11/30/77, 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
TODD RICHARDSON
IDENTIFYING DATA
B/M, 7/6/75, 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

## COUNT IV

MICHAEL J. SATZ, State Attorney of the Seventeenth Judicial Circuit of
Florida, as Prosecuting Attorney for the State of Florida in the County of
Broward, by and through his undersigned Assistant State Attorney, charges
that TRAVIS RUSSELL on the 19th day of February, A.D. 1996, in the County and
State aforesaid, Travis Russell did knowingly cause a law enforcement officer
to engage in a high speed vehicle pursuit while said Travis Russell was in
the course of unlawfully fleeing or attempting to elude said law enforcement
officer, said law enforcement officer being in an authorized law enforcement
patrol vehicle with agency insignia and other jurisdictional markings
prominently displayed on said vehicle with siren and lights activated, and at
the time Travis Russell had knowledge of an order by said duly authorized law
enforcement officer to stop the motor vehicle that he was operating, contrary
to F.S. 316.1935(2) and (4), (L1),

GHP/jlg/3/12/96
COUNTY OF BROWARD
STATE OF FLORIDA

Personally appeared before me _____, duly
appointed as an Assistant State Attorney of the 17th Judicial Circuit of
Florida by MICHAEL J. SATZ, State Attorney of said Circuit and Prosecuting
Attorney for the State of Florida in the County of Broward, who being first
duly sworn, certifies and says that testimony has been received under oath
from the material witness or witnesses for the offense(s), and the
allegations as set forth in the foregoing Information would constitute the
offense(s) charged, and that this prosecution is instituted in good faith.

_____
Assistant State Attorney, 17th Judicial Circuit of Florida

SWORN TO AND SUBSCRIBED before me this ____ day of _____, A.D. 19__

ROBERT E. LOCKWOOD

Clerk of the Circuit Court, 17th Judicial Circuit,
Broward County, Florida

By _____
Deputy Clerk

To the within Information, Defendant pleaded _____

ROBERT E. LOCKWOOD

Clerk of the Circuit Court, 17th Judicial Circuit,
Broward County, Florida

By _____
Deputy Clerk

A TRUE COPY
Circuit Court Seal

4

# EXHIBIT  2

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: 96-3122CF10C
JUDGE   : WILLIAM P. DIMITROULEAS

STATE OF FLORIDA,

    Plaintiff,

vs.                                    VERDICT

TODD D. RICHARDSON,

    Defendant.

_____//

Filed In Open Court
ROBERT E. LOCKE
ON _____
BY _____

COUNT I

WE, THE JURY, find as follows as to the Defendant in this

case: (Check only one)

_____A.  The Defendant is Guilty of Armed Robbery with a Firearm,
as charged in the Information.

__/__B.  The Defendant is Guilty of Strong Arm Robbery, as lesser
included offense.

_____C.  The Defendant is Guilty of Petit Theft, a lesser
included offense.

_____D.  The Defendant is Not Guilty.

SO SAY WE ALL, this 15TH day of January, A.D. 1997, at Fort

Lauderdale, Broward County, Florida.

FOREPERSON RICHARD PEREZ

24

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: 96-3122CF10C
JUDGE    : WILLIAM P. DIMITROULEAS

STATE OF FLORIDA,

    Plaintiff,

vs.                                        **VERDICT**

TODD D. RICHARDSON,

    Defendant.

_____ //

Filed in Open ...
ROBERT E. LOCK...

ON

BY

COUNT II

WE, THE JURY, find as follows as to the Defendant in this case: (Check only one)

__✓__ A.  The Defendant is Guilty of Armed Robbery with a Firearm, as charged in the Information.

_____ B.  The Defendant is Guilty of Strong Arm Robbery, as lesser included offense.

_____ C.  The Defendant is Guilty of Petit Theft, a lesser included offense.

_____ D.  The Defendant is Not Guilty.

SO SAY WE ALL, this _15th_ day of January, A.D. 1997, at Fort Lauderdale, Broward County, Florida.

FOREPERSON _RICHARD PEREZ_

25

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

                              CASE NO.: 96-3122CF10C
                              JUDGE   : WILLIAM P. DIMITROULEAS

STATE OF FLORIDA,

     Plaintiff,

vs.                                        VERDICT

TODD D. RICHARDSON,

     Defendant.

_____//

                         COUNT III


     WE, THE JURY, find as follows as to the Defendant in this

case: (Check only one)

_____A.   The Defendant is Guilty of Kidnapping, as charged in the
Information.

_____B.   The Defendant is Guilty of False Imprisonment, as lesser
included offense.

___✓___C.   The Defendant is Not Guilty.


     SO SAY WE ALL, this 15TH day of January, A.D. 1997, at Fort

Lauderdale, Broward County, Florida.

                         FOREPERSON RICUARD PEREZ

                                                              26

# EXHIBIT 3

17th Judicial Circuit   for Broward County

CLOCK IN

| DIVISION:<br>Criminal | as to Count | **SENTENCE**<br>I | |
|---|---|---|---|

THE STATE OF FLORIDA VS.                                    **CASE NUMBER**

_Todd Richardson_                    96-3702 CFC

**PLAINTIFF**                    **DEFENDANT**

The Defendant, being personally before this Court, accompanied by his attorney, _William Laswell_
and having been adjudicated guilty herein, and the Court having given the Defendant an opportunity to be heard and to offer matters
in mitigation of sentence, and to show cause why he sentenced as provided by law, and cause shown,

(Check One)
- [✓] and the Court having on _1-15-97_ deferred imposition of sentence until this date.
- [ ] and the Court having previously entered a judgment in this case on the defendant now re sentences the defendant.
- [ ] and the Court having placed the Defendant on Probation/Community Control and having subsequently revoked the Defendant's Probation/Community Control.

**IT IS THE SENTENCE OF THE COURT** that:

The Defendant pay a fine of $ _____ , pursuant to F.S. 775.063, plus $ _____ at the 5% surcharge required by F.S. 960.25

- [✓]    The Defendant is hereby committed to the custody of the Department of Corrections.

- [ ]    The Defendant is hereby committed to the custody of the Sheriff of Broward County, Florida.

- [ ]    The Defendant is hereby sentenced as a youthful offender in accordance with F.S. 958.04.

**TO BE IMPRISONED** (check one: unmarked sections are inapplicable)

- [ ]    For a term of Natural Life.

- [✓]    For a term of _30 Years_

- [ ]    Said SENTENCE IS SUSPENDED for a period of _____ subject to conditions set forth in this Order.

If "split" sentence,
complete either
paragraph.

_____    Followed by a period of _____ on Probation/Community Control under the supervision of the Department of Correction according to the terms and conditions of supervision set forth in separate order entered herein.

_____    However, after serving a period of _____ imprisonment in

the balance of such sentence shall be suspended and the defendant shall be placed on Probation/Community Control for a period of _____ under supervision of the Department of Corrections according to the terms and conditions of Probation/Community Control set forth in a separate order entered herein.

50

FORM MR930
REVISED 3/93

| DIVISION:<br>CRIMINAL | SENTENCE<br><br>( AS TO COUNT _____ I _____ ) | CASE NUMBER<br><br>96 - 3122 CF/0C |
|---|---|---|

In the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be satisfied before the defendant begins service of the supervision terms.

## SPECIAL PROVISIONS
### ( As to Count _____ I _____ )

By appropriate notation, the following provisions apply to the sentence imposed:

MANDATORY/MINIMUM PROVISIONS:

FIREARM _____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 775.087(2) are hereby imposed for the sentence specified in this count.

DRUG TRAFFICKING _____ It is further ordered that the _____ mandatory minimum imprisonment provisions of Florida Statute 893.135(1) are hereby imposed for the sentence specified in this court.

CONTROLLED SUBSTANCE WITHIN 1000 FEET OF SCHOOL _____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 893.13(1)(e) 1, are hereby imposed for the sentence specified in this court.

HABITUAL FELONY OFFENDER _____ The defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in this sentence in accordance to the provisions of Florida Statute 775.084(4). The requisite findings by the court are set forth in a separate order or stated on the record in open court.

HABITUAL VIOLENT OFFENDER _____ The defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provision of Florida Statute 775.084(4). A minimum term of _____ 10 _____ year(s) must be served prior to release. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

LAW ENFORCEMENT PROTECTION ACT _____ It is further ordered that the Defendant shall serve a minimum of_____ years before release in accordance with Florida Statute 775.0823.

CAPITAL OFFENSE _____ It is further ordered that the Defendant shall serve no less than 25 years in accordance with the provisions of Florida Statute 775.082(1).

VIOLENT CAREER CRIMINAL _____ The defendant is adjudicated a violent career criminal offender and has been sentenced to an term in accordance with the provision of Florida Statute 775.084(4)(c). A minimum term of _____ year(s) must be served prior to release. The requisite findings by the court a set forth in a separate order or stated on the record in open court.

51

| DIVISION:<br>CRIMINAL | SENTENCE<br>( AS TO COUNT _____ 1 _____ ) | CASE NUMBER<br>96 - 3122 CF10C |
|---|---|---|

**OTHER PROVISIONS**

**SHORT-BARRELED RIFLE,**
**SHOTGUN, MACHINE GUN**     _____ It is further ordered that the five-year minimum provisions of Florida Statute 790.221(2) are hereby imposed for the sentence specified in this court.

**CONTINUING CRIMINAL**
**ENTERPRISE**     _____ It is further ordered that the 25 year mandatory minimum sentence provisions of Florida Statute 893.20 are hereby imposed for the sentence specified in this count.

**RETENTION OF**
**JURISDICTION**     _____ The court retains jurisdiction over the defendant pursuant to Florida Statutes 947.16(3).

**JAIL CREDIT**     _____ It is further ordered that the defendant shall be allowed a total of _372_ days as credit for time incarcerated prior to imposition of this sentence.

**PRISON CREDIT**     _____ It is further ordered that the defendant be allowed credit for all time previously served on this count in the Department of Corrections prior to resentencing.

**CONSECUTIVE/**
**CONCURRENT AS**
**TO OTHER COUNTS**     _____ It is further ordered that the sentence imposed by this court shall run _____ consecutive to _____ concurrent with (check one) the sentence set forth in count _____ of this case.

52

17th Judicial Circuit i    1 for Broward County

**CLOCK IN**

DIVISION:
Criminal

as to Count _____ **SENTENCE** _II_

THE STATE OF FLORIDA VS.

_Todd Richardson_

**CASE NUMBER**

_96 - 3122 C foe_

PLAINTIFF                          DEFENDANT

The Defendant, being personally before this Court, accompanied by his attorney, _William Caswell_
and having been adjudicated guilty herein, and the Court having given the Defendant an opportunity to be heard and to offer matters
in mitigation of sentence, and to show cause why he sentenced as provided by law, and cause shown,

(Check One)

[/] and the Court having on _1-15-97_ deferred imposition of sentence until this date.

[ ] and the Court having previously entered a judgment in this case on the defendant now re-sentences the defendant.

[ ] and the Court having placed the Defendant on Probation/Community Control and having subsequently revoked
the Defendant's Probation/Community Control.

IT IS THE SENTENCE OF THE COURT that:

The Defendant pay a fine of $ _____ , pursuant to F.S. 775.063, plus $ _____ at the 5% surcharge required by F.S. 960.25

[/]        The Defendant is hereby committed to the custody of the Department of Corrections.

[ ]        The Defendant is hereby committed to the custody of the Sheriff of Broward County, Florida.

[ ]        The Defendant is hereby sentenced as a youthful offender in accordance with F.S. 958.04.

TO BE IMPRISONED (check one: unmarked sections are inapplicable)

[ ]        For a term of Natural Life.

[/]        For a term of _30 Years_

[ ]        Said SENTENCE IS SUSPENDED for a period of _____ subject to conditions set forth in
this Order.

If "split" sentence,
complete either
paragraph.

_____  Followed by a period of _____ on Probation/Community Control under the
supervision of the Department of Correction according to the terms and conditions of
supervision set forth in separate order entered herein.

_____  However, after serving a period of _____ imprisonment in

the balance of such sentence shall be suspended and the defendant shall be placed on
Probation/Community Control for a period of _____
under supervision of the Department of Corrections according to the terms and conditions
of Probation/Community Control set forth in a separate order entered herein.

53

FORM 38F070
REVISED 9/93

| DIVISION: CRIMINAL | SENTENCE<br>( AS TO COUNT_____II_____ ) | CASE NUMBER<br>96-3/22 CHo |

In the event the defendant is ordered to serve additional split sentences, all incarceration portions shall be satisfied before the defendant begins service of the supervision terms.

## SPECIAL PROVISIONS
### ( As to Count _____II_____ )

By appropriate notation, the following provisions apply to the sentence imposed:

MANDATORY/MINIMUM PROVISIONS:

**FIREARM** _____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 775.087(2) are hereby imposed for the sentence specified in this count.

**DRUG TRAFFICKING** _____ It is further ordered that the _____ mandatory minimum imprisonment provisions of Florida Statute 893.135(1) are hereby imposed for the sentence specified in this court.

**CONTROLLED SUBSTANCE WITHIN 1000 FEET OF SCHOOL** _____ It is further ordered that the three year minimum imprisonment provision of Florida Statute 893.13(1)(e) 1, are hereby imposed for the sentence specified in this court.

**HABITUAL FELONY OFFENDER** _____ The defendant is adjudicated a habitual felony offender and has been sentenced to an extended term in this sentence in accordance to the provisions of Florida Statute 775.084(4). The requisite findings by the court are set forth in a separate order or stated on the record in open court.

**HABITUAL VIOLENT OFFENDER** _____ The defendant is adjudicated a habitual violent felony offender and has been sentenced to an extended term in accordance with the provision of Florida Statute 775.084(4). A minimum term of _____15_____ year(s) must be served prior to release. The requisite findings by the court are set forth in a separate order or stated on the record in open court.

**LAW ENFORCEMENT PROTECTION ACT** _____ It is further ordered that the Defendant shall serve a minimum of_____ years before release in accordance with Florida Statute 775.0823.

**CAPITAL OFFENSE** _____ It is further ordered that the Defendant shall serve no less than 25 years in accordance with the provisions of Florida Statute 775.082(1).

**VIOLENT CAREER CRIMINAL** _____ The defendant is adjudicated a violent career criminal offender and has been sentenced to an term in accordance with the provision of Florida Statute 775.084(4)(c). A minimum term of _____ year(s) must be served prior to release. The requisite findings by the court a set forth in a separate order or stated on the record in open court.

C 4

| DIVISION<br>CRIMINAL | SENTENCE<br>( AS TO COUNT _____ II _____ ) | CASE NUMBER<br>96 - 3122 CF 10 |
|---|---|---|

## OTHER PROVISIONS

**SHORT-BARRELED RIFLE,**
**SHOTGUN, MACHINE GUN** _____ It is further ordered that the five-year minimum provisions of Florida Statute 790.221(2) are hereby imposed for the sentence specified in this court.

**CONTINUING CRIMINAL**
**ENTERPRISE** _____ It is further ordered that the 25 year mandatory minimum sentence provisions of Florida Statute 893.20 are hereby imposed for the sentence specified in this count.

**RETENTION OF**
**JURISDICTION** _____ The court retains jurisdiction over the defendant pursuant to Florida Statutes 947.16(3).

**JAIL CREDIT** _____ It is further ordered that the defendant shall be allowed a total of _372_ days as credit for time incarcerated prior to imposition of this sentence.

**PRISON CREDIT** _____ It is further ordered that the defendant be allowed credit for all time previously served on this count in the Department of Corrections prior to resentencing.

**CONSECUTIVE/**
**CONCURRENT AS**
**TO OTHER COUNTS** _____ It is further ordered that the sentence imposed by this court shall run _____ consecutive to _____ concurrent with (check one) the sentence set forth in count _____ I _____ of this case.

**CONSECUTIVE/**
**CONCURRENT AS**
**TO OTHER**
**CONVICTIONS** _____ It is further ordered that the composite term of all sentences imposed for the courts specified in this order shall run
_____ consecutive to _____ concurrent with (check one) the following:
_____ Any active sentence being served.
_____ Specific sentences:

_94 - 2136 CF 10_
_____
_____

PSI ORDERED          YES [ ✓ ]          NO [  ]
In the event the above sentence is to the Department of Corrections, the Sheriff of Broward County, Florida, is hereby ordered and directed to deliver the Defendant to the Department of Corrections at the facility designated by the Department together with a copy _ _ of this Judgment and Sentence and any other documents specified by Florida Statutes.

The Defendant in Open Court was advised of his right to appeal from this Sentence by filing notice of appeal within thirty days from this date with the Clerk of this Court, and the Defendant's right to assistance of counsel in taking said appeal at the expense of the State upon showing of indigence.

In imposing the above sentence, the Court further recommends_____

_____

**DONE AND ORDERED** in Open Court at Broward County, Florida, this _25_ day of _February_ , 19 _97_

_____
JUDGE

# EXHIBIT 4

RECEIVED
OFFICE OF THE
ATTORNEY GENERAL

MAR 10 1997

CRIMINAL OFFICE
WEST PALM BEACH

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

TODD RICHARDSON,
    Defendant/Appellant,

CASE NO.:   96-3122CF10C

vs.

JUDGE:    DIMITROULEAS

STATE OF FLORIDA,
    Plaintiff/Appellee.

**NOTICE OF APPEAL**

_____

NOTICE IS HEREBY GIVEN that, TODD RICHARDSON, Defendant/Appellant,

appeals to the District Court of Appeal, Fourth District of Florida, the final order imposing

judgment of conviction rendered on JANUARY 15, 1997 and the final order imposing sentence

rendered on FEBRUARY 25, 1997 in the above-styled cause. Notice is also given that the

Defendant is in custody. The Defendant was sentenced to 30 YEARS FSP CONCURRENT.

I HEREBY CERTIFY that a copy of the foregoing Notice of Appeal was hand delivered

to the Office of the State Attorney, Broward County Courthouse, Fort Lauderdale, Florida

33301, and by U.S. Mail to the Department of Legal Affairs, 1655 Palm Beach Lakes Blvd., 3rd

Floor, West Palm Beach, Florida 33401-2299, this 6 day of MARCH, 1997.

ALAN H. SCHREIBER
Public Defender

WILLIAM T. LASWELL 142842
Assistant Public Defender
201 S. E. 6th Street
Broward County Courthouse, Rm 3872
Fort Lauderdale, Florida 33301
(305) 831-6775
Attorney for Defendant/Appellant

STATE OF FLORIDA
BROWARD COUNTY
I DO HEREBY CERTIFY the within and foregoing is a true
and correct copy of the original as it appears on record
and file in the office of the Circuit Court Clerk of Broward
County, Florida.
WITNESS my hand and Official Seal in Fort Lauderdale,
Florida, this the 7    day of MAR A.D. 19 97

Robert E. Lockwood Clerk

Deputy Clerk

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

TODD RICHARDSON,              )
                             )
    Appellant,              )
                             )
  vs.                         )    Case No.  97-0818
                             )
STATE OF FLORIDA,            )
                             )
    Appellee.               )
_____)

**RECEIVED**
OFFICE OF THE
ATTORNEY GENERAL

AUG 1 9 1997

CRIMINAL OFFICE
WEST PALM BEACH

## INITIAL BRIEF OF APPELLANT

On Appeal from the Circuit Court of the
17th Judicial Circuit of Florida,
In and For Broward County (Criminal Division)

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida


ALLEN J. DeWEESE
Assistant Public Defender
Attorney for Todd Richardson
Criminal Justice Building/6th Floor
421 3rd Street
West Palm Beach, Florida  33401
(561) 355-7600
Florida Bar No.  237000

*State's pleading (Brief) due Sept. 4, 1997*

No.  97-00818
<u>Todd Richardson v. State of Florida</u>

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

Counsel for defendant/appellant certifies that the following persons and entities have or

may have an interest in the outcome of this case:

Linda Butler
(victim)

Allen J. DeWeese, Assistant Public Defender
Office of Public Defender, Fifteenth Judicial Circuit
Richard L. Jorandby, Public Defender
(appellate counsel for defendant/appellant)

Honorable William Dimitrouleas
Circuit Court Judge, Seventeenth Judicial Circuit
(trial judge)

Georgina Jimenez-Orosa, Assistant Attorney General
Office of Attorney General, State of Florida
Robert Butterworth, Attorney General
(appellate counsel for prosecution/appellee)

William Laswell, Assistant Public Defender
Office of Public Defender, Seventeenth Judicial Circuit
Alan H. Schreiber, Public Defender
(trial counsel for defendant/appellant)

Alberto Milian, Assistant State Attorney
Office of State Attorney, Seventeenth Judicial Circuit
Michael J. Satz, State Attorney
(trial counsel for prosecution/appellee)

Erica Outridge
(victim)

Todd Richardson
(defendant/appellant)

i

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### POINT I

THE TRIAL COURT ERRED IN DENYING JUDGMENT OF
ACQUITTAL ON COUNT I WHERE APPELLANT WAS
MERELY PRESENT AT THE ROBBERY COMMITTED BY A
CO-DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### POINT II

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY
ON PRINCIPALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

### POINT III

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY
ON ROBBERY WITH A FIREARM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### POINT IV

THE VERDICTS ON COUNTS I AND II WERE
INCONSISTENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ii

**CERTIFICATE OF SERVICE** ................................................... 14

iii

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

B. W. v. State, 546 So.2d 29
    (Fla. 1st DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bunderick v. State, 528 So. 2d 1247
    (Fla. 1st DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Chaudoin v. State, 362 So.2d 398
    (Fla. 2d DCA 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Coots v. State, 578 So.2d 873
    (Fla. 2d DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Dixon v. State, 603 So. 2d 570
    (Fla. 5th DCA 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 11, 12

Eaton v. State, 438 So. 2d 822
    (Fla. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Gonzalez v. State, 440 So. 2d 514
    (Fla. 4th DCA 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Greene v. State, 460 So.2d 986
    (Fla. 4th DCA 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Hall v. State, 500 So.2d 661
    (Fla. 1st DCA 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Howard v. State, 473 So.2d 841
    (Fla. 1st DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

Jones v. State, 648 So. 2d 1210
    (Fla. 4th DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Lewis v. State, 693 So. 2d 1055
    (Fla. 4th DCA 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

iv

Lovette v. State, 654 So. 2d 604
    (Fla. 2d DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

M. F. v. State, 549 So.2d 225
    (Fla. 3d DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mahaun v. State, 377 So. 2d 1158
    (Fla. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Redondo v. State, 403 So. 2d 954
    (Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Simmons v. State, 541 So. 2d 171
    (Fla. 4th DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

State v. Pennington, 534 So.2d 393
    (Fla. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

W. B. v. State, 554 So.2d 577
    (Fla. 3d DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

West v. State, 585 So. 2d 439
    (Fla. 4th DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## OTHER AUTHORITIES

## FLORIDA CONSTITUTION

    Article I, section 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13
    Article I, section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13

## UNITED STATES CONSTITUTION

    Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13
    Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13

## PRELIMINARY STATEMENT

Appellant was the defendant and appellee was the prosecution in the Criminal Division

of the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County, Florida.

In the brief, the parties will be referred to as they appear before this Honorable Court.

The following symbols will be used:

R = Record on Appeal

T = Transcript

## STATEMENT OF THE CASE AND FACTS

Appellant, along with Travis Russell and Juvonal Allen, was charged with two counts of robbery with a firearm and one count of armed kidnaping. All three counts alleged that a firearm was "in the possession of Travis Russell." Linda Butler was the alleged victim in one of the robbery counts. Erica Outridge was the alleged victim in the other and in the kidnaping count (R 3-4).

Appellant was tried alone. Travis Russell and Juvenol Allen were called to testify for the defense but refused (T 154, 241). Appellant was convicted by a jury of the lesser offense of strong arm robbery of Linda Butler, was convicted as charged of robbery with a firearm of Erica Outridge, and was acquitted of kidnaping (R 24-26).

At trial, Linda Butler testified that she was shopping at a mall with her friend Erica Outridge when they met Appellant and several of his friends. Appellant struck up a conversation with Erica, and they exchanged phone numbers. Then the groups separated (T 131, 163-164).

It was about 5:00 p.m. Linda and Erica left the mall and went to a bus stop. They had missed their bus. While they waited, a Nissan 300ZX pulled up with Appellant and three of his friends. Appellant was a passenger. The driver, Travis Russell, offered to give the girls a ride home, which they accepted (T 131-134, 166-168).

Linda got in front and sat on one of the boys' laps. Erica got in back, between Appellant, who was on the driver's side, and Juvonal Allen. As they drove off, Russell said he had to drop off some keys for his cousin. Appellant said no, take them home. Russell pulled in to a bank, then behind an IHOP. After stopping, Russell pulled out a gun and held it to Linda's side. At

1

first she thought it was a toy, but Russell said it was not and pulled back on it until it clicked.

Russell wanted money and jewelry. Allen reached from the back seat and took a chain with a

charm from around her neck. Linda opened the car door and began to struggle. Her face got

scratched (T 133-138, 145-146, 175, 179).

Appellant never used any force, violence or threats against Linda (T 135, 138, 145, 163,

175). Linda did not know if Appellant knew what was going on or whether he tried to stop the

robbery; she did not hear him say anything other than to take the girls home (T 178, 180).

After her chain was taken, Linda got out of the car, ran into the IHOP and called the

police. The car drove off with Erica still in the back seat (T 138-144, 150).

Erica testified that she got into the back seat with Appellant on her left and Allen on her

right. It was a tight squeeze because the car was so small. Erica could not sit up straight. She

and Allen were leaning forward, while Appellant leaned back, slightly behind her. Erica told

Russell where she lived, and they started in that direction. When Russell said he was going to

his cousin's, Appellant said to take the girls home first. Before they stopped at the IHOP, Allen

extended his legs over her while he reached for a key. He then opened the car's hatch to give

them room to sit up. After they stopped, the boy in the front passenger seat said he wanted to

get out. He opened the door, but closed it again when Russell told him to. The hatch was also

closed again (T 185-188, 202-206).

Then Erica heard Russell say, "Let me get your gold and your money," and she saw a gun

at Linda's side. Allen, with his leg still over Erica, said, "Let me get your chain." He grabbed

2

for it, but Erica told him she would take it off herself. Russell was now pointing his gun toward her (T 188-189, 206).

Appellant then asked, "Can I have your chain?" Erica gave it to him. He asked, "Can I have your bag?" and she gave it to him also. Appellant did not use any force, violence or threats. He prevented Allen from ripping her chain off her. She could not get out of the car because she was stooped over under the hatch and both Allen and Appellant had their feet over her. Meanwhile, Linda was fighting in the front. Erica told her just to give her things to them, but Linda said no. Then Linda got out and stood by the car until it drove off (T 189-192, 205).

As they drove off, Russell turned the gun on Erica and said, "Your friend did a stupid thing. She could have got shot." Then he put the gun away (T 193). Allen began to search her, but when she asked him to please stop Appellant moved Allen's hand away from her (T 205). Russell drove to a motel and let Erica out. She was told not to call the police. As she got out of the car she had her purse in her hand. Appellant asked for it back, so she gave it to him. She did so because she was afraid. The purse contained two dollars and a chain with a charm. Erica went inside and asked for the police (T 189-190, 193-194, 197, 207).

The police pursued the car pursuant to a BOLO. Appellant was seen hunched up in back under the hatch. After it was stopped, the passengers ran. It was Russell's car. In the car a charm was found in the front right. A handgun was found under the driver's seat. No fingerprints were found on it. A purse was found in the car's center console (T 211-226). Appellant was caught with two one-dollar bills, a piece of paper with a phone number, and a

3

broken gold necklace with a medallion in his possession (T 255). The girls identified Russell

and Appellant in a photographic lineup (T 228-237).

The defense's motion for judgment of acquittal, arguing that there was no evidence that

Appellant robbed Linda Butler, was denied (T 260-261). The defense argued to the jury that

Appellant did not participate in the robbery and kidnaping committed by Russell, but conceded

that he committed theft against Erica (T 287-292, 313).

The defense objected to the jury instruction on principals, arguing that there was no

evidence to support it (T 269, 280). The instruction was given (T 320-321). The defense also

objected to all instructions on firearms because there was no evidence that Appellant had

anything to do with a firearm (T 278). The court instructed on robbery with a firearm (T 318).

After trial, the defense filed a Motion to Correct or Reconsider Defective or Ambiguous

Verdict or to Arrest Judgement, alleging, among other things, that the jury's verdict of guilty as

charged of robbery with a firearm on Count I was inconsistent with the verdict on the lesser

included offense of unarmed robbery on Count II (R 47-49).

4

## SUMMARY OF ARGUMENT

### I.

Judgment of acquittal for robbery with a firearm should have been granted on Count I. Appellant was merely present in the back of Travis Russell's car when Russell pulled a gun and robbed Linda Butler. There was no evidence that Appellant intended to participate in the robbery of Butler or that he even knew about it beforehand or knew that Russell was armed.

### II.

The jury should not have been instructed on principals. The instruction was not supported by the evidence. Appellant was not an aider and abetter to robbery of Linda Butler, but was merely present. Appellant was also not an aider and abetter to robbery of Erica Outridge since it was Appellant himself who obtained Outridge's property from her. Moreover, Appellant could not properly have been convicted of robbery with a firearm because the information alleged that it was Travis Russell who had the firearm.

### III.

The jury should not have been instructed on robbery with a firearm because only Travis Russell was charged with the firearm and because the evidence was that Appellant did not use or possess it.

5

## IV.

The two verdicts are inconsistent: unarmed robbery of Linda Butler, armed robbery of Erica Outridge. It was Travis Russell who was charged with using a firearm, and the evidence showed that Appellant did not. Moreover, Appellant was not responsible for the robbery of Butler; he only obtained the property of Outridge. It was illogical for the jury to convict of a more serious charge on Count II, where Appellant's culpability was in fact less.

6

## ARGUMENT

### POINT I

### THE TRIAL COURT ERRED IN DENYING JUDGMENT OF ACQUITTAL ON COUNT I WHERE APPELLANT WAS MERELY PRESENT AT THE ROBBERY COMMITTED BY A CO-DEFENDANT.

Appellant was improperly convicted under Count I of robbery of Linda Butler (R 3-4). The evidence was that this robbery was initiated independently by co-defendant Travis Russell. Butler was in the front seat of the car between Russell, the driver, and another boy. Entirely on his own, and over Appellant's protests that they should take the girls home, Russell pulled a gun on Butler and demanded money and jewelry; a fourth boy, Juvonal Allen, became involved by reaching forward from the back seat and taking a chain from around Butler's neck (T 134-136, 145, 175, 179, 206). There was no evidence that Appellant intended to participate in Russell's and Allen's act, or that Appellant even knew about it beforehand or knew that Russell was armed. Appellant was merely present when it occurred. The defense's motion for judgment of acquittal, arguing that there was no evidence that Appellant robbed Butler (T 260-261), should have been granted on this count.

Mere presence at the scene of a crime is not sufficient to convict. See Chaudoin v. State, 362 So.2d 398 (Fla. 2d DCA 1978); Howard v. State, 473 So.2d 841 (Fla. 1st DCA 1985); State v. Pennington, 534 So.2d 393 (Fla. 1988); and Greene v. State, 460 So.2d 986 (Fla. 4th DCA 1984). Nor can a conviction be upheld on a theory of aiding and abetting where the defendant is merely present at the scene and there is no proof of his intent to participate in the crime. See

7

<u>W. B. v. State</u>, 554 So.2d 577 (Fla. 3d DCA 1989); <u>Hall v. State</u>, 500 So.2d 661 (Fla. 1st DCA 1986); and <u>Coots v. State</u>, 578 So.2d 873 (Fla. 2d DCA 1991). Also insufficient is mere knowledge. <u>See</u>, <u>M. F. v. State</u>, 549 So.2d 225 (Fla. 3d DCA 1989).

The conviction on Count I was a denial of due process and a fair trial under Article I, Sections 9 and 16, <u>Florida Constitution</u>, and the Fifth and Fourteenth Amendments to the <u>United States Constitution</u>. This Court must reverse and order appellant discharged on this count.

## ARGUMENT

### POINT II

### THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON PRINCIPALS.

The defense objected to the jury instruction on principals, arguing that there was no evidence to support it (T 269, 280, 320-321). As shown above in Point I of this brief, Appellant was not an aider and abetter to Count I, robbery of Linda Butler, but was merely present. As to Count II, robbery of Erica Outridge, the evidence was also that Appellant was not an aider and abetter, since it was Appellant himself who obtained Outridge's chain and purse from her (T 189-192).

Moreover, specifically regarding the firearm element on which Appellant was convicted under Count II, Appellant was not charged as a principal: the information alleged that it was Travis Russell who had the firearm (R 3-4). It is axiomatic that a defendant cannot be convicted of a crime unless it is properly charged. Dixon v. State, 603 So. 2d 570 (Fla. 5th DCA 1992).

It is reversible error to instruct on the principal theory where there is no evidence the defendant acted in concert with anyone. Lovette v. State, 654 So. 2d 604, 606 (Fla. 2d DCA 1995); see also, Simmons v. State, 541 So. 2d 171 (Fla. 4th DCA 1989). This is because the jury may be confused by the instruction. Lewis v. State, 693 So. 2d 1055, 1057 (Fla. 4th DCA 1997). In regard to the firearm, Jones v. State, 648 So. 2d 1210 (Fla. 4th DCA 1995), does not apply here because, as show in Points I and III of this brief, there was no evidence that Appellant intended to participate in a robbery with a firearm.

9

In order for the unnecessary instruction to constitute reversible error, it must, under the circumstances of the case, be capable of misleading the jury in such a way as to prejudice the defendant's right to a fair trial. <u>Lewis</u>, <u>supra</u>. Here, it is evident that the jury was confused because under Count I it convicted Appellant of the lesser offense of unarmed robbery of Linda Butler, thereby acquitting on the firearm or weapon element, but convicted him as charged of robbery with a firearm of Erica Outridge (R 24-26). There is no logical reason for these contradictory verdicts (see Point IV in this brief), because Travis Russell did in fact use a firearm against Linda Butler, whereas Appellant's obtaining of Erica Outridge's property was without any weapon.

This Court must reverse for a new trial on both counts. Alternatively, it must reverse for a new trial on Count II, under which Appellant was convicted of the firearm charge. The convictions were a denial of due process and a fair trial under Article I, Sections 9 and 16, <u>Florida Constitution</u>, and the Fifth and Fourteenth Amendments to the <u>United States Constitution</u>.

# ARGUMENT

## POINT III

### THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON ROBBERY WITH A FIREARM.

The defense objected to the jury instruction on robbery with a firearm because there was no evidence that Appellant had anything to do with a firearm (T 278, T 318). As shown in Points I and II of this brief, the defense's view of the evidence was accurate.

First, as discussed in Point II, Appellant was not charged as a principal: the information alleged that it was Travis Russell who had the firearm(R 3-4). It is axiomatic that a defendant cannot be convicted of a crime unless it is properly charged. <u>Dixon v. State</u>, 603 So. 2d 570 (Fla. 5th DCA 1992).

Second, Appellant cannot be guilty of using a firearm on a theory of aiding and abetting because he did not know that the principal had the requisite intent. <u>West v. State</u>, 585 So. 2d 439 (Fla. 4th DCA 1991); <u>see also</u>, <u>Jones v. State</u>, 648 So. 2d 1210 (Fla. 4th DCA 1995) (aider <u>intending to participate</u> guilty of robbery with firearm if one participant carried a firearm).

This Court must reverse for a new trial on Count II, under which Appellant was convicted of the firearm charge. The conviction was a denial of due process and a fair trial under Article I, Sections 9 and 16, <u>Florida Constitution</u>, and the Fifth and Fourteenth Amendments to the <u>United States Constitution</u>.

11

# ARGUMENT

## POINT IV

## THE VERDICTS ON COUNTS I AND II WERE INCONSISTENT.

After trial, the defense filed a Motion to Correct or Reconsider Defective or Ambiguous

Verdict or to Arrest Judgement, alleging, among other things, that the jury's verdict of guilty as

charged of robbery with a firearm on Count II was inconsistent with the verdict on the lesser

included offense of unarmed robbery on Count I (R 47-49).

The verdicts are inconsistent, as claimed. As shown in Points II and III of this brief, it

was Travis Russell who was charged with using a firearm, and the evidence showed that

Appellant did not. Moreover, as shown in Points I and II, Appellant was not responsible for the

robbery of Linda Butler (Count I); he only obtained the property of Erica Outridge (Count II).

It was illogical for the jury to convict of the more serious charge on Count II, where in fact there

was no firearm.

The jury is, in all cases, required to return consistent verdicts on interlocking charges.

Gonzalez v. State, 440 So. 2d 514, 515 (Fla. 4th DCA 1983), quoting Eaton v. State, 438 So. 2d

822 (Fla. 1983). In Gonzalez, supra, this Court recognized that in Florida "true" inconsistent

verdicts may not stand. This Court relied upon the decisions of the Florida Supreme Court in

Eaton v. State, supra; Mahaun v. State, 377 So. 2d 1158 (Fla. 1979); and Redondo v. State, 403

So. 2d 954 (Fla. 1981).

The verdicts here were truly inconsistent. This Court must reverse and order reduction of the conviction on Count II to unarmed robbery, in order to make it consistent with Count I. The present conviction on Count I is a denial of due process and a fair trial under Article I, Sections 9 and 16, <u>Florida Constitution</u>, and the Fifth and Fourteenth Amendments to the <u>United States Constitution</u>.

13

## CONCLUSION

Based on the foregoing arguments and the authorities cited therein, Appellant respectfully requests this Court to reverse the judgment and sentence of the trial court and to remand this cause with proper directions.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida

ALLEN J. DeWEESE
Assistant Public Defender
Attorney for Todd Richardson
Criminal Justice Building/6th Floor
421 3rd Street
West Palm Beach, Florida  33401
(561) 355-7600
Florida Bar No.  237000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished by courier to Celia Terenzio, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Suite 300, West Palm Beach, Florida 33401-2299 this 15th day of August, 1997.

ALLEN J. DeWEESE
Counsel for Appellant

14

# IN THE DISTRICT COURT OF APPEAL OF FLORIDA

## FOURTH DISTRICT

### CASE NO. 97-0818

**TODD RICHARDSON,**

Appellant,

-vs-

**THE STATE OF FLORIDA,**

Appellee.



---

## APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT OF FLORIDA IN AND FOR BROWARD COUNTY

---

## BRIEF OF APPELLEE

---

ROBERT A. BUTTERWORTH
Attorney General

DOUGLAS GURNIC
Assistant Attorney General
Florida Bar No. 0000063
Office of the Attorney General
Department of Legal Affairs
110 Tower. 110 S.E. 6th Street
Ft. Lauderdale, Florida 33301
Telephone: (954) 712-4600
Facsimile: (954) 712-4658

## CERTIFICATE OF INTERESTED PERSONS

### Case Number: 97-0818

### Todd Richardson v. State of Florida

Counsel for the Appellee, the State of Florida, certifies that the following persons and entities

have or may have an interest in the outcome of this case.

Linda Butler
(Victim)

The Honorable Robert A. Butterworth
Attorney General, State of Florida

Assistant Public Defender Allen J. DeWeese
(Appellate Counsel for Defendant/Appellant)

The Honorable William Dimitrouleas
Circuit Court Judge, Seventeenth Judicial Circuit
(Trial Judge)

Assistant Attorney General Douglas Gurnic
(Counsel for the Appellee / State of Florida)

The Honorable Richard L. Jorandby
(Public Defender)

Assistant Public Defender William Laswell
(Trial Counsel for Defendant)

Assistant State Attorney Alberto Milian
(Prosecutor)

Erica Outridge
(Victim)

Todd Richardson
(Defendant/Appellant)

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE AND FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**POINTS INVOLVED ON APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**POINT ONE**

      **WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A JUDGEMENT OF ACQUITTAL FOR THE COUNT ONE ARMED ROBBERY?**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7

**POINT TWO**

      **WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON PRINCIPALS?**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

**POINT THREE**

      **WHETHER TH TRIAL COURT ERRED IN INSTRUCTING THE JURY ON ROBBERY WITH A FIREARM?**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

**POINT FOUR**

   WHETHER THE VERDICTS IN COUNTS ONE AND TWO
   ARE INCONSISTENT AND REQUIRE REVERSAL?
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

iii

# TABLE OF AUTHORITIES

## STATE CASES

Blackburn v. State, 314 So. 2d 634 (Fla. 4th DCA 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bufford v. State, 473 So. 2d 795 (Fla. 5th DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Chaudoin v. State, 118 So. 2d 569 (Fla. 2d DCA 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Demps v. State, 649 So. 2d 938 (Fla. 5th DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Freeny v. State, 621 So. 2d 505 (Fla. 5th DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Gonzalez v. State, 440 So. 2d 514 (Fla. 4th DCA 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Howard v. State, 473 So. 2d 841 (Fla.1st DCA 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Jacobs v. State, 396 So. 2d 713 (Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Jones v. State, 648 So. 2d 1210 (Fla. 4th DCA 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Lewis v. State, 625 So. 2d 102 (Fla. 1st DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lovette v. State, 636 So. 2d 1304 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Lynch v. State, 293 So. 2d 44 (Fla. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mahaun v. State, 377 So. 2d 1158 (Fla. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Marshall v. State, 421 So. 2d 714 (Fla. 3d DCA 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Redondo v. State, 403 So. 2d 954 (Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State v. Roby, 246 So. 2d 566 (Fla. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Stripling v. State, 645 So. 2d 589 (Fla. 3d DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Terry v. State, 668 So. 2d 954 (Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

## STATUTES

§777.011, Fla. Stat. (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## INTRODUCTION

The Appellant, Todd Richardson, was the Defendant below, and the State of Florida was the prosecution. In this brief, the parties will be referred to as they stood in the proceedings below. The symbols "T." and "R." will designate the transcript of the proceedings below, and the record, respectively.

## STATEMENT OF THE CASE AND FACTS

The State is in substantial agreement with the Defendant's version of the case and facts. However the State would add the following relevant facts:

The Defendant made initial contact with the two victims in a shopping mall by calling the victims over to where he was to talk. (T-131, 182). The Defendant spotted the victims later standing at a bus stop outside and offered to give them a ride home. (T-133, 185). The victims accepted the offer and the two women got into the car which the defendant and his three codefendants were riding in. The women were driven to a location behind a restaurant were the Defendant and his three codefendants robbed the two women at gunpoint. (T 135-44, 188-97). Once behind the restaurant the driver, Travis Russell, pulled out a gun and stuck it in the side of Linda Butler, who was in the front seat, and demanded her money and her gold. (T 134-35, 188). A struggle ensued over Linda Butler's gold chain. (T-138). At that time Juvenal Allen, another codefendant in the back seat with the Defendant and Erica Outridge, grabbed at Ms. Outridge's gold chain. (T-188). Ms. Outridge said she would take it off herself. (T-188). During the course of the robberies Travis Russell pointed the gun at Ms. Outridge as well as Ms. Butler. (T-189). The Defendant asked that Victim Outridge give

1

him the gold chain and additionally the Defendant asked that the victim give him her purse.  (T-189).

Victim Outridge testified that she was unable to move during the course of the robbery as both

Juvenal Allen and the Defendant had placed their feet over her rendering her immobile.  (T-189).

During the struggle victim Butler was able to escape from the vehicle.  (T-138).  Victim Outridge

was not as fortunate as she was trapped by the Defendant and Juvenal Allen in the back seat.  Victim

Outridge was taken to a motel were she was threatened and ultimately released.  (T-193).  The police

were alerted and began chasing the vehicle.  (T-263).  The vehicle eventually stopped and all four

men jumped out and ran.  (T-215).  Jewelry, the purse, and firearm were all recovered from the

vehicle.  (T 217-19).  The two dollars from victim Outridge's purse and her gold chain and medallion

were recovered from the Defendant.  (T-255).

2

## POINTS INVOLVED ON APPEAL

### POINT ONE

**WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A JUDGEMENT OF ACQUITTAL FOR THE COUNT ONE ARMED ROBBERY?**

### POINT TWO

**WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON PRINCIPALS?**

### POINT THREE

**WHETHER TH TRIAL COURT ERRED IN INSTRUCTING THE JURY ON ROBBERY WITH A FIREARM?**

### POINT FOUR

**WHETHER THE VERDICTS IN COUNTS ONE AND TWO ARE INCONSISTENT AND REQUIRE REVERSAL?**

## SUMMARY OF THE ARGUMENT

### POINT ONE

The trial court properly denied the Defendant's motion fro a judgement of acquittal on count one as there was sufficient evidence for the jury to reasonably conclude that the Defendant had participated in the common scheme or plan to rob both of the victims.

### POINT TWO

The acts of the Defendant, in taking victim Outridge's gold chain and purse as well as well as holding her down and prohibiting her from attempting to assist victim Butler, provided sufficient evidence to support the instruction on principals given by the trial court.

### POINT THREE

Because the Defendant was a principal to the crimes against these two women the fact he was not the one carrying the firearm did not shield him from being convicted of robbery with a firearm.

### POINT FOUR

The convictions in counts one an two are not legally inconsistent and do not require reversal.

4

**ARGUMENT**

**POINT ONE**

**WHETHER THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A JUDGEMENT OF ACQUITTAL FOR THE COUNT ONE ARMED ROBBERY?**

The Defendant argues the trial court erred in denying his motion for a judgement of acquittal to the count one robbery charge. Defendant claims he was an innocent bystander merely present at the scene of the robbery of Linda Butler. However, the record shows the Defendant was not an innocent bystander as he actively participated in the common scheme or plan to rob both Linda Butler and Erica Outridge.

To begin with it should first be noted that:

> a defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence. The Courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference in opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established . . . the court should submit the case to the jury for there finding.

Lynch v. State, 293 So. 2d 44 (Fla. 1974). Here the record shows that the State presented sufficient evidence to allow a reasonable jury to conclude that the Defendant was involved in the robbery of these two women.

The Defendant made initial contact with the two victims in a shopping mall by calling the

5

victims over to where he was to talk. (T-131, 182). The Defendant spotted the victims later standing at a bus stop outside and offered to give them a ride home. (T-133, 185). The victims accepted the offer and the two women got into the car which the defendant and his three codefendants were riding in. The women were driven to a location behind a restaurant were the Defendant and his three codefendants robbed the two women at gunpoint. (T 135-44, 188-97). Once behind the restaurant the driver, Travis Russell, pulled out a gun and stuck it in the side of Linda Butler, who was in the front seat, and demanded her money and her gold. (T 134-35, 188). A struggle ensued over Linda Butler's gold chain. (T-138). At that time Juvenal Allen, another codefendant in the back seat with the Defendant and Erica Outridge, grabbed at Ms. Outridge's gold chain. (T-188). Ms. Outridge said she would take it off herself. (T-188). During the course of the robberies Travis Russell pointed the gun at Ms. Outridge as well as Ms. Butler. (T-189). The Defendant asked that Victim Outridge give him the gold chain and additionally the Defendant asked that the victim give him her purse. (T-189). Victim Outridge testified that she was unable to move during the course of the robbery as both Juvenal Allen and the Defendant had placed their feet over her rendering her immobile. (T-189). During the struggle victim Butler was able to escape from the vehicle. (T-138). Victim Outridge was not as fortunate as she was trapped by the Defendant and Juvenal Allen in the back seat. Victim Outridge was taken to a motel were she was threatened and ultimately released. (T-193). The police were alerted and began chasing the vehicle. (T-263). The vehicle eventually stopped and all four men jumped out and ran. (T-215). Jewelry, the purse, and firearm were all recovered from the vehicle. (T 217-19). The two dollars from victim Outridge's purse and her gold chain and medallion were recovered from the Defendant. (T-255).

Hence the record shows the Defendant acted in concert with his three codefendants to rob

6

these two victims after luring them into the vehicle.  Defendant's argument that because he was not the one who held the gun or actually took the jewelry from victim Butler  he cannot be convicted of that robbery is without merit.  As shown the Defendant actively participated in the common scheme of robbing these two women.  "It is sufficient for the jury to find that appellant aided and abetted the codefendant to find him also guilty of **any crime committed by the codefendant in pursuance of the common scheme.**" Jones v. State, 648 So. 2d 1210 (Fla. 4th DCA 1995)(emphasis added)(citing Davis v. State, 275 So. 2d 575 (Fla. 1st DCA 1973)).  There was not two separate schemes or plans to rob each victim separately.  The Defendant's participation in the plan was guided by the placement of the four men and the two victims.  The fact the victims  were placed one in the backseat and one in the front did not render the robberies separate schemes or plans.  Thus, there was sufficient evidence to support a finding by the jury of the Defendant's guilt to the charged crimes.  The trial court did not err in denying the motion for a judgement of acquittal.  The underlying issue in Points One, Two, and Three of this appeal is whether the Defendant was properly classified as a principal. The State will continue its argument regarding this issue in Points Two and Three as divided in the Defendant's initial brief.

## POINT TWO

### WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON PRINCIPALS?

The Defendant argues the trial court committed reversible error in instructing the jury on the theory of principals because he did not qualify as a principal in this case. Defendant's claim is without merit.

Section 777. 011 of the Florida Statutes provides as follows:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he is or is not actually or constructively present at the commission of such offense.

As stated in <u>Jacobs v. State</u>, 396 So. 2d 713 (Fla. 1981): "One who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime."

"In order to be convicted as a principal for a crime physically committed by another, the defendant must intend that the crime be committed and must do some act to assist the other person in actually committing the crime." <u>Terry v. State</u>, 668 So. 2d 954 (Fla. 1996)(citation omitted). As shown in Point One, the acts of the Defendant here in assisting the robbery scheme show that he intended these women be robbed. Hence, he properly qualified as a principal in these crimes.

In addition to the Defendant physically taking victim Outridges' purse and jewelry, his actions in keeping Ms. Outridge immobile assisted in both robberies. Actions which assist in

8

keeping two victims separated are sufficient for classification as a principal to all crimes against both victims. See Terry, 668 So. 2d at 964-65. Here, as demonstrated in Point One, the Defendant acted to keep the two victims separated by placing his feet over victim Outridge, thus immobilizing her and prohibiting her from making any attempt to assist her friend victim Butler, thereby the Defendant was assisting in the robbery of Linda Butler. See also Howard v. State, 473 So. 2d 841 (Fla.1st DCA 1985)(where the court held the acts of Howard in preventing the first victim from rescuing the second victim contributed to the accomplices sexual assaults being carried out and provided evidence of participation by Howard in the common scheme to commit sexual battery on both young victims.) The Defendant was properly convicted of the robbery of Linda Butler as a principal to the robbery.

Defendant also argues that he can not be convicted as a principal in this case because he was not charged as a principal in either counts one or two. This claim is without merit as the courts of this State have long held that "it is immaterial whether the indictment or information alleges that the defendant committed the crime or was merely aiding or abetting in its commission" to be convicted of the charged crime as a principal. State v. Roby, 246 So. 2d 566 (Fla. 1971). See also Blackburn v. State, 314 So. 2d 634 (Fla. 4th DCA 1975); Chaudoin v. State, 118 So. 2d 569 (Fla. 2d DCA 1960).

9

## POINT THREE

### WHETHER TH TRIAL COURT ERRED IN INSTRUCTING THE JURY ON ROBBERY WITH A FIREARM?

Again the Defendant makes the argument that because he was not charged as a principal he could not be convicted as a principal. This claim is without merit. (See argument, Point Two.)

Defendant also argues that because he did not personally possess the firearm he could not be convicted of armed robbery. In order to convict a defendant as a principal to armed robbery "[t]he State need not show that the defendant personally possessed the firearm." Stripling v. State, 645 So. 2d 589 (Fla. 3d DCA 1994). See also Demps v. State, 649 So. 2d 938 (Fla. 5th DCA 1995)(confirming Demps' conviction for armed robbery under principal theory as he was in the backseat of the cab while his co-perpetrator of the robbery was in the front seat with the gun to the head of the cab driver.)

Defendant argues he should not be held responsible for the use of a firearm because he did not know his codefendant Russell was going to use it in the commission of the robberies. Here the robberies were committed simultaneously with both victims testifying to having the gun pointed at them and clearly causing them to give up their property. (T- 134, 189) The Defendant obviously benefited from the use of the firearm in committing these robberies thus, he can not separate himself and his actions from the firearm usage. One codefendant's use of a firearm during the course of the criminal episode is sufficient to convict a defendant of the firearm charge. See Freeny v. State, 621 So. 2d 505 (Fla. 5th DCA 1993); Lewis v. State, 625 So. 2d 102 (Fla. 1st DCA 1993).

In Lovette v. State, 636 So. 2d 1304 (Fla. 1994) Lovette claimed he should not be held responsible for the shooting deaths of three of the robbery victims because he had no idea his co-

10

defendant was going to shoot them. The Court held he was properly convicted of these murders as he was a willing participant in the robberies and the killings furthered the robbery. Id. at 1307. Similarly here, even if the Defendant did not initially know codefendant Russell was going to us a firearm, Defendant soon realized it was being used and benefitted from its use in robberies. Defendant was properly convicted of robbery with a firearm.

11

## POINT FOUR

## WHETHER THE VERDICTS IN COUNTS ONE AND TWO ARE INCONSISTENT AND REQUIRE REVERSAL?

Defendant argues that his conviction in Count One of strong arm robbery of Linda Butler is inconsistent with his conviction of armed robbery of Erica Outridge in Count Two, and such inconsistency requires reversal of his armed robbery conviction. It is true that based on the facts, a firearm was clearly used in the robbery of both victims and the Defendant was responsible for both robberies as a principal, that it would seem inconsistent for the jury to convict the Defendant to a lesser included offense on Count One. However, this inconsistency is not a legal or "true" inconsistency which would require reversal.

As this court expressed in Gonzalez v. State, 440 So. 2d 514 (Fla. 4th DCA 1983), inconsistent verdicts which require reversal are interlocking verdicts in which a jury's acquittal on one count negates a specific element necessary for conviction on the other count. Id. at 515. Such was the case in Mahaun v. State, 377 So. 2d 1158 (Fla. 1979) were the conviction for felony murder had to be vacated because the jury had acquitted the defendant of the underlying felony. Thus, no felony to support the felony murder conviction existed. Likewise in Redondo v. State, 403 So. 2d 954 (Fla. 1981), the court held the defendant's conviction for possessing a firearm during the commission of a felony had to be vacated because on the underlying offense the jury found him guilty of only a lesser included misdemeanor.

In the instant case, the Defendant's conviction for the armed robbery of Linda Butler was not contingent on the jury also finding the Defendant guilty of the armed robbery of Erica Outridge. The

12

counts are legally independent. The jury could have legally returned verdicts of guilty to armed robbery on one victim and acquitted the Defendant of all charges as to the other. The finding of guilt to the lesser included offense of strong arm robbery was clearly an expression of the juries pardoning power. The jury must have felt the defendant's actions made him more culpable in the robbery of Erica Outridge than the robbery of Linda Butler.

"The jury pardon concept is a well-accepted principle throughout the majority of jurisdictions . . . The preservation of the jury "pardon power" is the basis for the rule that the jury must be charged on all necessary lesser included offenses." Bufford v. State, 473 So. 2d 795 (Fla. 5th DCA 1985)(citations omitted). In a similar case Marshall v. State, 421 So. 2d 714 (Fla. 3d DCA 1982), the appellate court affirmed what appeared to be factually inconsistent verdicts. There Marshall was convicted of armed robbery and armed sexual battery but acquitted of the possession of a firearm during the commission of the felonies count. Id. at 715. Marshall argued the inconsistency required the reversal of his armed robbery and armed sexual battery convictions. The appellate court affirmed the convictions pointing out that juries may return inconsistent verdicts and that this was obviously an expression of the jury's pardoning power as there, like the instant case, the defendant was not the actual "triggerman". Id. at 716, (n. 3). Here, because the verdicts were not "true" inconsistent verdicts on interlocking counts, the expression of the juries pardoning power on count one must be affirmed.

13

# CONCLUSION

Based upon the foregoing arguments and cited authorities, the Appellee respectfully requests that this Court affirm the Defendant's convictions and sentences as imposed.

Respectfully Submitted,

ROBERT A. BUTTERWORTH
Attorney General

DOUGLAS GURNIC
Assistant Attorney General
Florida Bar No. 0000063
Office of the Attorney General
Department of Legal Affairs
110 Tower. 110 S.E. 6th Street
Ft. Lauderdale, Florida 33301
Telephone:  (954) 712-4600
Facsimile:  (954) 712-4658

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Brief of Appellee was mailed this 2nd day of September, 1997, to Allen J. DeWeese, Assistant Public Defender, The Criminal Justice Building, 421 Third Street, 6th Floor, West Palm Beach, Florida 33401.

DOUGLAS GURNIC
Assistant Attorney General

14

IN THE DISTRICT COURT OF APPEAL THE STATE OF FLORIDA

FOURTH DISTRICT

TODD RICHARDSON,

     Appellant,

vs.

STATE OF FLORIDA,

     Appellee.

Case No. 97-0818

CRIMINAL APPEALS
FT. LAUDERDALE

## MOTION FOR REHEARING

    The appellee respectfully moves for rehearing pursuant to rule 9.330(a) on the ground that the court overlooked controlling points of law or fact. In support of the motion, the appellee states:

1.  On February 4, 1998, this court issued a per curiam affirmance.  Appellant files this pro se rehearing in good faith.

2.  The appellant believes this court has overlooked the controlling case law under point one of the appellants initial brief.  It is clear that the appellant did not initiate or plan the robbery in which he was charged for.

3.  The appellant would ask the court to see Evans v. State 643 So.2d 1204 (1rst DCA 1994)  In that case Evans was also in a vehicle while the driver and other passenger committed a robbery.  He was convicted but the case was reversed on appeal.  The appellant believes his case is in conflict with this decision.

    Wherefor, the appellee respectfully moves the court for an order granting rehearing pursuant to rule 9.330(a).

*Todd Richardson*

TODD RICHARDSON 961139
Glades Correctional Inst.
500 Orange Avenue Circle
Belle Glade, Florida 33430

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this motion was furnished to

Douglas Gurnic, Assistant Attorney General, Department of Legal Affairs

110 Tower. 110 S.E. 6th Street, Ft. Lauderdale, Florida 33301

TODD RICHARDSON/APPELLANT

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

TODD RICHARDSON                          CASE NO. 97-00818

  Appellant(s),

vs.

STATE OF FLORIDA                         L.T. CASE NO. 96-3122 CF10C
                                         BROWARD
  Appellee(s).

March 23, 1998

BY ORDER OF THE COURT:

      ORDERED that appellant's motion filed February 25, 1998,

for rehearing is hereby denied.


  I hereby certify the foregoing is a
true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:   Attorney General-W. Palm Beach
      Public Defender 15
      Douglas Guernick
      Todd Richardson


      /CH



RECEIVED
MAR 24 1998
CRIMINAL APPEALS
FT. LAUDERDALE

DOCKETED
MAR 24 1998
S.S.
ATTORNEY GENERAL

# M  A  N  D  A  T  E

RECEIVED
APR 14 1998

CRIMINAL APPEALS
FT. LAUDERDALE

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

### FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Barry J. Stone, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

DATE:                   April 13, 1998

CASE NO.:               97-0818

COUNTY OF ORIGIN:       Broward

T.C. CASE NO.:          96-3122 CF10C

STYLE:                  Todd Richardson v. State

DOCKETED
APR 14 1998
S.S.
ATTORNEY GENERAL



Marilyn Beuttenmuller, Clerk
District Court of Appeal
Fourth District

ORIGINAL TO:   Hon. Robert E. Lockwood, Clerk

cc:  Public Defender #15
     Attorney General - Fort Lauderdale

     /CR

# EXHIBIT 5

IN THE CIRCUIT COURT OF THE
SEVENTEENTH _____ JUDICIAL
CIRCUIT, IN AND FOR BROWARD
COUNTY, FLORIDA.

CRIMINAL DIVISION

CASE NO.:  96-3122CF10C
(The Original Case Number)

STATE OF FLORIDA,

vs.

TODD RICHARDSON
   (Your Name)

    Defendant.

_____/

## MOTION FOR POST CONVICTION RELIEF

1.   Name and location of the court which entered the judgment of conviction under attack:  Circuit Court of the Seventeenth Judicial in and for Broward County, Florida

_____

2.   Date of judgment of conviction:  January 15, 1997

3.   Length of sentence:  30 years violent habitual offender

4.   Nature of offense(s) involved (all counts):  _____

Count I Strong Arm Robbery,  Count II Robber w/a Deadly Weapon

_____

5.   What was your plea?  (check only one)

      (a)  Not Guilty _XXX___
      (b)  Guilty _____
      (c)  Nolo Contendere _____
      (d)  Not Guilty by reason of insanity _____

If you entered one plea to one count, and a different plea to another count, give details:  ___NA___

_____

_____

_____

6.    Kind of trial:  (check only one)

    (a)  Jury  __XXX__
    (b)  Judge only without jury  _____

7.    Did you testify at the trial or at any pre-trial hearing?

    Yes  _____          No  __XXX__

If yes, list each such occasion:  _____

_____

_____

_____

8.    Did you appeal from the judgment of conviction?

    Yes  __XXX__          No  _____

9.    If you did appeal, answer the following:

    (a)  Name of court:  Fourth District Court of Appeal

    (b)  Result:  PER CURIAM AFFIRMED

    (c)  Date of result:  February 4, 1998

    (d)  Citation (if known):  Not published

10.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motions, etc. with respect to this judgment in this court?

    Yes  _____          No  __XXX__

- 2 -

11. If your answer to number 10 was "yes", give the following information (applies only to proceedings in this court):

(a) (1) Nature of the proceeding: NA _____

_____

_____

(2) Grounds raised: _____

_____

_____

_____

_____

_____

(3) Did you receive an evidentiary hearing on your petition, application, motion, etc.?

　　　　Yes _____        No _____

(4) Result: _____

_____

12. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motions, etc. with respect to this judgment in any other court?

　　　　Yes _____        No XXX

13. If your answer to number 12 was "yes", give the following information:

(a) (1) Name of court: NA _____

(2) Nature of proceeding: _____

_____

- 3 -

(3)  **Grounds raised:** __NA_____.

_____

_____

_____

_____

_____

(4)  **Did you receive an evidentiary hearing on your petition, application, motion, etc.?**

Yes _____          No _____

(5)  **Result:** _____

(6)  **Date of result:** _____

(b)  **As to any second petition, application, motion, etc., give the same information:**

(1)  **Name of court:** _____

(2)  **Nature of proceeding:** _____

_____

(3)  **Grounds raised:** _____

_____

_____

_____

_____

_____

- 4 -

(4)  Did you received an evidentiary hearing on your petition, application, motion, etc.?

     Yes  _____          No  _____

(5)  Result:  __NA_____

(6)  Date of result:  _____

(c)  As to any third petition, application, motion, etc., give the same information:

(1)  Name of court:  __NA_____

(2)  Nature of proceeding:  _____

_____

(3)  Grounds raised:  _____

_____

_____

_____

_____

_____

_____

     (4)  Did you receive an evidentiary hearing on your petition, application, motion, etc.?

     Yes  _____          No  _____

(5)  Result:  _____

(6)  Date of result:  _____

14.  State concisely every ground on which you claim that the judgment or sentence is unlawful.  Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and the facts supporting them.

- 5 -

For your information, the following is a list of the most frequently raised grounds for post-conviction relief. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that your conviction or sentence is unlawful.

DO NOT CHECK ANY OF THESE LISTED GROUNDS. If you select one or more of these grounds for relief, you must allege facts. The motion will not be accepted by the court if you merely check (a) through (l):

(a) Conviction obtained by plea of guilty or nolo contendere which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful search.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected or impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

(k) Lack of jurisdiction of the court to enter the judgment or impose sentence (such as an unconstitutional statute).

(l) Sentence in excess of the maximum authorized by law.

A.   Ground One:  (i) Denial of effective assistance of counsel

**Supporting FACTS (tell your story _briefly_ without citing cases or law):** Defendant was denied effective assistance of counsel when his counsel repeatedly argued defendants guilt during opening and closing arguments. The defendant pledd not guilty to all charges. Counsel never informed the defendant that his strategy was to argue his guilt nor did the court ever make an inquiry as to the defendant agreeing with such a defense. Counsels strategy was tantamount to a guilty plea and contrary to the defendants earlier entered plea of not guilty.

**B.    Ground Two:** (i) Denial of effective assistance of counsel

**Supporting FACTS (tell your story _briefly_ without citing cases or law):** During the defendants trial defense counsel failed to object to improper comments by the prosecutor. During closing arguments the prosecutor stated that the value of property according to the definition of "Petit Theft" was pennies as well as wothless. The jury was lead to believe that petit theft could'nt possibly be property worth hundreds of dollars. The proprty value of the items stolen in defendants case was much more than pennies but nonetheless "Petit Theft".

**C.    Ground Three:** _____

**Supporting FACTS (tell your story _briefly_ without citing cases or law):** _____

_____

_____

_____

_____

- 7 -

_____

_____

**D.    Ground Four:** _____

_____

**Supporting FACTS (tell your story briefly without citing cases or law):** _____

_____

_____

_____

_____

_____

**15.  If any of the grounds listed in 14A, B, C and D were not previously presented on your direct appeal, state briefly what grounds were not so presented, and give your reasons why they were not presented:**

   The defendant  did'nt raise this ground on direct appeal because he had

   no legal knowledge that a violation of his rights had occured.

_____

_____

_____

_____

_____

_____

**16.  Do you have any petition, application, appeal, motion, etc. now pending in any court, either state or federal, as to the judgment under attack?**

                 **Yes** _____            **No** __**XXX**__

17.  If your answer to number 16 was "yes", give the following information:

    (a)  Name of court: ___NA_____

    (b)  Nature of proceeding: ___NA_____

_____

    (c)  Grounds raised: ___NA_____

_____

_____

_____

_____

_____

_____

    (d)  Status of the proceedings: _____

_____

18.  Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein.

    (a)  At the preliminary hearing: __Public Defenders Office_____

_____

    (b)  At arraignment and plea: _Public Defenders Office_____

_____

    (c)  At trial: _Assistant Public Defender, William T. Laswell___

_142842_____

    (d)  At sentencing: _Assistant PD William  T. Laswell_____

_____

    (e)  On appeal: __Assistant Public Defender Allen J. DeWeese___

_West Palm Beach, Florida  Fourth District Court of Appeal_____

- 9 -

(f)   In any post-conviction proceeding:  __NA_____

_____

(g)   On appeal from any adverse ruling in a post-conviction
proceeding:  __NA_____

_____

WHEREFORE, Movant prays that the court grant all relief to which
he/she may be entitled in this proceeding, including but not
limited to (here list the nature of the relief sought):

1.    The defendant would ask this court to vacate his judgement and

 sentence and remand this cause back for a new trial.

 The defendant would ask that an evidentiary hearing be held at the

 soonest possible date.

_____

2.   Such other and further relief as the court deems just and
proper.

- 10 -

STATE OF FLORIDA            )

COUNTY OF __PALM BEACH_____)

_____/

　　　　BEFORE ME, the undersigned authority, this day personally
appeared __TODD RICHARDSON_____·_____, who first being duly
sworn, says that he/she is the Defendant in the above-styled cause,
that he/she has read the foregoing Motion for Post-Conviction
Relief and has personal knowledge of the facts and matters therein
set forth and alleged; and that each and all of these facts and
matters are true and correct.

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　(Your Signature)

SWORN AND SUBSCRIBED TO before
me this __15__ day of __May__,
19_98_.

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　NOTARY PUBLIC, or other person
　　　　　　　　　　　　　　　　authorized to administer oath.
　　　　　　　　　　　　　　　　(Print, type, or stamp commissioned
　　　　　　　　　　　　　　　　name or notary public.)

Personally known _____
Produced Identification _X_____
Type of Identification Produced _Inmate I.D._

- 11 -

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWRD COUNTY,
FLORIDA

STATE OF FLORIDA,

     Plaintiff,

vs.

                           CASE NO.: 96-3122CF10C
                           JUDGE: DIMITROULEAS

TODD RICHARDSON,

     Defendant,

_____/

### MEMORANDUM OF LAW

Defendant, **TODD RICHARDSON**, pro se, presents this Memorandum of Law in support of his Motion for Post Conviction relief filed pursuant to Rule 3.850, Florida Rules of Criminal Procedure.

### STATEMENT OF FACTS

On February 19, 1996, the Defendant was arrested along with three co-defendants. On March 13, 1996, the Defendant was charged by way of State's information with Count I and II, Robbery with a Firearm; Count III, Armed Kidnapping. The Defendant plead "not guilty" on March 20, 1996 in open court. The Defendant proceeded to trial on January 13, 1997. On January 15, 1997, the Defendant was found guilty by a jury of a lessor included offense of Strong Arm Robbery to Count I. As to Count

II Armed Robbery with a Firearm, the Defendant was found guilty as charged. As to Count III, Armed Kidnapping, the Defendant was found not guilty. The Defendant filed a Direct Appeal that was per curiam affirmed on February 4, 1998. Now this Motion for Post-Conviction Relief and Memorandum of LAw follows alleging the following grounds:

<u>GROUND I</u>

**DEFENSE COUNSEL WAS INEFFECTIVE FOR ADMITTING DEFENDANT'S GUILT AFTER DEFENDANT PLEAD NOT GUILTY TO ALL CHARGES.**

During the Defendant's trial, Defense Counsel repeatedly argued the Defendant's guilt, which was contrary to Defendant's earlier entered plea of "not guilty". The Defendant was shocked by Defense Counsel's comments during opening statement and closing arguments. Defense Counsel had not advised the Defendant of his strategy to conceed his guilt to any of the counts he was charged with or any lessor included offense. Nor at any time did the Court make an inquiry as to the fact of the Defendant agreeing with such strategy. During opening arguments, Defense Counsel made the following statements to the jury: "What my stupid client did was while this was going on is commit a theft." (See Record on Appeal, page 128). Towards the end of his opening argument, Defense Counsel again argues the Defendant's guilt by making the following comments to the jury: MR. LASWELL: Quite frankly, what we come to you as Defense Counsel and Defendant am telling you in our opening statement,

2

is listen to all the **evidence**, pay close attention and you will see that Todd Richardson **may** be no angel, he's badly overcharged in this case. And you will be able to convict him of the appropriate offense, that it should not be the one charged. So just pay close attention. See what you all come up with. Thank you very much. (See Record on Appeal page 129.)

The following statements were made by Defense Counsel during the closing arguments:

1. MR. LASWELL: What **he started** to do after Travis Russel began his kidnapping and his **robbery** was not nice. But it was theft. (See page 288 Record on Appeal.)

2. MR. LASWELL: As a matter of fact, she testified that Jouvonal Allen was going to rip **off the** necklace and he **stopped** Jouvonal Allen, and told her to take it off and she did, and give me your purse, and she did. **That's** a theft. That's disrespect. That's showing no regard for another person's property whether it's $20,000. dollars or two dollars. (See pages 289-290 Record on Appeal.)

3. MR. LASWELL: And I'm asking you not to get carried away. Do not go above and **beyond** the evidence and speculation and theory, and pay attention to what the evidence showed, and-- convict my client of theft. <u>Because I'll admit to you that's what he is guilty of, not guilty of robbery</u>. (See page 291 Record on Appeal.)

4. MR. LASWELL: So make this State of Florida tow the line. Examine the law. Examine the facts. Discuss the evidence. Come back wit a verdict guilty to the lesser included offense of

3

theft. Thank you. (See page 292 Record on Appeal.)

5. MR. LASWELL: Travis Russel had controlled that, Travis controlled this will whole thing. Damn fool that he is, he took advantage of that little girl and shame on him for it and convict him for it, for it, because he committed a theft. (See page 312 Record on Appeal.)

6. MR. LASWELL: This kid should be convicted of theft. (See page 313 Record on Appeal.)

In **Wiley v. Sowders**, 647 F.2d 642 (6th Cir.)(1981) the Court ruled that;

> ..." An Attorney may not admit his client's guilt which is contrary to his client's earlier entered plea of 'not guilty' unless the Defendant unequivocally understands the consequences of the admission...." It further stated; ..."While counsel may believe it tactically wise to stipulate to a particular element of a charge or to issue of proof, an attorney may not stipulate to facts which amount to the 'functional equivalent' of a guilty plea without the defendant's consent..."

The Sixth Circuit recognized that Defense Counsel's admission of defendant's guilt before the finder of fact is the functional equivalent of a guilty plea which triggers the trial court's obligation to make an inquiry into the defendant's consent to the legal strategy.

Further evidence of trial counsel's ineffectiveness reveals on page 275 Record on Appeal. Defense Counsel insisted on arguing the defendant committed grand theft even though the court instructed him that he was not given 'grand theft' as a lesser included offense of Robbery with a Deadly Weapon. Therefore,

4

grand theft did not exist on the verdict form and it was impossible for the jury to find the defendant guilty of grand theft, because the jury was specifically instructed that they could only find the defendant guilty as charged in the information or guilty of such lesser included crimes that the evidence may justify.

The defendant was denied effective assistance of counsel in violation of his Sixth Amendment rights guaranteed under the United States Constitution and his Fourteenth Amendment rights of due process of law. Therefore, the defendant would request that his sentence and judgment be vacated and have his cause remanded for a new trial.

5.

## GROUND II

**DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO IMPROPER CLOSING ARGUMENT BY PROSECUTOR AND REQUEST CURATIVE INSTRUCTION.**

During the prosecutors closing argument he proceeded to explain the verdict form selections to the jurors. The three selections were, Armed Robbery, Strong Arm Robbery, and Petit Theft. He gave the proper instructions to Armed Robbery and Strong Arm Robbery. But once her reached the charge of Petit Theft, he stated the following to the jury:

MR MILLIAN: Then you will have a Petit Theft under Armed Robbery. What is Petit Theft? You will hear about it. Petit Theft is what the word tells you. It's insignificant. It's value is pennies! That's not what happened. Todd Richardson didn't walk somewhere and see some worthless item on the floor and take it. (See Record on Appeal.)

The Defense Counsel was ineffective for failing to object to this misleading information. In <u>Cumbie v. State</u>, 378 So.2d 1, (1st DCA 1978), the Court ruled that a new trial is required when comments by the prosecutor were unfair and denied defendant the right to a fair trial. The prosecutor's statement in his closing argument that the value of property in a petit theft was (pennies), then later stating that Todd Richardson didn't walk somewhere and see some (worthless) item on the floor and take it. These statements were totally contrary to the definition of petit theft under Florida Statute §812.014(2)(e). Defense

6

Counsel failed to make any objection at all, thus not preserving the issue for appellate review.

Florida Statute §812.014(e) states that if the property stolen is valued at $100.00 or more, but less that $300.00, the offender commits "Petit Theft" of the first degree, punishable as a misdemeanor of the first degree as provided in s. §775.082 or s. §775.083.

The Prosecutors comment that petit theft consisted of property with a value of pennies was correct. But what he failed to state was that any property stolen that is valued at $300.00 or less is still petit theft.

The value of the property in the defendant's case was approximately $160.00. During the jury instructions the court never advised the jurors that even if the property stolen was valued at pennies, property stolen valued up to $300.00 dollars is still petit theft. Therefore, the jury was lead to believe that the defendant couldn't possibly be found guilty of petit theft. Furthermore, Defense Counsel argued that the defendant committed "Grand Theft" although he knew the property stolen was valued at less than $300.00 dollars, contrary to Florida Statute §812.014 (2)(e).

## CONCLUSION

WHEREFORE, the Defendant requests this Court to grant an evidentiary hearing, requiring the Defendant's presence and vacate and set aside judgment and sentence.

Respectfully Submitted,

Todd Richardson, #961139
Defendant/ Pro se
Glades C.I.
500 Orange Ave. Cir.
Belle Glade, Fl 33430-5221

8

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing Memorandum of Law and Motion for Post-Conviction Relief has been furnished to:

| | |
|---|---|
| Robert E. Lockwood | Michael J. Satz |
| Clerk of the Court | State Attorney |
| Broward County Courthouse | Broward County Courthouse |
| 201 S.E. 6th Street | 201 S.E. 6th Street |
| Ft. Lauderdale, Fl. 33301 | Ft. Lauderdale, Fl. 33301 |

...via U.S. Mail this _15_ day of May, 1998.

Todd Richardson, # 961139

9

| [ ] 17th Judicial Circuit in and for Broward County<br>[ ] In the County Court in and for Broward County | | **CLOCK IN**<br>**Filed in Open Court,**<br>ROBERT E. LOCKWOOD, CLERK |
|---|---|---|
| **DIVISION:**<br>[ ] Criminal<br>[ ] Traffic<br>[ ] Other | **ORDER** | ON   OCT 3 0 1998<br>BY _Shipts_ |

THE STATE OF FLORIDA VS.

_Todd Dee Richardson_
DEFENDANT

CASE NUMBER

_963122CFC_

CHARGE _Robbery / Deadly Weapon_

Evidentiary (3.850)
Hearing Held
is hereby Denied
By Court for Reason's
Stated On the Record in Open
Court.

DONE AND ORDERED THIS 30 DAY OF _October_, 19 _98_, IN

BROWARD COUNTY, FLORIDA.

_James I. Cohn_
JUDGE

Deft to Be Return
BACK to FSP

COPIES:   BSO - SAO

FORM ICC18

# EXHIBIT 6

## IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
## OF THE STATE OF FLORIDA IN AND FOR BROWARD COUNTY

STATE OF FLORIDA

VS.

TODD RICHARDSON

Case No.     96-3122 CF 10 C
JUDGE        COHN

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

NOV 04 1998

CRIMINAL DIVISION
WEST PALM BEACH

## NOTICE OF APPEAL

**NOTICE IS GIVEN** that Todd Richardson appeals to the Fourth District Court of Appeal the final Order of this Court denying his motion for post-conviction relief rendered October 30, 1998.

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished by US Mail to the Office of the State Attorney, 201 SE 6th Street, Fort Lauderdale, FL 33301, and the Office of the Attorney General, 110 SE 6th Street, Fort Lauderdale, FL 33301, this 3rd day of November, 1998.

LAW OFFICES OF MATTHEW I. DESTRY

By _____
Matthew I. Destry
Counsel for the Defense
Florida Bar #0764736
633 S. Andrews Ave., Suite 201
Fort Lauderdale, FL 33301
(954) 527-1999

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

TODD RICHARDSON,               )
                               )
    Appellant,             )
                               )
-vs.                           )     Case No. 98-04323
                               )
STATE OF FLORIDA,              )
                               )
    Appellee.              )
_____)

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

APR 30 1999

CRIMINAL DIVISION
WEST PALM BEACH

## INITIAL BRIEF OF APPELLANT

On Appeal from the Circuit Court of the
17th Judicial Circuit of Florida,
In and For Broward County (Criminal Division)

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida

ALLEN J. DeWEESE
Assistant Public Defender
Attorney for Todd Richardson
Criminal Justice Building/6th Floor
421 3rd Street
West Palm Beach, Florida  33401
(561) 355-7600
Florida Bar No.  237000

No.    98-04323
<u>Todd Richardson v. State of Florida</u>

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

Counsel for defendant/appellant  certifies that the following persons and entities

have or may have an interest in the outcome of this case:

Linda Butler
Erica Outridge
(victims)

Allen J. DeWeese, Assistant Public Defender
Office of Public Defender, Fifteenth Judicial Circuit
Richard L. Jorandby, Public Defender
(appellate counsel for defendant/appellant)

Honorable William P. Dimitrouleas
Circuit Court Judge, Seventeenth Judicial Circuit
(trial judge)

William Laswell, Assistant Public Defender
Office of Public Defender, Seventeenth Judicial Circuit
Alan H. Schreiber, Public Defender
(trial counsel for defendant/appellant)

Albert Milian, Assistant State Attorney
Office of State Attorney, Seventeenth Judicial Circuit
Michael J. Satz, State Attorney
(trial counsel for prosecution/appellee)

Todd Richardson
(defendant/appellant)

Celia Terenzio, Assistant Attorney General
Office of Attorney General, State of Florida
Robert Butterworth, Attorney General
(appellate counsel for prosecution/appellee)

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

### POINT I

APPELLANT'S 3.850 MOTION WAS ERRONEOUSLY
DENIED ON ITS FIRST GROUND WHERE TRIAL COUNSEL
ADMITTED APPELLANT'S GUILT TO THE JURY. . . . . . . . . . . . . . 10

### POINT II

THE    TRIAL    COURT    ERRONEOUSLY    DENIED
APPELLANT'S 3.850 MOTION ON ITS SECOND GROUND
BASED ON A FINDING THAT THE PROSECUTOR'S
IMPROPER COMMENTS WERE NOT FUNDAMENTAL
ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ii

# TABLE OF AUTHORITIES

CASES                                                                     PAGE

Ashley v. State, 614 So. 2d 486
     (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709,
     23 L.Ed.2d 274 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

DeFreitas v. State, 701 So. 2d 593
     (Fla. 4th DCA 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Golden v. State, 509 So. 2d 1149
     (Fla. 1st DCA 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Groover v. State, 489 So. 2d 15
     (Fla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Hen Lin Lu v. State, 683 So. 2d 1110
     (Fla. 4th DCA 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

J.O. v. State, 552 So. 2d 1167
     (Fla. 3d DCA 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Knight v. State, 721 So. 2d 287
     (Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Negron v. State, 306 So. 2d 104
     (Fla. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Randolph v. State, 608 So. 2d 573
     (Fla. 5th DCA 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Randolph v. State, 608 So. 2d 573
     (Fla. 5th DCA 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Teffeteller v. Dugger, 24 Fla. L. Weekly S110
     (Fla. March 4, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Turner v. Dugger, 614 So. 2d 1075
     (Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375,
      87 L.Ed.2d 481(1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Weidmann v. State, 523 So. 2d 737
      (Fla. 2d DCA 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

York v. State, __ So. 2d __ (Fla. 4th DCA 1999)
      (Case. No. 98-1610, April 21, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

## OTHER AUTHORITIES

## FLORIDA STATUTES

      Section 812.014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## FLORIDA CONSTITUTION

      Article I, section 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14
      Article I, section 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

## UNITED STATES CONSTITUTION

      Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14
      Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14
      Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

## FLORIDA RULES OF CRIMINAL PROCEDURE

      Rule 3.850 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9-13

## PRELIMINARY STATEMENT

Appellant was the defendant and appellee was the prosecution in the Criminal

Division of the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County,

Florida.

In the brief, the parties will be referred to as they appear before this Honorable

Court.

The following symbols will be used:

R = Record on Appeal

T = Transcript

SR = Supplemental Record (trial transcript)

## STATEMENT OF THE CASE AND FACTS

This is an appeal from denial of a Rule 3.850 motion with a hearing (R 1, 43).

Appellant was convicted in 1997 of one count of strong arm robbery and one count of robbery with a deadly weapon, and was sentenced to 30 years in prison as a violent habitual offender (R 5). The convictions were affirmed by this Court (R 3).

Appellant's 3.850 motion alleged ineffective assistance of counsel in that defense counsel at trial argued in opening and closing that Appellant was guilty and also failed to object to the prosecutor's comments during closing misstating the value element of theft (R 10-11).

At the beginning of the hearing on the motion, before any testimony was taken, the court denied the motion on the second asserted ground, finding that the prosecutor's comments were not fundamental error (T 3).

Appellant then testified that he had no conversations with his trial lawyer, Assistant Public Defender William Laswell, about trial strategy. They conversed about going for the lesser offense of theft, but not about how Laswell was going to present the case at trial. Laswell never told him that he was going to argue to the jury that Appellant was guilty of theft. Appellant was surprised when Laswell argued he was guilty of theft, but did not say anything to him because he figured he was a lawyer and knew what he was doing. The jury found Appellant not guilty on a kidnaping count and guilty of a lesser degree of robbery on one of the robbery counts (T 5-11).

Laswell testified that he had discussions with Appellant about trial strategy. His strategy was to argue that Appellant was not guilty of robbery or of kidnaping, but that his

1

acts amounted at most to petty theft. He discussed this with Appellant, and Appellant was aware that he was going to argue for the lesser offense. The strategy was based on trying to avoid conviction for the more serious crimes of kidnaping and armed robbery. This was based on Laswell's 25 years experience in criminal law. Laswell spoke to Appellant about it, and he concurred; "I don't think he had any choice really" (T 12-16).

Laswell discussed the strategy with Appellant on more than one occasion, but did not want to say he did so "in detail" or that their contact was "extensive." Appellant was not at all sophisticated, and Laswell also had discussions with his mother and aunt. It was Laswell's opinion that it would be "folly" to assume that Appellant could be found not guilty of all charges. "It almost worked" because of the not guilty on the kidnaping and the lesser on one of the robberies (T 16-18).

The court found that Laswell's trial strategy was sound and was discussed with Appellant and that Appellant concurred (T 22).

By order of this Court the appellate record was supplemented with the trial transcripts. As reflected in the transcripts, in opening Laswell stated to the jury:

> ... The evidence is going to show that my client has got a lot of flaws and a lot of burdens. And he's not going to win any good citizenship awards. But when you cut through all of the evidence and it's going to be a pretty simple case, what you're going to find is that if there was a kidnaping, if there was a taking or whatever, it wasn't done by anybody except Travis Russell...

(SR 126-127).

> ... What my stupid client did while this was going on is commit a theft. And the essence of robbery as opposed to theft is that the taking is by force or violence

2

(SR 128).

       ... in fact, and I'm telling you right now it was a theft...

(SR 128).

       ... while Todd Richardson may be no angel, he's badly overcharged in this case. And you will be able to convict him of the appropriate offense, that it should not be the one charged

(SR 129).

    Linda Butler, the first of the two victims to testify at trial, testified that she was shopping at a mall with her friend Erica Outridge, the other victim, when they met Appellant and several of his friends, including codefendants Travis Russell and Juvonal Allen (not on trial). Appellant struck up a conversation with Erica, and they exchanged phone numbers. Then the groups separated (SR 131, 163-164).

    It was about 5:00 p.m. Linda and Erica left the mall and went to a bus stop. They had missed their bus. While they waited, a Nissan 300ZX pulled up with Appellant and three of his friends. Appellant was a passenger. The driver, Travis Russell, offered to give the girls a ride home, which they accepted (SR 131-134, 166-168).

    Linda got in front and sat on one of the boys' laps. Erica got in back, between Appellant, who was on the driver's side, and Juvonal Allen. As they drove off, Russell said he had to drop off some keys for his cousin. Appellant said no, take them home. Russell pulled in to a bank, then behind an IHOP. After stopping, Russell pulled out a gun and held it to Linda's side. At first she thought it was a toy, but Russell said it was not and pulled back on it until it clicked. Russell wanted money and jewelry. Allen reached from

the back seat and took a chain with a charm from around her neck. Linda opened the car door and began to struggle. Her face got scratched (SR 133-138, 145-146, 175, 179).

Appellant never used any force, violence or threats against Linda (SR 135, 138, 145, 163, 175). Linda did not know if Appellant knew what was going on or whether he tried to stop the robbery; she did not hear him say anything other than to take the girls home (SR 178, 180).

After her chain was taken, Linda got out of the car, ran into the IHOP and called the police. The car drove off with Erica still in the back seat (SR 138-144, 150).

A pendant on Linda's chain was gold, but she did not know how much it cost her (SR 162).

Erica testified that she got into the back seat with Appellant on her left and Allen on her right. It was a tight squeeze because the car was so small. Erica could not sit up straight. She and Allen were leaning forward, while Appellant leaned back, slightly behind her. Erica told Russell where she lived, and they started in that direction. When Russell said he was going to his cousin's, Appellant said to take the girls home first. Before they stopped at the IHOP, Allen extended his legs over her while he reached for a key. He then opened the car's hatch to give them room to sit up. After they stopped, the boy in the front passenger seat said he wanted to get out. He opened the door, but closed it again when Russell told him to. The hatch was also closed again (SR 185-188, 202-206).

Then Erica heard Russell say, "Let me get your gold and your money," and she saw a gun at Linda's side. Allen, with his leg still over Erica, said, "Let me get your chain." He

4

grabbed for it, but Erica told him she would take it off herself. Russell was now pointing his gun toward her (SR 188-189, 206).

Appellant then asked, "Can I have your chain?" Erica gave it to him. He asked, "Can I have your bag?" and she gave it to him also. Appellant did not use any force, violence or threats. He prevented Allen from ripping her chain off her. She could not get out of the car because she was stooped over under the hatch and both Allen and Appellant had their feet over her. Meanwhile, Linda was fighting in the front. Erica told her just to give her things to them, but Linda said no. Then Linda got out and stood by the car until it drove off (SR 189-192, 205).

As they drove off, Russell turned the gun on Erica and said, "Your friend did a stupid thing. She could have got shot." Then he put the gun away (SR 193). Allen began to search her, but when she asked him to please stop Appellant moved Allen's hand away from her (SR 205). Russell drove to a motel and let Erica out. She was told not to call the police. As she got out of the car she had her purse in her hand. Appellant asked for it back, so she gave it to him. She did so because she was afraid. The purse contained two dollars and a chain with a charm. Erica went inside and asked for the police (SR 189-190, 193-194, 197, 207).

The police pursued the car pursuant to a BOLO. Appellant was seen hunched up in back under the hatch. After it was stopped, the passengers ran. It was Russell's car. In the car a charm was found in the front right. A handgun was found under the driver's seat. No fingerprints were found on it. A purse was found in the car's center console (SR 211-226). Appellant was caught with two one-dollar bills, a piece of paper with a phone

number, and a broken gold necklace with a medallion in his possession (SR 255). The

girls identified Russell and Appellant in a photographic lineup (SR 228-237).

In closing, Laswell argued to the jury:

> ... there is absolutely no question about it that he probably doesn't have any, particularly, respect we would like someone to have for young ladies. But he didn't have a pistol. But he didn't rob anybody.

> \* \* \*

> What he was doing he was in the back seat. What he was doing was taking advantage of the situation of a disrespect for Erica. And that's a theft. And I'll admit that's a theft. But it's not a robbery ...

(SR 287).

> I'll tell you that Todd is a disrespectful kid, and I'm not going to ask you to award him a good citizenship award for anything.

> \* \* \*

> What he started to do after Travis Russell began his kidnaping and his robbery was not nice. But it was a theft

(SR 288).

> ... she testified that Juvonal Allen was going to rip off the necklace and he stopped Juvonal Allen, and told her to take it off and she did, and give me your purse, and she did. That's a theft. That's disrespect. That's showing no regard for another person's property whether it's 200,000 dollars or two dollars.

> \* \* \*

> He is overcharged here. This is just a theft ...

> \* \* \*

6

> ... he got out of the car and ran, which we can agree, when he
> ran, he had the purse. I'll admit that.

<p style="text-align:center">* * *</p>

> ... He committed a theft, and that is what he was running from

(SR 289-290).

> ... This kid was the dummy in the back seat who took
> advantage of the situation by Travis Russell ...

<p style="text-align:center">* * *</p>

> ... pay attention to what the evidence showed, and convict my
> client of theft

(SR 291).

In closing, the prosecutor argued, without objection:

> ... pinning that young girl in the back of that automobile and
> telling her to give up her property and take her purse and take
> her money, to take a pathetic two dollars that she had on her
> person.

> And you know the law doesn't care, when you do that, how
> much money is involved. Obviously, you all could tell there is
> value to all the things these girls had. The law doesn't even
> say that.

> The law doesn't say it has some value. Todd Richardson
> thought it was some value because he went in like a shark
> after the tongue ...

(SR 300-301).

> Then, you will have a Petit Theft under an Armed Robbery.
> What is Petit Theft? You will hear about it. Petit Theft is what
> the word tells you. It's insignificant. Its value is pennies ...

(SR 302).

<p style="text-align:center">7</p>

It wasn't a Petit Theft. It was an Armed Robbery ...

(SR 303).

In his rebuttal Laswell stated:

> ... Travis Russell controlled this will whole thing. Damn fool that he is, he took advantage of that little girl and shame on him for it and convict him for it, for it, because he committed a theft.

* * *

> The difference between Petit Theft and Grand Theft are indelibly described in the law. They do make a difference. It's not like stealing a purse. He did a bad thing. But he didn't do the overcharged zealous things that Mr. Milian wants you to believe did he

(SR 312).

> ... I'm not presenting him for any boy scouts. What he did was bad. What he did was wrong. But he wasn't a robber and he wasn't a kidnapper.

> ... my client is guilty of Petit theft

(SR 314).

8

## SUMMARY OF ARGUMENT

### I.

Appellant's Rule 3.850 motion was improperly denied on its first ground.  Defense counsel was ineffective because he conceded Appellant's guilt to the jury in argument. Appellant did not intelligently and knowingly consent to counsel's strategy of admitting guilt on a lesser offense, which was equivalent to a guilty plea.

### II.

The motion was improperly denied on the second ground.  Defense counsel was ineffective because he failed to object to the prosecutor's improper comments misstating the value element of theft, the lesser offense which counsel was seeking.

9

## ARGUMENT

### POINT I

### APPELLANT'S 3.850 MOTION WAS ERRONEOUSLY DENIED ON ITS FIRST GROUND WHERE TRIAL COUNSEL ADMITTED APPELLANT'S GUILT TO THE JURY.

The first ground of Appellant's 3.850 motion alleged ineffective assistance of counsel in that defense counsel at trial argued in opening and closing that Appellant was guilty (R 10-11).

The relevant portions of defense counsel's opening and closing are quoted in full in the statement of case and facts in this brief.

To summarize, counsel admitted that Appellant was guilty of the lesser offense of theft. In opening, counsel said that Appellant was "not going to win any good citizenship awards" (SR 126) and that "my stupid client" "commit[ed] a theft"; "I'm telling you right now it was a theft" (SR 128).

In closing, defense counsel said that Appellant did not have the "respect we would like someone to have for young ladies ... What he was doing was taking advantage of a situation of a disrespect for Erica. And that's a theft" (SR 287). Counsel admitted that Appellant ran with the purse (SR 289) and called him a "dummy" (SR 291) and a "damn fool"; "he took advantage of that little girl and shame on him" (SR 312). Counsel said nine times it was theft (SR 287-291, 312-314).

The better practice is to obtain the defendant's on-the-record consent before counsel concedes guilt on a lesser charge. York v. State, __ So. 2d __ (Fla. 4th DCA 1999) (Case. No. 98-1610, April 21, 1999). Failure of counsel to obtain the client's consent may

10

be raised, as it is here, as a claim of ineffective assistance of counsel in a postconviction

motion. Id.

Appellant's trial lawyer, Assistant Public Defender William Laswell, testified at the

3.850 hearing that he discussed with Appellant his strategy to argue that Appellant was not

guilty of robbery or of kidnaping, but that his acts amounted at most to petty theft, in order

to try to avoid conviction for the more serious crimes. Laswell did not want to say that the

discussions were "in detail" or that their contact was "extensive," but he said that Appellant

concurred because "I don't think he had any choice really" (T 12-18).

In testimony not contradicted by Laswell, Appellant did not deny speaking with

Laswell about strategy, but did state that Laswell did not fully inform him of his intentions

or obtain his agreement. Appellant testified that he and Laswell conversed about going for

the lesser offense of theft, but not about how Laswell was going to present the case at

trial. Laswell never told him that he was going to argue to the jury that he was guilty of

theft, and he was surprised when Laswell argued that he was guilty (T 5-11).

Laswell admitted that Appellant was not at all sophisticated (T 18). Appellant

testified that he did not say anything to Laswell when he argued that he was guilty because

he figured he was a lawyer and knew what he was doing (T 7).

This Court in York v. State, supra, while declining to hold across the board that due

process requires a court inquiry to determine that the defendant understands the

consequences of counsel's concession of guilt, did recognize that due process is involved

when counsel concedes guilt: there is a cognizable claim of ineffective assistance where

counsel does not obtain consent. In York, the record on direct appeal was silent as to

11

consent. Here, on the other hand, the 3.850 record affirmatively shows that there was no intelligent and voluntary consent: the limited discussions between client and counsel left Appellant surprised when counsel conceded guilt to the jury. Due process requires a guilty plea to be intelligent and voluntary. Hen Lin Lu v. State, 683 So. 2d 1110 (Fla. 4th DCA 1996); Ashley v. State, 614 So. 2d 486 (Fla. 1993); Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

Appellant's trial counsel was ineffective for failing to obtain Appellant's intelligent and voluntary consent before conceding guilt. Appellant was denied his rights to due process, a fair trial and effective assistance of counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections 9 and 16 of the Florida Constitution. The consequences were disastrous: a 30-year violent habitual offender sentence (R 5).

This Court must reverse and order a new trial.

12

## ARGUMENT

### POINT II

**THE TRIAL COURT ERRONEOUSLY DENIED APPELLANT'S 3.850 MOTION ON ITS SECOND GROUND BASED ON A FINDING THAT THE PROSECUTOR'S IMPROPER COMMENTS WERE NOT FUNDAMENTAL ERROR.**

The second ground of Appellant's 3.850 motion alleged ineffective assistance of counsel in that defense counsel failed to object to the prosecutor's comments during closing misstating the value element of theft (R 10-11).

The prosecutor's relevant comments are quoted in full in the statement of case and facts in this brief. He argued to the jury, without objection, that "the law doesn't care ... how much money is involved.... The law doesn't even say that.... The law doesn't say it has some value" (SR 300-301). "Petit Theft is what the word tells you. It is insignificant. Its value is pennies" (SR 302).

Although the prosecutor clearly improperly argued that petty theft meant no value, the trial court on the 3.850 erroneously disposed of this ground, before any testimony was taken, simply by finding that the prosecutor's comments were not fundamental error (T 3).

An error is not required to be fundamental in order to be raised in a 3.850. On the contrary, a fundamental error could be raised on direct appeal. See, DeFreitas v. State, 701 So. 2d 593, 596 (Fla. 4th DCA 1997); Knight v. State, 721 So. 2d 287, 294 (Fla. 1998); and Turner v. Dugger, 614 So. 2d 1075, 1079 (Fla. 1992). Fundamental error therefore is not cognizable on postconviction if not raised on direct appeal first. Teffeteller v. Dugger, 24 Fla. L. Weekly S110 (Fla. March 4, 1999).

13

The prosecutor's comment presented a clear and prejudicial, although not fundamental, error. Value is an essential element of theft, distinguishing two degrees of petit and four degrees of grand. Section 812.014, Fla. Stat. (1997). Value is an element which must be proven by the state beyond and to the exclusion of every reasonable doubt. Negron v. State, 306 So. 2d 104, 108 (Fla. 1974). The jury may not be permitted to simply speculate about. Randolph v. State, 608 So. 2d 573, 575 (Fla. 5th DCA 1992).

Here value was important to the defense asserted by defense counsel, who conceded guilt for theft in hopes of avoiding convictions for the more serious crimes charged (Point I). The prosecutor's misstatement of the element, calling it insignificant, misled the jury as they considered the lesser offense. Defense counsel's deficiency in failing to attempt to correct the misstatement undermines confidence in the outcome of the case and shows a reasonable probability that the outcome of the trial would have been different. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481(1985); Groover v. State, 489 So. 2d 15, 17 (Fla. 1986).

Appellant was denied his rights to due process, a fair trial and effective assistance of counsel under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, sections 9 and 16 of the Florida Constitution. This Court must reverse and order a new trial.

Alternatively, this Court must reverse for an evidentiary hearing on the second ground. The record does not conclusively refute Appellant's allegations on this ground. Therefore an evidentiary hearing is required. Weidmann v. State 523 So. 2d 737 (Fla. 2d DCA 1988); Golden v. State, 509 So. 2d 1149 (Fla. 1st DCA 1987).

14

## CONCLUSION

Based on the foregoing arguments and the authorities cited therein, Appellant respectfully requests this Court to reverse the judgment and sentence of the trial court and to remand this cause with proper directions.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit of Florida

ALLEN J. DeWEESE
Assistant Public Defender
Attorney for Todd Richardson
Criminal Justice Building/6th Floor
421 3rd Street
West Palm Beach, Florida  33401
(561) 355-7600
Florida Bar No.  237000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished by courier to Celia Terenzio, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Suite 300, West Palm Beach, Florida 33401-2299 this 28th day of April, 1999.

ALLEN J. DeWEESE
Counsel for Appellant

15

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA,
FOURTH DISTRICT


TODD RICHARDSON,

     Appellant,

vs.                        Case No. 98-04323

STATE OF FLORIDA,

     Appellee.

_____/



ON APPEAL FROM THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA


ANSWER BRIEF OF APPELLEE


                      ROBERT BUTTERWORTH
                      ATTORNEY GENERAL
                      Tallahassee, Florida

                      ROBERT R. WHEELER
                      Assistant Attorney General
                      Florida Bar No.: 0796409
                      1655 Palm Beach Lakes Blvd.
                      Suite 300
                      West Palm Beach, FL 33401
                      (561) 688-7759

                      Counsel for Appellee



CASE NO.:98-04323

**TODD RICHARDSON   v.   STATE OF FLORIDA**

**CERTIFICATE OF INTERESTED PERSONS**

Counsel for Appellee certifies that the following persons or entities may have an interest in the outcome of this case:

1.  Honorable William P. Dimitrouleas
    Circuit Court Judge, Seventeenth Judicial Circuit
    (trial judge)

2.  Robert R. Wheeler, Assistant Attorney General
    Office of the Attorney General, State of Florida
    Robert Butterworth, Attorney General
    (appellate counsel for State/Appellee)

3.  Albert Milian, Assistant State Attorney(s),
    Office of the State Attorney, Seventeenth Judicial Circuit
    Michael Satz, State Attorney
    (trial counsel for State/Appellee)

4.  Linda Butler, Erica Outridge
    (Complainant/victim)

5.  Todd Richardson
    (Defendant/Appellant)

6.  William Laswell, Assistant Public Defender(s)
    Office of the Public Defender, Seventeenth Judicial Circuit
    Alan Schreiber, Public Defender
    (trial counsel for Defendant/Appellant)

7.  Allen J. DeWeese, Assistant Public Defender
    Office of the Public Defender, Fifteenth Judicial Circuit
    Richard Jorandby, Public Defender
    (appellate counsel for Defendant/Appellant)

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . - ii -

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . - iii -

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . - iv -

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . - vi -

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . - 1 -

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . - 2 -

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . - 3 -

        POINT 1

            THE TRIAL COURT PROPERLY DENIED
            APPELLANT'S 3.850 MOTION: TRIAL
            COUNSEL DISCUSSED THE TRIAL STRATEGY
            WITH APPELLANT.
            . . . . . . . . . . . . . . . . . . - 3 -

        POINT 2

            THE TRIAL COURT PROPERLY DENIED
            APPELLANT'S 3.850 MOTION BASED ON
            ITS FINDING THAT THE PROSECUTORIAL
            COMMENTS WERE NOT IMPROPER.
            . . . . . . . . . . . . . . . . . . - 9 -

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . - 15 -

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . - 15 -

# TABLE OF AUTHORITIES

## FEDERAL CASES

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.
        2d 674 (1984) . . . . . . . . . . . . . . . . 4,5,7,13

## STATE CASES

Barnes v. State, 643 So. 2d 83 (Fla. 3rd DCA 1994)  . . . . . 4

Blanco v. State, 702 So. 2d 1250 (Fla. 1997) . . . . . . . . . 3

Breedlove v. State, 413 So. 2d 1 (Fla. 1982)  . . . . . . . 10

Cobb v. State, 376 So. 2d 230 (Fla. 1979) . . . . . . . . . . 10

Crump v. State, 622 So. 2d 963 (Fla. 1993)  . . . . . . . . 10

Dade County School Bd. v. Radio Station WQBA, 24 FLW 216, 218 (Fla.
        May 13, 1999)  . . . . . . . . . . . . . . . . 14

Gomez v. State, 415 So. 2d 822 (Fla. 3d DCA 1982)  . . . . . 10

Grossman v. Dugger, 708 So. 2d 249 (Fla. 1997)  . . . . . . 3

Hampton v. State, 680 So. 2d 581 (Fla. 3d DCA 1996)  . . . . 11

Kennedy v. State, 547 So. 2d 912 (Fla. 1989) . . . . . . . . 4

Maxwell v. Wainwright, 490 So. 2d 927 (Fla. 1986) . . . . . . 4

McBride v. State, 524 So. 2d 1113 (Fla. 4th DCA 1988)  . . . 14

McNeal v. State, 409 So. 2d 528 (Fla. 5th DCA 1982)  . . . . 7

Parker v. State, 603 So. 2d 616 (Fla. 1st DCA 1992)  . . . . 5

Reaves v. State, 593 So. 2d 1150 (Fla. 1st DCA 1992)  . . . . 4

Spencer v. State, 133 So. 2d 729 (Fla. 1961)  . . . . . . . 10

State v. Murray, 443 So. 2d 955 (Fla. 1984) . . . . . . . . 10

Thomas v. State, 326 So. 2d 413 (Fla. 1976)  . . . . . . . 10

Torres-Arboleda v. Dugger, 636 So. 2d 1321 (Fla. 1994)  . . . 4

## RULES

Florida Rule of Criminal Procedure 3.850 . . . . 2,3,7,8,10,14,15

## <u>PRELIMINARY STATEMENT</u>

Appellee was the Prosecution and Appellant was the Defendant in the Criminal Division of the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida.

In this brief, the parties will be referred to as they appear before this Court, except that Appellee may be referred to as "State" or "Prosecution," and Appellant may be referred to as "Defendant."

The following symbols will be used:

IB = Appellant's Initial Brief

R = Record on Appeal

T = Transcript of Evidentiary Hearing

TT = Trial Transcript

## STATEMENT OF THE CASE AND FACTS

Appellee accepts Appellant's statement of the case and facts for purposes of this appeal subject to the additions and clarifications set forth in the argument portion of this brief, which are necessary to resolve the legal issues presented upon appeal.

## SUMMARY OF ARGUMENT

The trial court properly denied Appellant's 3.850 motion for post conviction relief. Appellant's trial counsel fully informed and discussed the trial strategy employed with Appellant. Furthermore, it was a sound trial strategy.

The trial court properly denied Appellant's 3.850 motion on the grounds that his trial counsel failed to object to improper comments made by the prosecutor during closing argument. The prosecutor's comments were a fair comment on the law.

## ARGUMENT

## POINT 1

### THE TRIAL COURT PROPERLY DENIED APPELLANT'S 3.850 MOTION: TRIAL COUNSEL DISCUSSED THE TRIAL STRATEGY WITH APPELLANT.

Appellant asserts that he was not fully informed or did not agree that his trial counsel was going to argue to the jury that he was guilty of the lesser offense of theft (IB 11). Appellant contends that trial counsel was ineffective for failing to obtain Appellant's consent before admitting guilt (IB 12).

The Florida Supreme Court has defined this Court's standard of review for claims asserted in 3.850 motions following an evidentiary hearing.

> In reviewing a trial court's application of the [relevant] law to a rule 3.850 motion following an evidentiary hearing, this Court applies the following standard of review: As long as the trial court's findings are supported by competent substantial evidence, "this Court will not 'substitute its judgment for that of the trial court on questions of fact, likewise the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'"

Grossman v. Dugger, 708 So. 2d 249, 250 (Fla. 1997) quoting Blanco v. State, 702 So. 2d 1250 (Fla. 1997).

The Supreme Court of Florida has set forth the standards for this Court to evaluate an ineffective assistance of counsel claim.

> A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must

-3-

identify particular acts or omissions of the
lawyer that are shown to be outside the broad
range of reasonably competent performance
under prevailing professional standards.
Second, the clear, substantial deficiency
shown must further be demonstrated to have so
affected the fairness and reliability of the
proceeding that confidence in the outcome is
undermined.

Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) citing

Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S.Ct. 2052,

2064, 2068, 80 L.Ed.2d 674 (1984); Kennedy v. State, 547 So. 2d

912, 913 (Fla. 1989). A court "need not make a specific ruling on

the performance component of the test when it is clear that the

prejudice component is not satisfied." Id.

"Under the two-prong Strickland test, [Appellant] must

demonstrate that 1) counsel's performance was deficient [;] and 2)

there is a reasonable probability that the outcome of the

proceeding would have been different." Torres-Arboleda v. Dugger,

636 So. 2d 1321,1324 (Fla. 1994). "General allegations or mere

conclusions are insufficient to demonstrate entitlement to relief."

Reaves v. State, 593 So. 2d 1150 (Fla. 1st DCA 1992). The motion

must allege facts that the appellant was prejudiced by counsel's

failure to act, or else the allegations "are facially insufficient

to demonstrate an entitlement to relief." Id.

To obtain relief pursuant to a rule 3.850 motion, the

Appellant "must allege facts which are not conclusively rebutted by

the record . . ." Barnes v. State, 643 So. 2d 83, 84 (Fla. 3rd DCA

1994).   The court cannot grant Appellant relief when the ineffective assistance of counsel allegations are conclusions "conclusively refuted by the record . . ." Parker v. State, 603 So. 2d 616 (Fla. 1st DCA 1992).

In the case at hand, there is undoubtedly competent, substantial evidence that supports the trial court's finding that Appellant's trial counsel was not ineffective.   Under the first prong of the Strickland test, trial counsel's performance was not deficient.   There is overwhelming evidence that trial counsel communicated with Appellant about the trial strategy of admitting to the lesser offense of petty theft to possibly avoid a conviction on the greater offenses and a harsher sentence.

Appellant's trial counsel had been practicing criminal defense law for over twenty-five years (T 13).   He had discussions with Appellant about trial strategy (T 13-4).   He discussed with Appellant that the strategy should be that only Appellant's co-perpetrator, the driver of the car, should be responsible for the kidnaping, and that Appellant's actions did not amount to robbery but to petty theft (T 15).   Trial counsel confirmed that Appellant was aware that he was not going to argue for guilt, but that the best strategy was to offer the alternative of petty theft to the jury (T 15).   This strategy was based on counsel's years of experience (T 15).   Appellant agreed with counsel's theories (T 16).   Counsel recalled having specific conversations with Appellant

-5-

about this trial strategy (T 17). They discussed it on more than one occasion (T 17).

Appellant admitted in his testimony, that he and his trial counsel had conversations regarding trying to get the lesser charge of petty theft (T 6). Appellant admitted that he never questioned the trial strategy of his counsel to his counsel or the trial judge (T 10).

Certainly, the evidence proves that trial counsel discussed with Appellant the strategy of admitting guilt to petty theft in order to avoid greater charges and a harsher sentence. The trial court relied on trial counsel's and Appellant's testimony to determine that trial counsel discussed this strategy with Appellant. The trial court properly found, based on competent, substantial evidence that trial counsel's performance was not deficient because he informed Appellant of the strategy.

Trial counsel's performance was also not deficient because he employed a sound trial strategy.

> We do not think courts should review any specific discretionary or judgmental act or position of trial counsel, whether tactical or strategic, on an inquiry as to effectiveness of counsel.
> When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing without the remotest legal justification, or excuse, it is commonly considered a good trial strategy for a defense counsel to make some halfway concessions to the truth in order to give the appearance of

> reasonableness and candor and to thereby gain
> credibility and jury acceptance of some more
> important position. To be effectual, trial
> counsel should be able to do this without
> express approval of his client and without
> risk of being branded as being professionally
> ineffective because others may have different
> judgment or less experience.

McNeal v. State, 409 So.2d 528, 529 (Fla. 5th DCA 1982) (citations and footnote omitted). Although counsel did communicate this strategy to Appellant, even if he did not, it was effective trial strategy to concede guilt to a lesser offense (especially when the evidence of Appellant's guilt was overwhelming) in order to avoid a conviction on a greater offense and a harsher sentence. Trial counsel cannot be deficient for employing effective trial strategy.

Additionally, the allegations in Appellant's 3.850 motion could not meet the second prong of the Strickland test -- that he suffered prejudice as a result of counsel's actions. First, trial counsel employed well-recognized, effective trial strategy. Appellant could not have suffered prejudice because of trial counsel's use of a constructive and practical strategy.

Second, notwithstanding trial counsel's strategy, there is no reasonable probability that the verdict would have been any different because the evidence against Appellant was overwhelming. Both of the victims testified to Appellant's participation in these crimes (TT 130-62,181-200). Erica Outridge specifically testified that Appellant asked for her chain and her bag, and that she gave it to him because she was afraid (TT 189). Appellant had his foot

-7-

over her so she could not get out of the car (TT 189). She also testified that a co-perpetrator pointed a gun at her while she gave her items to Appellant (TT 189). Linda Butler testified that Appellant was present the entire time (TT 148) when a co-perpetrator put a gun in her side and asked for her money and jewelry (TT 136-37). Certainly, the evidence overwhelming proved Appellant's crimes, and the outcome of the proceedings would have been the same regardless of the whether trial counsel inappropriately employed this trial strategy.

Without any doubt, the trial court properly determined that Appellant's trial counsel was effective by discussing the trial strategy with Appellant and by employing a sound trial strategy (T 22). The trial court correctly denied Appellant's 3.850 motion on these grounds.

## POINT 2

**THE TRIAL COURT PROPERLY DENIED APPELLANT'S 3.850 MOTION BASED ON ITS FINDING THAT THE PROSECUTORIAL COMMENTS WERE NOT IMPROPER.**

Appellant asserts that the trial court denied Appellant's 3.850 motion "simply by finding that the prosecutor's comments were not fundamental error" (IB 13).    Appellant contends that the court's finding was based on "fundamental error" in the context of whether something was preserved at the trial court level or not. This was not the case.    The court was referring to "fundamental error" in the context that the prosecutor's remarks were not so "fundamentally" egregious that they vitiated the entire trial. This is evident from the court's ruling:

> DEFENSE COUNSEL:  I read the transcript.  I can't argue with the Court that Mr. Milian committed fundamental error.    Although, I don't know if his remarks were all that proper.  I had some discussions with my client about that.
>
> THE COURT:  I did review that portion of the transcript to the State's amended response. The Court finds that the remarks are not fundamental error.    As to count two of your motion, that will be respectfully denied.

(T 3).  When the trial court denied the motion as to count two, it specifically referred to and relied on the State's argument in its amended response (R 37-8).    The State's amended response directly addressed the merits of the prosecutor's arguments by stating that the remarks were a fair comment on the law (R 37).    Defense counsel was also referring to the merits of the prosecutor's statements

-9-

when he stated that although the remarks may not have been fundamental error, they may not have been proper (T 3). The trial court denied Appellant's 3.850 motion based on a determination that the prosecutor's comment's were not "fundamental error" in the context that they were not so prejudicial as to have any effect on the verdict.

Wide latitude is permitted in arguing to a jury during closing argument. Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982). Logical inferences may be drawn and prosecutors are allowed to advance all legitimate arguments within the limits of their forensic talents in order to effectuate their enforcement of the criminal laws. Spencer v. State, 133 So. 2d 729, 731 (Fla. 1961). The control of comments during closing argument is within the trial court's discretion and an appellate court will not interfere unless an abuse of discretion is shown. Breedlove, 413 So. 2d at 8; Thomas v. State, 326 So. 2d 413, 415 (Fla. 1976). A prosecutor generally is allowed a considerable degree of latitude in closing argument. Crump v. State, 622 So. 2d 963, 972 (Fla. 1993).

The trial court properly determined that the prosecutor's comments were not error -- the remarks were a fair comment on the law. The prosecutor's remarks must be so prejudicial as to vitiate the entire trial. State v. Murray, 443 So. 2d 955 (Fla. 1984), quoting Cobb v. State, 376 So. 2d 230, 232 (Fla. 1979). The remarks must be so egregious that reversal is compelling. Gomez v.

-10-

State, 415 So. 2d 822, 823 (Fla. 3d DCA 1982).    Prosecutorial

misconduct must be so prejudicial as to vitiate the entire trial.

Hampton v. State, 680 So. 2d 581, 585 (Fla. 3d DCA 1996).

Appellant contends that "the prosecutor clearly improperly

argued that petty theft meant no value" (IB 13).    In closing

argument, the prosecutor stated:

> And you just -- not even stay silent, but
> you indulge in all the lust and greed that you
> have by pinning that young girl in the back of
> that automobile and telling her to give up her
> property and take her purse and take her
> money, to take a pathetic two dollars that she
> had on her person.
> And you know the law doesn't care, when
> you do that, how much money is involved.
> Obviously, you all could tell there is value
> to all the things these girls had.  The law
> doesn't even say that.
> The law doesn't say it has some value.
> Todd Richardson thought it was some value
> because he went in like a shark after the
> tongue.  The actions of the individual speak
> loudest of all.

(TT 300-01).  This statement was a fair comment on the law -- the

jury instruction regarding robbery -- and certainly was not

egregious.  Element three of the robbery jury instruction stated

that the property taken be of some value (TT 316).  This statement

was not in regard to the petit theft charge so it could not have

been improper argument, as alleged by Appellant, that petit theft

meant no value (IB 13).  The prosecutor was clearly referring to

element three of the robbery instruction in regards to value of the

property taken.

-11-

Additionally, this statement in regard to value was a fair comment on the law. The prosecutor was not arguing that this element of "some value" did not exist. He was aware of this element of robbery and knew that the jury would be instructed on it. The prosecutor was making this statement in relation to the value of the property taken -- that the property taken need not have a particular or certain value for this element to be met. The prosecutor was referring to "some" value as the equivalent to a "certain" value. This is patently apparent considering that his argument prior to this statement was specifically about the value of the item stolen. Certainly, this was a fair and truthful comment on the law.

In a separate part of his closing argument, the prosecutor does comment on the offense of petit theft.

> Then, you will have Petit Theft under an Armed Robbery. What is Petit Theft? You will hear about it. Petit theft is what the word tells you. It's insignificant. Its value is pennies. That's not what happened. Todd Richardson didn't walk somewhere and see some worthless item on the floor and take it.
> Not when he pinned that young girl back there with his leg. Not when he kept that girl against her will, obviously, when they drove away from the initial manifestation. Not when he took her property and put it in his pocket and stole it.
> It wasn't a Petit Theft. It was an Armed Robbery. It was made possible by the use of force and intimidation. That's the best words I think that applies in this case.

(TT 302-03). This argument was a fair comment on the law and not

prejudicial. He was explaining that this was not a petit theft, but an armed robbery, because of Appellant's use of force and intimidation -- an element of robbery stated in the jury instructions (TT 316). The prosecutor's comparison of petit theft to armed robbery was not improper comment, but a fair comparison to show how Appellant's use of force, an element of robbery, justified a conviction for that offense.

Because the prosecutor's remarks were proper as a fair comment on the law, Appellant's trial counsel had no basis for an objection. With no basis for an objection by counsel, Appellant has no claim for ineffective assistance of counsel for not objecting. Under the __Strickland__ analysis, Appellant cannot meet the first prong because trial counsel's performance was not deficient.

Notwithstanding trial counsel's performance, Appellant cannot meet the second prong of the __Strickland__ analysis because there was no reasonable probability that the outcome of the trial would have been different had trial counsel objected. The jury was instructed to follow the law as set out in the instructions (TT 324) and was given the proper jury instructions concerning robbery and petit theft (TT 316-320). This allegedly improper comment was certainly overridden by the court's instructions.

Additionally, the evidence of Appellant's crime was overwhelming. Both of the victims testified to Appellant's

- 13 -

participation in these crimes (TT 130-62,181-200). Erica Outridge specifically testified that Appellant asked for her chain and her bag, and that she gave it to him because she was afraid (TT 189). Appellant had his foot over her so she could not get out of the car (TT 189). She also testified that a co-perpetrator pointed a gun at her while she gave her items to Appellant (TT 189). Linda Butler testified that Appellant was present the entire time (TT 148) when a co-perpetrator put a gun in her side and asked for her money and jewelry (TT 136-37). Certainly, the evidence overwhelming proved Appellant's crimes, and the outcome of the proceedings would have been the same regardless of the allegedly improper comments by the prosecutor.

Even if this Court determines that the trial court denied Appellant's 3.850 motion for the wrong reasons (based on Appellant's argument in his Initial Brief regarding fundamental error as opposed to making a determination on the merits of the prosecutor's statements), the trial court reached the right result, as set forth in this Answer Brief addressing the merits on the issue of the prosecutor's allegedly improper comments. "[I]f a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record." Dade County School Bd. v. Radio Station WQBA, 24 FLW 216, 218 (Fla. May 13, 1999). See also McBride v. State, 524 So. 2d 1113 (Fla. 4th DCA 1988).

- 14 -

## CONCLUSION

WHEREFORE based on the foregoing arguments and authorities cited herein, Appellee respectfully requests that this **Honorable Court** affirm the trial court's denial of Appellant's 3.850 motion.

Respectfully submitted,

ROBERT BUTTERWORTH
ATTORNEY GENERAL
Tallahassee, Florida

ROBERT R. WHEELER
Assistant Attorney General
Florida Bar No.: 0796409
1655 Palm Beach Lakes Blvd.
Suite 300
West Palm Beach, FL 33401
(561) 688-7759

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY  that a copy hereof has been furnished to Allen J. DeWeese, Assistant Public Defender, Criminal Justice Building, 421 3rd Street, 6th Floor, West Palm Beach, FL 33401, on June 28, 1999.

ROBERT R. WHEELER
Counsel for Appellee

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT                                    JULY TERM 1999

**TODD RICHARDSON,**

Appellant,

v.

**STATE OF FLORIDA,**

Appellee.

---

CASE NO. 98-4323

---

Decision filed  October 6, 1999

Appeal from the Circuit Court of the Seventeenth Judicial Circuit, Broward County; James I. Cohn, Judge; L.T. Case No. 96-3122 CF10C.

Richard L. Jorandby, Public Defender, and Allen J. DeWeese, Assistant Public Defender, West Palm Beach, for appellant.

Robert A. Butterworth, Attorney General, Tallahassee, and Robert R. Wheeler, Assistant Attorney General, West Palm Beach, for appellee.

PER CURIAM.

AFFIRMED.

GUNTHER, STONE and SHAHOOD, JJ., concur.

**NOT FINAL UNTIL THE DISPOSITION OF ANY TIMELY FILED MOTION FOR REHEARING.**

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

OCT 06 1999

CRIMINAL DIVISION
WEST PALM BEACH

*D/δχ*

# M A N D A T E

from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable MARTHA C.WARNER, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this day.

**DATE:**            October 22, 1999

**CASE NO.:**         98-4323

**COUNTY OF ORIGIN:**   Broward

**T.C. CASE NO.:**      96-3122 CF10C

**STYLE:**            TODD RICHARDSON      v.   STATE OF FLORIDA



*Marilyn Beuttenmuller*
**MARILYN BEUTTENMULLER, Clerk**
**Fourth District Court of Appeal**

**RECEIVED**
**OFFICE OF THE ATTORNEY GENERAL**
**OCT 25 1999**
CRIMINAL DIVISION
WEST PALM BEACH

**ORIGINAL TO:**      Robert E. Lockwood, Clerk
**cc:**
Attorney General-W.P.B.      Public Defender-P.B.

al

# EXHIBIT  7

IN THE DISTRICT COURT OF APPEALS
FOURTH DISTRICT, STATE OF FLORIDA


TODD RICHARDSON,
    Petitioner,


VS.                                    CASE NO.: _____
                                       To Be Supplied

                                       L.T. NO.: 96-3122 CF10C


MICHAEL MOORE, et al.,
    Respondent(s).
_____/


## PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW, the Petitioner, TODD RICHARDSON, pursuant to rule
9.100, in his pro'se status, with the assistance of another inmate
and respectfully petitions this Court to enter an order granting
this writ of habeas corpus.  As ground for granting such relief,
the Petitioner would show this Court as follows:


## I.

## BASIS FOR INVOKING THE JURISDICTION


This Court has jurisdiction to issue a writ of habeas corpus
under Article V section 4(b)(3) of the Florida Constitution, and
Rule 9.030(b)(3) of the Florida Rules of Appellate Procedure.

RECEIVED
OFFICE OF THE ATTORNEY GENERAL
DEC 20 1999
CRIMINAL DIVISION
WEST PALM BEACH

# II.

## INTRODUCTION

In **STRICKLAND V. WASHINGTON**, 466 U.S. 668, 104 S.Ct. 2052 (1984), the United States Supreme Court set forth the standard of review for ineffective assistance of counsel claims. There the Supreme Court noted "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Id. 466 U.S. at 686, 104 S.Ct. at 2064.

To prevail on an ineffective assistance of counsel claim a defendant must show two components. **First**, the defendant must show that counsel's performance was deficient. This requires showing that counsel made error(s) so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. **Second**, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's error(s) were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Id. 466 U.S. at 687, 104 S.Ct. at 2064.

In sum, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.

2

A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. 466 U.S. at 694, 104 S.Ct. at 2068.

This "reasonable probability" of a different result is simply a probability sufficient to undermine confidence in the outcome of the case, a standard less than proof by a preponderance of the evidence.

The standard enunciated by the Supreme Court in **STRICKLAND** has been adopted by Florida Jurisprudence, **DOWNS V. WAINWRIGHT**, 476 So.2d 654, 656 (Fla.1985), expressly for the adjudication of state constitutional claims of ineffective assistance of counsel under Article I, section 16(a), of the Florida Constitution.

The same standard apply for judging appellate counsel's assistance as for trial counsel. **BARCLAY V. SINGLETARY**, 642 So.2d 583 (Fla. 3d Dist. 1994).

3

# III.

## GROUND AND ARGUMENT ONE

> INEFFECTIVE ASSISTANCE OF COUNSEL...
> APPELLATE COUNSEL INEFFECTIVE IN
> FAILING TO RAISE THE MERITORIOUS AND
> REVERSIBLE FUNDAMENTAL ERROR ISSUE –
> WHERE THE TRIAL COURT COMMITTED
> REVERSIBLE ERROR IN FAILING TO
> CORRECTLY AND INTELLIGENTLY
> INSTRUCTED THE JURY ON THE ESSENTIAL
> ELEMENT(S) OF THE CRIME CHARGED

It is the petitioner's contention in this ground for relief that his appellate counsel rendered assistance which fell far below that of competent counsel, when he failed to raise the fundamental error issue that the trial court committed error in failing to correctly and intelligently instruct the jury on the essential element(s) of the crime charged and in front of jury.

The law is clear that an instruction that includes the necessary elements of the crime as understood by the ordinary and popular meaning of the words is proper. GITMAN V. STATE, 482 So.2d 367 (Fla. App. 4th DCA 1985); however, the giving of an instruction that eliminates an essential element of the crime charged is error, LONG V. STATE, 44 Fla. 134, 32 So. 870 (Fla. 1902); KOLTAY V. STATE, 360 So.2d 802 (Fla. App. 2nd Dist. 1978), and that error is of a fundamental nature and amounts to a denial of fair and impartial trial. CHICONE V. STATE, 684 So.2d 736 (Fla. 1996).

---

[1] The issues which were raised by the petitioner's appellate counsel are contained in the initial brief (Exhibit "A"), which grounds were per curiam affirmed by the Fourth DCA.

In accordance with the general principles as to instructions in criminal cases, the court in a prosecution for theft is required to instruct the jury on all the essential elements of the offense charged.

In the case before the court, the petitioner was charged with the offense of two armed robberies and one count of kidnapping. The petitioner was tried by jury and his defense counsel argued to the jury that the acts of the petitioner only amounted to petit theft as opposed to the more serious offense of armed robbery.

After both the prosecution and the defense rested their case, the trial judge instructed the jury on the necessary elements of the crime charge (Armed Robbery) as well as the elements on the lesser included offenses of Strong Armed Robbery and Petit Theft.

It is the petitioner's contention that the trial court failed to properly, correctly and intelligently instruct the jury on the elements of the crime of petit theft and this mis-led the jury and is grounds for reversal.

In Florida Statutes §812.014(3)(a), it provides:

> Theft of any property not specified in subsection (2) is petit theft and a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

In subsection (2)(c)1 of the theft statute, it provides that property valued at $300 or more, but less than $5,000 is grand theft in the third degree. Petit theft is one less degree under grand theft ($300 or more, but less than $5,000), which makes the value of the property taken to be less than $300.

The sole defense of the petitioner, as raised by his trial counsel, was that the petitioner was only guilty of the lesser offense of petit theft and not guilty of the more serious offense of armed robbery and/or strong armed robbery. The petitioner's defense was that he was not in on the planning and execution of the robbery and that his obtaining the victim's gold chain and/or purse containing two dollars amounted to petit theft based on the monetary value of the offense.

As such, the instruction(s) to the jury should have contained the statement that [the value of the property taken was less than $300 dollars].

Florida Standard Jury Instructions in relation to Theft F.S. 812.014 reads, in pertinent part(s), as follows:

Elements  1. (Defendant) knowingly and unlawfully [obtained] the (property alleged) of (victim).

2. {He} did so with intent to, either temporarily or permanently, [deprive (victim) of [her] right to the property or any benefit from it.]

If you find the defendant guilty of theft, you must determine by your verdict whether:

d. [The value of the property taken was less than $300].[2]

The value of the property obtained in the case at bar was clearly an issue. In fact, during the prosecution's closing arguments they [mis]-informed the jury concerning the value of the property to constitute petit theft.

---

[2] The Standard Jury Instructions provides on degrees; that these instructions are to be given if property is of monetary value up to extent of charge.

The prosecutor informed the jury as follow:

> The law doesn't say it has some value. Todd
> Richardson thought it was some value because
> he went in like a shark after the tongue ...
> (T. 300-301).

> Then, you will a Petit Theft under an Armed
> Robbery. What is Petit Theft? You will hear
> about it. Petit Theft is what the word tells
> you. It's insignificant. Its value is
> pennies ... It wasn't a Petit Theft. It was
> an Armed Robbery. (T. 302).

Minus any objection by the petitioner's trial counsel, the
trial judge instructed the jury as follows in pertinent to the
lesser included offense of petit theft:

> Okay, now I'll read you the law of the lesser
> included offense of Petit Theft. Before you
> can find the defendant guilty of Petit Theft,
> the State must prove the following two
> elements beyond a reasonable doubt:

> 1. Todd Richardson knowingly and unlawfully
> obtained or endeavored to obtain the jewelry
> as to Count 1, and or the jewelry and money as
> to Count 2, of Linda Butler as to Count 1 and
> or Erica Outridge as to Count 2.

> 2. He did so with the intent to permanently
> or temporarily deprive Linda Butler as to
> Count 1, and or Eric Outridge as to Count 2,
> as to her right of the property or any benefit
> from it.... (T. 319).

At no time during these instruction(s) on petit theft did the
trial judge instruct the jury that in order for the taking to
constitute petit theft that the value of the property had to be
less than $300 dollars.

This was highly prejudicial and fundamental due to the fact
that there must be an element of value when a defendant is charged
and convicted of theft.

In the interests of justice, the appellate court may consider any fundamental error that is apparent in the record, even though no objection to it was made in the lower court. HOPKINS V. STATE, 632 So.2d 1372 (Fla. 1994).

Further, it is an inherent and indispensable requisite of a fair and impartial trial that a defendant be accorded the right to have a court correctly and intelligently instruct the jury on the essential and material elements of the crime charged and required to be proven by competent evidence. STATE V. DELVA, 575 So.2d 643 (Fla. 1991).

It is the petitioner's contention that had the trial court correctly and intelligently instructed the jury on the element of value to constitute a petit theft, there is a probable likelihood that the jury would have convicted the petitioner of petit theft and not the higher offenses of strong armed and armed robbery.

This is in light of the fact that the prosecution advised the jury that the value of property to constitute petit theft would have to amount to pennies, when the facts presented during trial was that the value of the property taken was approximately $160 and the two dollars contained in the purse.

8

# CONCLUSION

WHEREFORE, the petitioner prays that this court would enter an order granting this petition for writ of habeas corpus finding that his appellate counsel rendered ineffective assistance on his direct appeal. The petitioner request that his conviction be vacated and remanded for new trial.

The petitioner also prays that this court would grant him any and other further relief it deems proper, just and necessary.

Respectfully submitted,

Todd Richardson, pro'se

9

## NOTARY AND ACKNOWLEDGMENT

      **BEFORE ME**, the undersigned authority, this day personally appeared <u>TODD RICHARDSON</u>, who first being duly sworn, says that he is the defendant is the above-styled cause, that he has read the foregoing PETITION FOR WRIT OF HABEAS CORPUS and that he has personal knowledge of the facts and matters herein set forth and alleged and that each and all of these facts and matters are true and correct.

                                        _____

                                        Todd Richardson, pro'se

**SWORN** and **SUBSCRIBED** to before me this __17__ day of December, 1999.

CASSIE C. MANGER
MY COMMISSION # CC 622079
EXPIRES: January 2, 2000
Bonded Thru Notary Public Underwriters

                         **NOTARY PUBLIC**, State of Florida

Personally known _____ or produced identification <u>XXXXX</u>
Type of Identification produced was Inmate D.O.C. State Picture I.D.

# CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing PETITION FOR WRIT OF HABEAS CORPUS has been furnished upon: Office of the Attorney General; 1655 Palm Beach Lakes Blvd.; West Palm Beach, FL 33401 and Office of the State Attorney; 201 S.E. 6th Street; Ft. Lauderdale, FL 33301, by U.S. Mail, on this 17ᵗʰ day of December, 1999.

Todd Richardson, pro'se
#961139 / B-3-118-U
Glades Correctional Inst.
500 Orange Avenue Circle
Belle Glade, FL 33430

11

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

March 9, 2000

**CASE NO.: 4D99-4258**
L.T. No. : 96-3122 CF10C

Todd Richardson                    v.    Michael Moore, Et Al.

_____

Appellant / Petitioner(s),                    Appellee / Respondent(s).

_____

## BY ORDER OF THE COURT:

ORDERED that the petition for writ of habeas corpus filed December 20, 1999, is hereby denied.

I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

Served:

State Attorney- Brow.        Todd  Richardson        Attorney General-W.P.B.

dm

*Marilyn Beuttenmuller*
**MARILYN BEUTTENMULLER, Clerk**
**Fourth District Court of Appeal**



RECEIVED
OFFICE OF THE ATTORNEY GENERAL
MAR 1 0 2000
CRIMINAL DIVISION
WEST PALM BEACH

[X] IN THE DISTRICT COURT OF APPEAL FOURTH DISTRICT
WEST PALM BEACH, FLORIDA

CLOCK IN

| DIVISION: APPELLATE | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION |
|---|---|

TODD RICHARDSON                    Appellant

VS.

STATE OF FLORIDA                   Appellee

CASE NUMBER
96-3122CF10C

APPEAL NUMBER
98-4323

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

DEC 2 9 1998

CRIMINAL DIVISION
WEST PALM BEACH

3.850

PAGES 1 - 46

RICHARD L. JORANDBY, 15TH P.D.
Attorney for Appellant

GEORGINA JIMENEZ-AROSA
Assistant Attorney General

| DIVISION: APPELLATE | INDEX TO RECORD ON APPEAL | CASE NO. 96-3122CF10C APPEAL NO. 98-4323 |
|---|---|---|

| DATE OF FILING | KIND OF INSTRUMENT | PAGES |
|---|---|---|
| 11-4-98 | NOTICE OF APPEAL................................ | 1 |
| 4-14-98 | MANDATE......................................... | 2-3 |
| 4-14-98 | 4DCA ORDER DENYING MOTION FOR REHEARING........ | 4 |
| 5-18-98 | MOTION FOR POST CONVICTION RELIEF.............. | 5-15 |
| 5-18-98 | MEMORANDUM OF LAW.............................. | 16-24 |
| 5-21-98 | ORDER DIRECTONG STATE TO RESPOND............... | 25 |
| 9-8-98 | RESPONSE TO DEFENDANT'S MOTION FOR POST CONVICTION RELIEF............................... | 26-27 |
| 9-8-98 | ORDER TRANSPORTING DEFENDANT TO COURT.......... | 28 |
| 9-9-98 | ORDER TRANSPORTING DEFENDANT TO COURT.......... | 29 |
| 9-9-98 | MOTION TO REMOVE PROPERTY FROM EVIDENCE........ | 30-31 |
| 9-11-98 | MOTION TO ORDER STATE TO RESPOND............... | 32-34 |
| 9-15-98 | ORDER GRANTING MOTION TO REMOVE PROPERTY FROM EVIDENCE...................................... | 35 |
| 10-2-98 | ORDER GRANTING MOTION FOR ATTORNEY TO WITHDRAW. | 36 |
| 10-29-98 | AMENDED RESPONSE TO DEFENDANT'S MOTION FOR POST CONVICTION RELIEF............................... | 37-41 |
| 11-20-98 | ORDER OF INSOLVENCY AND APPOITING 17TH P.D..... | 42 |
| 10-30-98 | ORDER DENYING 3.850 MOTION..................... | 43 |
| 11-4-98 | DIRECTIONS TO CLERK............................ | 44 |
| 11-4-98 | DESIGNATION TO COURT REPORTER.................. | 45-46 |

## COURT REPORTER'S TRANSCRIPTS

### VOLUME I

| | | |
|---|---|---|
| 10-30-98 | EVIDENTIARY HEARING............................ | 1-23 |
| 12-24-98 | CERTIFICATE OF THE CLERK | |

IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR BROWARD COUNTY

STATE OF FLORIDA

VS.                                      Case No.    96-3122 CF 10 C
                                         JUDGE       COHN

TODD RICHARDSON
_____/

## NOTICE OF APPEAL

NOTICE IS GIVEN that Todd Richardson appeals to the Fourth District Court of Appeal the final Order of this Court denying his motion for post-conviction relief rendered October 30, 1998.

I HEREBY CERTIFY that a copy of the foregoing has been furnished by US Mail to the Office of the State Attorney, 201 SE 6th Street, Fort Lauderdale, FL 33301, and the Office of the Attorney General, 110 SE 6th Street, Fort Lauderdale, FL 33301, this 3rd day of November, 1998.

LAW OFFICES OF MATTHEW L DESTRY

By _____
Matthew I. Destry
Counsel for the Defense
Florida Bar #0764736
633 S. Andrews Ave., Suite 201
Fort Lauderdale, FL 33301
(954) 527-1900

1

# M   A   N   D   A   T   E

from

DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

This cause having been brought to the Court by appeal, and after due consideration the Court having issued its opinion;

YOU ARE HEREBY COMMANDED that such further proceedings be had in said cause as may be in accordance with the opinion of this Court, and with the rules of procedure and laws of the State of Florida.

WITNESS the Honorable Barry J. Stone, Chief Judge of the District Court of Appeal of the State of Florida, Fourth District, and seal of the said Court at West Palm Beach, Florida on this date

DATE:                    April 13, 1998

CASE NO.:                97-0818

COUNTY OF ORIGIN:        Broward

T.C. CASE NO.:           96-3122 CF10C

STYLE:                   Todd Richardson v. State



Marilyn Beuttenmuller, Clerk
District Court of Appeal
Fourth District

ORIGINAL TO:   Hon. Robert E. Lockwood, Clerk

cc:  Public Defender #15
     Attorney General - Fort Lauderdale

     /CR

2

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT                          JANUARY TERM 1998

TODD RICHARDSON,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

CASE NO. 97-0818

Decision filed  February 4, 1998

Appeal from the Circuit Court for the Seventeenth
Judicial Circuit, Broward County; William P.
Dimitrouleas, Judge; L.T. Case No. 96-3122
CF10C.

Richard L. Jorandby, Public Defender, and Allen
J. DeWeese, Assistant Public Defender, West Palm
Beach, for appellant.

Robert A. Butterworth, Attorney General,
Tallahassee, and Douglas Gurnic, Assistant
Attorney General, Fort Lauderdale, for appellee.

PER CURIAM.

AFFIRMED.

STONE, C.J., GUNTHER and SHAHOOD, JJ.,
concur.

NOT FINAL UNTIL THE DISPOSITION OF
ANY TIMELY FILED MOTION FOR
REHEARING.

3

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

TODD RICHARDSON                          CASE NO. 97-00818

  Appellant(s),

vs.

STATE OF FLORIDA                         L.T. CASE NO. 96-3122 CF10C
                                         BROWARD

  Appellee(s).

March 23, 1998
_____

BY ORDER OF THE COURT:

          ORDERED that appellant's motion filed February 25, 1998

for rehearing is hereby denied.


  I hereby certify the foregoing is a
  true copy of the original court order.

MARILYN BEUTTENMULLER
CLERK

cc:   Attorney General-W. Palm Beach
      Public Defender 15
      Douglas Guernick
      Todd Richardson


      /CH

4

IN THE CIRCUIT COURT OF THE
SEVENTEENTH _____ JUDICIAL
CIRCUIT, IN AND FOR BROWARD
COUNTY, FLORIDA.

CRIMINAL DIVISION

CASE NO.:  96-3122CF10C
(The Original Case Number)

STATE OF FLORIDA,

vs.

TODD RICHARDSON
        (Your Name)

        Defendant.
_____/

RECEIVED
17TH CIRCUIT COUNTY COURT
BROWARD COUNTY, FL

1998 MAY 18 PM 12: 13

### MOTION FOR POST CONVICTION RELIEF

1.    Name and location of the court which entered the judgment of conviction under attack:   Circuit Court of the Seventeenth Judicial in and for Broward County, Florida

_____

2.    Date of judgment of conviction:   January 15, 1997

3.    Length of sentence:   30 years violent habitual offender

4.    Nature of offense(s) involved (all counts):   _____
Count I Strong Arm Robbery.  Count II Robber w/a Deadly Weapon

_____

_____

5.    What was your plea?  (check only one)

        (a)   Not Guilty   XXX
        (b)   Guilty _____
        (c)   Nolo Contendere _____
        (d)   Not Guilty by reason of insanity _____

5

If you entered one plea to one count, and a different plea to another count, give details: __NA__ _____

_____

_____

_____

6.  Kind of trial:  (check only one)

(a)  Jury __XXX____
(b)  Judge only without jury _____

7.  Did you testify at the trial or at any pre-trial hearing?

Yes _____        No __XXX____

If yes, list each such occasion: _____

_____

_____

_____

8.  Did you appeal from the judgment of conviction?

Yes __XXX____        No _____

9.  If you did appeal, answer the following:

(a)  Name of court: __Fourth District Court of Appeal__

(b)  Result: __PER CURIAM AFFIRMED__

(c)  Date of result: __February 4, 1998__

(d)  Citation (if known): __Not published__

10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motions, etc. with respect to this judgment in _this_ court?

Yes _____        No __XXX____

- 2 -

6

11.  If your answer to number 10 was "yes", give the following information (applies only to proceedings in this court):

(a)  (1)  Nature of the proceeding:  NA _____

_____

_____

(2)  Grounds raised: _____

_____

_____

_____

_____

_____

_____

(3)  Did you receive an evidentiary hearing on your petition, application, motion, etc.?

        Yes _____        No _____

(4)  Result: _____

_____

12.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, motions, etc. with respect to this judgment in any other court?

        Yes _____        No  XXX

13.  If your answer to number 12 was "yes", give the following information:

(a)  (1)  Name of court:  NA _____

(2)  Nature of proceeding: _____

_____

- 3 -

7

(3)  **Grounds raised:**  ___NA_____

_____

_____

_____

_____

_____

_____

(4)  **Did you receive an evidentiary hearing on your petition, application, motion, etc.?**

      Yes _____        No _____

(5)  **Result:** _____

(6)  **Date of result:** _____

(b)  **As to any second petition, application, motion, etc., give the same information:**

(1)  **Name of court:** _____

(2)  **Nature of proceeding:** _____

_____

(3)  **Grounds raised:** _____

_____

_____

_____

_____

_____

_____

- 4 -

8

(4)  Did you received an evidentiary hearing on your petition, application, motion, etc.?

      Yes _____          No _____

(5)  Result:  NA _____

(6)  Date of result: _____

(c)  As to any third petition, application, motion, etc., give the same information:

(1)  Name of court:  NA _____

(2)  Nature of proceeding: _____

_____

(3)  Grounds raised:  _____

_____

_____

_____

_____

_____

_____

(4)  Did you receive an evidentiary hearing on your petition, application, motion, etc.?

      Yes _____          No _____

(5)  Result: _____

(6)  Date of result: _____

14.  State concisely every ground on which you claim that the judgment or sentence is unlawful.  Summarise briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and the facts supporting them.

- 5 -

9

For your information, the following is a list of the most frequently raised grounds for post-conviction relief. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that your conviction or sentence is unlawful.

DO NOT CHECK ANY OF THESE LISTED GROUNDS. If you select one or more of these grounds for relief, you must allege facts. The motion will not be accepted by the court if you merely check (a) through (l):

(a)  Conviction obtained by plea of guilty or nolo contendere which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b)  Conviction obtained by use of coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful search.

(e)  Conviction obtained by a violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by a violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected or impanelled.

(i)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

(k)  Lack of jurisdiction of the court to enter the judgment or impose sentence (such as an unconstitutional statute).

(l)  Sentence in excess of the maximum authorized by law.

A.    Ground One:  (i) Denial of effective assistance of counsel

10

Supporting **FACTS** (tell your story **briefly** without citing cases or law): ~~Defendant was denied effective assistance of counsel when his counsel repeatly argued defendents guilt during opening and closing arguments. The defendant plead not guilty to all charges. Counsel never informed the defendant that his strategy was to argue his guilt nor did the court ever make an inquiry as to the defendant agreeing with such a defense. Counsels strategy was tantamount to a guilty plea and contrary to the defendants earlier entered plea of not guilty.~~

B.    Ground Two:  ~~(i) Denial of effective assistance of counsel~~

Supporting **FACTS** (tell your story **briefly** without citing cases or law): ~~During the defendants trial defense counsel failed to object to improper comments by the prosecutor. During closing arguments the prosecutor stated that the value of property according to the definition of "Petit Theft" was pennies as well as wothless. The jury was lead to believe that petit theft could'nt possibly be property worth hundreds of dollars. The proprty value of the items stolen in defendants case was much more than pennies but nonetheless "Petit Theft".~~

C.    Ground Three: _____

_____

Supporting **FACTS** (tell your story **briefly** without citing cases or law): _____

_____

_____

_____

_____

_____

- 7 -

11

D.    Ground Four: _____

_____

Supporting FACTS (tell your story briefly without citing cases or

law): _____

_____

_____

_____

_____

_____

15.  If any of the grounds listed in 14A, B, C and D were not
previously presented on your direct appeal, state briefly what
grounds were not so presented, and give your reasons why they were
not presented:

   The defendant  did'nt raise this ground on direct appeal because he had

   no legal knowledge that a violation of his rights had occured.

_____

_____

_____

_____

_____

16.  Do you have any petition, application, appeal, motion, etc.

now pending in any court, either state or federal, as to the

judgment under attack?

             Yes _____          No  __XXX__

                         - 8 -

1 2

17. If your answer to number 16 was "yes", give the following information:

    (a) Name of court: __NA__

    (b) Nature of proceeding: __NA__

_____

    (c) Grounds raised: __NA__

_____

_____

_____

_____

_____

    (d) Status of the proceedings: _____

_____

18. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein.

    (a) At the preliminary hearing: __Public Defenders Office__

_____

    (b) At arraignment and plea: __Public Defenders Office__

_____

    (c) At trial: __Assistant Public Defender, William T. Lassell__

__147862__

    (d) At sentencing: __Assistant PD William T. Lassell__

_____

    (e) On appeal: __Assistant Public Defender Allen J. DeWeese__

__West Palm Beach, Florida  Fourth District Court of Appeal__

- 9 -

13

(f) In any post-conviction proceeding: __NA__

_____

(g) On appeal from any adverse ruling in a post-conviction proceeding: __NA__

_____

WHEREFORE, Movant prays that the court grant all relief to which he/she may be entitled in this proceeding, including but not limited to (here list the nature of the relief sought):

1. __The defendant would ask this court to vacate his judgement and sentence and remand this cause back for a new trial. The defendant would ask that an evidentiary hearing be held at the soonest possible date.__

_____

2. Such other and further relief as the court deems just and proper.

14

STATE OF FLORIDA                    )

COUNTY OF ___PALM BEACH_____ )

_____/

    BEFORE ME, the undersigned authority, this day personally appeared ___TODD RICHARDSON_____, who first being duly sworn, says that he/she is the Defendant in the above-styled cause, that he/she has read the foregoing Motion for Post-Conviction Relief and has personal knowledge of the facts and matters therein set forth and alleged; and that each and all of these facts and matters are true and correct.

                                 _____
                                   (Your Signature)

SWORN AND SUBSCRIBED TO before
me this ___15___ day of __May___,
19_98___.

                    _____
                    NOTARY PUBLIC, or other person
                    authorized to administer oath.
                    (Print, type, or stamp commissioned
                    name or notary public.)

Personally known _____

Produced Identification __X_____

Type of Identification Produced ___Inmate I.D.___

- 11 -

15

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY,
FLORIDA

STATE OF FLORIDA,

     Plaintiff,

vs.

                    CASE NO.: 96-3122CF10C
                    JUDGE: DIMITROULEAS

TODD RICHARDSON,

     Defendant,

_____/

## MEMORANDUM OF LAW

     Defendant, **TODD RICHARDSON**, pro se, presents this Memorandum of Law in support of his Motion for Post Conviction relief filed pursuant to Rule 3.850, Florida Rules of Criminal Procedure.

## STATEMENT OF FACTS

     On February 19, 1996, the Defendant was arrested along with three co-defendants. On March 13, 1996, the Defendant was charged by way of State's information with Count I and II, Robbery with a Firearm; Count III, Armed Kidnapping. The Defendant plead "not guilty" on March 20, 1996 in open court. The Defendant proceeded to trial on January 13, 1997. On January 15, 1997, the Defendant was found guilty by a jury of a lessor included offense of Strong Arm Robbery to Count I. As to Count

**16**

II Armed Robbery with a Firearm, the Defendant was found guilty as charged. As to Count III, Armed Kidnapping, the Defendant was found not guilty. The Defendant filed a Direct Appeal that was per curiam affirmed on February 4, 1998. Now this Motion for Post-Conviction Relief and Memorandum of LAw follows alleging the following grounds:

## GROUND I

### DEFENSE COUNSEL WAS INEFFECTIVE FOR ADMITTING DEFENDANT'S GUILT AFTER DEFENDANT PLEAD NOT GUILTY TO ALL CHARGES.

During the Defendant's trial, Defense Counsel repeatedly argued the Defendant's guilt, which was contrary to Defendant's earlier entered plea of "not guilty". The Defendant was shocked by Defense Counsel's comments during opening statement and closing arguments. Defense Counsel had not advised the Defendant of his strategy to conceed his guilt to any of the counts he was charged with or any lessor included offense. Nor at any time did the Court make an inquiry as to the fact of the Defendant agreeing with such strategy. During opening arguments, Defense Counsel made the following statements to the jury: "What my stupid client did was while this was going on is commit a theft." (See. Record on Appeal, page 128). Towards the end of his opening argument, Defense Counsel again argues the Defendant's guilt by making the following comments to the jury:
MR. LASWELL: Quite frankly, what we come to you as Defense Counsel and Defendant am telling you in our opening statement,

2

17

is listen to all the evidence, pay close attention and you will see that Todd Richardson may be no angel, he's badly overcharged in this case. And you will be able to convict him of the appropriate offense, that it should not be the one charged. So just pay close attention. See what you all come up with. Thank you very much. (See Record on Appeal page 129.)

The following statements were made by Defense Counsel during the closing arguments:

1. MR. LASWELL: What he started to do after Travis Russel began his kidnapping and his robbery was not nice. But it was theft. (See page 288 Record on Appeal.)

2. MR. LASWELL: As a matter of fact, she testified that Joseph Allen was going to rip off the necklace and he stopped Joseph Allen, and told her to take it off and she did, and give me your purse, and she did. That's a theft. That's disrespect. That's showing no regard for another person's property whether it's $20,000. dollars or two dollars. (See pages 289-290 Record on Appeal.)

3. MR. LASWELL: And I'm asking you not to get carried away. Do not go above and beyond the evidence and speculation and theory, and pay attention to what the evidence showed, and convict my client of theft. Because I'll admit to you that's what he is guilty of, not guilty of robbery. (See page 291 Record on Appeal.)

4. MR. LASWELL: So make this State of Florida tow the line. Examine the law. Examine the facts. Discuss the evidence. Come back wit a verdict guilty to the lesser included offense of

3

18

theft. Thank you. (See page 292 Record on Appeal.)

5. MR. LASWELL: Travis Russel had controlled that, Travis controlled this will whole thing. Damn fool that he is, he took advantage of that little girl and shame on him for it and convict him for it, for it, because he committed a theft. (See page 312 Record on Appeal.)

6. MR. LASWELL: This kid should be convicted of theft. (See page 313 Record on Appeal.)

In **Wiley v. Sowders**, 647 F.2d 642 (6th Cir.)(1981) the Court ruled that;

> ..." An Attorney may not admit his client's guilt which is contrary to his client's earlier entered plea of 'not guilty' unless the Defendant unequivocally understands the consequences of the admission...." It further stated; ..."While counsel may believe it tactically wise to stipulate to a particular element of a charge or to issue of proof, an attorney may not stipulate to facts which amount to the 'functional equivalent' of a guilty plea without the defendant's consent..."

The Sixth Circuit recognized that Defense Counsel's admission of defendant's guilt before the finder of fact is the functional equivalent of a guilty plea which triggers the trial court's obligation to make an inquiry into the defendant's consent to the legal strategy.

Further evidence of trial counsel's ineffectiveness reveals on page 275 Record on Appeal. Defense Counsel insisted on arguing the defendant committed grand theft even though the court instructed him that he was not given 'grand theft' as a lesser included offense of Robbery with a Deadly Weapon. Therefore,

4

**19**

grand theft did not exist on the verdict form and it was impossible for the jury to find the defendant guilty of grand theft, because the jury was specifically instructed that they could only find the defendant guilty as charged in the information or guilty of such lesser included crimes that the evidence may justify.

The defendant was denied effective assistance of counsel in violation of his Sixth Amendment rights guaranteed under the United States Constitution and his Fourteenth Amendment rights of due process of law. Therefore, the defendant would request that his sentence and judgment be vacated and have his cause remanded for a new trial.

5.

20

## GROUND II

**DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO IMPROPER CLOSING ARGUMENT BY PROSECUTOR AND REQUEST CURATIVE INSTRUCTION.**

During the prosecutors closing argument he proceeded to explain the verdict form selections to the jurors. The three selections were, Armed Robbery, Strong Arm Robbery, and Petit Theft. He gave the proper instructions to Armed Robbery and Strong Arm Robbery. But once her reached the charge of Petit Theft, he stated the following to the jury:

MR MILLIAN: Then you will have a Petit Theft under Armed Robbery. What is Petit Theft? You will hear about it. Petit Theft is what the word tells you. It's insignificant. It's value is pennies! That's not what happened. Todd Richardson didn't walk somewhere and see some worthless item on the floor and take it. (See Record on Appeal.)

The Defense Counsel was ineffective for failing to object to this misleading information. In **Cumbie v. State**, 378 So.2d 1, (1st DCA 1978), the Court ruled that a new trial is required when comments by the prosecutor were unfair and denied defendant the right to a fair trial. The prosecutor's statement in his closing argument that the value of property in a petit theft was (pennies), then later stating that Todd Richardson didn't walk somewhere and see some (worthless) item on the floor and take it. These statements were totally contrary to the definition of petit theft under Florida Statute §812.014(2)(e). Defense

21

Counsel failed to make any objection at all, thus not preserving the issue for appellate review.

Florida Statute §812.014(e) states that if the property stolen is valued at $100.00 or more, but less that $300.00, the offender commits "Petit Theft" of the first degree, punishable as a misdemeanor of the first degree as provided in s. §775.082 or s. §775.083.

The Prosecutors comment that petit theft consisted of property with a value of pennies was correct. But what he failed to state was that any property stolen that is valued at $300.00 or less is still petit theft.

The value of the property in the defendant's case was approximately $160.00. During the jury instructions the court never advised the jurors that even if the property stolen was valued at pennies, property stolen valued up to $300.00 dollars is still petit theft. Therefore, the jury was lead to believe that the defendant couldn't possibly be found guilty of petit theft. Furthermore, Defense Counsel argued that the defendant committed "Grand Theft" although he knew the property stolen was valued at less than $300.00 dollars, contrary to Florida Statute §812.014 (2)(e).

22

## CONCLUSION

**WHEREFORE**, the Defendant requests this Court to grant an evidentiary hearing, requiring the Defendant's presence and vacate and set aside judgment and sentence.

Respectfully Submitted,

Todd Richardson, #961139
Defendant/ Pro se
Glades C.I.
500 Orange Ave. Cir.
Belle Glade, Fl 33430-5221

**2 3**

<u>**CERTIFICATE OF SERVICE**</u>

I **HEREBY CERTIFY** that a true and correct copy of the foregoing Memorandum of Law and Motion for Post-Conviction Relief has been furnished to:

Robert E. Lockwood                     Michael J. Satz
Clerk of the Court                     State Attorney
Broward County Courthouse              Broward County Courthouse
201 S.E. 6th Street                    201 S.E. 6th Street
Ft. Lauderdale, Fl. 33301              Ft. Lauderdale, Fl. 33301


...via U.S. Mail this __*/5*__ day of May, 1998.

Todd Richardson, # 961139

24

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY,
FLORIDA

STATE OF FLORIDA,

     Plaintiff,

vs.

TODD RICHARDSON,

     Defendant.

_____/

Case No.: 96-3122 CF10C

Division: FM

## O R D E R

THIS CAUSE having been heard upon Defendant's Motion For
Post-Conviction Relief, and the Court having considered same, it
is hereby ordered that the State Attorney shall respond to the
motion within twenty (20) days.

DONE AND ORDERED at Fort Lauderdale, Broward County,
Florida, this 21 day of May, 1998.

WILLIAM P. DIMITROULEAS
Circuit Court Judge

Copies furnished to:

State Attorney's Office/Appeals

Todd Richardson, #961139, Glades Corr. Inst., 500 Orange
   Avenue Circle, Belle Glade, FL  33430

IN THE CIRCUIT COURT OF
THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA )
)
)
vs. )
)
TODD RICHARDSON )
)
_____Defendant_____)

CASE NO.: 96-3122 CFC

JUDGE: COHN

## RESPONSE TO DEFENDANT'S MOTION FOR
## POST-CONVICTION RELIEF

COMES NOW, the State of Florida, by and through the
undersigned Assistant State Attorney, and responds to the
Defendant's Motion for Post-Conviction Relief pursuant to Rule
3.850 of the Florida Rules of Criminal Procedure and the Order of
this Honorable Court as follows:

1. Pursuant to *Harvey v. Dugger*, 656 So.2d 1253 (Fla. 1995),
the State of Florida agrees that an evidentiary hearing is needed
in this matter.

2. Although the State agrees that an evidentiary hearing is
needed in this matter, it does contest the allegations raised in
the motion.

WHEREFORE, the State of Florida respectfully requests this
Honorable Court to grant an evidentiary hearing on the Defendant's
Motion for Post-Conviction Relief.

1

26

I HEREBY CERTIFY that a copy of the foregoing was furnished by U.S. Mail to Todd Richardson, Defendant, Pro Se, Inmate #961139, Glades Correctional Institution, 500 Orange Avenue Circle, Belle Glade, Florida 33430, this 8th day of September, 1998.


MICHAEL J. SATZ
State Attorney


By: _____
JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar #608092
Room 675
201 S.E. 6th Street
Fort Lauderdale, Florida
33301
Telephone: (954) 831-7913


2

27

IN THE CIRCUIT C      A  OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    :

     Plaintiff,                    :        Case No. 96-3122CF10C
                                  Judge JAMES L. COHN

v.                                                  :

TODD RICHARDSON,                     :

     Defendant.                    :

_____

## ORDER TRANSPORTING DEFENDANT TO COURT

THIS CAUSE having been set down for hearing on September, the 23rd, 1998 at 8:30
AM, before the Honorable James L. Cohn , Judge of the Circuit Court, and it appearing unto this
Court that the Defendant Todd Richardson, DC#961139 is presently incarcerated at Glades
Correctional Institution, 500 Orange Avenue Circle, Belle Glades, Florida  33430, and being
fully advised in the premises, it is, upon consideration,

ORDERED AND ADJUDGED that the Sheriff of Broward County, Florida shall
obtain custody of the said Defendant, Todd Richardson, Inmate #961139, Race: Black Male,
DOB: 7/6/74, and present him, before this Court on Wednesday, September 23, 1998 at 8:30
AM, in Courtroom 5750 for              STATUS HEARING

DONE AND ORDERED in Chambers, Broward County Courthouse, Ft. Lauderdale,
Florida, this _____ day of September, 1998.

_____
JAMES L. COHN
CIRCUIT COURT JUDGE

SEP 0 9 1998

cc:
Joel Silvershein, Esquire
Counsel for Plaintiff

Todd Richardson, #961139
Glades Correctional Institution
500 Orange Avenue Circle
Belle Glades, Florida  33430

28

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,                    :

     Plaintiff,                    :       Case No. 96-3122CF10C
                              Judge JAMES I. COHN

v.

TODD RICHARDSON,                    :

     Defendant.                    :

---

### ORDER TRANSPORTING DEFENDANT TO COURT

THIS CAUSE having been set down for hearing on September, the 23rd, 1998 at 8:30

AM, before the Honorable James I. Cohn , Judge of the Circuit Court, and it appearing unto this

Court that the Defendant Todd Richardson, DC#961139 is presently incarcerated at Glades

Correctional Institution, 500 Orange Avenue Circle, Belle Glades, Florida 33430, and being

fully advised in the premises, it is, upon consideration,

ORDERED AND ADJUDGED that the Sheriff of Broward County, Florida shall

obtain custody of the said Defendant, Todd Richardson, Inmate #961139, Race: Black Male,

DOB: 7/6/74, and present him, before this Court on Wednesday, September 23, 1998 at 8:30

AM, in Courtroom 5750 for                    STATUS HEARING

DONE AND ORDERED in Chambers, Broward County Courthouse, Ft. Lauderdale,

Florida, this ___8TH___ day of September, 1998.

                            JAMES I. COHN
                            CIRCUIT COURT JUDGE

cc:
Joel Silvershein, Esquire
Counsel for Plaintiff

Todd Richardson, #961139
Glades Correctional Institution
500 Orange Avenue Circle
Belle Glades, Florida 33430

BROWARD COUNTY, FLORIDA
I certify this document to be a true
and correct copy of the original.
WITNESS MY HAND AND SEAL
SEP 0 9 1998
CO_____ E LOCK___
BY_____

29



IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,

     Plaintiff,

vs.

TODD D. RICHARDSON,

     Defendant.

_____//

CASE NO: 96-3122CF10A
JUDGE  : JAMES I.COHN



MOTION TO REMOVE PROPERTY FROM
EVIDENCE AND RETURN TO VICTIM

COMES NOW the State of Florida, by and through the
undersigned Assistant State Attorney, and requests the
following, to-wit:

An Order of the Court removing property from evidence
and returning same to the victim and as ground therefore would
states that:

1.  The defendant was convicted on January 15, 1997.

2.  The conviction has been affirmed by the 4th District
Court of Appeals, P.C.A.

3.  The victim Patricia Wilson wants the property returned.
The property is a firearm stolen from the victim and used in the
crime.

30

Page 2
State vs. Todd D. Richardson
Case No. 96-3122CF10C
Motion to Remove Property from Evidence
and Return to Victim

4.  The property can be photographed in lieu of keeping it in
evidence.

I HEREBY CERTIFY that a true copy hereof has been furnished
by U.S. MAIL/hand delivery this ___ day of _____ , 1998, to:
William Laswell, Esq., PUBLIC DEFENDER'S OFFICE.

                              MICHAEL J. SATZ
                              State Attorney
                              Seventeenth Judicial Circuit


                          By:
                              ALBERTO MILIAN
                              Assistant State Attorney
                              Fla.Bar #651168
                              Broward County Courthouse
                              Fort Lauderdale, FL 33301
                              (954) 831-7991

                                                            31

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT

IN AND FOR BROWARD COUNTY, FLORIDA


STATE OF FLORIDA,

        Plaintiff,               CASE NO.: 96-3122 CF10C


vs.     .                        JUDGE.: COHN


TODD RICHARDSON

        Defendant.

_____/


## MOTION TO ORDER STATE TO RESPOND AND/OR
## GIVE RULING IN PENDING MOTION


    Comes Now, the Defendant, **Todd Richardson, pro se** and pursuant to **Florida Rules of Judicial Administration 2.050(f)**, files this Motion To Order The States Response and/or Enter a Ruling and the defendant would state the following grounds in support:


### GROUNDS

    1.  On May 1, 1998 the defendant filed a Motion For Post Conviction Relief.

    2.  The Court issued an order requesting the State to respond to said motion within 20 days.  At this time approximately eighty

32

days has elapsed since that deadline.

3.  Pursuant to the Rules of Judicial Aministration 2.050(f)
Duty to Rule Within a Reasonable Time; the court should have taken
some consideration by now.

4.  The rule says:  Every judge has a duty to rule upon and
annouce an order or judgement on every matter submitted to that
judge within a resonable time.  Each judge shall maintain a log of
cases under advisement and inform the chief judge of the circuit at
the end of each month of each case that has been held under
advisement for more than 60 days.

5.  This motion is deemed proper under the authority of **Gore
v. State 490 So.2d 1366 (Fla.App. 5 Dist. 1986)** where the court
ruled that the proper remedy was a petition to the court to take
further action was proper, rather than filing a petition for writ
of mandamus in the district court when the state failed to respond
to the courts show cause order within the 30 days indicated on the
order.

**WHEREFORE** the defendant would ask this court to enter a
ruling in this cause without allowing the state a chance to
respond.  The defendant would also ask that he be notified of what
ever action the court decides.

2.

**33**

Respectfully submitted,

TODD RICHARDSON 961139
Glades Correctional Inst.
500 Orange Avenue Circle
Belle Glade, Florida 33430

### CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the fore
going Motion To Order State To Respond And/Or Give Ruling In
Pending Motion to the Office of the State Attorney, Michael J.
Satz, Broward County Courthouse, 201 SE 6th Street, Fort
Lauderdale, Florida 33301. via the U.S. Mail this 8th day of
September 1998.

TODD RICHARDSON 961139

### UNNOTARIZED OATH

Under penalties of perjury, I declare that I have read the
foregoing motion and that the facts stated in it are true.

3.

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: 96-3122CF10A
JUDGE    : JAMES I. COHN

STATE OF FLORIDA,

    Plaintiff,

vs.                                    O R D E R

TODD D. RICHARDSON,

    Defendant.

_____//

THIS CAUSE having been brought before the Court by the State of Florida, by and

through ALBERTO MILIAN , Assistant State Attorney, and it appearing to the Court that

the WILLIAM LASWELL, ESQ.., representing the aforesaid Defendant, has no objection to the

State's  Motion to Remove Property from Evidence, and for good cause shown, it is, therefore

ORDERED that the evidence be returned to the victim.   Exhibit #29 (292815)

DONE AND ORDERED at Fort Lauderdale, Broward County, Florida, this 15th day

of September, 1998.

_____

HONORABLE JAMES I. COHN
Judge of the Circuit Court

Copies furnished:
ALBERTO MILIAN, Assistant State Attorney
WILLIAM LASWELL, ESQ.

**3 5**

[ ] 17th Judicial Circuit in and for Broward County
[ ] In the County Court in and for Broward County

**ORDER**

DIVISION:
[ ] CRIMINAL
[ ] TRAFFIC
[ ] OTHER

CLOCK IN
Filed in Open Court,
ROBERT E. LOCKWOOD, CLERK
ON _OCT 02 98_
BY _____

THE STATE OF FLORIDA VS.

_Todd K Richardson_

PLAINTIFF                    DEFENDANT

CASE NUMBER

_963122CF_

CHARGE _Robbery
      Robbery
      Armed Kidnap_

DEFENSE MOTION TO _WD as Atty Record_ IS HEREBY
_Granted_. FOR REASONS AS STATED ON THE RECORD
IN OPEN COURT.

DONE AND ORDERED THIS _2_ DAY OF _OCT_, 19 _98_ IN

BROWARD COUNTY, FLORIDA

_James I. Cohn_

JUDGE

COPIES:    BSO  -  SAO

36

FORM #CC-092
REVISED 10/90

IN THE CIRCUIT COURT OF
THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

STATE OF FLORIDA              )         CASE NO.: 96-3122 CFC
                             )
                             )         JUDGE: COHN
vs.                          )
                             )
TODD RICHARDSON              )
_____Defendant_____

## AMENDED RESPONSE TO DEFENDANT'S MOTION FOR

## POST-CONVICTION RELIEF

   **COMES NOW,** the State of Florida, by and through the
undersigned Assistant State Attorney, and responds to the
Defendant's Motion for Post-Conviction Relief pursuant to Rule
3.850 of the Florida Rules of Criminal Procedure and the Order of
this Honorable Court as follows:

   1. Pursuant to *Harvey v. Dugger*, 656 So.2d 1253 (Fla. 1995),
the State of Florida agrees that an evidentiary hearing is needed
in this matter.

   2. Although the State agrees that an evidentiary hearing is
needed in this matter, it does contest the allegations raised in
the motion.

   3. The allegation of the defendant that trial counsel was
ineffective for failing to object to prosecutorial misconduct is
not a ground upon which relief can be granted. The remarks alluded
to by the defendant (Exhibit I) were a fair comment on the law that

1

37

the jury was to be instructed on. Element three of the robbery jury instructions requires that the property taken was of some value. The remark clearly is a reference to that instruction. The "value" element sets petit theft and robbery apart from grand theft. Furthermore, even if the reference was to the petit theft charge, a showing of value of property was not an essential element of the crime of petit theft. *McDaniel v. State*, 221 So.2d 758 (Fla. 4th DCA 1969). Since the remarks of the prosecutor were proper, there was no basis for an objection, and, therefore, no basis for a claim of ineffective assistance of counsel.

**WHEREFORE**, the State of Florida respectfully requests this Honorable Court to grant an evidentiary hearing on claim one of the Defendant's Motion for Post-Conviction Relief, and to summarily deny claim two of the motion.

2

3 8

**I HEREBY CERTIFY** that a copy of the foregoing was furnished by FAX to Matthew Destry, Attorney for the Defendant, Todd Richardson, this 29th day of October, 1998.

MICHAEL J. SATZ
State Attorney

By: _____
JOEL SILVERSHEIN
Assistant State Attorney
Florida Bar #608092
Room 675
201 S.E. 6th Street
Fort Lauderdale, Florida
33301
Telephone: (954) 831-7913

3

3 9

1   with the crime and exploited for all the advantage

2   that he could get.  I don't have to prove anything

3   about what Travis Russel knew or didn't know.

4           But you follow your common sense in this

5   cases.  He is the man who makes the introductions.  He

6   makes the openings, and he puts those young girls in

7   that position.

8           And, if he doesn't know anything about it at

9   the time of the slaughter or robbery -- I would except

10  your common sense would tell you.

11          Some surprisement:

12          You mean you give somebody a ride.  You are

13  in the automobile, and then all of a sudden one of the

14  accomplices in there start committing a crime.

15          And you just-- not even stay silent, but you

16  indulge in all the lust and greed that you have by

17  pinning that young girl in the back of that automobile

18  and telling her to give up her property and take her

19  purse and take her money, to take a pathetic two

20  dollars that she had on her person.

21          And you know the law doesn't care, when you

22  do that, how much money is involved.  Obviously, you

23  all could tell there is value to all the things these

24  girls had.  The law doesn't even say that.

25          The law doesn't say it has some value.  Todd

EXHIBIT I

40

301

1  Richardson thought it was some value because he went

2  in like a shark after the tongue.  The actions of the

3  individual speak loudest of all.

4          Ladies and gentlemen, that's what you have

5  to consider in this case.  And Mr. Laswell's talk

6  about our taking out on menace to society is

7  nonsense.

8          This is not about a total or giving a break

9  to anybody.  This is a case saying to Todd Richardson

10  you are a man, and you are held to the same standards

11  as every other citizen in our society.  And these laws

12  that apply to him, apply universally to all of us.

13          There is a, have attempted to have, some

14  code of decency out there for not to allow these type

15  of crimes could be done, and this is the time that you

16  must make that decision.

17          You must consider, along with your common

18  sense and life experiences, the crimes that were

19  committed in this case.

20          I only get one opportunity to speak to you.

21  Ladies and gentlemen, when you get either of the

22  verdict forms, you are going to have several

23  selections under each count to make -- you are going

24  to have a robbery with firearm, which is what the

25  evidence in this case is showing you.

LAUDERDALE REPORTING    (305)467-6671

41

## IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
## OF THE STATE OF FLORIDA IN AND FOR BROWARD COUNTY

STATE OF FLORIDA

VS.

TODD RICHARDSON

Case No.    96-3122 CF 10 C
JUDGE       COHN

### ORDER
### DECLARING DEFENDANT INDIGENT AND APPOINTING APPELLATE COUNSEL

THIS CAUSE coming before the Court on motion by the Defense and the Court having taken testimony, heard argument of Counsel and being otherwise fully advised in the premises, the Court hereby finds:

1. The Defendant has previously been declared indigent and counsel was appointed to represent him at the trial level and on a motion for post-conviction relief.

2. The Defendant's financial condition has not improved such that he would be able to suffer costs on appeal without substantial hardship to him or his family.

It is, therefore:

ORDERED AND ADJUDGED that, pursuant to Fla. Stat. §924.17, and in accordance with the provisions of Fla. Stat. §939.15, all costs allowed by law, including, but not limited to, the costs of transcripts necessary to fully prosecute this Appeal, shall be borne by Broward County, Florida.

It is, further:

ORDERED AND ADJUDGED that ___Lewis A. Fishman___ be appointed to represent the Defendant/Appellant in the prosecution of this Appeal.

DONE AND ORDERED in Fort Lauderdale, Broward County, Florida, this 17TH day of November, 1998.

_____
JAMES I. COHN
CIRCUIT JUDGE

cc:    Counsel for the Defense - Motion for Post-Conviction Relief, Matthew I. Destry, 633 S. Andrews Ave., Suite 201, Fort Lauderdale, FL 33301
State Attorney, Broward County Courthouse, Appeals, Rm 675
Attorney General, West Palm Beach Regional Office, Criminal Division, 1655 Palm Beach Lakes Blvd., Third Floor, West Palm Beach, FL 33401

42

| | | |
|---|---|---|
| ] 17th Judicial Circuit in and for Broward County<br>] In the County Court in and for Broward County | | CLOCK IN<br>Filed in Open Court,<br>ROBERT E. LOCKWOOD, CL |
| DIVISION:<br>[ ] Criminal<br>[ ] Traffic<br>[ ] Other | **ORDER** | ON OCT 3 0 1998<br>BY _____ |

| THE STATE OF FLORIDA VS. | CASE NUMBER |
|---|---|
| Todd Dee Richardson<br>DEFENDANT | 963122C |

CHARGE Robbery Robbery + Deadly w

Evidentiary (3.850)
Hearing Held
is hereby Denied
By Court for Reason's
Stated on the Record in open
Court. DONE AND ORDERED THIS 30 DAY OF October, 19 98, IN
BROWARD COUNTY, FLORIDA.

James I. Cohn
JUDGE

Deft to Be Return
Back to FSP

COPIES:    BSO - SAO

4 3

# IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
## OF THE STATE OF FLORIDA IN AND FOR BROWARD COUNTY

STATE OF FLORIDA     )

VS.                     )           Case No.    96-3122 CF 10 C
                        )           JUDGE       COHN

TODD RICHARDSON      )
_____/

## DIRECTIONS TO THE CLERK

**APPELLANT,** Todd Richardson, pursuant to Fla. R. App. P. 9.200, directs the Clerk to include the following items from the original record:

1. Any original documents or exhibits, <u>excluding</u> summonses, praecipes, subpoenas, returns, and notices.

2. Transcript of the hearing on the Motion for Post-Conviction Relief held October 30, 1998 before the Honorable James I. Cohn.

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished by US Mail to the Office of the State Attorney, 201 S.E. 6th Street, Fort Lauderdale, FL 33301, and the Office of the Attorney General, 110 SE 6th Street, Fort Lauderdale, FL 33301 this 3rd day of November, 1998.

LAW OFFICES OF MATTHEW I. DESTRY

By _____

Matthew I. Destry
Counsel for the Defense
Florida Bar #0764736
633 S. Andrews Ave., Suite 201
Fort Lauderdale, FL 33301
(954) 527-1999

44

## IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
## OF THE STATE OF FLORIDA IN AND FOR BROWARD COUNTY

STATE OF FLORIDA |

VS. |        Case No.    96-3122 CF 10 C

|        JUDGE      COHN

TODD RICHARDSON |
_____/

### DESIGNATION TO THE COURT REPORTER AND
### REPORTER'S ACKNOWLEDGEMENT

     **APPELLANT**, Todd Richardson, files these designations and directs the Court Reporter to transcribe the following proceedings to be used in this Appeal:

     1. The hearing on the motion for post-conviction relief recorded by the reporter on October 30, 1998, before the Honorable James I. Cohn.

     The Court Reporter is directed to file the original and two (2) copies with the Clerk of the lower tribunal.

     **I HEREBY CERTIFY** that satisfactory financial arrangements have been made with the Court Reporter for the preparation of these transcripts in that the Defendant/Appellant has been declared indigent and Broward County will bear the cost.

     **I HEREBY CERTIFY** that a copy of the foregoing has been furnished by US Mail to the Office of the State Attorney, 201 S.E. 6th Street, Fort Lauderdale, FL 33301, and to the Office of the Attorney General, 110 SE 6th Street, Fort Lauderdale, FL 33301, this 3rd day of November, 1998.

                  LAW OFFICES OF MATTHEW I. DESTRY, P.A.

                  By _____
                  Matthew I. Destry
                  Counsel for the Defense
                  Florida Bar #0764736
                  633 S. Andrews Ave., Suite 201
                  Fort Lauderdale, FL 33301
                  (954) 527-1999

45

## REPORTER'S ACKNOWLEDGEMENT

1. The foregoing Designation was served on _____, 19___, and received on _____, 19___.

2. Satisfactory arrangements ❑ have ❑ have not been made for payment of the transcript cost. These financial arrangements were completed on _____.

3. Number of trial or hearing days:_____.

4. Estimated number of transcript pages:_____.

5a. The transcript will be available within 30 days of service of the foregoing Designation and will be filed on or before the ___ day of _____, 19___.

**OR**

5b. For the following reason(s) the Court Reporter requests and extension of time of ____ days for preparation of the transcript that will be filed on or before the ___ day of _____, 19___:

| |
|---|
| |
| |
| |

6. Completion and filing of this Acknowledgment by the Court Reporter constitutes submission to the jurisdiction of the Court for all purposes in connection with these appellate proceedings.

7. The undersigned Court Reporter certifies that the foregoing is true and correct and that a copy has been furnished by ❑ mail ❑ hand delivery this ___ day of _____, 19___, to each of the parties or their counsel.

By_____

Court Reporter
Address:

| |
|---|
| |
| |

NOTE: The foregoing Court Reporter's Acknowledgment to be placed "at the foot of" or attached to a copy of the Designation, shall be promptly completed, signed by the Court Reporter, and filed with the Clerk of the Appellate Court withing 5 days of service of the Designation on the Court Reporter. A copy shall be served on all parties or their counsel, who shall have 5 days to object to any requested extension of time. See Fla. R. App. P. 9.200(b)(1), (2) & (3).

Δ 6

| [x] 17th Judicial Circuit in and for Broward County<br>[ ] In the County Court in and for Broward County | CLOCK IN |
|---|---|
| **DIVISION:**<br>[X] Criminal<br>[ ] Traffic<br>[ ] Other     **CERTIFICATE OF THE CLERK** | |
| | **CASE NUMBER**<br><br>98-4323 |

STATE OF FLORIDA      :

COUNTY OF BROWARD  :

     I, ROBERT E. LOCKWOOD, Clerk of the Circuit Court for the 17th Judicial Circuit, County of Broward, State of Florida, do hereby certify that the foregoing pages 1 to _____46_____ inclusive contain a correct transcript of the record of the judgment in the case of **STATE OF FLORIDA** vs _____TODD RICHARDSON_____ , and a true and correct recital and copy of all such papers and proceedings in said cause as appears from the records and files of my office that have been directed to be included in said record by the directions furnished me.

     Volume ___I___ , page ___1___ to ___23___ inclusive embrace the transcribed notes of the reporter as made at the trial and certified to me by ____HER_____ .

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Seal of said Court this ___24TH___ day of _____DECEMBER_____ , 19 _98_ .

ROBERT E. LOCKWOOD, Clerk
Circuit Court
Broward County, Florida

BY: _____
                                **Deputy Clerk**

1

IN THE CIRCUIT COURT OF THE 17th

JUDICIAL   CIRCUIT,   IN   AND   FOR
BROWARD COUNTY, FLORIDA


CASE NO.:  96 3122 CF10


STATE OF FLORIDA,
     Plaintiff,


VS.

TODD RICHARDSON,
     DEFENDANT.
_____/


OCTOBER 30, 1998 CALENDAR PROCEEDINGS



     The above-entitled cause came on for hearing before
the Honorable James I. Cohn at the Broward County
Courthouse, Ft. Lauderdale, Florida, on the 30th day of
October, 1998, commencing at 9:30 a.m.




Appearances:
On behalf of the Plaintiff:
     The State Attorney's Office
     Ft. Lauderdale, Florida
     By: Mr. J. Silvershine

On behalf of the Defendant:
     Special Appointed Counsel
     Ft. Lauderdale, Florida
     By: Mr. M. Destry

1        THE COURT: State versus Todd Richardson. We're going

2    to have a Richardson hearing. Mr. Richardson is present,

3    represented by Mathew Destry.  The State is represented

4    by Joel Silvershine. Both parties ready to proceed?

5        MR. SILVERSHINE: My witness will be here soon.

6        MR. DESTRY: My client will testify this morning,

7    too.

8        MR. SILVERSHINE: Judge, yesterday I filed an amended

9    response dealing with the second portion of Mr.

10   Richardson's claim. One is an allegation of violation of

11   Harvey versus Delger (PHONIC). Mr. Richardson's prior

12   attorney argued for a lesser included offense without his

13   knowledge. The second claim deals with a claim of

14   prosecutorial misconduct and ineffective assistance of

15   counsel in the fact that Mr. Laswell failed to object to

16   Mr. Milian's closing argument regarding value of the

17   items.  My response directly contests the second

18   portion.  Of course, as the first portion, we are going

19   to need Mr. Laswell's testimony.

20       MR. DESTRY: I can save the Court some time here.

21   I've had some discussions with Mr. Silvershine about the

22   3.850.  I read the transcript.  Regardless of what I

23   think of Mr. Milian's remarks, that is up to the Court to

24   make a determination.

25       I can tell the Court, unless you find his remarks to

1      be fundamental error, they are not really subject to

2      review at this stage. Even if Mr. Laswell failed to

3      object to certain remarks made by Mr. Milian, it would

4      not come under rule 3.850. There are several recent

5      cases.  One is fairly recent.  McGowen versus State, 586

6      So. 2nd 1311.  That is a Third District case from 1991.

7      That case says, essentially, even if you should have

8      objected at the trial level and because you didn't

9      object, you didn't preserve the issue on appeal, you

10     still don't have a valid claim, unless you can show

11     fundamental error.

12          MR. DESTRY: I read the transcript.  I can't argue

13     with the Court that Mr. Milian committed fundamental

14     error.  Although, I don't know if his remarks were all

15     that proper.  I had some discussions with my client about

16     that.

17          THE COURT: I did review that portion of the

18     transcript to the State's amended response. The Court

19     finds that the remarks are not fundamental error.  As to

20     count two of your motion, that will be respectfully

21     denied.  I think we have the witness present.  Are we

22     ready to proceed?

23          MR. SILVERSHINE: This is Mr. Richardson's burden.

24          THE COURT: We are having a Richardson hearing here.

25          MR. DESTRY: I was going to call my client first.

1   Then I think the State will call Mr. Laswell. You should

2   probably invoke the rule.

3        THE COURT: The Court is going to invoke the rule.

4   Mr. Laswell, there are bagels, coffee, and juice in the

5   bailiff's room. Help yourself. Mr. Richardson, raise your

6   hand, sir.

7        ( DEFENDANT TODD RICHARDSON, called as a witness by

8   the Defense, having been first duly sworn, testified as

9   follows:)

10        THE CLERK: State your name and spell your last for

11   the record, please.

12        THE DEFENDANT: Todd Richardson, R-i-c-h-a-r-d-s-o-n.

13                    DIRECT EXAMINATION

14   BY MR. DESTRY:

15   Q. Mr. Richardson, are you the same person that was

16   arrested back in February of 1996 on several charges,

17   including armed robbery, robbery, and kidnapping and grand

18   theft -- well, it wasn't grand theft, but everything else?

19   A. I guess.

20   Q. You remember being arrested, though?

21   A. Yes.

22   Q. Then subsequently you went to trial, correct?

23   A. Yes, sir.

24   Q. As a result of that, I think you were convicted of one

25   count of robbery and armed robbery, right, one of each;

1    correct?

2        A. Strong armed robbery and robbery with a deadly weapon.

3        Q. So one count of robbery with a deadly weapon and

4    strong armed robbery.  And you were sentenced to 30 years as

5    a habitual offender; correct?

6        A. Uh-huh.

7        Q. Mr. Laswell of the Public Defender's Office was the

8    lawyer that defended you, and you went to trial?

9        A. Yes.

10        Q. Before you went to trial, did you have conversations

11    with Mr. Laswell about how you were going to go about

12    defending the case?

13        A. No, sir.

14        Q. You had no conversations with him at all?

15        A. No, sir.

16        Q. Did he ever discuss with you his strategy, that is,

17    what he was going to argue to the jury, that you were guilty

18    of theft, but not robbery?

19        A. No, sir.

20        Q. He never told you that is what he was going to do?

21        A. No, sir.

22        Q. You need to speak up.

23        A. No, sir, never.

24        Q. What conversations, if any, did you have with Mr.

25    Laswell before trial?

1    A. Um, it was conversations about, you know, me going and

2    trying to get a lesser charge, but never the strategy on how

3    he was going to go in there and argue my case.

4    Q. What conversations did you have about how you were

5    going to get a lesser charge? Tell the judge.

6    A. Well, Your Honor, I asked him could my charge go down

7    to a petty theft. He told me it could or it couldn't.

8    Q. You were asking him what the possibility of the

9    outcome would be or were you inquiring--

10          MR. SILVERSHINE:-- Objection.  Leading.

11          THE COURT: Overruled.

12    Q. In what context did you have these conversations with

13    him?  What were you actually talking about?

14    A. When he came to see me, I told him I had a drug

15    problem in the case, you know. He told me it wasn't a drug

16    problem.

17          Marijuana is a drug problem.  If you can get

18    arrested for it, if you smoke heavily, it is a problem.

19    Q. Mr. Richardson, try to understand and answer my

20    question. With regard to petty theft, what were you two

21    talking about at the time when you were talking about that?

22    A. No conversation at all about it.

23          THE COURT: You're telling this Court you had no

24     conversations with Mr. Laswell about how he was going

25     to defend your case?

1          THE DEFENDANT: No.

2   BY MR. DESTRY:

3     Q. Were you surprised when you heard Mr. Laswell argued

4   you were guilty of theft?

5     A. I was like, "What is he doing? What is he doing?"

6     Q. Did you say anything to Mr. Laswell?

7     A. No.

8     Q. Did you ask Mr. Laswell why he didn't discuss it with

9   him?

10    A. I figured he was a lawyer; he knew what he was doing.

11    Q. At any time during the course of the trial did you

12  mention it to him?

13    A. No, sir.

14         MR. DESTRY: I have nothing further.

15         THE COURT: Cross examination?

16         MR. SILVERSHINE: Yes.

17              CROSS EXAMINATION

18  BY MR. SILVERSHINE:

19    Q. It is your testimony, Mr. Richardson, you had no

20  conversations with Mr. Laswell about your case, or you had

21  some conversations?

22    A. There were conversations about it, but never about a

23  strategy or how he was going to perform this case at trial.

24    Q. But you had discussions about asking for a lesser

25  offense, petty theft?

1    A. I knew the charge could go down to petty theft because

2    I never had the gun.  I never was in control over the car or

3    what was going on in the car.  I was as scared as the victim

4    was.

5        Q. You know that petty theft is a misdemeanor, right?

6        A. Yes.

7        Q. Were you in custody at the time of this trial?

8        A. Yes, sir.

9        Q. And how long were you in custody in the Broward County

10   Jail?

11       A. A whole year and a couple of days.

12       Q. You knew if Mr. Laswell prevailed on the petty theft,

13   even if he prevailed, meaning the jury would come back with

14   the petty theft, you could walk out because you did all the

15   time?

16       A. On a petty theft, yes.

17       Q. Now, you were surprised when Mr. Laswell was asking

18   for petty theft, asking the jury to convict you of petty

19   theft?

20       A. It was theft.  That's a felony.

21       Q. A felony? Wasn't there a lot of argument about how

22   little was taken from these two women?

23       A. Was it argued? No, it wasn't argued. Not at all when I

24   think about it.

25       Q. It wasn't argued at all? Isn't it true Mr. Laswell, in

1  closing, spoke about the nominal or very little value of the

2  jewelry that was taken?

3      A. I still feel I shouldn't be convicted of felony theft.

4      Q. Was there any testimony to the fact that the jewelry

5  taken was worth more than three hundred dollars?

6      A. No.

7      Q. Now, you were charged with some various charges -- two

8  counts of armed robbery, two counts of kidnapping?

9      A. One.

10     Q. No, it is two on my paper.  It is two armed

11  kidnappings, two armed robberies, and two violations.

12          The fact of the matter is Mr. Laswell successfully

13  argued to the jury and the jury returned, on count one, a

14  lesser included offense of strong armed robbery; correct?

15     A. Yes.

16     Q. Okay.  Even though you were convicted as charged in

17  count two of the information, of armed robbery with a deadly

18  weapon--

19     A.-- Can I say this?

20     Q. Let me ask this question:  Mr. Laswell was able to get

21  a not guilty verdict from the jury on the kidnapping count.

22  Isn't that correct?

23     A. Correct. But can I say this, why was I found guilty on

24  the robbery with a deadly weapon when I never had the

25  weapon?

1    Q. My question is this:  Despite what you are arguing was

2    ineffective assistance on the part of Mr. Laswell, you were

3    still able to get a lesser verdict on count one, and he was

4    able to walk you on kidnapping on count three; is that

5    correct, sir?

6    A. Count three is correct, but let me tell you this:  I

7    was going to be found not guilty any way because I never

8    forced anyone into their car. They got in at their own will.

9    Q. You're testimony is that Mr. Laswell never talked to

10   you about this?

11   A. Nope.

12   Q. You said you were surprised during closing arguments

13   that he raised this?

14   A. Yes.

15   Q. You were so surprised that you never spoke to Mr.

16   Laswell about it, saying, "Hey, how come you didn't argue

17   lack of guilt?" Did you ever say that?

18   A. No.

19   Q. Did you ever tell the judge that?

20   A. No.

21   Q. You were sentenced at a later date on this charge?

22   A. Yes.

23   Q. Did you mention anything to the judge about Mr.

24   Laswell did me wrong by not arguing I was not guilty?

25   A. Let me put it to you this way:  I went to prison.

1    This is when I learned about all of this.

2        Q. So nothing really upset you until you went to prison

3    and saw some inmate?

4        A. No, a dude studied my case in prison.  He made

5    allegations for me.

6        Q. You were so upset about the fact that you were

7    convicted and at the time you were sentenced that you never

8    mentioned to Judge Dimitrouleas, who was the judge in the

9    case, or to Mr. Laswell, and you never mentioned it on the

10    record during sentence?

11        A. Can I say something?

12        Q. Answer my question.

13        A. No, I didn't.

14            MR. SILVERSHINE: Thank you.  I have nothing further,

15        judge.

16            THE DEFENDANT: I said a lot--

17            THE COURT:-- Sir. Any redirect?

18            MR. DESTRY:  No, Your Honor.

19            THE COURT: Okay, any additional evidence on behalf

20        of Mr. Richardson?

21            MR. DESTRY: I don't have any additional evidence on

22        his behalf.  I would rest.  I do want to put on the

23        record his mother is present, as she was through the

24        entire trial. I did have discussions with her about a

25        week ago as to whether she was present during any

```
1    conversations that Mr. Laswell may have had with my
2    client. She told me she can't remember ever having been
3    there or having conversations about strategy in her
4    presence.
5         Mr. Richardson, that is confirmed by you as well?
6    Your mother was never around?
7         THE DEFENDANT: No, sir, she was never around.
8         THE COURT: You may call your first witness, Mr.
9    Silvershine.
10         MR. SILVERSHINE: Bill Laswell.
11         THE DEFENDANT: Judge, can I say something?
12         THE COURT: No.  You have one of the best lawyers
13    around. I suggest you speak to him.
14         ( WILLIAM LASWELL, called as a witness by the State,
15    having been first duly sworn, testified as follows:)
16         THE CLERK: State your full name and spell your last
17    name for the record, please.
18         THE WITNESS: William Laswell, L-a-s-w-e-l-l.
19                    DIRECT EXAMINATION
20  BY MR. SILVERSHINE:
21    Q. What is your occupation?
22    A. Attorney.
23    Q. For how long have you been an attorney?
24    A. Slightly over a quarter of a century.
25    Q. Do you specialize in a particular area?
```

1      A. Yes.

2      Q. What·area?

3      A. Criminal defense lawyer.

4      Q. During the course of your career as a criminal defense

5   lawyer, did you represent a gentleman by the name of Todd

6   Richardson?

7      A. Yes, I did.

8      Q. You see him in the courtroom today?

9      A. I am not sure.  Its been a long time. I primarily

10  don't concern myself with the kind of case Mr. Richardson

11  had.

12     Q. What do your cases entail?

13     A. Death penalty work in the Public Defender's Office

14  these days.

15     Q. Did you represent Mr. Richardson in Case Number

16  96 3122, armed robbery and kidnapping?

17     A. Yes, I did.

18     Q. Did the case go to trial?

19     A. Yes, it did.

20     Q. Did you have discussions with Mr. Richardson as far as

21  your trial strategy?

22     A. Yes.

23     Q. Have you reviewed the transcript?

24     A. I have seen part of a transcript.

25     Q. Mr. Laswell, are you aware there is a claim of

1    ineffective assistance of counsel regarding your strategy

2    involving this case?

3        A. I am unaware of the details, but I'm aware a 3.850 was

4    filed, and that seems to be the crux of it; that I never

5    sought nor received permission to do certain things for Mr.

6    Richardson.

7        Q. Do you recall your strategy in this particular case?

8        A. Yes.

9        Q. What was it, sir?

10       A. To understand the strategy, you have to understand the

11   facts.  Without going into them in depth, this case involved

12   four young men in a little bitty car who managed to attract

13   the attention of two young ladies to get in the little car.

14   There were six people in this 280-Z, as I recall.

15           Mr. Richardson was in the back seat with another

16   individual and one of the young ladies.  And there were two

17   other fellows and a lady. The lady was confronted with a gun

18   stuck between her ribs and was dispossessed of certain

19   property. They all managed to get out of the car, leaving

20   only Mr. Richardson.  One young girl was left. She claimed

21   Mr. Richardson went through her purse and stole her

22   necklace.

23           Mr. Richardson was arrested and gave a statement

24   admitting that he was there, saying that, as I recall, he

25   didn't rob her, he just took it.  He had the necklace in his

1    pocket when he was arrested.

2           So it was my strategy to suggest to this jury that

3    he should not be held responsible for the kidnapping -- only

4    the person driving the car and having the firearm should do

5    that; and he had no liability for any robbery because, at

6    most, what his acts amounted to was petty theft.  That's the

7    position I took.

8        Q. You discussed that with Mr. Richardson?

9        A. Yes, I did.

10       Q. Mr. Richardson was aware of the fact you were not

11   going to argue for guilt, but for a lesser offense; correct?

12       A. Yes, that I wasn't going to argue for guilt.

13       Q. Sorry?

14       A. I did argue not guilty for the kidnapping, and I did

15   argue not guilty as to the robberies, but I offered up to the

16   jury the alternate theory -- they could find him guilt even

17   of petty theft if they felt he was involved in any

18   wrongdoing. Of course the evidence screamed of involvement of

19   wrongdoing.  It was the best strategy I could find.

20       Q. Your strategy is based on what?

21       A. Trying to avoid the conviction for the very intense

22   charges of kidnapping and armed robbery.

23       Q. You based this on your lifetime experience in the

24   criminal law field?

25       A. Yes.

1    Q. When you spoke to Mr. Richardson about it, did he

2    concur with your theories?

3    A. Yes.  I don't think he had any choice really. Here is

4    a kid at that time who was twenty years old or thereabouts.

5    Maybe a little older.  And he had not been successful in

6    prior brushes with the criminal justice system.  I am going

7    to give the best advise.

8    Q. Had he been convicted of petty theft, it would have

9    been a time-served sentence?

10    A. Yes.

11        MR. SILVERSHINE: I have nothing further.

12        THE COURT: Okay, cross examination?

13        MR. DESTRY: Yes.

14                CROSS EXAMINATION

15    BY MR. DESTRY:

16    Q. Good morning, Mr. Laswell.

17    A. Mr. Destry.

18    Q. I don't want to draw this out unnecessarily.  You have

19    been practicing criminal law for some time?

20    A. Yes.

21    Q. This particular case, I read the record.  I know you

22    read portions of it.  Of course you tried the case. You refer

23    to Mr. Richardson's actions, at the very least, disrespectful

24    towards these young ladies.  Is this a fair characterization?

25    A. Yes.

1    Q. The way I take it your entire philosophy throughout

2    the trial, as you have just described to Mr. Silvershine in

3    court, that being that Todd Richardson was not where he was

4    suppose to be, doing things he shouldn't be doing, and

5    probably guilty of petty theft, but not of robbery and

6    certainly not of armed robbery?

7    A. That's exactly the trial strategy.

8    Q. You pretty much argued that theory?

9    A. As I recall, yes, during voir dire and opening

10   statement and throughout.

11   Q. Through cross examination and finally in closing

12   argument?

13   A. Yes.

14   Q. Okay.  At any time do you recall -- and you have

15   stated for Mr. Silvershine in this court -- that you recall

16   having specific conversations with Mr. Richardson about the

17   strategy?

18   A. Yes.

19   Q. I assume you discussed it in detail?

20   A. I'm little bothered by "in detail," but, yes, we

21   discussed it on more than one occasion.  It was my opinion

22   then and now I really thought that it would be folly to

23   assume, under the facts that were to be presented in

24   evidence, that Mr. Richardson can be found not guilty of all

25   charges. So I adopted that strategy -- trying to lessen the

1   impact. Better he get a lesser. I think we were successful.

2   I think we got not guilty on one count and a lesser on one

3   count. So, you know, you can sit here and say it almost

4   worked.

5       Q. Let me ask you this:  Your contact with Mr. Richardson

6   at that time when he was twenty-something years of age were

7   extensive?

8       A. No.

9       Q. Prior to the trial?

10      A. It is like your other question, pretty extensive.

11          MR. SILVERSHINE: It does not constitute ineffective

12      assistance.  We are here to determine whether Mr. Laswell

13      spoke to Mr. Richardson before trial about the strategy

14      employed. As far as questions like how much time he saw

15      Mr. Richardson is not relevant.

16          THE COURT: Overruled.

17      Q. Mr. Laswell, from what you remember, was Mr.

18   Richardson a sophisticated individual in the sense he

19   understood the law?

20      A. No, absolutely not. As a matter of fact, I discussed

21   it with his mother and his aunt.  It was their position that

22   Todd's problems primary were from being at the wrong place at

23   the wrong time through his life. I think that the transcript

24   of the sentencing would probably show that was the position

25   she took with Billy D.

```
1        Q. Judge Dimitrouleas?
2        A. I can't say it, that's why I call him "Billy D."
3        Q. Did you at anytime take any notes or commit these
4    notes to writing?
5        A. I did not document them, as I recall.
6            MR. DESTRY: Nothing further, Your Honor.
7            THE COURT: Any redirect?
8            MR. SILVERSHINE: No, sir.
9            THE COURT: Thank you, Mr. Laswell.
10            MR. LASWELL: Thank you.  Nice to see you.
11            THE COURT: Have a nice day, and happy birthday.
12            MR. LASWELL: It started out with the chief judge.
13    I'm sure the day will get better.
14            THE COURT: Anything further?
15            MR. SILVERSHINE: Some argument.
16            THE COURT: Any rebuttal?
17            MR. DESTRY: No.
18            THE COURT: Okay.  Argument?
19            MR. DESTRY: I guess I should go first, Your Honor.
20    Judge, I think this pretty much boils down to an issue of
21    credibility. I do not mean to impugn Mr. Laswell.  I have
22    high respect for the man.  I will say this on behalf of
23    my client, I have seen this before.  Lawyers may or may
24    not have conversations with their client about how they
25    intend to proceed.  They have the best of intentions.
```

1    And I can say this, the Public Defender's Office has many

2    cases to deal with and many clients. This boils down to a

3    question of credibility. I think it is whether you

4    believe Mr. Richardson or Mr. Laswell.

5         THE COURT: In a 3.850 hearing is the standard by a

6    preponderance of evidence?

7         MR. SILVERSHINE: Clear and convincing.

8         THE COURT: Okay.

9         MR. DESTRY: The only argument that I make to the

10   Court is there is nothing in writing  -- no documentary

11   evidence, which is a bit unusual. Standard practice is

12   documenting one file concerning discussions with clients

13   for the very reason it may come back to haunt you. I know

14   Mr. Laswell has been around long enough to know that.

15   Judge, this is strictly your call. I can't say more than

16   the evidence does. It is up to you whether you think

17   there is an error.

18        THE COURT: Thank you, Destry.  Mr. Silvershine?

19        MR. SILVERSHINE: He is correct.  On one hand it is a

20   matter of credibility. The question is:  Are you going to

21   believe Mr. Laswell, who has been practicing criminal law

22   for 25 years, or Mr. Richardson, who is standing here

23   convicted of this crime because he is HO as a prior

24   convicted felon?

25        We must look at this case and see the prejudice. The

1    question is, even if you were to believe Mr. Richardson,

2    how is he prejudiced?

3        Anyway, Mr. Laswell is dealing with a case where he

4    has the victim coming in; he has the fact that Mr.

5    Richardson was caught with the goods, and what is he left

6    with?

7        There is a statement that Mr. Richardson has made.

8    So he employed a strategy of asking for petty theft,

9    which in turn, would be a time-served sentence.   The

10    border between robbery and theft in these cases can be

11    very thin.

12        Contrary to what Mr. Richardson has stated the

13    circumstances presented in this case would have been

14    petty theft because there is no allegation as to the

15    value of the things that were taken, if you read the

16    transcript, the value of the things that were taken were

17    certainly under $300.   There was a firearm.   So it was

18    either going to be strong armed robbery as charged,

19    robbery, or petty theft.

20        Mr. Laswell was successful in getting a lesser

21    included offense in count one and walking him with a not

22    guilty verdict on the kidnapping count, which is count

23    three. Ineffective assistance or issues involving

24    ineffective assistance must be on the totality of the

25    situation.   Based on the totality of the situation, the

1    trial strategy employed here is sound.

2         I submit to this Court Mr. Laswell was truthful when

3    he said he spoke to Mr. Richardson.  And to also bolster

4    that, why does Mr. Richardson wait until he is in prison

5    to raise these arguments?  He wasn't upset at the time of

6    trial.  He wasn't upset at the time of sentencing.  If he

7    really was upset, he would have told Judge Dimitrouleas.

8         THE COURT: I think you've convinced me. The Court

9    finds that the trial strategy employed by Mr. Laswell was

10   not only sound, but that strategy was, in fact, discussed

11   with the defendant Todd Richardson; and that Todd

12   Richardson did concur with his attorney in employing the

13   strategy that was ultimately utilized during the trial.

14        Accordingly, the Court finds he failed to meet his

15   burden.  Thereby this Court respectfully denies his

16   motion under 3.850.

17        MR. SILVERSHINE: You must inform him he has 30 days

18   for appeal.

19        THE COURT: You have 30 days to appeal this

20   decision.  If you cannot forward a lawyer, the Court will

21   appoint one to represent you. Thank you.

22

23

24

25

## CERTIFICATE OF OATH

STATE OF FLORIDA        )

                        )   SS:

COUNTY OF BROWARD     )


    I, SHELLY FLAHERTY, certify that I was

authorized to and did stenographically report the

foregoing deposition; and that the transcript is

a true record of the testimony given by the witness.

    I further certify that I am not a relative,

employee, attorney or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorneys or counsel connected with this action, nor

am I financially interested in this action.

    Dated this 10th day of December, 1998.



_____

SHELLY FLAHERTY

SHORTHAND REPORTER

NOTARY PUBLIC- STATE OF FLORIDA

| | | CLOCK IN |
|---|---|---|
| **IN THE DISTRICT COURT OF APPEAL - FOURTH DISTRICT** **WEST PALM BEACH, FLORIDA** | | |
| **DIVISION:** [X] CRIMINAL | **RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION** | TBA |

| | |
|---|---|
| *Appellant* | **CASE NUMBER** 96-3122CF10C |
| TODD RICHARDSON VS. STATE OF FLORIDA | **APPEAL NUMBER** 98-4323 |
| *Appellee* | |

VOLUME ___I___    PAGES ___1___    TO ___112___

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

FEB 01 1999

CRIMINAL DIVISION
WEST PALM BEACH

RICHARD L. JORANDBY, 15TH P.D.
ATTORNEY FOR APPELLANT

GEORGINA JIMENEZ OROSA
ASSISTANT ATTORNEY GENERAL

| DIVISION:<br>APPELLATE | INDEX TO RECORD ON APPEAL<br>SUPPLEMENTAL | CASE NO.<br>96-3122CF10C<br>APPEAL NO. 98-4323 |
|---|---|---|

| DATE OF FILING | KIND OF INSTRUMENT | PAGES |
|---|---|---|
| 1-12-99 | 4DCA ORDER GRANTING MOTION TO SUPPLEMENT WITH ATTACHED MOTION................................ | |
| | **VOLUME I** | |
| 1-13-97 | VOIR DIRE.................................... | 1-82 |
| 1-13-97 | VOIR DIRE.................................... | 85-112 |
| | **VOLUME II** | |
| 1-13-97 | TRIAL PROCEEDINGS............................ | 113-272 |
| | **VOLUME III** | |
| 1-14-97 | TRIAL PROCEEDINGS CONT....................... | 273-339 |
| 1-15-97 | TRIAL PROCEEDINGS CONT....................... | 340-356 |
| 1-28-98 | CERTIFICATE OF THE CLERK | |
| | _Volume IV_ | |
| 2-25-97 | _Sentencing Hearing_ ............... | 1-14 |

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT, P.O. BOX 3315, WEST PALM BEACH, FL 33402

TODD RICHARDSON                          CASE NO. 98-04323

  Appellant(s),

vs.

STATE OF FLORIDA                         L.T. CASE NO. 96-3122 CF10C
                                         BROWARD
  Appellee(s).

January 11, 1999

BY ORDER OF THE COURT:

      ORDERED that appellant's unopposed motion filed January
8, 1999, to supplement record on appeal and toll the time for
service of initial brief is granted.  The material requested in
the motion shall be included in the record on appeal.  Appellant
shall be responsible for prompt preparation and filing of the
supplemented material within twenty (20) days from the date of
this order; further,

      ORDERED that the time for filing appellant's initial
brief is tolled pending receipt of the supplemental record.

I hereby certify the foregoing is a
true copy of the original court order.

MARILYN BEUTENMULLER
CLERK

cc:  Attorney General-W. Palm Beach
     Robert E. Lockwood, Clerk    (copy of motion attached)
     Public Defender 15

     /KB

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## FOURTH DISTRICT

TODD RICHARDSON,

    Appellant,

vs.

                               CASE NO.   98-4323

STATE OF FLORIDA,

    Appellee.



### UNOPPOSED
### MOTION TO SUPPLEMENT RECORD ON APPEAL
### ~~AND TOLL THE TIME FOR SERVICE OF INITIAL BRIEF~~

Appellant, by and through undersigned counsel, moves to supplement the record on appeal

with the original transcripts and toll the time for filing of the initial brief pending receipt of the

supplemental record.  As grounds, appellant states:

    1.  Appellant seeks review of the denial of his motion for post-conviction relief based upon

ineffective assistance of counsel after an evidentiary hearing.

    2. To prevail on an ineffectiveness claim, a defendant must show that counsel's performance

was outside the range of professionally competent assistance and whether except for the error of

counsel, a "reasonable probability' existed that the result of the trial would have been different.

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Review of the

original trial transcript is necessary to the latter determination.

    3. The trial transcripts were prepared for direct appeal in DCA case no. 97-0818.

    4.  Assistant Attorney General Georgina Jimenez-Oroso has ~~no objection to~~ this motion.

WHEREFORE, appellant requests that this Court direct the clerk to supplement the record on appeal with the original trial transcripts which had been filed in this Court in DCA Case no. 97-0818. Further, appellant requests that this Court toll the time for service of appellant's initial brief pending receipt of the supplemental record by the Office of the Public Defender.

Respectfully Submitted,

RICHARD L. JORANDBY
Public Defender
15th Judicial Circuit

MARCY K. ALLEN
Assistant Public Defender
Attorney for Appellant
Criminal Justice Building
421 Third Street, 6th Floor
West Palm Beach, Florida 33401
(407) 355-7600
Florida Bar No. 332161

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy hereof has been furnished by courier, to CELIA TERENZIO, Assistant Attorney General, 1655 Palm Beach Lakes Boulevard, Third Floor, West Palm Beach, Florida 33401, this 7th day of JANUARY, 1999.

MARCY K. ALLEN
Assistant Public Defender

- 2 -

| [X]  17th Judicial Circuit in and for Broward County<br>[ ]  In the County Court in and for Broward County | CLOCK IN |
|---|---|
| DIVISION:<br>[X] Criminal<br>[ ] Traffic<br>[ ] Other       **CERTIFICATE OF THE CLERK** | |
| | **CASE NUMBER**<br>98-4323 |

I, ROBERT E. LOCKWOOD, Clerk of the Circuit Court for the 17th Judicial Circuit, County of Broward, State of Florida,

do contain a correct transcript of the record of the judgment in the case of STATE OF FLORIDA vs _____

TODO RICHARDSON _____ and a true and correct recital and copy of all such papers and

proceedings in said cause as appears from the records and files of my office that have been directed to be included in said record

by the directions furnished me.

| | | |
|---|---|---|
| I | 1 | 82 |
| II | 85 | 112 |
| III | 113 | 272 |
| IV | 273 | 339 |
| V | 340 | 356 |

Volume _____ , pages _____ to _____ inclusive embrace the transcribed notes of the reporter as made at the

trial and certified to me by        HER _____ .

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Seal of said Court this _____28TH_____ day

of _____ JANUARY   1999 _____ .

ROBERT E. LOCKWOOD, Clerk
Circuit Court
Broward County, Florida

BY: _____
                    Deputy Clerk

```
                        IN THE CIRCUIT COURT OF THE
                        SEVENTEENTH JUDICIAL CIRCUIT,
                        IN AND FOR BROWARD COUNTY, FLORIDA

                                    )
TODD RICHARDSON,                    )
                                    )
          Appellant/Defendant,      )
                                    ) Case
vs.                                 ) No. 96-3122CF10C
                                    )
STATE OF FLORIDA,                   )
                                    )
          Appellee/Plaintiff.       )
-----------------------------------X

                            Broward County
                            Fort Lauderdale, Florida


                    ----------------------------------
                    APPEAL ON BEHALF OF THE DEFENDANT
                    ----------------------------------
```

ORIGINAL

```
                         VOLUME I (1)
                        Pages 1 to 82
```

2

1

2                          I-N-D-E-X

3

        __Date__                __Proceedings__                __Page__
4   January 13, 1997        Voir dire                        1-82

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                          IN THE CIRCUIT COURT OF THE
                            SEVENTEENTH JUDICIAL CIRCUIT IN
 2                          AND FOR BROWARD COUNTY, FLORIDA

 3    STATE OF FLORIDA,            )
                                   )
 4              Plaintiff,         )
                                   ) Case no. 3122CF10C
 5    vs.                          )
                                   )
 6    TODD RICHARDSON,             )
                                   )
 7              Defendant.         )
                                   )
 8    ------------------------------X

 9                           Fort Lauderdale, Florida
                             January 13, 1996
10                           2:30 o'clock p.m.

11    APPEARANCES:

12          OFFICE OF THE STATE ATTORNEY
            By:  ALBERTO MILIAN, ESQ.
13          Appearing on behalf of the Plaintiff

14          OFFICE OF THE PUBLIC DEFENDER
            By:  WILLIAM LASWELL, ESQ.
15          Appearing on behalf of the Defendant

16                      ----------------

17          The above-styled cause came on for jury trial,

18    before the Honorable WILLIAM P. DIMITROULEAS, Presiding

19    Judge, at the Broward County Courthouse, Fort

20    Lauderdale, Broward County, Florida, on the 13th day

21    of January, 1997, commencing at 2:30 o'clock p.m.

22

23

24

25
```

1

1          (Thereupon, the following proceedings were had:)

2          MR. LASWELL:  May I approach the bench, Judge?

3          THE COURT:  Okay.

4          MR. LASWELL:  Judge, Mr. Richardson is on for

5     today.  And as I've indicated to the Court I'm ready.

6          THE COURT:  Right.

7          MR. LASWELL:  However, we're sort of getting a

8     late start here if at all.  Mr. Milian's not here.

9     But I think the Court should know I've got a pnealty

10    phase Thursday.

11         THE COURT:  We'll be done by then.

12         MR. LASWELL:  I could use Wednesday to work on

13    it.

14         THE COURT:  We'll be done by tomorrow.

15         MR. LASWELL:  Maybe we can be done today.

16         THE COURT:  No, I don't think we'll get it done

17    today.  I'm sure Mr. Milian will be here.

18         MR. LASWELL:  I am, too.  He hasn't missed yet.

19         THE COURT:  I'm sure Mr. Milian will be here.

20         MR. LASWELL:  Well, I just want the Court to know

21    because Judge Cohn is sort of counting on me.

22         THE COURT:  Okay.  Well, I think we'll be done by

23    then.

24         BAILIFF DELONG:  Who was that on, Judge?

25         THE COURT:  That was on Mr. Richardson.

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1       THE DEFENDANT: Yes, sir.

2       THE COURT: Keep it on recall.

3       (Thereupon, matters unrelated to this case were

4   heard, after which the following proceedings were

5   had:)

6       THE COURT: On Richardson, who's the prosecutor

7   on Mr. Richardson?

8       MR. MILIAN: I am, Judge.

9       THE COURT: Any plea offers on Mr. Richardson's

10  case? Where is Mr. Richardson at?

11      THE DEFENDANT: Right here, sir.

12      MR. MILIAN: I believe I had offered him two

13  hundred and forty-six months as a violent habitual

14  offender.

15      THE COURT: You don't want that, Mr. Richardson,

16  right?

17      THE DEFENDANT: Excuse me, what was his offer?

18      THE COURT: Two hundred forty-six months as a

19  violent habitual offender. You can plea open to me

20  hoping I'll give you less than that realizing I could

21  give you more than that.

22      MR. LASWELL: Twenty years.

23      THE COURT: Or we could go to trial on the case.

24  You want to have a trial, right?

25      THE DEFENDANT: Yes, sir.

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1          THE COURT:  Okay.  And how long, how many

2     witnesses does the State have on Mr. Richardson

3     approximately?

4          MR. MILIAN:  About a dozen, Judge.

5          THE DEFENDANT:  Your Honor.

6          MR. MILIAN:  About a dozen witnesses.

7          THE DEFENDANT:  Your Honor.

8          THE COURT:  All right.  So if we pick a jury this

9     afternoon and start the trial tomorrow morning, can we

10    finish it tomorrow or will it take till Wednesday do

11    you think?

12         MR. MILIAN:  I think at least until Wednesday,

13    Judge.

14         THE COURT:  We'll see if we can finish the

15    testimony tomorrow.  Does the defense anticipate any

16    witnesses other than maybe Mr. Richardson?

17         MR. LASWELL:  Nominal.

18         THE COURT:  Okay.  So we'll pick a jury on Mr.

19    Richardson.

20         MR. LASWELL:  I assume you'll give me some

21    instruction on how you do this.

22         THE COURT:  You go first.  You'll go first.  It's

23    just the regular way.

24         MR. LASWELL:  All right.

25         THE COURT:  And then maybe we'll -- who's the

1     other one that wanted to go to trial.  Mr. Narducci's

2     client.  Maybe we'll pick Mr. Narducci and Mr. Hicks

3     second.  That's a strong arm robbery on Mr. Hicks?

4     Who's the prosecutor on that?

5          MR. GHATTAS:  Like I said, Judge, the

6     prosecutor's in trial in another division.

7          THE COURT:  Oh.

8          MR. GHATTAS:  In that case.

9          THE COURT:  Maybe I've got to continue that then.

10          DEFENDANT RICHARDSON:  Excuse me, Mr.

11     Dimitrouleas.

12          THE COURT:  Right.

13          DEFENDANT RICHARDSON:  How can you give a man

14     twenty years for never touching the gun?

15          THE COURT:  Don't talk about the facts of the

16     case.

17          DEFENDANT RICHARDSON:  Or never, never driving

18     the car.

19          THE COURT:  Talk to your lawyer first.

20          DEFENDANT RICHARDSON:  How can you give a man

21     twenty years?

22          THE COURT:  After talking to your lawyer, you can

23     tell me and the jury whatever you want to say.

24          DEFENDANT RICHARDSON:  Offer a man twenty years.

25          THE COURT:  Maybe we'll try Mr. Marchetta's case

1    second.

2         Mr. Marchetta, let me explain to you how I like

3    to pick a jury.  Where is Mr. Laswell at?

4         MR. LASWELL:  Listening with bated ear.

5         THE COURT:  We'll bring in thirty jurors that we

6    selected at random in the jury assembly room.  We'll

7    seat them in the order that they were selected, one

8    through seven in the first row.  Eight through

9    fourteen in the second row.  Four rows of four all

10    going right to left.

11         I'll make some preliminary comments to the

12    jurors.  Explain to them what the jury system is all

13    about.  I'll ask them to give us some background

14    information in the form of their answers to the

15    questionnaires that will be laying on their seats, a

16    copy of which the attorneys will have.

17         I'll give the first set of attorneys an

18    opportunity to talk to the first thirty jurors.  After

19    we've done that, we'll excuse the jury.  I'll take

20    challenges for cause first.  After you've done that,

21    I'll ask the State if they have any challenges as to

22    the first six.

23         Let's assume they bump off Juror Number 1.  Then

24    I'll ask Mr. Laswell if he has any challenges two

25    through seven.  And we'll go back and forth until you

1    all have either agreed on six jurors or have exhausted

2    your ten peremptory challenges.  Once we have six

3    jurors, we'll pick an alernate.  Each of you will have

4    one challenge for the alternate irrespective of how

5    many of the other ten challenges you may have used and

6    back striking is permissible.

7        After we select those six jurors, we'll excuse

8    them until tomorrow morning.  Then we'll continue and

9    select six jurors on Mr. Mathis' case.  And we'll

10   start off wherever we left off on Mr. Richardson's

11   case.  In other words, if Juror Number 14 was the

12   alternate juror in Mr. Richardson's trial, then the

13   first six we'll be looking at to select from on Mr.

14   Mathis will be fifteen through twenty.

15       And we'll work our way back to Juror 30.  If we

16   don't pick a jury by Number 30, we'll come back around

17   to Number 1, whoever was left over, and work our way

18   through the ones that weren't selected in the first

19   case.  And we'll bring that jury back Wednesday

20   afternoon.  Any questions?

21       MR. MARCHETTA:  No, Judge.

22       MR. MILIAN:  No, Your Honor.

23       MR. LASWELL:  No.

24       (Thereupon, matters unrelated to this case

25   were heard, after which the following proceedings were

```
1    had:)

2           THE COURT:  Okay.  Whenever you're ready, Pat,

3    let's bring in the jury.

4           MR. LASWELL:  Judge, is this the order of the

5    line up?

6           THE COURT:  Right down the list the way they were

7    selected at random by the computer.

8           MR. LASWELL:  All right.

9           THE COURT:  Mr. Schulson, your first name is

10   David?

11          MR. SCHULSON:  David, yes, sir.

12          (Thereupon, the prospective jury entered the

13   courtroom, after which the following proceedings were

14   had:)

15          THE COURT:  Okay.  Pat, if we can swear the panel

16   in.

17          THE CLERK:  Would everyone please stand and raise

18   your right hand?

19          (Thereupon, the prospective jury was duly sworn

20   by the clerk of the court.)

21          THE CLERK:  Please be seated.

22          THE COURT:  Well, good afternoon.  I'm Bill

23   Dimitrouleas, and welcome to the criminal division of

24   the Circuit Court of the 17th Judicial Circuit in and

25   for Broward County, Florida.  We're here today to pick
```

1    two different juries on two different cases.  They

2    have nothing to do with each other.  But we're going

3    to kind of pick them one after the other out of the

4    same panel to save a little time.  And speaking of

5    time, I want to take this opportunity now to apologize

6    to you for our tardiness in getting started here

7    today.  We've been going since about 8:30 this morning

8    on other cases and we've had just one of those days.

9    It's been a busy day.

10         The lawyers were here ready, willing and able to

11    go this morning.  So don't hold it against them that

12    we're getting a late start.  Hold it against me.  I

13    just had too many cases set on the docket for today.

14    But now that we've gotten started, hopefully, we can

15    hit the ground running.

16         Now let's talk a little bit about scheduling.

17    We're going to try to pick both juries this afternoon

18    on both of these two different cases.  If you're

19    selected on the first case, you'll come back tomorrow

20    about 10:30 and try the case.  And we'll work till say

21    10:30 till noon.  Take a break for lunch.  Come back

22    after lunch.  Continue with the trial in the

23    afternoon.  And if we don't finish the case tomorrow

24    morning -- tomorrow evening, then we'll come back and

25    finish it up Wednesday morning.  So that's the time

3

1    schedule if you're selected on the first case.

2        If you're selected on the second case, then

3    you're off tomorrow.  You don't have to come tomorrow.

4    Go to work, do whatever you want to do and we're going

5    to resume that trial Wednesday afternoon about 1:30.

6    And, again, we'll work till around five thirty or six

7    o'clock in the evening.  Come back and finish the case

8    up on Thursday.  So that kind of gives you an idea of

9    what to expect scheduling-wise should you be selected

10   as a juror in either of these two cases.

11       Now was everybody down in the jury assembly room

12   this morning about eight, eight fifteen when all those

13   questions would have been asked of you touching on

14   your qualifications to serve on jur -- serve as a

15   juror and that is, are you over the age of eighteen,

16   all those questions?

17       Anybody that was a little late getting here this

18   morning and wasn't asked all those questions?  If so,

19   please raise your hand.  Don't see any hands.  So I

20   take it by that that everybody here is a registered

21   voter.  Anyone who's not a registered voter please

22   raise your hand.  Don't see any hands.  So clearly

23   everybody here is qualified to sit as a juror in

24   either of these two cases.

25       Okay.  Let me take a few moments to introduce to

13

1     you to some of the court personnel we're going to be

2     working with during the trial.  You've already met Pat

3     Lavigne who's the court clerk.  Pat's in charge of all

4     the paperwork in the case.  Kind of operates as the

5     judge's secretary in the courtroom.  If there's any

6     evidence that's introduced into the trial, it's into

7     her care, custody and control that it goes.

8          Kim Kidd's our court reporter.  Kim's taking down

9     everything that I'm saying right now and will take

10    down everything that is said during the course of this

11    trial in this courtroom including your answers to the

12    questions during jury selection.  So if you would,

13    please speak up nice and loudly and clearly so that

14    Kim can get your answers down.  And again she's been

15    working now almost nonstop since 8:30.  I think we're

16    going have a substitute court reporter come in in a

17    little while this afternoon.  So if Kim leaves halfway

18    through the proceedings, that's the reason why.  We

19    don't want her fingers to fall off.

20         Representing the State of Florida in the first

21    trial is Assistant State Attorney Al Milian.

22         MR. MILIAN:  Good afternoon, ladies and

23    gentlemen.

24         THE COURT:  Defense counsel is Bill Laswell.

25         MR. LASWELL:  Hi, everybody.

14

1       THE COURT:  Mr. Laswell, if you can introduce

2   your client.

3       MR. LASWELL:  This is Mr. Todd Richardson.

4       THE COURT:  Anybody know Mr. Richardson, either

5   of the two lawyers or any of the court personnel?  If

6   so, please raise your hand.  Don't see any hands.  A

7   little later on the attorneys in the first case will

8   have an opportunity to read to you a list of possible

9   witnesses who might testify.

10      If you happen to know any of those witnesses,

11  please let us know.  That's something that the

12  attorneys may want to check into to see if it would

13  affect your ability to be a fair and impartial juror.

14  I'll introduce to you the attorneys and the defendant

15  in the second case a little later on this afternoon.

16      Okay.  What I'm going to do at this time is I'm

17  going to give you some background information about

18  picking a jury in general and specifically about, you

19  know, I guess I'm going to give you some general

20  information about trying a criminal case in general.

21  And specifically about picking a jury in a criminal

22  case.  Then I'm going to ask you all to give us some

23  background information about yourselves in the form of

24  your answers to the questionnaires that were on your

25  seats when you came in.  And I'm going to ask you to

15

1    stand, if you would, when you give your answer.  It

2    will make it a little bit easier for everybody and Kim

3    in the courtroom to hear your answers.

4        Once we've gotten that background information,

5    I'm going to turn it over to the first set of

6    attorneys.  Give them an opportunity to ask you some

7    questions.  And when all the questioning is done, the

8    lawyers and I and Mr. Richardson will get together and

9    we'll select the six jurors and one alternate to serve

10   on this first trial.

11       Now this part of the case is known as voir dire

12   examination.  And voir dire examination is for the

13   purpose of determining if your decision in this case

14   would in any way be influenced by opinions which you

15   now hold or by some personal experience or special

16   knowledge which you may have concerning the subject

17   matter to be tried.  The object of voir dire

18   examination is to obtain seven persons who will

19   impartially try the issues of this case based upon the

20   evidence presented in the courtroom without being

21   influenced by any other factor.

22       Now please understand that this questioning is

23   not for the purpose of prying into your affairs for

24   personal reasons but is only for the purpose of

25   obtaining a fair and impartial jury.  Now as I

1        mentioned, when all the questioning is done, Mr.

2        Richardson, myself and the attorneys are going to get

3        together and we're going to select the jury.

4            And the way that works is kind of a process of

5        elimination.  Because the attorneys have an

6        opportunity to challenge or excuse prospective jurors.

7        And during that challenging process each side has a

8        certain number of peremptory challenges.  And by that

9        I mean that each side can challenge you and ask that

10       you be excused and they don't even have to give a

11       reason.  But they only have a limited number of those

12       peremptory challenges.

13           Additionally, each side has an unlimited number

14       of challenges for cause.  And by that I mean that each

15       side can challenge you and ask that you be excused,

16       but in that situation they have to give a reason, and

17       I have to agree with that reason.  Now if you're

18       excused by either side for either reason please do not

19       feel that your honesty or integrity is being

20       questioned because it is not.

21           Now this first case is the State of Florida

22       versus Todd Richardson.  And I'm now going to read to

23       you the pertinent portion of the Information which

24       sets forth the charges against the defendant.  The

25       Information is not to be considered as evidence but is

17

1    a mere formal charge against the defendant.  You must

2    not consider it as any evidence of the defendant's

3    guilt.  And you must not be influenced by the fact

4    that this Information has been filed against a

5    defendant.

6        The Information charges that Todd Richardson

7    along with two other people not on trial here today,

8    in Broward County, Florida, on the 19th day of

9    February, 1996, in Broward County, Florida, did

10   unlawfully take from the person or custody of Linda

11   Butler, certain property of value, that is, jewelry

12   with the intent to permanently or temporarily deprive

13   her of the right to the property or a benefit

14   therefrom, by the use of force, violence, assault or

15   putting her in fear and in the course thereof there

16   was carried a firearm.  That firearm being in the

17   possession of another person, Travis Russel.

18       Count II charges the same thing except the

19   alleged victim was Erica Outridge and the alleged

20   property taken was jewelry and money.

21       Count III charges on the same date, February

22   19th, 1996 in Broward County, Florida, that Todd

23   Richardson along with two other people not on trial

24   here today did unlawfully and forcibly and secretly or

25   by threat confine, abduct or imprison Erica Outridge

1    against her will and without lawful authority with the

2    intent to commit or facilitate the commission of a

3    felony, that is, robbery.  And in the course thereof

4    there was carried a firearm being in the possession of

5    Travis Russel.

6         Count IV charges on the same date in Broward

7    County Florida, oops, that's -- Mr. Richardson's not

8    charged in Count IV.  That's someone else who's not on

9    trial here today.  So Count I and Count II charge

10   armed robbery.  Count III charges armed kidnapping.

11        Now you all have heard the charges made in the

12   Information against the defendant.  Do any of you know

13   anything about this case either through your own

14   personal knowledge, rumor or by discussion with anyone

15   else?  And if you know anything about the case, please

16   raise your hand.  Don't see any hands.  Has anybody

17   read or heard anything about the case in any of the

18   news media?  If so, please raise your hand.  Don't see

19   any hands.

20        Does anybody have a state of mind with reference

21   to the charges against this defendant which would in

22   any way prevent you from acting with impartiality?  If

23   so, please raise your hand.  Don't see any hands.

24   Does anybody have any physical defects, hearing, sight

25   or otherwise which would render you incapable of

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1    performing your duty as a juror in this case?  If so,

2    please raise your hand.  Don't see any hands.

3         Does anybody have any bias or prejudice either

4    for or against the defendant or for or against the

5    State?  If so, please raise your hand.  Don't see any

6    hands.  Now if you're selected as a juror in this

7    case, will render a fair and and impartial verdict

8    based upon the evidence presented in the courtroom and

9    the laws that pertain to this particular case as

10   instructed by the Court?  If you can't do that, please

11   raise your hand.  Don't see any hands.

12        And does anybody have any other reason why you

13   couldn't give this case your undivided attention and

14   render a fair and impartial verdict?  If so, please

15   raise your hand.  Don't see any hands.

16        Okay.  At this point I'm going to ask you all to

17   give us that background information in the form of

18   your answers to the questionnaires that were on your

19   seat.  And if you could stand when you give your

20   answer, it will make it a little bit easier for us.

21   Mr. Perez, if you can go first please, sir.

22        MR. PEREZ:  Yes, sir.  My name is Richard Perez.

23   Spelling P-E-R-E-Z.  Years of residence in Florida,

24   twenty-two years.  Former residence, New York City,

25   New York.  Present occupation, civil engineer for the

```
1    State of Florida.  Marital status, single.  Never
2    served as juror before.  I'm not related or a friend
3    of an officer.  Never been arrested or immediate
4    family.  And never been a witness either.  Hobbies is
5    boating, water skiing, flying airplanes.
6         THE COURT:  Thank you, sir.  Mr. Constant.
7         MR. CONSTANT:  My name is Castera Carl Constant,
8    C-O-N-S-T-A-N-T.  I live in Florida for five years.
9    Former residence New York State, Rockland County.
10   Present occupation, real estate salesman.  Married.  I
11   have three children.  I never serve as a juror before.
12   I'm not related to any law enforcement officer.  I
13   have been arrested December 31st, 1996.  Member of my
14   family never been victim of any crime.  I never been
15   the witness of any crime.  Hobbies, soccer, tennis and
16   basketball.
17        THE COURT:  Thank you, sir.  Ms. Feindt.
18        MS. FEINDT:  My name is Pauline Feindt,
19   F-E-I-N-D-T.  I live in Broward County, Hollywood,
20   thirty-nine years.  I'm a retired Bell South employee.
21   I retired last year with twenty nine and-a-half years.
22   My husband is also retired, AT&T.  I have three
23   children.  One is a federal -- with the federal post
24   office.  One works with Warner Lambert Pharmaceutical
25   company.  I have a daughter in Georgia who is a
```

1       beautician.  I've served as a juror before.  As a

2       matter of fact, I get called every year.

3            THE COURT:  Aren't you lucky.

4            MS. FEINDT:  Every year.  So I have a nephew, my

5       husband's nephew in Gainesville who's a highway

6       patrolman.  I've never been arrested.  I have a

7       daughter that had a home burglary in Weston about two

8       years ago.  I've never been a witness to a crime.  And

9       I have gardening as my hobby.

10           THE COURT:  Thank you, ma'am.

11           MS. FEINDT:  Thank you.

12           THE COURT:  Is it Ruiz?

13           MS. RUIZ:  That's me.

14           THE COURT:  Is it misspelled on the --

15           THE CLERK:  Yes, it is.

16           THE COURT:  It's supposed to be Ruiz.

17           MS. RUIZ:  R-U-I-Z.

18           THE COURT:  It's R-U-I-Z.

19           MS. RUIZ:  Yeah.

20           THE COURT:  It's misspelled.  Go ahead.  I'm

21       sorry, ma'am.

22           MS. RUIZ:  Okay.  My name is Sherry Ruiz.  It's

23       R-U-I-Z.  I live in Pompano Beach.  I've been a

24       resident for twenty-five years.  Cleveland, Ohio was

25       my former residence.  My occupation is consumer loan

```
 1        in Capital Bank.  And I am married.  My husband works

 2        for Pizza Hut.  I have no children.  I have served as

 3        a juror many, many times.  Do you want to know how

 4        many times?

 5             THE COURT:  Sure.

 6             MS. RUIZ:  Three within the last seventeen years.

 7        I'm not related to anybody in law, law enforcement.

 8        Nobody's been arrested in my family.  Never been a

 9        victim of crime.  Never been a witness.  And my

10        hobbies are diving and snow skiing.

11             THE COURT:  Thank you, ma'am.  Ms. McNeil.

12             MS. MCNEIL:  Ann McNeil, M-C-N-E-I-L.  I live in

13        Lighthouse Point.  I've been here for seventeen years.

14        I came from Pennsylvania.  I'm a nurse.  I work at

15        Hospice by the Sea.  I'm married.  My husband's a

16        homemaker.  I have four children.  They're all under

17        ten.  Never served as a juror.  And I'm not related.

18        No arrests, no victim, no witness.  I would have a

19        hardship serving Wednesday.  One of my sons is having

20        surgery for a bone tumor.  So I wouldn't be able --

21             THE COURT:  What time on Wednesday is it going to

22        be?

23             MS. MCNEIL:  University of Miami, six a.m.

24             THE COURT:  In the morning.

25             MS. MCNEIL:  I mean, I can get a note.
```

1          THE COURT:  If you were selected on the second

2     case to start Wednesday afternoon, is that still a

3     problem?

4          MS. MCNEIL:  Might be depending on the surgery.

5          THE COURT:  Okay.  I appreciate you mentioning

6     that, Ms. McNeil.  Ms. Farrington.

7          MS. FARRINGTON:  Yes.  My name is Jill

8     Farrington.  My last name is F-A-R-R-I-N-G-T-O-N.  I

9     live in Deerfield Beach for thirty-nine years.  I'm a

10    tester at Motorola.  I'm married.  My husband works at

11    the City of Deerfield.  I have five children.  Three

12    of them are employed.  One at Target.  One is at the

13    movie theater.  One with the after school program.  I

14    have never served on a jury before.  None of my close

15    friends are law enforcement officers.  I've never been

16    arrested.  Not been convicted of a crime, a witness to

17    a crime.  My hobby is sewing.

18         THE COURT:  Thank you, ma'am.  Ms. Henry.

19         MS. HENRY:  Annie Henry, H-E-N-R-Y.  I live in

20    Deerfield Beach for thirty-six years.  Former

21    residence, North Carolina.  Homemaker.  Married.

22    Three children.  One is a supervisor, personnel

23    supervisor for Walmart.  One works as a supervisor in

24    a lumber company in North Carolina.  And another is a

25    supervisor in an electronics firm near Broward County.

24

1        I've served as a juror before on a civil case.

2    Never a foreperson.  No close friend or relative of

3    law enforcement.  Have never been arrested.  Have no

4    member of immediate family a victim of a crime.  And

5    have never witnessed a crime.  And my hobbies are

6    reading.

7        THE COURT:  Thank you, ma'am.  Mr. Smith.

8        MR. SMITH:  My name is Don Smith, S-M-I-T-H.  I

9    live in Broward County for twenty-eight years.  In

10   Hollywood.  Before that it was -- it was Miami.

11   Present occupation I sell life insurance and annuities

12   for the Knights of Columbus.  I'm married.  My wife is

13   self-employed.  She paints porcelain and teaches

14   porcelain painting.  I have three children.  My son

15   works as a graphics specialist in Hollywood.

16       I have served on a jury before in a civil case.

17   I'm not currently a -- I don't know any law

18   enforcement people.  I have not been arrested.  Nor

19   has anyone in my family.  I have been -- I have been a

20   victim of a crime.  It was a robbery at gunpoint.  And

21   I have other than that I have not been a witness to a

22   crime.  And my hobbies are golf and pool.

23       THE COURT:  Thank you, sir.  Ms. Ellison.

24       MS. ELLISON:  My name is Margo Ellison,

25   E-L-L-I-S-O-N.  I've lived in Broward County in

1      Hollywood.  I've lived in Florida for ten years.

2      Before that I lived in Quincy, Massachusetts.  I

3      manage contracts for Broward County elderly services.

4      I'm married.  My husband is an administrator of

5      Goodwill Industry in Miami.  I have two children.  One

6      is a salesman.  The other works for the gas company as

7      a training officer.

8          I've never served on the jury before.  And no one

9      I know is a law enforcement officer.  No one has been

10     arrested in my family.  My husband had some things

11     stolen from his apartment in Boston.  I've never

12     witnessed a crime.  And I enjoy riding and swimming.

13          THE COURT:  Thank you, ma'am.  Ms. Gallagher.

14          MS. GALLAGHER:  Yes.  My name is Christy

15     Gallagher, G-A-L-L-A-G-H-E-R.  I have lived in Broward

16     County for fifteen years.  My former residence was

17     Buffalo, New York.  I'm a pediatric medical assistant.

18     And I am married but separated.  My husband works for

19     the City of Lauderhill.  I have two children.  I

20     served as a juror about twenty years ago and a grand

21     jury in Buffalo.  No friends.  I was the victim of a

22     crime.  I had had my car stolen about two years ago.

23     No witness.  And hobbies, bowling, gardening, reading.

24          THE COURT:  Thank you, ma'am.  Ms. Moultry.

25          MS. MOULTRY:  My name is Sharon Moultry,

1    M-O-U-L-T-R-Y.  I live here in Lauderdale Lakes.  I've

2    been a resident of Florida all of my life.  I'm not

3    employed at this time.  But I was currently employed,

4    I mean, recently employed with Motorola.  I'm single.

5    I have three kids.  Never served as a juror.  I have a

6    cousin that's married to a law enforcement officer.

7    He works with BSO.  And I've never been arrested.  But

8    I have two brothers that are currently incarcerated at

9    this time.  I have an aunt and uncle that were victims

10   of a home invasion.  And I've never been a witness to

11   a crime.  My hobbies are exercising and traveling.

12        THE COURT:  Thank you, ma'am.  Mr. Garcimonde.

13        MR. GARCIMONDE:  My name is Manny Garcimonde,

14   G-A-R-C-I-M-O-N-D-E.  I live in Plantation, Florida.

15   In Broward County.  I have lived in Florida for

16   thirty-six years.  My present occupation is a teacher

17   for the Broward County school system.

18        THE COURT:  Tropical?

19        MR. GARCIMONDE:  Yes, sir.

20        THE COURT:  I remember.  You taught my stepson.

21   Go ahead.

22        MR. GARCIMONDE:  My marital status is married.

23   My spouse is also an employee for the Broward County

24   schools.  I have two children, two high school age

25   children.  I have served as a juror before in a civil

1    case.  I was not the foreperson of the jury.  I am not

2    a close friend or related to any law enforcement

3    officer.  I have been arrested, eighteen years ago in

4    Miami.  I have never been the victim of crime nor my

5    immediate family.  I have never witnessed a crime.  My

6    hobbies are reading and traveling.

7         THE COURT:  Thank you, sir.  Ms. Dhue.

8         MS. DHUE:  It's Dhue.

9         THE COURT:  Dhue.

10         MS. DHUE:  My name is Debra Dhue.  D-H-U-E is the

11    last name.  I live in Pembroke Pines.  I've been here

12    about fifteen years.  Before that I lived in Niagara

13    Falls, New York.  I'm employed by the U.S. Postal

14    Service.  I'm an address management systems

15    specialist.  My husband is a chef.  Oops.  I am

16    married.  Happily.  My husband is a chef.  We have two

17    children under age five.  They don't work, yet.

18         And I've never been on a jury before.  I have no

19    one related to me or close friend in law enforcement.

20    And I have never been arrested or anyone in my family.

21    And never been the victim of a crime.  Never witnessed

22    a crime.  And hobbies, I love to travel and read.

23         THE COURT:  Thank you, ma'am.  Mr. Hagan.

24         MR. HAGAN:  My name is Terry Hagan, H-A-G-A-N.  I

25    live in Pompano Beach.  Been there about eighteen

```
 1    years.  Originally from Sioux City, Iowa.  I work for
 2    Bell South as a cable repairman.  I'm married.  My
 3    wife works for Embraer Aircraft.  I have two children.
 4    They're both students.
 5         I was a juror once.  Not related to any law
 6    enforcement officer.  No member of -- no member of
 7    family has been arrested.  I did have my car stolen
 8    about eighteen years ago.  And I've not been a witness
 9    to any crime.  And my hobby is reading and working on
10    my home.
11         THE COURT:  Thank you, sir.  Ms. Lee.
12         MS. LEE:  Tracy Lee, L-E-E.  I live in Pompano
13    Beach.  I have been in Florida thirty years.  Before
14    that I was a kid in Chicago.  I do data entry.  My
15    husband -- I'm married.  My husband is production
16    supervisor at a pharmaceutical company.  I have three
17    kids.  One is a singer.  One is a bartender.  And one
18    does part-time refereeing.
19         I was a juror on a civil crime two years ago.
20    Was not the foreperson.  Don't know any law
21    enforcement officers.  Two brothers who have been
22    arrested years ago.  Crime, my house has been broken
23    into three or four times in the past fifteen years.
24    And my first husband was murdered about eight years
25    ago.  I like biking, reading and skiing.
```

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1       THE COURT:  Thank you, ma'am.  Mr. Sartwell.

2       MR. SARTWELL:  My name is Walter Sartwell.

3   Spelling of last name is S-A-R-T-W-E-L-L.  I live in

4   Margate in Broward County.  Resident of Florida about

5   twenty-three years.  Out of Chicago.  I'm production

6   manager for a data systems company.  I'm married.  My

7   wife's a housewife.  And I have four children.  One of

8   my sons is a -- works for the state as an employment

9   counselor.  One is a laser technician and another two

10  girls are housewives.

11      I've never served on a jury before.  I do have a

12  granddaughter who's married to a Seminole County

13  patrol officer.  I've never been arrested, and I have

14  a grandson who has been.  And it was under Seminole

15  County jurisdiction.  And I have never seen a crime or

16  been involved in one.  My hobbies are golf.

17      THE COURT:  Thank you, sir.  Ms. Myers.

18      MS. MYERS:  Julia Myers, M-Y-E-R-S.  I live in

19  Broward twenty years.  About twenty-three.  Former

20  residence Dover, New Jersey.  Retired.  I'm a widow.

21  I have two children grown in Dover, New Jersey.  I

22  have never served as a juror.  I have no close friends

23  or related to an officer.  I have not been arrested.

24  I have been a victim of crime.  I was mugged once, and

25  my car was stolen once.  And I was never a witness to

1     a crime.  And my hobby is yard work.

2          THE COURT:  Thank you, ma'am.  Mr. Schoenebeck.

3          MR. SCHOENEBECK:  Hans Shoenebeck,

4     S-C-H-O-E-N-E-B-E-C-K.  Lived for seventeen years

5     Coral Springs.  Former residence is Long Island, New

6     York.  I'm retired from the New York City Police

7     Department.  Married.  I have two daughters go to

8     college.  Never served as a juror before.  Neither

9     myself.  Never been arrested.  Never -- nobody in my

10    family was arrested.  I have witnessed many crimes.

11    My hobby is traveling.

12         THE COURT:  Thank you, sir.  Ms. Boardman.

13         MS. BOARDMAN:  My name is Francis Boardman,

14    B-O-A-R-D-M-A-N.  I have been in Broward County since

15    1960.  I now reside in Hollywood, Florida.  I am a

16    retired school teacher for thirty-seven years.  Did I

17    tell you?  I came from West Virginia.  I'm a West

18    Virginian.  I am a widow.  My husband was a court

19    reporter.  Had his own business in Hollywood.

20    Boardman & Associates.  I have one child.  She went --

21    works for Winn-Dixie.

22         I have never been a juror before.  I've been on

23    jury selection but never made it to the panel.  I mean

24    right next to the trial.  I am not related to any law

25    officers.  I have been victimized twice, robbed.  I

1    now have a security system on my house.  My daughter

2    at Winn-Dixie was robbed at gunpoint.  That was quite

3    an experience.  But I myself have never been a victim

4    of a crime.

5         THE COURT:  Thank you, ma'am.  Mr. Schwartz.

6         MR. SCHWARTZ:  My name is Steven Schwartz,

7    S-C-H-W-A-R-T-Z.  Lived in Broward County for

8    twenty-seven years.  I've worked for Home Owner's

9    Group Real Estate Service Company in accounts

10   receivable.  I'm single.  I have never served on a

11   jury panel before.  No close friends or relation as a

12   law enforcement officer.  No family member or myself

13   has been arrested.  None have been victims of crime.

14   And I have not been a witness to crime.  My hobbies

15   are gardening and tropical fish.

16        THE COURT:  Thank you, sir.  Mr. Rosenblum.

17        MR. ROSENBLUM:  Your Honor, my name is Richard

18   Rosenblum, R-O-S-E-N-B-L-U-M.  I live in Davie,

19   Florida.  And I've lived in Florida since the early

20   70's.  Previous I lived in the Washington, D.C. area.

21   I'm a civil trial lawyer.  I do not do criminal

22   trials.  And I'm a partner in the firm of Walton,

23   Lantoff, Schroeder and Carson.

24        I'm married.  I have two small children.  My wife

25   is disabled and not employed outside of the house.  I

1    have never served as a juror before.  But I would like

2    to.  I do not have any close friends who are law

3    enforcement officers.  No member of my immediate

4    family has ever been arrested nor have I.  I had a car

5    stolen in approximately 1980.  And I have not

6    witnessed any other crimes, and my hobbies are reading

7    and jogging.

8         THE COURT:  Thank you, sir.  Ms. Crane.

9         MS. CRANE:  Yeah.  My name is Patricia Crane,

10   C-R-A-N-E.  I live in Hollywood.  For twenty-four

11   years.  I used to live in Connecticut.  I'm a

12   housewife.  I'm married.  My husband works for A

13   Culture Court.  He's an instructor.  I have two

14   teen-age boys.  The oldest works for Subway.  I have

15   never been a juror before.  I have no friends or

16   related to a law enforcement officer.  My husband was

17   arrested in Broward County fourteen years ago.  My

18   brother is on probation at this time from the State of

19   Connecticut.  I've had my purse stolen, and my

20   brother's been robbed at gunpoint.  No witness to a

21   crime, and my hobby is golf.

22        THE COURT:  Thank you, ma'am.  Ms. Yeomans.

23        MS. YEOMANS:  My name is Faye Yeomans.  My last

24   name is Y-E-O-M-A-N-S.  I live in Oakland Park.  I've

25   been here for eighteen years.  I'm formerly from

1    Pennsylvania.  I work for Allied Signal in the

2    marketing department.  Not married.  I've never served

3    as a juror before.  I do have a friend that works on

4    the Fort Lauderdale police reserves.  I do not have a

5    member of my family that's been arrested nor have I.

6    Nor a victim.  Nor have I been a witness.  And my

7    hobbies are arts and crafts and writing.

8          THE COURT:  Thank you, ma'am.  Mr. Fastov.

9          MR. FASTOV:  Laurence Fastov, F-A-S-T-O-V.  I

10   live in Dania, Broward County, Florida.  I'm in

11   Florida from approximately fourteen years.  From

12   Brooklyn, New York.  My present occupation is with the

13   City of Fort Lauderdale as the assistant parking

14   manager.  I'm single.

15         I have served as juror before approximately

16   twenty years ago in New York on a criminal case.  I

17   don't remember it.  I don't have any close friends or

18   relatives as law enforcement officers.  My family and

19   myself have never been arrested nor have we witnessed

20   or been victims of crimes.  And my hobby right now is

21   weight training.

22         THE COURT:  Thank you, sir.  Ms. Guldstrand.

23         MS. GULDSTRAND:  My name is Karen Guldstrand,

24   G-U-L-D-S-T-R-A-N-D.  I live in Sunrise, Florida.  I'm

25   a native Floridian.  Been here all my life.  My

1    present occupation, I'm a Humana payroll coordinator

2    for Dr. Hans Morgan in Margate.  I'm single.  I have

3    no children.  I have served as a juror before both on

4    a civil and a criminal trial.  I do have a cousin who

5    is on the Florida Highway Patrol in Dade County.  No

6    member of my immediate family has ever been arrested

7    nor myself.  I'm not the victim of a crime nor have I

8    witnessed a crime.  And my hobbies are tropical fish

9    and photography.

10         THE COURT:  Thank you, ma'am.  Ms. Nowell.

11         MS. NOWELL:  My name is Gail Nowell.  It's

12    N-O-W-E-L-L.  I've lived in Broward County for

13    twenty-four years.  In Hollywood.  My former residence

14    was Boston, Massachusetts.  I am a bookkeeper with

15    Moody Accounting.  I am married.  No children.  I've

16    served as a juror on a civil trial here about three

17    years ago in Broward County.  I was not the

18    foreperson.  My husband's a correctional officer with

19    Metro-Dade Corrections and Rehabilitation for the past

20    twenty-five years.  And my close friends are sergeants

21    with Metro-Dade Corrections.  Okay.  My home has been

22    burglarized about two years ago.  I have not witnessd

23    a crime.  And my hobbies are camping, reading and arts

24    and crafts.

25         THE COURT:  Thank you, ma'am.  Mr. Prisco.

1          MR. PRISCO:  My name is John Prisco, P-R-I-S-C-O.

2    I live in Coral Springs.  I've been a resident of

3    Florida for fourteen years.  I used to live in New

4    Jersey.  I work for IBM as a computer repair.  I am

5    married.  I have three children.  Two of them are

6    engineers.  One is going to school.  I have served on

7    a jury twice.  The whole time civil.  I have no close

8    friends who are in law enforcement.  I've never been

9    arrested nor have my family.  My daughter was recently

10   the victim of a crime.  And I have -- we have not

11   witnessed a crime, and my hobby is my work.

12         THE COURT:  Thank you, sir.  Mr. Kirkland.

13         MR. KIRKLAND:  My name is Steve Kirkland,

14   K-I-R-K-L-A-N-D.  I live in Dania.  I used to live in

15   California.  I head up a legal video department for an

16   agency that covers the tricounty area.  Let's see.  I

17   am married.  My spouse is a director of entertainment.

18   I have three children that don't live with me.  They

19   live in California.

20         I have never served on a jury before.  I don't

21   have any relatives or close friends in a law

22   enforcement agency.  I have been arrested.  About

23   eighteen years ago for a parking ticket.  I have not

24   been a victim or witnessed a crime.  And my hobbies

25   are bike riding.

36

```
1          THE COURT:  Thank you, sir.  Ms. Weissberg.
2          MS. WEISSBERG:  My name is Carol Weissberg,
3    W-E-I-S-S-B-E-R-G.  I live in Broward for twenty
4    years.  You can tell where I'm from, New York.  I work
5    for Mervyn's department store.  I've been -- I'm
6    married.  My spouse works for Broward County.  I have
7    three children.  One is a registered dietitian working
8    towards LD.  One works for Publix.  And one is in
9    college.  I have never served as a juror before.  I'm
10   not close friends or related to any enforcement
11   officer.  Nobody in my family has been arrested.
12   Nobody has been the victim of a crime.  And I haven't
13   been a witness to a crime.  And my hobbies are
14   reading, traveling and boating.
15         THE COURT:  Thank you, ma'am.  Mr. Folmar.
16         MR. FOLMAR:  Yes.  My name is Jeffrey Folmar,
17   F-O-L-M-A-R.  I live in Broward County now about
18   thirteen, fourteen years.  I'm a Florida resident
19   since I was born.  A few years I was in the military.
20   I work for an exhibition company.  I'm foreman slash
21   heavy equipment operator.  My wife works for an
22   engineering company.  Married.  I have two small
23   children.  No, I've never served on a jury before.  I
24   have a brother-in-law that's an ex cop, service aide.
25   I have never been the victim of a crime.  I have been
```

1    arrested for driving on a suspended license.  My

2    hobbies are work and Nascar.

3         THE COURT:  Thank you, sir.  If everyone can take

4    your questionnaires and pass them down to the end, the

5    bailiffs will pick up the questionnaires.

6         Mr. Milian, you may inquire.

7         MR. MILIAN:  Thank you, Judge.  Good afternoon

8    once again, ladies and gentlemen.  As the judge

9    introduced me earlier today, I'm going to be the

10   prosecutor in the first case, the first jury we're

11   going to select.  And you're going to hear these words

12   ad nauseam today, especially those of you that are

13   going to be stuck being here all afternoon, about

14   being fair and impartial.

15        But the bottom lime is that that's what we want.

16   And I'm going to tell you basically as a prosecutor

17   what I'm looking for.  If Ms. McNeil for example,

18   let's say you had a terrible experience with police

19   officers in the past.  Well, as a prosecutor you take

20   it for granted that, you know, the police investigate,

21   make the arrest, bring me the case and I present it to

22   a jury.

23        If you hate police officers, it would be hard for

24   you to be fair and impartial.  I mean, you might have

25   had a bad experience.  It might have been a terrible

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1      police officer, a crooked police officer, but **we**

2      wouldn't want you on the jury.

3          By the same token if anybody disliked the

4      defendant in the case for whatever reason, let's say

5      you're just prejudiced against people that wear yellow

6      shirts, to be ridiculous as an example.  Well, Mr.

7      Schwartz, if you, you know, were the defendant wearing

8      a yellow shirt, you wouldn't want to be judged by

9      somebody who hated yellow shirts.

10         I'm looking for people who can basically follow

11     the law, listen to the evidence as it comes from the

12     witness stand, put aside sympathy, and if the evidence

13     is there to prove that he committed these crimes, find

14     him guilty.  That's what I'm looking for.  So,

15     obviously, what I would zero in when I hear you all

16     talking, if there's an arrest, times you had

17     encounters with the police, even like Mr. Kirkland,

18     you got arrested for a parking ticket.

19         MR. KIRKLAND:  Yeah.

20         MR. MILIAN:  Okay.  You know the kind of stuff

21     that concerns me about that believe it or not is --

22     really somebody arrested you for a parking ticket?

23         MR. KIRKLAND:  (Nods head.)

24         MR. MILIAN:  It was a police officer.

25         MR. KIRKLAND:  (Nods head.)

1          MR. MILIAN:  Did they treat you fairly?

2          MR. KIRKLAND:  Fair enough.

3          MR. MILIAN:  Okay.  Did they actually take you to

4      to jail for that?

5          MR. KIRKLAND:  Yeah.

6          MR. MILIAN:  That couldn't have been a good

7      experience, could it?

8          MR. KIRKLAND:  It was kind of interesting.  The

9      sheriff's department asked me if I wanted to join the

10     sheriff's department when I was sitting behind bars.

11         MR. MILIAN:  Because it was a minor type of

12     thing.  And I'm not concerned in a situation like

13     yours, for example, because either it could be a lot

14     of different things.  It could have been just a cop

15     exercising poor judgment.  And I have a feeling that

16     most people, most sensible, common, logical people are

17     not going to look at that and say, next time I get on

18     the jury I'm going to acquit that defendant because

19     that cop was an idiot to me.

20         I'm not as concerned about that, but I'm

21     concerned about people who have had serious, bad

22     experiences with police officers.  Can anybody give me

23     an example of that, that you think would affect your

24     outlook as a juror in the case?  Nobody at all.  Okay.

25         Then we'll go to the next step.  I've heard from

40

1      some of you who said you've been arrested.  Besides

2      Mr. Kirkland, was anybody else here arrested?  Okay.

3      Mr. Folmar.  And Mr. Garcimonde.  You said eighteen

4      years ago.  Could you tell me what that was for?

5              MR. GARCIMONDE:  It was for lascivious behavior.

6              MR. MILIAN:  Was that in Broward County?

7              MR. GARCIMONDE:  No.

8              MR. MILIAN:  What was that, what county or state?

9              MR. GARCIMONDE:  Miami, Dade County.

10             MR. MILIAN:  Were you fairly treated by everybody

11     involved in that case?

12             MR. GARCIMONDE:  (Nods head.)

13             MR. MILIAN:  Were the charges dropped, dismissed,

14     or resolved in some other fashion?

15             MR. GARCIMONDE:  Charges were dismissed.

16             MR. MILIAN:  Did the police officer who arrested

17     you treat you fairly?

18             MR. GARCIMONDE:  Uh-huh.

19             MR. MILIAN:  How about the prosecutors involved

20     in the case?

21             MR. GARCIMONDE:  It didn't go to court.  It

22     didn't go to trial.

23             MR. MILIAN:  Never felt -- had you had any

24     contact with any prosecutors at all in the process?

25             MR. GARCIMONDE:  No.

1    MR. MILIAN:  All right.  How about the judge, was

2    the judge involved in any shape or form or fashion?

3    MR. GARCIMONDE:  Yes.

4    MR. MILIAN:  Okay.  Anything about that that you

5    think would affect your ability to sit as a fair and

6    impartial juror on a trial?

7    MR. GARCIMONDE:  (Shakes head.)  No, nothing.

8    MR. MILIAN:  All right.  Mr. Folmar, your

9    situation, if I recall correctly, was a driving with a

10   suspended license, correct?

11   MR. FOLMAR:  Twice.

12   MR. MILIAN:  Twice.  Okay.  That is not the name

13   of the charges that I'm most concerned about because a

14   lot of people can have a suspended license for a

15   variety of reasons, but I will ask you this.  What

16   department was it that arrested you?

17   MR. FOLMAR:  A member of the Broward County

18   sheriff.

19   MR. MILIAN:  The other one.

20   MR. FOLMAR:  The Lee County sheriff.

21   MR. MILIAN:  Anything about their treatment of

22   you?

23   MR. FOLMAR:  No.

24   MR. MILIAN:  By the cop, one of the cops, you

25   wouldn't hold that against police officers in general.

42

1          MR. FOLMAR:  No.  Just one with an attitude.

2          MR. MILIAN:  Okay.  Were you fairly treated by

3     the prosecutor and the judge in the case?

4          MR. FOLMAR:  Never went to trial.

5          MR. MILIAN:  Never went to trial.  Was it

6     resolved?

7          MR. FOLMAR:  Forty-five days in jail.

8          MR. MILIAN:  Okay.  Anything about doing

9     forty-five days in jail that you would --

10         MR. FOLMAR:  No.

11         MR. MILIAN:  Would that affect --

12         MR. FOLMAR:  By the time I got to court they

13    threw it out of court.

14         MR. MILIAN:  All right.  Anybody else with any

15    experiences like that that might become a factor if

16    you're a juror in the case?  I'll tell you right up

17    front you are going to hear from police officers.

18    Because they are the ones who investigate most of

19    these crimes.  Nothing like that.

20         I'll go to my next question.  How many of you

21    have had a close friend or relative that has been

22    arrested?  Anybody at all?  Okay.  Let me start with,

23    okay, Ms. Feindt.  Let me start with you in the front

24    row.  Would you tell us what that was for?

25         MS. FEINDT:  My husband and I have a neighborhood

1       bar in Hollywood.

2              MR. MILIAN:  What's the name of it?

3              MS. FEINDT:  Anchor Inn.

4              MR. MILIAN:  Okay.

5              MS. FEINDT:  Familiar with --

6              MR. MILIAN:  Yes, I'm familiar with a lot of

7       bars, but --

8              MS. FEINDT:  I haven't seen you there.  Anyway,

9       one of the people that used to come in was arrested

10      for conspiracy to commit murder.

11             MR. MILIAN:  Okay.

12             MS. FEINDT:  He was filmed outside of the bar in

13      the parking lot area.

14             MR. MILIAN:  Okay.

15             MS. FEINDT:  And the gentleman, one of the

16      gentlemen that used to come in I found out he was an

17      informant, a police informant.

18             MR. MILIAN:  All right.

19             MS. FEINDT:  And that was a couple of years ago.

20      And, I mean, I wasn't really, I just knew him.  He

21      went to school with my daughter.  And --

22             MR. MILIAN:  All right.

23             MS. FEINDT:  And he came in the bar once in a

24      while late at night when he got off from work.

25             MR. MILIAN:  Anything about that that would

44

```
 1          affect your ability to be fair and impartial?

 2               MS. FEINDT:  No.  No.

 3               MR. MILIAN:  Ms. Moultry, you had mentioned that

 4          you had two instances that I'm concerned about

 5          obviously.  One you mentioned that you had an aunt and

 6          an uncle that had been victimized in some kind of a

 7          robbery.

 8               MS. MOULTRY:  Home invasion.

 9               MR. MILIAN:  Okay.  And where was that if you

10          could tell us?

11               MS. MOULTRY:  Melrose Park.

12               MR. MILIAN:  All right.  I know where that is.

13          Anything about that that would affect your ability to

14          be fair and impartial in the case?

15               MS. MOULTRY:  No.

16               MR. MILIAN:  You wouldn't hold that against the

17          defendant because they were victimized by robbers,

18          right?

19               MS. MOULTRY:  No.

20               MR. MILIAN:  All right.  Let me ask you this

21          question.  Was anybody arrested in that case?

22               MS. MOULTRY:  Yeah.  The guy was arrested.

23               MR. MILIAN:  Was anybody prosecuted in that case?

24               MS. MOULTRY:  I really don't know.

25               MR. LASWELL:  Ms. Moultry, could you speak up?
```

45

1          MR. MILIAN:  Yeah.  He just wanted to see you

2     because he can't hear very well.

3          MR. LASWELL:  My hearing is about as good as my

4     beard.

5          MS. MOULTRY:  The guy was arrested.

6          MR. MILIAN:  Other than your relationship with

7     the victims in the case, did you have any other

8     involvement in that particular matter?

9          MS. MOULTRY:  No.

10          MR. MILIAN:  All right.  Then you had mentioned

11     earlier today when the judge was breezing through all

12     of you that as a matter of fact you had two brothers.

13     And you said, and correct me if I'm wrong, but you

14     said that were in prison.

15          MS. MOULTRY:  Yeah, they're incarcerated.

16          MR. MILIAN:  Okay.  Here in the State of Florida?

17          MS. MOULTRY:  Yes.  One's in Imokolee and the

18     other one, he's at North Broward Detention Center at

19     Pompano.

20          MR. MILIAN:  Were they prosecuted in Broward

21     County?

22          MS. MOULTRY:  Yes.

23          MR. MILIAN:  Are any of them facing charges

24     currently at this time?

25          MS. MOULTRY:  Well, the one that's here in

1       Pompano, he's, I think he's going to trial sometime

2       this month.

3           MR. MILIAN:  Okay.  And do you know what the

4       charges are for in that case?

5           MS. MOULTRY:  It's a drug charge.

6           MR. MILIAN:  Okay.  All right.  In addition to

7       that, but I assume that if he's being prosecuted in

8       Broward that the office that I work for covers the

9       entire county.

10          MS. MOULTRY:  Uh-huh.

11          MR. MILIAN:  We're one of the bigger circuits.

12      Obviously, I can tell you that probably one of my

13      colleagues in our office is prosecuting your brother.

14      And if your other brother was prosecuted in this

15      county he was prosecuted by one of my colleagues.  Do

16      you think that that would affect your ability to be

17      fair and impartial?

18          MS. MOULTRY:  No.

19          MR. MILIAN:  Okay.  Are you going to look at the

20      defendant somehow, and I ask you this question only

21      because it just fits in at this point but actually I

22      mean it to everybody in the panel.  What I'm asking

23      you to do is look at the defendant.  He's a young

24      person.

25          MS. MOULTRY:  Uh-huh.

47

1      MR. MILIAN:  I mean, that's fairly obvious,

2  right, to everybody here?  One of the things that the

3  judge with tell you at the end of the trial, you can't

4  consider sympathy as a factor in reaching a verdict.

5  What my concern as a prosecutor is you're going to be

6  sitting here and you're going to say, you know, he's

7  accused of some serious crimes, robbery and

8  kidnapping.  I feel bad for him.  I feel sorry for

9  him.  I'm going to cut him a break.  I'm going to give

10  him a chance.  Is that you think in any way going to

11  be a problem for you, Ms. Moultry?

12      MS. MOULTRY:  No, sir.

13      MR. MILIAN:  Is anybody sitting hear today,

14  consider that for a few minutes.  And you don't have

15  to give me your answer right now.  It might occur to

16  you a little bit later.  Being a juror is a very

17  difficult job.  We're going to throw you in here.

18  We're going to throw questions at you.  You don't even

19  get your instructions on how to do the job until the

20  end of the trial.

21      You know, the judge will give you an on the job

22  training kind of thing.  You'll get some preliminary

23  instructions.  But one of the important things, one of

24  the things that I can't combat with argument or with

25  evidence is going to be emotions.

**48**

```
 1          And if anybody feels uncomfortable, you know, for
 2     example, if anybody has a nephew or a niece, a son, a
 3     boyfriend, somebody that they're going to see sitting
 4     in that table because, you know, they're sympathetic
 5     naturally to that kind of person, that's something
 6     that we can address right now.  There's nothing wrong
 7     with that.  That's a human emotion.  It just makes it
 8     much more difficult for you to sit on the jury.  Does
 9     anybody have any problems that you think -- Ms.
10     Nowell.
11          MS. NOWELL:  Yes, it is.  My former employer in
12     Miami Shores was an accountant and he is now involved
13     in a very high profile case in Miami that happened to
14     be on the front page of the Miami Herald yesterday.
15     And in all fairness I really have a problem right now.
16          MR. MILIAN:  Are you talking about the muscles
17     and mayhem article?
18          MS. NOWELL:  Yes.
19          MR. MILIAN:  That was in the paper.
20          MS. NOWELL:  Yes.  I was the one that had the
21     search warrant slammed in my face when the police
22     officers came to the office.
23          MR. MILIAN:  Do you know if you're a witness
24     in that matter or not?
25          MS. NOWELL:  Not at this time.  No, I am not.  I
```

49

1   have not been questioned by the police.

2        MR. MILIAN:  Okay.  Are you saying that because

3   of your involvement in that you'd be unfair towards

4   the State or towards the defendant?

5        MS. NOWELL:  I just think maybe a question in my

6   mind.  I just may have a little bit of a problem.

7        MR. MILIAN:  Well, let me tell you.  We'll take

8   it to the next step.  If the judge tells you you have

9   to follow the law and he'll make you take an oath if

10  you're a juror to swear to follow the law.  Could you

11  put aside your feelings and follow the law even if you

12  disagreed with the law?

13       MS. NOWELL:  At this particular time, I'm saying

14  I just may have a hard time with it.

15       MR. MILIAN:  Okay.

16       MS. NOWELL:  You know, I don't disagree with

17  sitting on a jury at all.  And I would be glad to do

18  that at any time.  I'm just having a little bit of a

19  hard time with it right now.

20       MR. MILIAN:  Well, while I'm on the subject of

21  talking to you, this gets me back, did you mention

22  that your husband was a corrections officer in Dade

23  County?

24       MS. NOWELL:  Yes.

25       MR. MILIAN:  In addition to that you said you had

1    certain connections as far as social connections, I

2    assume.

3         MS. NOWELL:  Correct.

4         MR. MILIAN:  Is that going to affect your ability

5    to be fair and impartial?

6         MS. NOWELL:  That should not.

7         MR. MILIAN:  Okay.  You think it's only the other

8    thing, your knowledge about that other case.

9         MS. NOWELL:  That's been very, very stressful for

10   me for the past year and a half now.

11        MR. MILIAN:  All right.  Mr. Sartwell, you raised

12   your hand?

13        MR. SARTWELL:  Yes, sir.

14        MR. MILIAN:  What for, sir?

15        MR. SARTWELL:  I was concerned.  My grandson as I

16   mentioned in my speech had been arrested for robbery

17   and had served time for it.  And I've kind of bounced

18   between feeling sorry for him, and I want to beat the

19   hell out of him in the next instance.  That's my

20   concern.

21        MR. MILIAN:  That's normal enough when you love

22   somebody.  The thing that concerns me, and that is a

23   normal emotion.  And I think people who know they are

24   relatively guilty of a crime could have a little

25   sympathy or sympathize with that person because we

51

1    know other sides of that person.  That's why we don't

2    let family members judge them.  We need strangers.  We

3    need people from the community.

4        But it is very possible a thing called empathy.

5    The power of empathy is the power to really understand

6    how someone else feels.  And when that turns into

7    sympathy, that starts becoming a problem especially

8    for me, as a prosecutor, because certainly the last

9    thing I would like a juror to do is let somebody who's

10   guilty go because they feel sorry for them.  So is it

11   going to be a factor for you given that your grandson

12   was involved in a case like that?

13       MR. SARTWELL:  I'm sort of like the lady juror

14   behind me.  I'm sort of on a mixed emotion about it.

15   On one way I want to go one direction, the one moment

16   the other direction.  I said I don't think it would

17   inhibit my judgment.

18       MR. MILIAN:  Okay.  Anybody else with friends,

19   relatives?  Anybody else who's been arrested?  Mr.

20   Perez.

21       MR. PEREZ:  I didn't mention before, but it was

22   my stepdad, I don't know if it's immediate family, but

23   he had a DUI.

24       MR. MILIAN:  All right.  Anything about that that

25   you think will affect --

1              MR. PEREZ:  No, not really.

2              MR. MILIAN:  The judgment that you would have as

3      a juror on this case?

4              MR. PEREZ:  No, because I didn't have any part of

5      it all.  I just knew about it.

6              MR. MILIAN:  Okay.  All right.  Anybody else?

7      Ms. Crane.

8              MS. CRANE:  Yeah.  Well, my husband was arrested

9      about fourteen years ago, but it was dismissed.  It

10     was thrown out.  But my brother right at the moment is

11     serving probation for drug charges.

12             MR. MILIAN:  Okay.  Well, let me ask you about

13     your husband's charges first of all.

14             MS. CRANE:  Sure.

15             MR. MILIAN:  Did you know him at the time?

16             MS. CRANE:  Yeah, I was married to him.

17             MR. MILIAN:  Would you tell me what the charges

18     were for?

19             MS. CRANE:  It was assault.

20             MR. MILIAN:  And was that in Broward County?

21             MS. CRANE:  Yes, it was.  Dania.

22             MR. MILIAN:  And can you tell me how he was

23     treated by the police officers first of all?

24             MS. CRANE:  Fairly, I guess.  We had no

25     complaints at the time.

1          MR. MILIAN:  How about by the police?

2          MS. CRANE:  Everybody was fine.  I mean, he was,

3     he was under the influence of alcohol at the time.

4     And he had grabbed somebody and the charges were

5     dropped because it really didn't need to go to court

6     or anything like that.  He was in the military at the

7     time.

8          MR. MILIAN:  What branch if you can tell me?

9          MS. CRANE:  Navy.

10          MR. MILIAN:  Anything about that experience that

11     is going to taint you as far as being a juror on the

12     case?

13          MS. CRANE:  I don't think so.

14          MR. MILIAN:  All right.  What about the thing

15     with your brother?

16          MS. CRANE:  My brother was guilty.  He's on

17     probation.

18          MR. MILIAN:  Okay.  Was he prosecuted by my

19     office here in Broward County?

20          MS. CRANE:  No, no.  State of Connecticut.

21          MR. MILIAN:  That is in Connecticut.

22          MS. CRANE:  Yeah, he's down here now with the

23     probation officer's knowledge and doing his testing

24     and everything else.

25          MR. MILIAN:  Okay.  All right.  That sounds good.

5

1        I mean, I'm really looking, folks, I don't see that I

2   wrote down anybody else except Mr. Constant.  But I'm

3   really looking for experiences that are going to taint

4   you as a juror.  Stuff that is going to keep you from

5   listening to all of the evidence or exercising your

6   regular judgment.  Stuff that stands out in your

7   experience.  Mr. Constant, you mentioned you had been

8   arrested the 31st of '96.

9        MR. CONSTANT:  December.

10       MR. MILIAN:  December.  Can I ask you what that

11  was for?

12       MR. CONSTANT:  That was my wife calling the

13  police for domestic violence.

14       THE COURT:  I'm sorry.  I didn't hear you.

15       MR. CONSTANT:  That was my wife calling the

16  police for domestic violence.

17       MR. MILIAN:  Was that here in Broward County?

18       MR. CONSTANT:  Yes.

19       MR. MILIAN:  All right.  Did you actually get

20  arrested by the police?

21       MR. CONSTANT:  Yes.

22       MR. MILIAN:  Went down to the county jail and all

23  that?

24       MR. CONSTANT:  Yes.

25       MR. MILIAN:  Are those charges still pending

1        against you?

2             MR. CONSTANT:  I haven't been to court, yet.

3             MR. MILIAN:  You have not received a court date,

4        yet.

5             MR. CONSTANT:  (Shakes head.)

6             MR. MILIAN:  Did you bond out, is that what

7        happened when you were in the jail?

8             MR. CONSTANT:  Yes.

9             MR. MILIAN:  Can you tell me what police

10       department arrested you?

11            MR. CONSTANT:  North Lauderdale.

12            MR. MILIAN:  North Lauderdale.  Okay.  Do you

13       think that that experience is going to affect your

14       ability to be fair?

15            MR. CONSTANT: No.

16            MR. MILIAN:  And impartial?

17            MR. CONSTANT:  No.

18            MR. MILIAN:  Do you know who's the prosecuting

19       attorney in this circuit for North Lauderdale?

20            MR. CONSTANT:  No.

21            MR. MILIAN:  Okay.  It's my office.  Okay.  Are

22       you going to hold that against me?

23            MR. CONSTANT:  No, sir.

24            MR. MILIAN:  All right.  All right.  So you all

25       get the gist of it.  I guess I'm beating that punching

56

1    bag pretty hard.  Now that's one of the things that I

2    was concerned about here obviously.

3         The next thing I want to talk to you folks about

4    is the nature of the charges.  You know, when the

5    judge read that information to you, you all heard him.

6    You know, the three charges, the robbery, the

7    kidnapping, and other robbery.  Well, basically,

8    ladies and gentlemen, that's what we call an

9    accusation.  Of course that doesn't mean that the

10   defendant is guilty.  If you had to deliberate right

11   now you would have to say not guilty because you

12   haven't heard any evidence.

13        But in addition to letting the defendant know

14   what he's been charged with and letting you know what

15   this case is about, it also shows my road map.  It

16   tells me what the elements of the crime and what I

17   have to prove to you.  Does everyone understand that?

18   Does anyone have a problem with that?

19        Okay.  Ms. Dhue, let me ask you these questions.

20   You never heard during the time the judge was reading,

21   and I don't really expect you to memorize what he

22   read, but you'll get to hear later on again.  But you

23   never every heard anything in there about a motive,

24   did you?

25        MS. DHUE:  No.

1          MR. MILIAN:  People would like to know the motive

2     for a crime.  Come on.  Be honest.  The more you think

3     about it, you watch a murder show, everybody wants to

4     know the motive.  Right?  You know, it's not an

5     element of the crime.  It's good, it's important

6     information to know since we're logical, rational

7     people.  We want to understand what the world is all

8     about.

9          But it's not an element of the crime, and I'll

10    tell you a couple of reasons why it's not an element

11    of the crime.  It's difficult, impossible to prove

12    motive all the time.  The law says there's certain

13    elements the prosecutor has to prove to convince the

14    jury beyond a reasonable doubt.  Ladies and gentlemen,

15    I'm telling you now, that's what I intend to prove,

16    the elements of the crime.  Nothing more, nothing

17    less.

18         You might find out some information along the

19    way, you might hear some things that will help you

20    understand the context and the circumstances of the

21    crime, but motive is not an element.  So why do I make

22    it a big deal when I ask you this question?  Because

23    what I don't want jurors to do is to make my job more

24    difficult than it already is.

25         Obviously, I think I do have a difficult job.

1    It's proving the defendant's guilt beyond a reasonable

2    doubt.  It's not an impossible job.  It's the same

3    burden of proof we use in the courts throughout the

4    United States.  However, I don't want to have any

5    additional elements.  Can everybody stick to what the

6    elements of the crime are, and they're going to be

7    given to you by the judge actually.  He'll break them

8    down at the end of the trial.  Does anybody have a

9    problem with that?  Okay.  Everybody can live with

10   that.

11          You know, when I asked, were you jurors earlier

12   today, I was talking to Ms. Nowell, I believe, and I

13   said to her, look, you know, at the end of the trial,

14   the judge will read you the instructions that are

15   applicable to this crime.  Let's say you get to the

16   point where he reads you the instruction and you don't

17   agree with him.

18          Ms. Gallagher, for example, you know, are you

19   still going to be able to follow the law?  Or are you

20   going to feel that any conflict between your personal

21   opinions and what the judge tells you is the law

22   should be decided in favor of your personal opinions?

23          MS. GALLAGHER:  No.  Follow the law, of course.

24          MR. MILIAN:  It's like being in the military.

25   You have to follow a lawful order, and he's going to

1    tell you what the lawful instructions are that apply

2    in this particular case.  And one thing you have to do

3    as a juror is, again, it's a difficult task because

4    they don't tell you the instructions until the end, is

5    you have to first, you have to swear, you know, that

6    you're going to follow the law.  And then we tell you

7    the law at the very end.

8        And the whole idea being here is that whatever

9    the law is you are sworn as jurors to follow it.  Does

10   anybody feel that that's going to put a burden on

11   them?  And what I'm talking about here is actually a

12   moral burden.  Okay.  If you need clarification to

13   that I'll tell you what I mean.

14       Does anybody have any religious or philosophical

15   beliefs that would not allow them to judge another

16   human being?  That's actually happened on occasion.

17   I'm not encouraging anybody to raise their hand.  I

18   just want to make sure we don't put somebody in that

19   position again.  All right.  So all of us as you sit

20   here today tell me if selected as a juror you will

21   follow the law, whatever it may be.  Is that okay?

22       THE PROSPECTIVE JURY:  (Nod heads.)

23       MR. MILIAN:  You know, lawyers always say, you

24   know, there's a place to change the law.  That's in

25   Tallahassee.  As jurors you just need to follow the

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1    law.  Anybody have a problem with that concept?  Okay.

2    Great.  We talked about reasonable doubt or actually I

3    did.  I haven't given you much of a chance to say

4    anything.

5        But what I want to stress to all of you is the

6    following.  You've all heard of that reasonable doubt

7    burden of proof, okay.  It's not beyond a shadow of a

8    doubt, it's not beyond all possible doubt.  It's

9    beyond a reasonable doubt.  Reasonable it says.

10   Rational.  All right.  Does everybody believe or agree

11   with me that, that's the standard of proof that I can

12   achieve?  Let me ask Ms. Henry, for example.

13       MS. HENRY:  Yes.

14       MR. MILIAN:  Okay.  Do all of you know that's the

15   burden of proof that we use in our criminal courts

16   throughout the land?

17       THE PROSPECTIVE JURY:  (Nod heads..)

18       MR. MILIAN:  All right.  And, you know, the judge

19   will tell you it's not a speculative doubt, a possible

20   doubt, and I'll tell you it's not an imaginary or

21   forced doubt.  It's something we can all achieve.  All

22   right?  Anybody have a problem with that burden of

23   proof?  Anybody think it should be tougher on me than

24   what it already is?  Okay.  That's good.  Let me see.

25   Oh, here is a good point to stress to all of you at

61

1      this point.

2          MR. LASWELL:  There's a question there, right?

3          MR. MILIAN:  It's a question.

4          MR. LASWELL:  Not a lecture.

5          MR. MILIAN:  It's not a lecture.  Ms. Farrington,

6      if you're selected as a juror, do you understand that

7      your job is to simply to decide on the facts in the

8      case?

9          MS. FARRINGTON:  (Nods head.)

10         MR. MILIAN:  All right.  Do you understand you

11     have no role whatever on what a proper sentence will

12     be?

13         MS. FARRINGTON:  (Nods head.)  Yeah.

14         MR. MILIAN:  All right.  Does everybody

15     understand that?  Anybody have a problem with that?

16     All right.  Whatever a proper sentence will be is

17     something that the judge decides later on.  The jurors

18     in a case of this type have no role whatsoever in the

19     sentencing.  Because, you know, if anybody was

20     bothered that they might have to have a say in that,

21     it is not a factor.  All right.  Does that maybe help

22     some people on -- in some cases jurors do have a role

23     in sentencing.  Not in this case.  All right.

24         All right.  Let me ask a question, and I'm going

25     to throw it out generically.  It's a sensitive matter.

62

```
 1        Does anybody have a problem with interracial dating?

 2    Anybody have any strong beliefs about that?

 3        A VOICE:  What?

 4        MR. MILIAN:  Interracial dating.  Nobody at all

 5    is raising their hand.  If you see any of that coming

 6    up in this case, is anybody going to have a problem

 7    with it at all?  I'm just alerting you to it possibly.

 8    Mr. Folmar.

 9        MR. FOLMAR:  Explain what you're talking about

10    now.

11        MR. MILIAN:  I'm talking about a Hispanic dating

12    an Anglo, or a Hispanic dating a black, or black

13    dating an Anglo.

14        MR. FOLMAR:  I don't agree with it, no.

15        MR. MILIAN:  You don't agree with it.

16        MR. FOLMAR:  No, sir.

17        MR. MILIAN:  Okay.  And you think that might

18    affect your perception?

19        MR. FOLMAR:  Probably could.  Just the way I was

20    brought up.

21        MR. MILIAN:  Thank you.  That's what I'm talking

22    about.  Anybody have any other feelings like that?

23    All right.

24        All right.  Let me ask you here.  Let me ask Ms.

25    Ellison since I haven't asked you any questions.  Ms.
```

1      Ellison, do you have any preconceived notions of the

2      type of evidence I have to present on the case?

3           MS. ELLISON:  No, I don't think so.

4           MR. MILIAN:  Okay.  Have you ever heard of

5      fingerprint evidence?

6           MS. ELLISON:  Yes.

7           MR. MILIAN:  You've heard of it by now, right,

8      I'm sure.

9           MS. ELLISON:  Yes.

10          MR. MILIAN:  Okay.  And I'm sure you've seen

11     videos of crimes being committed.  If you haven't

12     watched Channel 7 any night they have all kinds of

13     stuff on there.  My point to you is, ladies and

14     gentlemen, is there, whatever the law requires,

15     whatever evidence has been gathered will be made

16     available to you as I present the evidence.  And there

17     is, you know, things that you can consider in coming

18     up with a deliberation from the lack of evidence, or

19     the inability of the prosecutor to prove an element of

20     the crime.

21          However, my concern is that none of you if

22     selected as a juror in my case will insist upon a

23     particular type of evidence.  Okay.  I don't think

24     anybody has that.  And I think that's why I bring the

25     subject up.  I don't know how much you know about the

1    criminal justice system. I really, you know, it would

2    take forever to question each one of you on that.

3        But I really, what I'm looking for is for you to

4    have an open mind and to be able to follow the law as

5    the judge lays it out for you. Okay. And you're also

6    going to hear arguments from the attorney. So that's

7    going to be a little bit more of a guide in addition

8    to that. As long as you don't have any preconceived

9    notions about the evidence and everybody. Nobody's

10   going to expect any DNA evidence or videotape of the

11   Bronco chases or anything like that, right?

12       Okay. Well, Ms. Ellison, I'll pick on some other

13   juror right now. Ms. Ruiz.

14       MS. RUIZ: Uh-huh.

15       MR. MILIAN: Let me ask you this. If I were able

16   to prove the elements of the crime beyond a reasonable

17   doubt by presenting you with one witness, and you

18   believe that witness beyond a reasonable doubt, would

19   you have any hesitation in returning a verdict of

20   guilty as charged against the defendant?

21       MS. RUIZ: I would have to hear all the evidence.

22       MR. MILIAN: Okay.

23       MS. RUIZ: I don't know by one witness.

24       MR. MILIAN: The reason I ask you this is, the

25   point to all this is the following. If somebody's in

1    the parking lot and gets mugged at eleven p.m. at

2    night, you don't expect to have a crowd of people

3    there watching the crime occurring.

4          MS. RUIZ:  (Nods head.)

5          MR. MILIAN:  Therefore, there would only be one

6    witness, the victim to the crime.  My question to you

7    is, would you insist that I present more witnesses,

8    would you out of hand dismiss the State's prosecution

9    because we didn't have more than one or two or three

10   witnesses?  Would you insist on a particular magic

11   number of witnesses to a particular crime?

12         MS. RUIZ:  (Shakes head.)

13         MR. MILIAN:  Does that make sense?

14         MS. RUIZ:  Yeah.

15         MR. MILIAN:  Okay.  Would you not simply out of

16   hand say, well, Mr. Milian, you were only able to

17   present one witness to this particular crime.  I

18   believed him beyond a reasonable doubt as to all the

19   elements, but I'm still not going to convict on more

20   than any one witness.

21         MS. RUIZ:  I would want to see all the evidence.

22         MR. MILIAN:  Okay.  But what about if that's all

23   the evidence in the case?  Would you reject that out

24   of hand?

25         MS. RUIZ:  I don't know about that.

1      MR. MILIAN:  Well, think about this.  Do you

2   think most crimes get culminated at Joe Robbie Stadium

3   or Pro Players Stadium, whatever they call it now at

4   half time?  No is my response to you.  Do you

5   understand that criminals don't normally commit crimes

6   in a place where they're under view of the public?

7      MS. RUIZ:  Right.

8      MR. MILIAN:  Would you agree with that?

9      MS. RUIZ:  Uh-huh.

10      MR. MILIAN:  And do you agree that in some

11   instances there's only going to be one witness to a

12   particular crime?

13      MS. RUIZ:  Okay.

14      MR. MILIAN:  All right.  Would you prejudge a

15   case because there is only one witness?

16      MS. RUIZ:  Probably not.

17      MR. MILIAN:  Okay.  I mean, I'm not telling you

18   not to look at it with your common sense and your

19   reason, but also apply your common sense to it.  You

20   know, if someone's mugged at eleven p.m. in the

21   parking garage there's isn't going to be a crowd of

22   people there watching.  I mean, it's not like a

23   spectator sport.

24      MS. RUIZ:  It could be both on one crime.  They

25   can both say something that's --

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1          MR. MILIAN:  Right.

2             MS. RUIZ:  For their benefit.

3          MR. MILIAN:  Okay.  But you are not going to

4    disregard the evidence of guilt simply because there

5    is only one witness for a crime.

6             MS. RUIZ:  Right.

7          MR. MILIAN:  All right.  Does everybody

8    understand and follow me where I'm going with that?

9    Does everybody agree with that?  Is anybody going to

10   insist on a magic number of witnesses in a case before

11   they can return a verdict of guilty?  Trust me,

12   there's going to be probably more than one witness.

13        The point being is that I do not want you to

14   prejudge the case as to the number of witnesses in a

15   particular case, you know, out of hand.  Because that

16   would not be fair to the State of Florida.  It

17   certainly wouldn't be fair to the victim of the crime.

18   Do you agree with me?

19          MS. RUIZ:  Uh-huh.

20        MR. MILIAN:  Okay.  Ladies and gentlemen, let me

21   ask this question.  I mean, anybody who's feeling in a

22   voluteering mood, just raise their hand.  Has anybody

23   ever heard of a getaway driver involved in robberies,

24   for example?  Anybody ever heard of that?

25          THE PROSPECTIVE JURY:  Yes.

1    MR. MILIAN:  Right.  You think that that person

2    is guilty of the crime even though he stays outside in

3    the car?

4         THE PROSECTIVE JURY:  Yes.

5         MR. MILIAN:  Okay.  There's a law in Florida that

6    covers that area.  Does everyone agree with that

7    concept that if you participate in a crime, get a

8    benefit out of it or do something, involve yourself,

9    you should be guilty and held responsible?  Even if

10   they're not present?  Anybody have a problem with that

11   concept?

12        THE PROSPECTIVE JURY:  No.

13        MR. MILIAN:  All right.  Nobody at all.

14        MS. GALLAGHER:  You said even if they're not

15   present.

16        MR. MILIAN:  Even if they're not present.

17        MS. GALLAGHER:  They're not there.

18        MR. MILIAN:  Let me give you a situation.  For

19   example, let's say I go and I get together with a

20   group of people and decide to have somebody murdered.

21   And they do a murder, and I'm not there.

22        MS. GALLAGHER:  Right.  Okay.

23        MR. MILIAN:  The law says I'm still responsible.

24        MS. GALLAGHER:  Right.

25        MR. MILIAN:  You understand.  I'm not really

1  trying to trick you.  I'm not trying to get into a

2  debate about it.  What I'm trying to do is find out if

3  anybody, because these are things we as lawyers take

4  for granted.

5       MS. GALLAGHER:  Right.

6       MR. MILIAN:  Now I know you don't.  And that's

7  good that you're listening to that because, believe

8  me, when you get the jury instructions they are very

9  detailed.  And the more you listen and the more you

10 look to the evidence, the more important it's going to

11 be for all parties concerned.  It's going to show that

12 you're fair and impartial and really have taken an

13 interest in the details.  And the devil sometimes is

14 in the details.  But it's an important concept and it

15 might apply in this case.

16      How many of you heard that there were other

17 people involved in this case when the judge read you

18 the Information?  All right.  All of you did.  Okay.

19 Those people are not on trial for this crime.  Only

20 the defendant is.  Can all of you focus on the

21 defendant's participation and guilt in this particular

22 crime?  Is that okay?

23      THE PROSPECTIVE JURY:  (Nod heads.)

24      MR. MILIAN:  Nobody's going to be wondering about

25 what the other people are doing or where they were or

70

1    anything like that.  Just for questions on his

2    involvement in the case.  Can everyone do that?  All

3    right.

4          Okay.  Let me pick on Ms. McNeil.  Let me ask you

5    a question.  Can you describe the color red for me?

6          MS. MCNEIL:  Red.

7          MR. MILIAN:  Yeah.

8          MS. MCNEIL:  Dark red, light red?

9          MR. MILIAN:  Any red.  It's almost impossible to

10   describe.  If you see anything red, if you can point

11   it out to me in the courtroom.  How about the flag?

12         MS. MCNEIL:  About the closest.

13         MR. MILIAN:  How many people see red in the flag?

14   Okay.  Pretty much everybody.  Unless you're color

15   blind, of course.  The point is that I picked that

16   example on purpose.  Because there are -- well, Mr.

17   Laswell's tie which he's been so helpful in

18   demonstrating for you.

19         MR. MARCHETTA:  My tie, also.

20         MR. MILIAN:  The point -- Mr. Marchetta is one of

21   the defense lawyers and I guess he wants to get

22   involved in the dialogue here.

23         MR. LASWELL:  There's no dialogue here.  There's

24   a lecture.

25         MR. MILIAN:  The point here, ladies and

1    gentlemen, is if you see red you recognize it.  Even

2    though it's impossible to describe.  Is anybody going

3    to hold it against a particular witness if they don't

4    describe things in a particular way or with a certain

5    expression of language?  You understand what I'm

6    saying?

7         My point being is that people describe things

8    differently.  They talk in accordance to their

9    education, their cultural background.  That doesn't

10    mean that they're not being truthful.  All of you

11    would agree with that, right?

12         THE PROSPECTIVE JURY:  Right.

13         MR. MILIAN:  All right.  The point being is that

14    there is a difference between describing something

15    and recognizing something.  That's what I'm driving

16    at.  You couldn't describe that because it's almost

17    impossible to.  On the other hand, you could recognize

18    it when you saw it, right?

19         MS. MCNEIL:  (Nods head.)

20         MR. MILIAN:  That might go to a lot of issues in

21    the case, the identification of a particular person.

22    It might be impossible to get two people even Ms.

23    Farrington and yourself to describe me the same way.

24    But you'd both recognize me if you saw me an hour from

25    now.  I'd hope you would.  Right?

72

1           MS. FARRINGTON:    (Nods head.)

2           MR. MILIAN:    Okay.    That's my point.    Have all of

3       you heard of circumstantial evidence, ladies and

4       gentlemen?    Okay.    Circumstantial evidence, you know,

5       stuff that is not directly observed by you but it's

6       indicative.    It's like seeing the crumbs and the

7       chocolate chips falling off a kid's mouth when he's

8       coming out of the kitchen.    Pretty good indicator he's

9       been tipping into the cookie jar.    That's a pretty

10      good example of circumstantial evidence.

11          You all can understand, you can look at direct

12      evidence in a case as well as the circumstantial

13      evidence and bring it all together with your common

14      sense, right?    Nobody has a problem with that simple

15      concept?    One that you can apply here in the

16      courtroom.

17          Okay.    These are a little more mundane questions

18      that I always ask the jurors.    Does anyone have any

19      medical problems that would impair your ability to be

20      a juror on the case?    So far I know Ms. McNeil you

21      have what I consider a medical necessity or emergency

22      coming up.    And that would probably distract you even

23      if you were sworn in as a juror.

24          Does anybody have any medical problems, any

25      required treatment?    For example, anybody on dialysis

1    or anything like that that would interfere with your

2    jury service?  How about hearing problems?  Anybody

3    have any particular type of hearing problems?

4    Anything, Ms. Weissberg, that is going on that you

5    want to tell us?

6        MS. WEISSBERG:  No.

7        MR. MILIAN:  Judge, may I have permission from

8    the Court to read a list of potential witnesses in the

9    case to see --

10        THE COURT:  Okay.

11        MR. MILIAN:  To see if any of the jurors know of

12    them.

13        THE COURT:  Please do.

14        MR. MILIAN:  Ladies and gentlemen, this is a list

15    of names that you might hear of witnesses that might

16    be called as witnesses in the trial.  Let me start off

17    with the law enforcement officers first.  Let me tell

18    you, Officer Hampton of the Plantation Police

19    Department.  Detective Barth.  Officer Moberg.

20    Service Tech Planske.  Officer Martin.  That's Gary

21    Martin.  Sergeant Massey.  Deputy Blaszyk of the

22    Broward Sheriff's Office.  Sergeant Springman of the

23    Plantation Police Department.  Officer Juskiewicz.

24    Officer Entus.  Lieutenant Riffle.  Mr. Gray of the

25    Broward Sheriff's Office.  And Ms. Hanlon of the

```
1    Plantation Police Department.  Any of those names ring
2    a bell?  How about of the civilians that you heard
3    mentioned earlier when the judge was reading the
4    Information to you?  Ms. Butler, Ms. Outridge, or any
5    of the other names that came up?  Any of those names
6    ring a bell whatsoever with anyone?
7        All right.  Let me ask a couple of questions to
8    wrap it up right now.  Now is there anything that's
9    come up during the course of our questioning or any of
10   the questioning you hear that you think would
11   interfere with your ability to be fair and impartial?
12   Anything at all.  That you've been able to think
13   about?  Any of your prior jury experiences?  For
14   example, Mr. Fastov, you mentioned you had a been a
15   juror before.  You don't even remember what that was.
16       MR. FASTOV:  It was my first time.  It was up in
17   New York.  It was criminal.  I think it had to do with
18   arson, but I don't remember.
19       MR. MILIAN:  Okay.  Were you the foreman in that
20   jury?
21       MR. FASTOV:  No.
22       MR. MILIAN:  Or just a member.
23       MR. FASTOV:  Member.
24       MR. MILIAN:  How about you, Mr. Prisco?
25       MR. PRISCO:  It was similar.
```

1          MR. MILIAN:  Could you stand up and say this so

2     the court reporter -- because she's way over here in

3     the corner.  She can't hear.  I'm sorry.

4          MR. PRISCO:  The trials, it's two trials.  Was

5     civil trials and one was somebody ran through a glass

6     window.  The other one involved a ride.

7          MR. MILIAN:  Okay.  Thank you, Mr. Prisco.

8     Ladies and gentlemen, what I'd ask of you and tell me

9     if you can't do this, is to the listen to all the

10    evidence in the case, all of the evidence and the

11    judge's instructions before you decide upon a verdict

12    in the case.  Can all of you do that?

13         All right.  In addition to that, let me just tell

14    you one more thing.  There might be some levity.  Some

15    people might make jokes or something, anything might

16    happen during the course of the trial.  You know, I

17    seldom find the necessity to apologize for smiling.

18    There's two things about that.

19         First of all, once you're selected or you're

20    picked as a juror, we really can't have any contact

21    with you outside of the courtroom.  We can't even say

22    good morning or good evening to you.  So if you see

23    any of the attorneys, and I'm among them myself, and I

24    ignore you, it's not out of any, you know, it's not

25    that there's something wrong with you.  It's simply

1       that that's the judge's instructions.

2            The second thing is that I hope that during the

3       course of your service as jurors you'll understand

4       that, you know, just because perhaps at some point

5       I'll make a comment like I have during the voir dire,

6       this jury selection process, it doesn't mean I don't

7       take the case very seriously.

8            Because, obviously, I think they're very serious

9       matters.  They're very serious to all of the parties

10      concerned, and I think all of you have indicated you

11      will take it very seriously.  Am I correct in assuming

12      that?  Okay.  Thank you very much for your attention

13      and your candid answers, ladies and gentlemen.

14           THE COURT:  Okay.  Mr. Laswell, you may proceed.

15           MR. LASWELL:  Thank you, Judge.  There's nothing

16      more serious than Florida's Criminal Code and the

17      charges facing my client.  So you can rest assured

18      that this matter deserves your utmost time.  You can

19      also rest assured that there will be some moments of

20      humor in this case.  I don't think any of us can live

21      without some humor.

22           Who's aware of the Brinks truck turning over

23      last week?  Did that make anybody think about, gee,

24      what's a guy's responsibility here?  Does anybody

25      think we're all a bunch of robbers and thieves?  The

1    guy walking along and suddenly here is money coming

2    down from the sky.

3         What, Ms. Farrington, what do you think his

4    responsibility is?  Should he run up there?

5         MS. FARRINGTON:  Just wait on it.

6         MR. LASWELL:  Should he just start grabbing?

7         MS. FARRINGTON:  I'm sorry, but I would have

8    waited there until it come.

9         MR. LASWELL:  How about you, Ms. Henry?

10        MS. HENRY:  I would probably do the same thing.

11   But I would think about what is the right thing to do.

12        MR. LASWELL:  Well, I think all of us would like

13   to think we would do that.  But how far does that go

14   is my question?  Would you run up to the top of the

15   overpass?

16        MS. HENRY:  No, I would not.

17        MR. LASWELL:  And knock and say, excuse me, is

18   this all your money?

19        MS. HENRY:  No, I would not do that.

20        MR. LASWELL:  How about you, Ms. McNeil?  Do you

21   think people -- pick on you for a minute.

22        MS. MCNEIL:  All right.

23        MR. LASWELL:  What do you think that your burden

24   of -- not your burden.  I'll put it on somebody out

25   here.  That nice young lawyer there in the front row.

78

```
1        Where is it that you start and where do you end in

2        trying to assess your own responsibility and

3        accountability?

4            MS. MCNEIL:  There are rules that are broken.

5            MR. LASWELL:  That's what we have a society for,

6        right?

7            MS. MCNEIL:  Yeah.

8            MR. LASWELL:  So where do you -- do you think

9        that you should follow the letter of the law exactly?

10           MS. MCNEIL:  Over here you better.  In here.

11           MR. LASWELL:  Do you all do that?

12           MS. MCNEIL:  Generally.

13           MR. LASWELL:  You drive a car?

14           MS. MCNEIL:  I'm a nurse.

15           MR. LASWELL:  Do you drive a car?

16           MS. MCNEIL:  Technical.  I do.

17           MR. LASWELL:  Do you always follow the rules in

18       your car?

19           MS. MCNEIL:  Yeah.  I don't drive very often.

20           MR. LASWELL:  Never had a traffic ticket.

21           MS. MCNEIL:  Never.

22           MR. LASWELL:  Who's had a traffic ticket?  Let me

23       ask you, Ms. Dhue, the question.  When you got the

24       traffic ticket, did you stop to think whether or not

25       you should be accountable or responsible for it?
```

```
 1            MS. DHUE:  Sure, I knew I was wrong.  I was

 2       speeding.

 3            MR. LASWELL:  What did you think when that light

 4       came on?  Damn, right?

 5            MS. DHUE:  Uh-huh.

 6            MR. LASWELL:  Isn't that probably about the sum

 7       of everybody's reaction to that sort of thing?  I've

 8       been caught.  Was that because you knew you'd done the

 9       wrong thing?

10            MS. DHUE:  I knew I was wrong.

11            MR. LASWELL:  You knew you were wrong.  Is that

12       true for everybody?  You knew you're wrong.  Your

13       reaction is damn.  All right.  You didn't know it.

14       Your reaction was probably I wonder what this guy

15       wants.  But you know you're going to find out in a

16       hurry.  Do each of you think that you should be

17       accountable and responsible for your actions if you

18       know what they are and you know how the law applies?

19       Ms. Ellison.

20            MS. ELLISON:  Yes.

21            MR. LASWELL:  Ms. Gallagher.

22            MS. GALLAGHER:  Certainly.

23            MR. LASWELL:  Do we agree on that?  Everybody

24       agree on that?  Let me ask you this, what if you don't

25       know about the law and how it applies?  Mr. Whiton.
```

1    Is that all right?  Wiggin.

2         MR. HAGAN:  Hagan.

3         MR. LASWELL:  Your pronunciation is as bad as

4    mine.  What about that?

5         MR. HAGAN:  If you don't know the law.

6         MR. LASWELL:  Yeah.

7         MR. HAGAN:  Give me an example.

8         MR. LASWELL:  Sure.  Suppose I'm from Montana

9    where the posted speed limit is reasonable.  Okay.

10   That's the posted daylight speed limit in Montana and

11   whatever is reasonable and I drop over into Idaho

12   where it's set and I don't know that.  We're staying

13   with traffic.  I like traffic.  We're staying with

14   traffic here.  Am I responsible for that?

15        MR. HAGAN:  Yes.

16        MR. LASWELL:  What?

17        MR. HAGAN:  If you're saying you're responsible

18   to be doing seventy miles an hour.

19        MR. LASWELL:  Yeah.  But I come from a place

20   where I can go ninety.  I came from Germany and I was

21   on the autobahn.

22        MR. HAGAN:  You're still responsible.

23        MR. LASWELL:  Why is that?  Because I don't know

24   what the law is.

25        MR. HAGAN:  Ignorance of the law is no excuse

81

```
 1        from what I've heard.
 2             MR. LASWELL:  Okay.  Everybody feel that way?
 3             THE COURT:  Mr. Laswell, let me interrupt for
 4        just a second.  I think we're going to switch court
 5        reporters now.  Donna, are you ready to switch?
 6             MS. VASSIELO:  I can start.
 7             THE COURT:  Bring your machine up and we'll set
 8        up.
 9             (Thereupon, a brief recess was taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

82

COURT CERTIFICATE

STATE OF FLORIDA
COUNTY OF BROWARD

       I, Kimberli M. Kidd, Court Reporter, certify
that I was authorized to and did stenographically
report the foregoing proceedings and that the
transcript is a true record.

Dated this ____ day of _____, 1997

_____
Kimberli M. Kidd, Court Reporter

83

1                                IN THE CIRCUIT COURT OF THE
                                 SEVENTEENTH JUDICIAL CIRCUIT, IN
2                                AND FOR BROWARD COUNTY, FLORIDA

3

4

5     --------------------)

6     STATE OF FLORIDA,    )            **ORIGINAL**

7          Plaintiff,      )

8     vs.                  )        Case No.   96-3122CFC

9     TODD RICHARDSON,     )

10         Defendant.      )

11    --------------------)

12

13

14

15                        MOTION FOR APPEAL

16                ON BEHALF OF THE DEFENDANT

17

18                          VOLUME II

19                        PAGES 83-112

20

21          The above-entitled cause came on for hearing

22    before the Honorable WILLIAM P. DIMITROULEAS, Circuit

23    Court Judge, at the Broward County Courthouse, on the

24    13th day of January, 1997, commencing at or about 4:05

25    p.m.


                LAUDERDALE REPORTING   (305) 467-6671

```
1   APPEARANCES:

2

3

4        MICHAEL J. SATZ, STATE ATTORNEY'S OFFICE,

5        BY: AL MILIAN, ESQUIRE,

6        ASSISTANT STATE ATTORNEY,

7        Appearing on behalf of the State of Florida.

8

9

10        ALAN H. SCHREIBER, PUBLIC DEFENDER'S OFFICE

11        BY: WILLIAM T. LASWELL, ESQUIRE,

12        ASSISTANT PUBLIC DEFENDER,

13        Appearing on behalf of the Defendant.

14

15   ALSO PRESENT:

16        DAVE SCHULSON, ESQUIRE,

17        ASSISTANT STATE ATTORNEY,

18        Appearing on behalf of the State,

19

20        ART MARCHETTA, ESQUIRE

21        Appearing on behalf of Travis Mathis.

22

23                    I N D E X

24   DESCRIPTION                          PAGE

25   VOIR DIRE (By Mr. Laswell)           85
```

LAUDERDALE REPORTING   (305) 467-6671

1           THE COURT: Okay.

2           Members of the jury, we are going to take a

3    five minute recess.

4           When we do select the juries this afternoon,

5    I'm going to be giving some preliminary instructions,

6    and one of those instructions is not to discuss the

7    case or allow it to be discussed in your presence, or

8    either one of the defendants.

9           During the breaks, counsel may see you in

10   the hallway and not even say hi.  They are not being

11   rude, they are following the rules of court.  They are

12   to have no contact with prospective jurors.

13          When we do come back in after the five

14   minute break, I'm going to ask you to take the same

15   exact seats that you are in right now.  So maybe count

16   down from the end or see who is sitting next to you so

17   you can get in the same seat.

18          This is courtroom 4810.  We will see you

19   back out side the courtroom door in five minutes.

20          (Whereupon at 4:05 p.m., a five minute

21   recess was had after which the following proceedings

22   were heard:)

23          THE BAILIFF: Remain seated court is in

24   session.

25          THE COURT: Okay, back on the record, both

LAUDERDALE REPORTING   (305) 467-6671

1  defendants are present.  All the counsel are present.

2  Anything to come before the court before we bring the

3  jury in?

4            MR. MARCHETTA: Can I make a quick call?

5            THE COURT: Have some bailiff go find a

6  courtroom and sit them in the courtroom and babysit

7  them until we are ready for them and call downstairs.

8            I want them here available when I'm done

9  picking a jury, and they better get use to it until

10  this docket gets under control.  Let's bring in the

11  jury.

12            (Whereupon at 4:14 p.m., the prospective

13  jurors enter the courtroom after which the following

14  proceedings were heard:)

15            THE COURT: Okay, we are back on the record.

16  Counsel can see the presence of the jury and waive

17  it's polling?

18            MR. LASWELL: Yes, sir.

19            MR. MILIAN: Yes, Your Honor.

20            MR. MARCHETTA: Yes, sir.

21            THE COURT: Did everyone follow my admonition

22  not to discuss the case or allow it to be discussed in

23  your presence?  I'm sorry to interrupt, you may

24  continue, Mr. Laswell.

25            MR. LASWELL: Thank you.


                LAUDERDALE REPORTING  (305) 467-6671

1                    VOIR DIRE EXAMINATION

2                      BY MR. LASWELL

3            Now, Miss Feindt.

4            MS. FEINDT: Yes, sir.

5            MR. LASWELL: Waiting for you to raise up

6    there.

7            MS. FEINDT: Trying to get my glasses.

8            MR. LASWELL: The police-- talking to Mr.

9    Hagan, police pulling up behind you and traffic

10   tickets and everything.

11           MR. HAGAN: Huh huh.

12           MR. LASWELL: And it reminded me of something

13   that Mr. Milian asked.  That's, a getaway driver is

14   just as responsible as the liquor store robber or bank

15   robber or whoever, I think everyone sort of agreed.

16           MR. HAGAN: Yes, right.

17           MR. LASWELL: Well, suppose he doesn't know

18   that rob-- that a robbery has occurred; is it still

19   your opinion that he is just as responsible?

20           MR. HAGAN: Okay, unknown, like everyone has

21   known what's been, been going on together.  It's been

22   like a gang type thing.

23           MR. LASWELL: What if that's not the case?  I

24   know it makes is it a lot easier if everyone knows

25   what is going on.  It's an easy question.


                LAUDERDALE REPORTING  (305) 467-6671

88

1          MR. HAGAN: I am sure there is times when
2     there was been innocent people.
3          MR. LASWELL: Well maybe they are not even
4     innocent people.  The question is what if they don't
5     know what is going on.
6          MR. HAGAN: I think they are as responsible.
7     I feel like they are as responsible as the people they
8     are with.
9          MR. LASWELL: Mr.-- I'm going to mess your
10    name up, Garcimonde; is that right?
11         MR. GARCIMONDE: Pretty good.
12         MR. LASWELL: What-- How do you feel?
13         MR. GARCIMONDE: About what specific.
14         MR. LASWELL: About getaway driver, that he,
15    we originally all agreed upon, is just as responsible
16    as bank robber.  What if he doesn't know about the
17    bank robbery.  What if he doesn't know the other guy
18    has a pistol?  What if he doesn't know he held up a
19    liquor store or whatever?  You still think the getaway
20    driver is as responsible.
21         MR. GARCIMONDE: If he doesn't know that
22    there is a weapon, that people he is with are about to
23    do something wrong?
24         MR. LASWELL: Right.
25         MR. GARCIMONDE: It's hard to tell.  If he


                LAUDERDALE REPORTING  (305) 467-6671

1    truly doesn't know, he is innocent.  If he knows, he

2    is guilty.

3              MR. LASWELL: Would you want to make sure of

4    that before you asses the accountability and

5    responsibility that a jury has to asses against

6    someone?  Would you want to know the answer to that

7    question?

8              MR. GARCIMONDE: To what question?

9              MR. LASWELL: A juror has to decide whether a

10   guy is guilty or innocent, right?

11             MR. GARCIMONDE: Right.

12             MR. LASWELL: And part of the jurors' process

13   of deliberation is determining what we lawyers

14   call,"mens rea" which is guilty knowledge.  In other

15   words, you got to have felonious intent to commit an

16   act.

17             And so if the evidence shows that an

18   individual doesn't have knowledge, he couldn't have

19   felonious intent, would you as juror, my question is

20   make sure that State proved beyond a reasonable doubt

21   that might be true that intent was there?

22             When you were young, anybody can answer this

23   one, did your mother ever tell you to stop hanging out

24   with other boys because they could get you in trouble.

25             MR. GARCIMONDE: (shaking head, no verbal

1   response)

2          MR. LASWELL: Do you think that's true?

3          MR. GARCIMONDE: No.

4          MR. LASWELL: You think you need to select

5   your social associates wisely?

6          MR. GARCIMONDE: Sometimes I do, sometimes

7   you don't.

8          MR. LASWELL: How about you, Miss Moultry?

9          MS. MOULTRY: Yes.

10          MR. LASWELL: You think the other kids on the

11   block can get you in trouble?

12          MS. MOULTRY: Probably, yeah.

13          MR. LASWELL: How is it that then-- Let me

14   ask you it this way, you think that as little kids,

15   you are less able to discern potential problems of the

16   company you keep as you are as an adult.

17          MS. MOULTRY: Right, yes.

18          MR. LASWELL: Everybody agree with that.

19          PROSPECTIVE JURY: (shaking heads)

20          MR. LASWELL: It's part of the maceration

21   process. As we go through life we learn what to look

22   out for and what not to look out for. Would you want

23   to know if there was two or three people involved in

24   something what state of knowledge and what the state

25   of activity of each person was?


          LAUDERDALE REPORTING  (305) 467-6671

1           MS. MOULTRY: Yes.

2           MR. LASWELL: In other words, you wouldn't

3  condemn the whole street corner, you would condemn the

4  actors that had the knowledge that had the intent?

5           MS. MOULTRY: Yes.

6           MR. LASWELL: Fair enough.

7           Who's religious?  Who belongs to a church?

8  See a show of kind?  Okay.  Mr. Perez, do you practice

9  your religion?

10          MR. PEREZ: Catholic, yes.

11          MR. LASWELL: You go to confession

12 occasionally?

13          MR. PEREZ: Yes.

14          MR. LASWELL: Miss Rviz.

15          MS. RVIZ: I am Christian.

16          MR. LASWELL: Do you belong to an organized

17 church?

18          MS. RVIZ: I belong to Jesus' church.

19          MR. LASWELL: You don't belong to Methodist

20 or Presbyterian an work on the committee and stuff?

21          MS. RVIZ: I go to one spot for worship.

22          MR. LASWELL: Do you don't go to Grace

23 Kaplan, Master Bob.

24          MS. RVIZ: Yes, I do.  But that's not the

25 name.

1               MR. LASWELL: What's the proper name?

2               MS. RVIZ: Calvary Chapel.

3               MR. LASWELL: Calvary Chapel, impressive man

4    Pastor Bob.  Anybody anyone else go there?  Mr. Smith,

5    what church do you go tb?

6               MR. SMITH: Catholic church.

7               MR. LASWELL: Catholic church where,

8    Hollywood?

9               MR. SMITH: (shaking head)

10              MR. LASWELL: Anybody else?  Mrs. Mc Neil.

11              MS. MC NEIL: Methodist Church of Lighthouse

12   Point.

13              MR. LASWELL: Miss Myers?

14              MS. MYERS: Saint Elizabeth in Pompano.

15              MR. LASWELL: Miss Crane.

16              MS CRANE: Crane.

17              MR. LASWELL: Patricia Crane, I'm not nearly

18   as good as Milian.  I don't know how he does that.

19              MS. CRANE: Enunciation Catholic Church.

20              MR. LASWELL: Is everyone Catholic except for

21   Mr. Rosenbloom, I guess.

22              MR. GARCIMONDE: That's pretty fair church.

23              MR. LASWELL: Sir?

24              MR. GARCIMONDE: Catholic.

25              MR. LASWELL: Miss Farrington?

1           MS. FARRINGTON: I'm Baptist.

2           MR. LASWELL: You're Baptist, thank you.

3 Miss Moulry- Moulbry.

4           MS. MOULTRY: Moultry.

5           MR. LASWELL: Moultry.

6           MS. MOULTRY: Baptist.

7           MR. LASWELL: I don't know how he knows

8 everybody's name in three minutes.  I know nobody's

9 name after three days.

10           Incidently, does everyone realize that the

11 office of the State Attorney is an elected office that

12 is held by Mr. Michael Satz and has been held by for

13 last 20 years.  It's not Al's office.  I didn't want

14 anyone to be confused about that.  Mr. Satz runs the

15 office not Mr. Milian.

16           But is everybody aware of the fact that that

17 office, whether its efforts are being directed by Mr.

18 Satz or Mr. Milian, whoever has the power and duty and

19 obligation to investigate activity which is suspected

20 to be is an illegal act, after the investigation, is

21 bring about a presentment of charges in different,

22 different ways that will be decided by a community

23 group.  You all aware of that?  You all aware of the

24 fact that until, up to and including, that time there

25 is a presumption of innocence?


                LAUDERDALE REPORTING  (305) 467-6671

1              Everybody has heard of that?  Right now Todd

2     is presumed to be innocent.  Just as I am, just as

3     prosecutor's are, the judge.  We are all presumed to

4     be innocent, and it's the State's job to strip that

5     away and to strip it away by competent evidence.

6              They should present to you all the evidence

7     they have, should not put a witness on if there are

8     other witnesses who testified and have other evidence

9     for you, understand that?  Would you make him do

10    that?

11             You heard the judge.  I think Mr. Milian was

12    talking about it, this and you heard the judge read

13    these charges and they are suppose to be two victims.

14    I assume you want to hear from them.  Not hearing from

15    one of them, you will- would be at grave disadvantage

16    in deciding whether or not that innocent person was a

17    victim, missing person was a victim.

18             There are police officers involved.  You

19    think, all of you, wouldn't have a problem in, in

20    being persuaded of the testimony of someone because

21    they are police officers; is that correct?

22             There was this, I think a couple of

23    questions that Mr. Milian posed concerning whether or

24    not a police officer's capable of exercising bad

25    judgment.

LAUDERDALE REPORTING   (305) 467-6671

1                    I think everybody sort of agreed.  I want to

2    make sure everybody's aware they are nothing more than

3    mere mortals like the rest of us, are they not?  Mr.

4    Hagan, what do you think a police officer's job and

5    life is?

6              MR. HAGAN: To enforce the law.

7              MR. LASWELL: How does he do that?

8              MR. HAGAN: How does he do it?

9              MR. LASWELL: Basically.

10             MR. HAGAN: Respond to calls.  He can see

11   something in progress.

12             MR. LASWELL: Suppose I told you this, that a

13   police officer line in life is to determine by

14   investigation or observation or whatever that a law

15   had been violated and to make an arrest or give a

16   summons or notice and then to follow through and go to

17   court and testify, see if there is a conviction; would

18   you agree with that, basically?

19             MR. HAGAN: Basically.

20             MR. LASWELL: And if there had been some poor

21   judgment used then you would expect that somewhere

22   along the line it would show up, right.

23             MR. HAGAN: I suppose so.

24             MR. LASWELL: Like Eric Williams, no arrest

25   was made in that case because a good investigation was

1    done.  You would want to see a good investigation in

2    this case like Eric Williams.

3            If the law requires Mr. Milian proved to you

4    that my client took property from another person by

5    force or by violence, or by the threat of force and

6    violence, would you want the- want the evidence to

7    clearly indicate that any needed, he had them.

8            Would you hold the State to their standard?

9    Anyone who wouldn't do that?  Would anyone think if he

10   was with somebody that if they got close and showed

11   the guy next to it, that would be close enough?

12           Are there any of you are that think probably

13   is the standard or, gees, Miss Henry?

14           MS. HENRY: No.

15           MR. LASWELL: Probably isn't good enough.

16           MS. HENRY: No, I don't think so.

17           MR. LASWELL: It's beyond and to the

18   exclusion of every reasonable doubt.

19           Reasonable doubt can arise from the

20   evidence, right?  A reasonable doubt can arise from

21   conflicts in the evidence. A reasonable doubt can

22   arise from the lack of evidence. You bear that in mind

23   if you are selected as jurors. Does anybody who

24   doesn't want to be here?  Let's put it this way.  Wait

25   a minute.  I don't want to hear from all of you that.

LAUDERDALE REPORTING  (305) 467-6671

1          Is there anyone who is unwilling to

2    undertake this job that is so important?  I know

3    everybody would like to be somewhere else.  You have

4    things on your mind.

5          I'm assuming this is an important job.  It

6    is the foundation of our criminal justice system.

7    Would you all do the job as best you can?  Will you

8    all promise me that you would listen to the judge and

9    try to follow his instructions?

10          We had a judge a few years ago, Henry

11    Weisling (phonetic), he use to talk about having you

12    take off your citizen hats and put on your juror hats

13    because we do some things in the criminal law business

14    that are unusual.

15          For example, whose got two or more kids when

16    the kids were young or are young, and you came home

17    and a lamp was broken or the kids were, you know, and

18    one of them said the other did it, would I be correct,

19    ma'am, in assuming or, Mr. Smith, in assuming that

20    what you would do, you would get one kid in one arm

21    and get the other kid in the other arm before you

22    would ever made a decision who was telling truth; is

23    that how you would do it?

24          MR. SMITH: (no verbal response)

25          MR. LASWELL: Is that yes?




                LAUDERDALE REPORTING  (305) 467-6671

1                MR. SMITH: Maybe, I don't know.

2                MR. LASWELL: Maybe?

3                MR. SMITH: Yeah, maybe.

4                MR. LASWELL: You wouldn't even want to hear

5    both sides?

6                MR. SMITH: I would want to hear both sides,

7    yes.

8                MR. LASWELL: That's sort of natural

9    instincts, isn't it?  Everyone agree with that?

10               Now, law tells you to take off your common

11   sense natural instinct hat and put on your juror hat

12   because at the end, the judge will tell you the law.

13   It is that no defendant in this courthouse or any

14   courthouse in America has to testify.

15               You understand there with one arm out, what

16   happened to this guy.  He didn't say anything.

17   Doesn't he have to testify?  If you are a juror, in

18   deliberations, you are instructed not to consider

19   that, could you do that?

20               MS. FARRINGTON: Yes.

21               MR. LASWELL: You know you can do that Miss

22   Farrington?

23               MS. FARRINGTON: Yes.

24               MR. LASWELL: Would you deliberate and say

25   that guy should have said something?  Why didn't he do

LAUDERDALE REPORTING  (305) 467-6671

1   that?

2          MS. FARRINGTON: No.

3          MR. LASWELL: He should have denied it,

4   right?

5          MS. FARRINGTON: (shaking head)

6          MR. LASWELL: That's normal to think that

7   way.  The judge instructs you that you can- can you

8   follow the Judge's instructions?

9          MS. FARRINGTON: Sure.

10         MR. LASWELL: Will everybody do that even

11  though it's unnatural?

12         MS. KALEN: I would have a hard time.

13         MR. LASWELL: Could you not do it?

14         MS. KALEN: I suppose I could.

15         MR. LASWELL: Um.

16         MS. KALEN: I suppose I could.  It would be

17  somewhat restrictive of my abilities to do that.

18         MR. LASWELL: All I'm doing, actually, Miss

19  Kalen is asking you to commit to the Florida legal

20  system and constitution.  All right.

21            And to take the the other hat.  That's

22  right, take off your common sense hat, if you will,

23  put on your Florida law hat.  That sounds pretty bad.

24  I don't mean pretty bad.  But if you will listen to

25  what the judge tells you the law is, and apply it

LAUDERDALE REPORTING  (305) 467-6671

1   without any outside considerations, you would be a

2   great juror. Will you do that? Will everybody do

3   that? Anybody who wouldn't?

4           Thank you, Your Honor. Thank you all for

5   your cooperation.

6           THE COURT: Okay. You want to take a few

7   moments to confer with your client, Mr. Laswell, then

8   we will go side-bar to do the challenges whenever you

9   are ready.

10          (Whereupon at 4:32 p.m., a short pause in

11  the proceedings after which the following proceedings

12  were heard:)

13          THE COURT: Ready? Okay approach the bench

14  side-bar.

15          (Whereupon a side-bar conference was had

16  outside the hearing of the jury as follows:)

17          THE COURT: Mr. Richardson, come on over

18  side-bar also, if you would.

19          (Whereupon Defendant Richardson approached

20  the bench side-bar after which the following

21  proceedings were had:)

22          THE DEFENDANT: How you doing today, Judge?

23          THE COURT: Okay. We are at side-bar. Both

24  counsel are present. Mr. Richardson is present. Any

25  challenge for cause?


                LAUDERDALE REPORTING  (305) 467-6671

1           MR. LASWELL: Think Miss Mc Neil.

2           THE COURT: Any objection to Miss Mc Neil for

3   cause?

4           MR. MILIAN: No.

5           THE COURT: Okay grant the challenge for

6   cause on Miss Mc Neil.  Any other challenges for

7   cause.

8           MR. MILIAN: Judge I want to challenge for

9   cause Mr. Constant.

10          THE COURT: Because of the personal charge?

11          MR. MILIAN: Yes, sir.

12          THE COURT: What is your position on Mr.

13  Constance for cause?

14          MR. LASWELL: He said he could be fair, I

15  think.

16          THE COURT: Deny the challenge for cause on

17  Mr. Constance.  Any other challenges for cause?

18          MR. LASWELL: How about Mrs. Nowell?  She is

19  pretty far down the list.  She is on the end outside

20  end of thirty.

21          THE COURT: What is your position on Miss

22  Nowell?

23          MR. MILIAN: I object.

24          MR. LASWELL: Are you sure?

25          THE COURT: Okay, deny the challenge for


               LAUDERDALE REPORTING  (305) 467-6671

1    cause on Miss Nowell.  Any other challenges for

2    cause?

3              MR. LASWELL: That's it that I picked up,

4    Judge.

5              THE COURT: Peremptory challenges through

6    Miss Farrington, Mr. Milian?

7              MR. MILIAN: Which way are you going, again?

8              THE COURT: One through seven, Perez through

9    Farrington.

10             MR. MILIAN: Mr. Constant.

11             THE COURT: Juror number two.  Through Mrs.

12   Henry, Mr. Laswell?

13             MR. LASWELL: Mrs. Feindt.

14             THE COURT: Juror number three.

15             MR. MILIAN: Who, Feindt?

16             MR. LASWELL: Yeah.

17             THE COURT: Through Donald Smith, Mr.

18   Milian?

19             MR. MILIAN: None.

20             THE COURT: Mr. Laswell?

21             MR. LASWELL: Miss Henry.

22             THE COURT: Juror number seven.

23             MR. MILIAN: Who?

24             MR. LASWELL: Annie Henry.

25             THE COURT: Through Mrs. Ellison, Mr.

LAUDERDALE REPORTING   (305) 467-6671

1    Milian?

2              MR. LASWELL: Okay.

3              MR. MILIAN: Who, Miss Ellison you said?

4              THE COURT: Yeah.  Mr. Laswell.

5              MR. LASWELL: Are you waiting on me?

6              THE COURT: Yeah.

7              MR. LASWELL: I don't like Mr. Smith.

8              THE COURT: Actually, it was wasn't your

9    turn.  It's Mr. Milian.

10             MR. LASWELL: Yeah, I know.

11             THE COURT: Okay, excuse Mr. Smith.  Now

12   through Mrs. Gallagher, Mr. Milian?

13             MR. MILIAN: Nobody, Judge.

14             THE COURT: All right.  Now, we will go back

15   to Mr. Laswell, through Mrs. Gallagher.

16             MR. LASWELL: Where is Mrs. Ellison?  She is

17   out here?

18             THE COURT: She is still on.

19             MR. LASWELL: Take her off.

20             THE COURT: Okay, Ellison. Now through Miss

21   Moultry, Mr. Milian?

22             MR. MILIAN: Strike Miss Moultry.

23             THE COURT: Okay, through Mr. Garcimonde, Mr.

24   Laswell?

25             MR. LASWELL: Take Miss Gallagher off.


                    LAUDERDALE REPORTING  (305) 467-6671

1          THE COURT: Okay through Miss Dhue, Mr.

2  Milian?

3          MR. MILIAN: Mr. Garcimonde.

4          THE COURT: Through Mr. Hagan, Mr. Laswell?

5          MR. LASWELL: Strike Mr. Hagan.

6          THE COURT: Skipped one, I guess we are

7  through Mr. Sartwell, Mr. Milian?

8          MR. MILIAN: I accept.

9          THE COURT: Mr. Laswell?

10          MR. LASWELL: I need to talk to him.

11          THE COURT: Okay.

12          (Whereupon a short pause in the proceedings

13  after which the following proceedings were heard:)

14          MR. LASWELL: Having had that opportunity to

15  discuss this with Mr. Richardson and having found

16  almost no one else on the list of prospective jurors

17  that one or other is in the liking to this is not a

18  perfect batch, it is one we will accept.

19          THE COURT: So if there is no backstrikes,

20  our panel will be Juror Number 1, Mr. Perez; Number 4,

21  Mrs. Ruiz; Number 6, Miss Farrington; Number 13, Mrs.

22  Dhue; Number 15, Mrs. Lee; Number 16, Mr. Sartwell.

23  These six jurors acceptable to the State?

24          MR. MILIAN: Let me have one second, Judge.

25  Yeah, that's acceptable, Judge.


LAUDERDALE REPORTING  (305) 467-6671

1           THE COURT: To the defense?

2           MR. LASWELL: Yes, sir.

3           THE COURT: Those six jurors okay with you,

4  Mr. Richardson?

5           THE DEFENDANT: Excuse me.

6           THE COURT: Are those six jurors okay with

7  you?

8           THE DEFENDANT: Yes, sir.

9           THE COURT: Let's pick an alternate juror.

10 Each of you will have one challenge for the

11 alternate.  Mrs. Myers acceptable to the State?

12          MR. MILIAN: Yes, judge.

13          THE COURT: To the defense?

14          MR. LASWELL: Here's the deal, you got one

15 execution to use, okay.  If you use this one, Miss

16 Myers, okay, then you get the old New York cop.

17          THE DEFENDANT: All right.

18          MR. LASWELL: We better take Miss Myers.

19          THE COURT: Miss Myers will be our alternate,

20 okay?

21          MR. LASWELL: Okay

22          (Whereupon the side-bar conference was

23 concluded after which and in the hearing of the jury

24 the following proceedings were heard:)

25          THE COURT: Okay, members of the jury, we

LAUDERDALE REPORTING   (305) 467-6671

1   have selected the six jurors and one alternate to

2   serve on this case.

3          If your name is called, please stand so you

4   can be sworn in.  The six jurors that will be serving

5   on this case is:

6          Mr. Perez, Mrs. Ruiz, Mrs. Farrington, Mrs.

7   Dhue, Mrs. Lee, Mr. Sartwell and the alternate juror

8   is going to be Mrs. Myers.  And if you seven jurors

9   could stand.

10          Pat, if you would swear in the seven jurors.

11          THE CLERK: Raise your right hand please

12          (Whereupon the jury was sworn by the Court

13   Clerk after which the following proceedings were

14   heard:).

15          THE COURT: Pat is going to give you some

16   juror buttons.  Please wear the buttons on the outside

17   of your clothes when you are inside the courthouse.

18          When the case is over with, we will need to

19   get the juror buttons back from you.  You can have a

20   seat.

21          When the six of you come back tomorrow, I am

22   going to ask you to wait outside the courtroom door at

23   10:30, and shortly after that, we will be able to

24   resume the trial.  Whenever we bring you in at 10:30,

25   we want to seat you as follows:

LAUDERDALE REPORTING  (305) 467-6671

1        Mr. Perez, the first seat in the back row.

2   Mr. Ruiz, second row.  Mrs. Farrington, four-- third

3   seat in the back row.  Mrs. Dhue, the fourth seat.

4   Mr. Sartwell, the fifth seat, and, Mrs. Myers, you

5   will be the last seat in the back row.

6        I am going to give you the preliminary

7   instructions that I eluded to earlier this afternoon.

8   And if if everyone listens to the instructions, maybe

9   I won't have to read them again to the seven of you

10  that are selected in the second case.

11       Okay, ladies and gentlemen, you have been

12  selected and sworn as the jury to try the case of

13  State of Florida versus Todd Richardson.

14       This is a criminal case, and Mr. Richardson

15  is charged with one count of Armed Robbery and one

16  count of Armed kidnapping.  The definitions of the

17  elements of those crimes will be explained to you

18  later.

19       It is your solemn responsibility to

20  determine if the State has proved its accusations

21  beyond a reasonable doubt against the defendant.  Your

22  verdict must be based solely on the evidence, or lack

23  of evidence and the law.

24       The Information is not evidence and is not

25  to be considered by you as any proof of guilt.


LAUDERDALE REPORTING   (305) 467-6671

1             It is the judge's responsibility to decide

2      which laws apply to this case and to explain those

3      laws to you. It is your responsibility to decide what

4      the facts of this case may be, and to apply the law to

5      those facts.

6             Thus, the province of the jury and the

7      province of the court are well defined, and they do

8      not overlap.  This is one of the fundamental

9      principles of our system of justice.

10            Before proceeding further, it will be

11     helpful if you understand how a trial is conducted.

12     At the beginning of the trial the attorneys will have

13     an opportunity to, if they wish, to make an opening

14     statement.

15            The opening statement gives the lawyers a

16     chance to tell you what evidence they believe will be

17     presented during the trial. Now, what the lawyers say

18     is not evidence, and you are not to consider it as

19     such.  Following the opening statements, witnesses

20     will be called to testify under oath.

21            They will be examined and cross-examined by

22     the attorneys.  Documents and other exhibits also may

23     be introduced as evidence.  After the evidence has

24     been presented, the attorneys will have the

25     opportunity to make their final argument.

LAUDERDALE REPORTING  (305) 467-6671

1           Following the arguments by the attorneys.

2    I'll instruct you on law applicable to this case.

3           After the instructions have been given, the

4    alternate juror will be excused and the remainder of

5    the jury will then retire to consider its verdict.

6           You should not form any definite or fixed

7    opinions on the merits of this case until after you

8    have heard all the evidence, the arguments of the

9    attorneys and instructions on the law from me. Until

10   that time, you should not discuss the case among

11   yourselves.

12          Now, during the course of the trial, the

13   court will take recesses, during which you will be

14   permitted to separate and go about your personal

15   affairs.

16          During these recesses, you will not discuss

17   the case with anyone nor permit anyone to say anything

18   to you or in your presence about the case.

19          If anyone attempts to say anything to you or

20   in your presence about this case, tell them that you

21   are on the jury trying the case and ask them to stop.

22   If they persist, leave them at once and immediately

23   report the matter to the bailiff who will advise me.

24          This case must be tried by you only on

25   evidence presented during the trial in your presence

LAUDERDALE REPORTING    (305) 467-6671

1    and in the presence of the defendant, the attorneys

2    and myself.   Jurors must not conduct any investigation

3    of their own.

4           Accordingly, you must not visit any of the

5    places described in the evidence and you must not read

6    nor listen to any reports about the case.

7           Further, you must not discuss this case with

8    any person and you must not speak with the attorneys,

9    the witnesses or the defendant about any subject until

10   your deliberations are finished.

11          The attorneys are trained in the rules of

12   evidence and trial procedure.  It is their duty to

13   make all objections they feel are proper.  When an

14   objection is made, you should not speculate on the

15   reason why it is made.

16          Likewise, when an objection is sustained or

17   upheld by me, you must not speculate on what might

18   have occurred if the objection had not been sustained

19   what the witness might have said if he or she been

20   permitted to answer.

21          Okay, the seven jurors that were just sworn

22   in, I am going to go ahead and excuse you until

23   tomorrow at 10:30.  Have a nice evening.

24          See you back outside the courtroom door at

25   10:30.


                    LAUDERDALE REPORTING   (305) 467-6671

111

1           And when you come in tomorrow, be careful
2    not to put yourself in a position to overhear
3    conversations because their may be witnesses waiting
4    to testify.  So the seven jurors are excused until
5    tomorrow at 10:30.
6           (Whereupon at 4:48 p.m., the jury selected
7    for Mr. Richardson's case exited the courtroom after
8    which the following proceedings were heard:)
9           THE COURT: Okay, now the remaining
10   twenty-three jurors, we are going to take another five
11   minute recess.
12          Remember my admonition not to discuss the
13   case or allow it to be discussed in your presence.  I
14   am going to ask you to be back outside the courtroom
15   door in five minutes.
16          (Whereupon proceedings for the above-styled
17   cause was concluded.)
18
19
20
21
22
23
24
25


              LAUDERDALE REPORTING   (305) 467-6671

112

1                          CERTIFICATE

2

3

4    STATE OF FLORIDA

5    COUNTY OF BROWARD

6

7

8

9

10          I, DONNA VASSELLO, Certified Professional

11   Reporter, certify that I was authorized to and did

12   stenographically report the foregoing proceedings and

13   that the transcript is a true and complete record of

14   my stenographic notes.

15

16

17

18

19          DATED this 21 day of APRIL , 19 97.

20

21

22          Donna J Vassello

23          Donna Vassello, Certified Reporter

24

25

LAUDERDALE REPORTING  (305) 467-6671

IN THE DISTRICT COURT OF APPEAL - FOURTH DISTRICT
WEST PALM BEACH, FLORIDA

CLOCK IN

| DIVISION: [X] CRIMINAL | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION |
|---|---|

TODD RICHARDSON
VS.
STATE OF FLORIDA

Appellant

Appellee

CASE NUMBER
96-3122CF10C
APPEAL NUMBER
98-4323

VOLUME ___II___    PAGES ___113___ TO ___272___

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

FEB 01 1999

CRIMINAL DIVISION
WEST PALM BEACH

RICHARD L. JORANDBY, 15TH P.D.
ATTORNEY FOR APPELLANT

GEORGINA JIMENEZ OROSA
ASSISTANT ATTORNEY GENERAL

1                       IN THE CIRCUIT COURT OF THE
2                       SEVENTEENTH JUDICIAL CIRCUIT,
                        IN AND FOR BROWARD COUNTY, FLORIDA
3
                                      )
4    TODD RICHARDSON,                 )
                                      )    ORIGINAL
5         Appellant/Defendant,        )
                                      ) Case
6    vs.                              ) No. 96-3122CF10C
                                      )
7    STATE OF FLORIDA,                )
                                      )
8         Appellee/Plaintiff.         )
     -----------------------------------X
9
                              Broward County
10                            Fort Lauderdale, Florida
11

12            ------------------------------------
              APPEAL ON BEHALF OF THE DEFENDANT
13            ------------------------------------

14

15

16

17

18

19                         VOLUME III (3)
                          Pages 113 to 272
20

21

22

23

24

25

1

                              I-N-D-E-X

2

3        <u>Date</u>                <u>Proceedings</u>              <u>Page</u>
         January 13, 1997        Opening statements      113-272
4                               Testimony

5

         W-I-T-N-E-S-S-E-S
6        (State)
         LINDA BUTLER                                      PAGE
7        Direct examination by Mr. Milian                  130
         Cont'd direct examination by Mr. Milian           158
8        Cross-examination by Mr. Laswell                  162
         Redirect examination by Mr. Milian                176
9        Recross-examination by Mr. Laswell                180

10       ERICA OUTRIDGE
         Direct examination by Mr. Milian                  181
11       Cross-examination by Mr. Laswell                  200
         Redirect examination by Mr. Milian                208
12       Recross-examination by Mr. Laswell                209

13       OFF. CURTIS HAMPTON
         Direct examination by Mr. Milian                  210
14       Cross-examination by Mr. Laswell                  221

15       DET. MARK WENDT
         Direct examination by Mr. Milian                  227
16       Voir dire examination by Mr. Laswell              230
         Continued direct examination by Mr. Milian        232
17       Cross-examination by Mr. Laswell                  236

18       DENNIS GREY
         Direct examination by Mr. Milian                  244
19       Cross-examination by Mr. Laswell                  249

20       SGT. JOHN SPRINGMAN
         Direct examination by Mr. Milian                  254
21       Cross-examination by Mr. Laswell                  255

22       SGT. LARRY MASSEY
         Direct examination by Mr. Milian                  257

23

24

25

1

E-X-H-I-B-I-T-S                                          PAGE
State's 1                                                140
State's 2 through 26                                     143
State's 27                                               159
State's 28                                               160
State's 29                                               161
Defendant's 1 through 3                                  169
State's 30                                               197
State's 31                                               200
State's 32                                               217
Defendant's 4                                            224
State's 33 and 34                                        232
Defendant's 5                                            251

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          IN THE CIRCUIT COURT OF THE
                           SEVENTEENTH JUDICIAL CIRCUIT IN
2                          AND FOR BROWARD COUNTY, FLORIDA

3    STATE OF FLORIDA,          )
                                )
4                    Plaintiff, )
                                ) Case no. 96-3122CF10C
5    vs.                        )
                                )
6    TODD RICHARDSON,           )
                                )
7                    Defendant. )
                                )
8    -------------------------------X

9                          Fort Lauderdale, Florida
                           January 13, 1997
10                         11:15 o'clock a.m.

11   APPEARANCES:

12          OFFICE OF THE STATE ATTORNEY
            By:  ALBERTO MILIAN, ESQ.
13          Appearing on behalf of the Plaintiff

14          OFFICE OF THE PUBLIC DEFENDER
            By:  WILLIAM LASWELL, ESQ.
15          Appearing on behalf of the Defendant

16                  ----------------

17          The above-styled cause came on for jury trial,

18   before the Honorable WILLIAM P. DIMITROULEAS, Presiding

19   Judge, at the Broward County Courthouse, Fort

20   Lauderdale, Broward County, Florida, on the 14th day

21   of January, 1997, commencing at 11:15 o'clock a.m.

22

23

24

25
```

197

1          (Thereupon, the following proceedings were had:)

2          THE COURT:  We're on the record.  Mr.

3     Richardson's here.  Mr. Laswell is here.  Mr. Milian's

4     not here.  Anything to come before the Court before we

5     bring the jury in?

6          MR. LASWELL:  Not at this time.

7          THE COURT:  Okay.  Let's bring in the jury.

8          (Thereupon, the jury entered the courtroom, after

9     which the following proceedings were had:)

10          THE COURT:  Good morning, everybody.  We're

11     waiting for the prosecutor.  Hopefully, he'll be in

12     here in a minute or two so just relax.  And we'll wait

13     here a couple of minutes, then we'll let you go back

14     in the jury room.  I'm sure he'll be here in a minute

15     or two.

16          Okay.  We're on the record.  Both counsel are

17     present.  Mr. Richardson's present.  Counsel concede

18     the presence of the jury and waive its polling?

19          MR. MILIAN:  Yes, Judge.  I'm sorry I'm late, but

20     I was in my office sitting there, and I never got the

21     message we were ready here.

22          THE COURT:  We start here at ten thirty.

23          MR. MILIAN:  I know.  I came but you were doing

24     you're docket still.

25          THE COURT:  Okay.  Well, did everyone follow my

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

118

1    admonition not to discuss the case or allow it to be

2    discussed in your presence?

3        THE JURY:  (Nod heads.)

4        THE COURT:  Okay.  I think we're ready for the

5    opening statements of the attorney.  Mr. Milian, you

6    may proceed.

7        MR. MILIAN:  Judge, I need to go side bar to

8    bring something to the Court's attention.

9        THE COURT:  Okay.  Approach the bench side bar.

10       (Thereupon, the following proceedings were had at

11   side bar, outside the hearing of the jury:)

12       MR. MILIAN:  Judge, this morning one of the

13   police officers showed up in my office and unbeknownst

14   to me and I think unbeknownst to the defense a

15   photographic line-up and a supplement was conducted on

16   Mr. Richardson.  You know, I had filed a request for

17   that photographic line-up in April of 1996, and it's

18   never been given to the State Attorney's Office.

19       THE COURT:  It's a discovery violation.  Don't

20   mention it in your opening.  If you want to use it

21   during the trial, we'll have to do a Richardson

22   inquiry.

23       MR. MILIAN:  Right.  That's why I wanted to bring

24   it up to the attention of the Court.  I have no

25   intention of mentioning it, but I'm trying to make Mr.

119

```
 1      Laswell --
 2              MR. LASWELL:  And I appreciate it.
 3              MR. MILIAN:  -- aware of it as soon as possible.
 4              THE COURT:  Okay.
 5              MR. MILIAN:  The other thing is, Judge, the
 6      defendant gave a self-serving statement that I don't
 7      intend to be using in this court.  And I'd like to
 8      move at this point in time not to have any mention of
 9      it unless you rule differently at some point in time
10      during the course of the trial.
11              THE COURT:  Mr. Laswell.
12              MR. LASWELL:  Quite frankly, Judge, I don't know
13      where I'm headed, but it would not be difficult for me
14      to comply with the Court's instruction not to refer to
15      his statement.
16              THE COURT:  All right.  Let's do that then.
17      Let's just not make reference with the understanding
18      that if you want to argue later on that it's
19      admissible, the door has been opened or in some way
20      it's admissible.  Just proffer it outside of the
21      presence of the jury.
22              MR. LASWELL:  I want some guidance from the Court
23      since this has come up and they say the police talked
24      to him.
25              THE COURT:  I don't know what the relevance is.
```

120

1    I don't know what the relevance is if the State isn't

2    going to introduce it.

3         MR. LASWELL:  The relevance is to show

4    cooperation.

5         THE COURT:  Yeah, I guess so.  Maybe it should

6    come in he talked to the police.  Okay.

7         MR. LASWELL:  Okay.

8         (Thereupon, the following proceedings were

9    resumed within the hearing of the jury:)

10        THE COURT:  Okay.  Proceed.

11        MR. MILIAN:  Thanks, Judge.  Good morning, ladies

12   and gentlemen.  And I apologize for not having been

13   down here earlier.  I'm going to tell you briefly what

14   this case is all about.  You're going to hear that

15   there's two girls, name of Linda Butler and Erica

16   Outridge.  These are young girls.  At the time of the

17   crime one was sixteen, the other one was seventeen

18   years old.

19        They went to the Broward Mall in February of last

20   year 1996.  And they went on a typical shopping trip.

21   And during the time that they were there at the mall,

22   one of girls, Erica, made the acquaintance of the

23   defendant in this case, Todd Richardson.  You will

24   hear that there were pleasantries exchanged.  They

25   engaged in conversation.

121

1        And, in fact, interestingly enough during the

2    course of that conversation Ms. Outridge provided her

3    telephone number to the defendant.  He in turn gave

4    her his own telephone number.  At some point that

5    conversation ended.  The girls were going to get a bus

6    to go back home that day.  Well, the girls went to the

7    bus stand and apparently they missed the bus that

8    passed by.  Well, within minutes guess who came by,

9    Todd Richardson.

10       Now as Todd Richardson and three other

11   individuals who was inside this automobile, a Nissan

12   automobile, and while they were inside this automobile

13   they apparently decided to offer the girls a ride.

14   These young girls, and in hindsight the evidence will

15   show was a lapse of judgment, decided to accept a ride

16   from these young men.

17       They got inside the car.  And, you know, it was

18   kind of a tight fit.  It's a two seater automobile.  I

19   think you will see a photograph of it in evidence.

20   And they were on their way to going home.  Or at least

21   they thought they were.  Unfortunately, things took a

22   different turn.

23       I think the evidence will tell you that one of

24   the individuals in this automobile pulled out an

25   automatic handgun.  He was the driver of the car.  Ms.

```
 1        Outridge was sitting in the back of the automobile at
 2        that time with Todd Richardson.  And what happened
 3        there, ladies and gentlemen, is a robbery took place.
 4        Plain and simple.
 5            At first one of the girls, Ms. Butler, who was
 6        sitting in the front seat couldn't believe what was
 7        going on.  And she, in fact, will tell you she thought
 8        that the gun was a toy gun.  But then the guy who had
 9        the gun went on ahead and pulled the slide action back
10        and put it into a slide.  And I think you're going to
11        have some testimony how the gun operates.  And the
12        girls were quite in fear, obviously, after getting
13        over the initial shock.
14            The individuals inside the automobile started
15        asking them for their property.  They had some jewelry
16        on them.  One of the girls, Linda Butler, had a chain
17        and a pendant yanked from her neck.  She was the one
18        who was sitting in the front.
19            In the back seat where Todd Richardson was
20        sitting, he started demanding that Erica Outridge give
21        him her chain.  Unsatisfied with taking her chain,
22        then he took her purse.  That particular purse only
23        had two dollars in it.  But I think you will see from
24        the evidence that the amount of money and the robbery
25        is not just a crime.
```

1      Well, they continued to ride in that automobile.

2 And Ms. Butler at one point when the automobile was

3 stopped, the girl who was sitting up front, was able

4 to dash from the car.  She was able to jump out and

5 run into an International House of Pancakes.  Well,

6 she was able to get on the phone and call the police,

7 911.

8      In the meantime, the third crime in this case was

9 being committed.  Erica Outridge was taken forcibly at

10 that point by these individuals, among them the

11 defendant, Todd Richardson.  Now the information was

12 relayed to the Plantation Police Department.  And they

13 put out a BOLO which will be explained to you as a Be

14 On the Lookout.  Certain identifications about the

15 automobile were given and a police officer, Officer

16 Hampton, was able to make contact with the car.

17      In the meantime, unbeknownst to him, Ms. Outridge

18 had been left in a desolate area and abandoned by the

19 perpetrators of this crime.  She also will tell you

20 she ran to the first phone she could get ahold of and

21 called the police.

22      Now Officer Hampton chased this automobile I

23 believe he will tell you three or four miles

24 continuously.  There were several stops along the way

25 before they were able to corner the defendant in this

124

3

1    case and get the automobile to stop.

2        Once the automobile was stopped, once that

3    automobile was stopped, the defendant fled from the

4    car.  Now Officer Hampton was able to apprehend the

5    driver of the car.  And Sergeant Massey of the

6    Plantation Police Department rode up right on the

7    scene immediately thereafter.

8        He initiated a foot pursuit of the defendant in

9    this case, Todd Richardson.  Mr. Richardson was chased

10   on foot, continued to run away from the police.

11   Continued to run, continued to run until Sergeant

12   Massey was able to tackle him and place him under

13   arrest.

14       You will hear from the evidence that in the

15   possession of Mr. Richardson was the chain that was

16   taken from Ms. Outridge.  In addition to that he had

17   those two dollar bills.  More importantly you will

18   hear from the police officers that in the front seat

19   of that Nissan automobile where the girls were

20   abducted they found the pendant that belonged to Linda

21   Butler.  Moreover, they also found the purse that Todd

22   Richardson took from Erica Outridge.

23       Interestingly enough, inside that purse you will

24   find the telephone number that Todd Richardson had

25   given to Erica Outridge at the mall.  And you'll also

125

1    find her phone number and the police found that in his

2    pocket.

3         The police will also tell you they found the gun

4    that was used in the robbery.  Officer Hampton located

5    that inside the vehicle.  That was the gun that the

6    driver of the car used during the commission of this

7    robbery.  I think the evidence will be clear and I

8    don't want you to be misled that the gun was being

9    held by the driver of the car.

10        At the conclusion of all the evidence in this

11   case, ladies and gentlemen, you will have to consider

12   certain instructions that I believe the Court will

13   give you as to how to judge a number of people who get

14   involved in this type of crime.  Listen carefully to

15   those instructions because they will help you to take

16   the evidence that you'll hear from the witness stand

17   and help you to analyze and see if those elements of

18   the crime happened then.

19        I think that you will find that on that date in

20   February when these girls were at the Broward Mall,

21   Todd Richardson was an accomplice and participant in

22   this crime and was a direct participant in this crime

23   who insisted on robbing Ms. Linda Butler and also who

24   directly by force and by putting Erica Outridge in

25   fear took her property against her will.

126

1    In addition, I think you will find that on that

2    same date Todd Richardson among the other occupants of

3    that car participated in the armed kidnapping of Erica

4    Outridge.  And therefore at the conclusion of all the

5    evidence, ladies and gentlemen, based on everything

6    that I believe the evidence will show, I'm going to

7    ask you to return a verdict of guilty as charged as to

8    each and every count against the defendant in this

9    case, Todd Richardson.  Thank you very much for your

10    attention and your patience.

11        THE COURT:  Mr. Laswell.

12        MR. LASWELL:  Thanks, Judge.  Good morning all.

13    One of the things that makes our system of justice if

14    not the best, better than lots of other places in the

15    world is the fact that we rely upon the life

16    experiences and the common sense of people like you

17    all to make decisions.  As opposed to some jaded old

18    lawyer, young judge or something like that.

19        And I'll tell you right now that the evidence is

20    going to show that my client has got a lot of flaws

21    and a lot of burdens.  And he's not going to win any

22    good citizenship awards.  But when you cut through all

23    of the evidence and it's going to be a pretty simple

24    case, what you're going to find is that if there was a

25    kidnapping, if there was a taking or whatever, it

1    wasn't done by anybody except Travis Russel.  That

2    Travis Russel was if not the owner, the possessor of

3    and the operator of this car.

4        And Travis Russel began this chain of events in

5    the front seat of the car which is the 300Z, which is

6    a little car like that wide, that high, and you all

7    have seen them on the streets.  And into this car full

8    of four fellows, including my client who's in the

9    back.  There's a hatchback so you're sort of laying

10   down.

11       These two girls voluntarily entered the car.

12   Young Erica, I think, will probably tell you she's a

13   little boy crazy and will say her parents don't let

14   her date and didn't at this time.  And these girls

15   knew, you know, shouldn't have gotten in that car.

16   That's what the evidence is going to be.

17       But the evidence is also going to be that Todd

18   didn't know what was going on in that front seat.

19   Didn't know Travis had a gun.  Didn't even know the

20   other fellow in the passenger seat where Linda Butler

21   was sitting.

22       What he and Juvonal and Erica in the back did

23   know was they were awfully cramped.  And that this

24   kidnapping and this robbery if, in fact, you determine

25   that it was a kidnapping or robbery was conducted by

1    the people in the front seat.  What my stupid client

2    did was while this was going on is commit a theft.

3    And the essence of robbery as opposed to theft is that

4    the taking is by force or violence.

5         And Linda Butler is going to tell you that he

6    never used any force or any violence or any threats of

7    force or threats of violence.  And, in fact, didn't

8    have anything to do with what happened to her in the

9    front seat with Travis Russel.  And, furthermore,

10   Erica is going to tell you that he never threatened

11   her; that he never used any violence; that there was

12   never any threats of force and violence.  And that, in

13   fact, it was and I'm telling you right now it was a

14   theft.  And that's what it was.

15        When somebody jumps out of a car and runs away

16   from a police officer, many of us are prone to think

17   as the Bible teaches that the wicked flee when no man

18   pursueth.  However, you need to know and the State

19   needs to prove from what that fleeing occurs.  It may

20   well be something else.  And you're not allowed to

21   speculate what it is.  And you're not allowed to fill

22   in the gaps.  And you're not allowed to come to

23   decisions what it probably was.

24        What the State has to do and what you all

25   promised to make him do is prove beyond and to the

1        exclusion of a reasonable doubt property was taken

2        from Linda Butler by Todd Richardson by force,

3        violence or threats of force and violence.  That

4        property was taken from Erica Outridge by force

5        violence and threats of force and violence.

6             Quite frankly what we come to you as defense

7        counsel and defendant am telling you in our opening

8        statement is listen to all the evidence, pay close

9        attention and you will see that while Todd Richardson

10       may be no angel, he's badly overcharged in this case.

11       And you will be able to convict him of the appropriate

12       offense, that it should not be the one charged.  So

13       just pay close attention.  See what you all come up

14       with.  Thank you very much.

15            THE COURT:  Mr. Gaudiosi, can you come back at

16       1:15 on Mr. Robinson?

17            MR. GAUDIOSI:  Willie, Judge?

18            THE COURT:  Yes.  We need to clear up what the

19       trial dates are on that.  If you would come back at

20       1:15.

21            MR. GAUDIOSI:  Oh, just set trial dates.

22            THE COURT:  Yes.

23            MR. GAUDIOSI:  Oh, okay.  One fifteen.

24            THE COURT:  Just for a trial date not for a

25       trial.

130

```
 1          MR. GAUDIOSI: Yes, sir.  That's what Judge

 2      Carney's wondering about., too.

 3          THE COURT:  No, it's not for a trial.

 4          MR. GAUDIOSI:  I see.

 5          THE COURT:  Mr. Milian, you may call your first

 6      witness.

 7          MR. MILIAN:  Yes, sir.  I would call to the stand

 8      Linda Butler.

 9   Thereupon,

10                    LINDA BUTLER,

11   having been first duly sowrn, was examined and testified

12   upon her oath as follows:

13          THE CLERK:  Please be seated.  Please state your

14      full name and spell your last name for the record.

15          THE WITNESS:  Linda Butler.  Last name

16      B-U-T-L-E-R.

17                  DIRECT EXAMINATION

18   BY MR. MILIAN:

19      Q.   Linda, tell the jury how old you are.

20      A.   Seventeen.

21      Q.   Back on February the 15th of 1996, how old were

22   you?

23      A.   Seventeen.

24      Q.   Linda, what are you doing right now?  Are you in

25   school or are you working?
```

1    A.    I'm in school.

2    Q.    Where do you go to school at?

3    A.    Gene Whiddon.

4    Q.    And do you know a lady by the name of Erica

5    Outridge?

6    A.    Yes, I do.

7    Q.    How do you know Erica?

8    A.    By friend.

9    Q.    Back on February 19th of 1996, did you and Erica

10   go somewhere shopping?

11   A.    Yes, to the Broward Mall.

12   Q.    All right.  Tell the jury approximately what time

13   you were down there at the mall?

14   A.    During the daytime about five o'clock.

15   Q.    All right.  And when you were down there at the

16   mall, did you have an opportunity to come in contact with

17   someone that later was identified to you as Todd

18   Richardson?

19   A.    Yes.

20   Q.    And how did that come about?

21   A.    Talking.  I was with Erica.  And he -- they were

22   talking and exchanged phone numbers.

23   Q.    All right.  And do you see the guy that you

24   learned his name was Todd Richardson in the courtroom

25   today?

132

1      A.   Yes.

2      Q.   Okay.  Just point to him, and just for the record

3   because they're taking down what you're saying, say for

4   the record what he's wearing, please.  You don't feel

5   comfortable?

6      A.   (Shakes head.)

7      Q.   Okay.  Let me ask you this --

8           MR. LASWELL:  Excuse me, Your Honor.  I'm going

9      to move that be stricken.  I'm not so sure that's the

10     case here.

11          THE COURT:  If the objection is leading, I'll

12     sustain the objection.

13          MR. LASWELL:   It is that.  And it is suggesting.

14     Thank you.

15  BY MR. MILIAN:

16     Q.   Let me ask you this, did you see this young man

17  by the name of Todd Richardson later on that day?

18     A.   Later on after, yes, when we left the mall.

19     Q.   Where were you when you saw this young man again?

20     A.   By the bus stop.

21     Q.   And what were you doing at the bus stop?

22     A.   Waiting for the bus.  The bus left.  We're going

23  to wait for the second one.

24     Q.   All right.  And how did Mr. Richardson come into

25  contact with you again the second time?

1      A.   The second time he drove up.  He didn't drive.

2  He was in the car with somebody else.

3      Q.   All right.  Can you tell the jury how many people

4  were in that car?

5      A.   Four.

6      Q.   And do you remember what kind of a car it was?

7      A.   A 300ZX.

8      Q.   And what kind of conversation did you have with

9  Mr. Richardson and the other guys inside the car?

10     A.   I didn't have a conversation.

11     Q.   Who did?

12     A.   Erica.

13     Q.   And would you tell the jury what the conversation

14  was about?

15     A.   What was the conversation about?  It was about

16  him, they were talking.  And we were going to get in.  We

17  were going to -- we needed a way home.  And I really

18  didn't want to get in the car with them but Erica got in

19  and that's when I got in with them.

20     Q.   All right.  Now you said there were four people

21  in the car.

22     A.   Yes.

23     Q.   Would you tell the jury were they male or female?

24     A.   All male.

25     Q.   And you know that's -- is that a big car or a

134

1    small car?

2        A.    It's a small car.

3        Q.    Okay.  How were you all able to fit inside that

4    small car?

5        A.    Erica went in the back and I sat on someone's

6    lap.

7        Q.    Now why did you get inside a car with four males

8    you had just met?

9        A.    Because Erica got inside.

10       Q.    All right.  Did you think it was a good idea?

11       A.    No.

12       Q.    And where did these four males offer to take you?

13       A.    Home.

14            MR. LASWELL:  Objection, Your Honor.  Until

15       there's some foundation to show that these four

16       fellows are talking in unison or doing things in

17       unison.

18            THE COURT:  Sustained.

19   BY MR. MILIAN:

20       Q.    Did any one of the individuals inside the car

21   offer to take you home?

22       A.    The driver.

23       Q.    All right.  Once you were inside the car, would

24   you describe for the jury what happened at that point?

25       A.    They were taking us onto University, and then

1    that's when the driver said he had to bring keys to his

2    cousin.  And then after that that's when we turned into

3    the bank.

4        Q.    What happened after that point?

5        A.    After that point?

6        Q.    Yeah.  That you just have described.

7        A.    After the bank we went behind the IHOP.  That's

8    when the lady told him to turn off the lights.  And they

9    pulled out -- he turned the lights off and that's when he

10   pulled the gun out and put it to my side.

11       Q.    Okay.  What lady told him to put out the lights?

12       A.    A lady in a car drove by.

13       Q.    And what were you all doing there when you were

14   at the IHOP area?

15       A.    We got hold up.  That's when the gun got to my

16   side.

17       Q.    Tell the jury who pulled out the gun.

18       A.    Driver.

19       Q.    And this was not Todd Richardson, was it?

20       A.    No, it wasn't.

21       Q.    Do you remember where Todd Richardson was sitting

22   inside the car?

23       A.    In the back seat on the driver's side.

24       Q.    And who was back there with him besides?

25       A.    Erica and the other guy on the right hand side.

136

1       Q.   All right.  When the driver of the car pulled out

2  the gun, what did he do with the gun if you can tell the

3  jury?

4       A.   He put it to my side.  And I thought it was a

5  toy.  He said this isn't a toy to be played with and

6  that's when he pulled the thing back.

7            MR. LASWELL:  Judge --

8            THE WITNESS:  He pulled it back.

9            MR. LASWELL:  Withdrawn.

10           THE WITNESS:  That's when I opened the door and

11    put up a struggle.

12           MR. MILIAN:  Okay.  Linda, will you tell the jury

13    what did he pull back on the gun, if you remember?

14           MR. LASWELL:  Objection, Your Honor, to the

15    "they".  May I come side bar?

16           MR. MILIAN:   I'll strike that, Judge.  I'll

17    rephrase the question.

18          THE COURT:  Okay.  Go ahead.

19           MR. LASWELL:  May I just ask the Court to

20    perhaps be proactive here.  I can't do anything with

21    questions about "they" and responses about "they".

22    I'm only here to defend Todd Richardson.

23          THE COURT:  Okay.  Just rephrase your question,

24    Mr. Milian.

25  BY MR. MILIAN:

137

1      Q.   Yes, sir.  What did he do with the gun when he

2   took it out exactly?  You said he did something with the

3   gun.

4      A.   He put it to my side.

5      Q.   Yeah.  Did he do anything else with the gun with

6   his hand?

7      A.   Not at that time.  Then that's when I said it

8   was -- I looked at it and thought it was a toy.  He goes,

9   this isn't a toy to be played with.

10     Q.   Okay.

11     A.   That's when he pulled the thing back.

12     Q.   Okay.  What did he pull back on the gun?

13     A.   The click.  I don't know what it's called.

14     Q.   All right.  And where was the gun at this time?

15     A.   That's when he -- it was still on the side.

16     Q.   Okay.  Did he ask you for anything?

17     A.   Yes, he wanted money and I didn't have money so

18   he wanted my jewelry.

19     Q.   What did he take from you exactly as far as

20   jewelry if you can tell the jury?

21     A.   He didn't take nothing but my chain.  That's when

22   I put up the struggle and I got the scratches on my side.

23     Q.   Okay.  Where was the chain on you?

24     A.   On my neck.

25     Q.   And what were the other guys in the car doing at

138

1    this point?

2        A.    The one in the back on the right hand side was

3    the one who took my chain.

4        Q.    All right.  And how did he take your chain if you

5    can explain to the jury?

6        A.    Put up a struggle.  That's when he scratched my

7    neck.

8        Q.    But how did he take it?  You said you put up a

9    struggle but how did he take it from you?

10       A.    With his hand.

11       Q.    Did he leave any marks on you?

12       A.    Yes.

13       Q.    What were those marks on if you recall?

14       A.    On my shoulder.

15       Q.    All right.  And this guy in the back that took

16   that chain, was that the Todd Richardson you had met over

17   at the mall?

18       A.    It wasn't Todd that took my chain.

19       Q.    All right.  What happened after that, after he

20   yanked your chain from your neck?

21       A.    That's when I got out the car.

22       Q.    All right.  What did you run to?

23       A.    IHOP.

24       Q.    And what did you do when you got to the IHOP?

25       A.    Called 911.

1        Q.    Now when you originally met Todd Richardson and

2    the other guys, will you tell the jury what city you were

3    in?

4        A.    Plantation.

5        Q.    And what county?

6        A.    Broward.

7        Q.    And what State?

8        A.    Florida.

9        Q.    And when you got out of the car, when you ran

10   away from the car and went to that IHOP, called the

11   police, do you know what city you were in at that point?

12       A.    Plantation.

13       Q.    Were you in fear?

14       A.    Yes.

15       Q.    When you were in there.

16       A.    Yes.

17       Q.    Did you give the guy who's the driver of the car

18   or anyone else inside that automobile permission to take

19   that chain from your neck?

20       A.    No.

21             MR. MILIAN:   Judge, may I approach the witness?

22             THE COURT:   Okay.

23   BY MR. MILIAN:

24       Q.    Let me show you one State's exhibit.  It's been

25   marked R.  Would you take a look at it, please, and see if

140

1    you recognize it.

2         A.    It's the car.

3         Q.    Okay.  Is that the way it looked on the 19th of

4    February?

5         A.    With the black thing in front, yes.

6              MR. MILIAN:  Judge, at this time I would like to

7         have State's R moved into evidence.  Published to the

8         jury.

9              MR. LASWELL:  No objection.

10             THE COURT:  R will be State's Number 1.

11             (Thereupon, State's Exhibit Number 1 was received

12        in Evidence.)

13             MR. MILIAN:  And, Judge, for purposes of

14        publication I'd like -- I'd request that the Court

15        instruct the jury although we are publishing it right

16        now they'll have an additional opportunity to take a

17        look at it at the end of the case.

18             THE COURT:  That's correct.

19             MR. MILIAN:  As long as they want to.

20             THE COURT:  It will be available for them during

21        the deliberations, also.

22             MR. LASWELL:  I don't have, if you want to just

23        save some time, all of those you went through, I don't

24        have any objection to them.

25             MR. MILIAN:  Okay.

141

1          THE COURT:  Okay.  You want to name off the

2     letters?

3          MR. MILIAN:  Judge, I do need the witness anyway

4     to testify as to what the pictures show.  I

5     appreciate --

6          THE COURT:  Why don't you read off the letters so

7     we can introduce them into evidence.  The clerk can

8     mark them and you can go through them with the

9     witnesses.

10          MR. MILIAN:  Yes, sir.  State's C.  State's M.

11     State's D, State's B, State's A.  State's W, State's

12     Y, State's X, State's Z, State's V as in Victor.

13     State's U as in uniform.  State's K, L, N.  State's T,

14     State's S, State's G as in golf.  State's O, State's

15     P, State's J, I, L.  State's F and State's E as in

16     echo.

17          THE COURT:  You have two E's.  Was the other one

18     a B?

19          MR. MILIAN:  Looked like an E to me, Judge.

20          THE COURT:  The only letter I'm missing is B so.

21          MR. MILIAN:  Well, the one I just moved into

22     evidence, I believe.

23          THE COURT:  That's R, I think.  You gave that to

24     the clerk.  She can mark it.  I think that's R.

25     That's Exhibit Number 1.  See if you have another E or

1    B.

2          MR. MILIAN:  I have a B.

3          THE COURT:  Okay.  All right.  So no objection to

4    those, Mr. Laswell?

5          MR. LASWELL:  Let me -- I don't think so.  Let me

6    check real quick here.

7          THE COURT:  Okay.

8          MR. LASWELL:  It's more than I remember.  Was

9    this all of them?

10          MR. MILIAN:  There's some more I'll introduce

11    through the other witnesses at a later time.

12          MR. LASWELL:  No, I don't have any objection,

13    Judge.

14          THE COURT:  Okay.  A will be 2.  B will be 3.  C

15    will be 4.  D will be 5.  E will be 6.  F will be

16    7.  G will be 8.  H will be 9.  I will be 10.  J,

17    11.  Twelve -- K is 12.  L is 13.  M is 14.  N is

18    15.  O is 16.  P is 17.  S is 18.  T is 19.  U is

19    20.  V is 21.  W is 22.  X is 23.  Y is 24.  Z is

20    25.  So we're missing a Q, I guess.  That's why

21    there's 25.

22          THE CLERK:  There should be 26.

23          THE COURT:  Is there a Q in there?  I didn't

24    think there were 25 letters in the alphabet.

25          THE CLERK:  Is that a Q?  That's G.

1          MR. MILIAN:  I don't know if there's a Q in there

2     or not.

3          THE CLERK:  There's a Q in there.

4          THE COURT:  All right.  Let's see if we have a Q.

5     Because Q then will be 26.

6          THE CLERK:  Yeah, there's a Q in here.

7          THE COURT:  Okay.  So Q is 26. .

8          (Thereupon, State's Exhibits Numbers 2 through 26

9     were received in evidence.)

10    BY MR. MILIAN:

11         Q.   Let me ask you this while the clerk is marking

12    the numbers on the evidence for those items.  What did you

13    tell the police when you called 911?

14         A.   The description of the car.

15         MR. LASWELL:  Objection, hearsay.

16         THE COURT:  Sustained.

17         THE WITNESS:  And how many people.

18         MR. LASWELL:  Excuse me.

19         MR. MILIAN:  I asked her what she said to the

20    police.

21         THE COURT:  And I sustained the objection as

22    being hearsay.

23    BY MR. MILIAN:

24         Q.   Did you provide them with a description of the

25    automobile?

1      A.   Yes, I did.

2      Q.   Did you tell them what had happened?

3      A.   Yes.

4      Q.   Other than this one individual by the name of

5   Todd Richardson being in the back, did you have any prior

6   acquaintance with any of the guys inside the automobile?

7      A.   Pretimes?

8      Q.   Have you ever met them before?

9      A.   No, I didn't.

10      Q.   Ever talk to them before?

11      A.   (Witness shakes head.)

12      Q.   And during the course of the crime, who held the

13   gun on you while your chain was being ripped off your

14   neck?

15      A.   The driver.

16      Q.   The same guy who held the gun throughout the

17   crime, right?

18      A.   Yes.

19      Q.   Did you voluntarily give up your chain to these

20   guys?

21      A.   No.

22      Q.   And explain to the jury, Linda, if you were

23   afraid, how come you were able to get out of the car and

24   run out of the car like that?

25      A.   My instincts.

145

1      Q.    Did they do anything to try to hold you back?

2            MR. LASWELL:   Objection to the "they".

3            THE COURT:    Sustained.

4    BY MR. MILIAN:

5      Q.    Did any of the four guys inside the vehicle do

6    anything to try to hold you back in?

7      A.    Hold my arm.

8      Q.    All right.  Which one of the guys did that to

9    you.

10     A.    Either one in the back seat.

11     Q.    Which side of the back seat?

12     A.    The passenger.

13     Q.    All right.  Is that the guy that you called Todd

14   Richardson or you said was Todd Richardson?

15     A.    No.

16     Q.    Ones you have marked already can I start going

17   through them?  Thank you.

18     Okay.  Let me show you what's been marked as State's

19   Exhibit 2 in Evidence.  Will you take a look at it?

20     A.    That's my charm.

21     Q.    Okay.  And let me show you also State's 3 which

22   is a close-up.  Can you tell me what that is?

23     A.    My charm.

24     Q.    Okay.  Was that the charm that was ripped off

25   your neck?

146

1        A.    Yes, it was on the necklace.

2        Q.    Let me ask you this, was the necklace taken along

3    with the charm?

4        A.    Yeah.

5        Q.    While the jury is looking at that, at any time

6    when you were in this car, were you sitting anywhere else

7    other than the right front seat?

8        A.    Unh-unh.

9        Q.    All right.  Would you take a look at State's 12,

10    4, and 5 and tell me if you recognize what's in those

11    photographs?

12        A.    My charm.  My charm.  And that's the charm.

13        Q.    Okay.  Let me show you now State's 13 and 14.

14    Would you take a look at them?

15        A.    This is the same charm.

16        Q.    Okay.  And before I show this to the jury, let me

17    show you State's 15.  Do you recognize the seat in there?

18        A.    It's the passenger seat with the charm in it.

19        Q.    Okay.  Where was Travis Russel seated or the guy

20    with the gun seated in contrast where that seat is

21    located?

22        A.    The driver.

23        Q.    Okay.  In that seat that we're looking in the

24    photograph, is that the seat that you were seated at?

25        A.    Yes.

1        Q.   On top of someone.

2        A.   Yes.

3        Q.   In addition, let me show you State's 17 and 16.

4    Ask you to take a look at them.  Do they show the interior

5    of the car?

6        A.   The front of it, the inside.

7        Q.   The front part of the compartment, is that what

8    you're saying?

9        A.   Uh-huh.

10        Q.   Okay.  Now let me ask you to take a look at

11   State's 19 through 22.  While you're looking at those, did

12   the police take any photographs during the investigation?

13        A.   Yes.

14        Q.   Of the scratches that you mentioned before that

15   were caused to you by the pulling of the chain off your

16   neck?

17        A.   Yeah.

18        Q.   Look at State's 19 through 22.  Do those

19   accurately depict those scratches?

20        A.   Yes, they do.

21        Q.   Were those pictures taken at the police station?

22        A.   Yes, it was.

23        Q.   May I have them, please?  How about State's 23

24   and 24?

25        A.   Yes.

1      Q.   Now let me ask you this, while this individual in

2   the driver's side was pointing the gun at you and the

3   other guy was taking the chain from your neck, did anybody

4   leave the car at any time?

5      A.   No.

6      Q.   To your knowledge did Todd Richardson leave the

7   car at any time?

8      A.   No.

9           MR. MILIAN:  Judge, while the jury is finishing

10   looking at the photographs, could we have a side bar?

11          THE COURT:  Okay.  Approach the bench side bar.

12          (Thereupon, the following proceedings were had at

13   side bar, outside the hearing of the jury:)

14          MR. MILIAN:  Well, what does the Court want

15   me to do now with the photographic line up?

16          THE COURT:  Is identity an issue in this case,

17   Mr. Laswell, based on your opening statement?

18          MR. LASWELL:  Not really.  I'd like to see it

19   sometime before it makes its appearance.

20          THE COURT:  Are you going to have somebody else

21   identify Mr. Richardson?

22          MR. MILIAN:  Yes, sir.

23          THE COURT:  He gave an opening statement about

24   his defendant is there.  As long as you have somebody

25   that identifies him, I don't think you need to

1    interject the photo line up particularly when she

2    didn't identify him in court.

3        MR. MILIAN:  Well, that's the thing.  She

4    identified him at the time though.  And I think the

5    photo line up would come in to identify him.

6        THE COURT:  Let's stay away from it.  It's

7    subject with leave for you to recall her later on in

8    the case if it becomes an important issue in the

9    case.

10       MR. MILIAN:  All right.  I just, you know, I was

11   more concerned also that on -- Mr. Laswell I know he

12   wasn't aware of it, and I didn't know if it was

13   relevant to any defense witness coming up.

14       THE COURT:  You mentioned it before the opening.

15   And his defense in opening is we were there, we didn't

16   do anything.

17       MR. MILIAN:  The Court doesn't feel we need to

18   have a Richardson hearing.

19       THE COURT:  What I'd rather do is stay away from

20   it at this point.  And if later on you wanted to

21   introduce it, then you can recall the witness and

22   we'll do the Richardson inquiry then.

23       MR. MILIAN:  All right.  That's fine, Judge.

24       (Thereupon, the following proceedings were

25   resumed within the hearing of the jury:)

1    BY MR. MILIAN:

2        Q.    Linda, tell me what did the guys in the

3    automobile do after you ran out of the car?

4            MR. LASWELL:  Objection, Your Honor, to the

5        "they".  I'm only here to defend Mr. Richardson.

6            THE COURT:  Rephrase the question.

7            MR. MILIAN:  The car -- what did the car do as

8        far as you were able to observe?

9            MR. LASWELL:  Same objection, Judge.

10           THE COURT:  Overruled.

11           MR. MILIAN:  I don't think cars can do anything.

12           THE WITNESS:  They drove off.

13           THE COURT:  Overruled.

14   BY MR. MILIAN:

15       Q.    All right.  Did anybody else get out of the car?

16       A.    No.

17       Q.    Were you able to see if Erica was still in the

18   car?

19       A.    She was still in the car when the car drove off.

20       Q.    And what part of the automobile was she if you

21   can tell the jury?

22       A.    What?

23       Q.    What part of the car was she in?

24       A.    She was in the back seat still.

25           MR. MILIAN:  Judge, I'd like to tender the

```
 1      witness for cross-examination.  But I'd like to
 2      reserve the right to recall her.
 3          THE COURT:  Okay.  We're going to break for lunch
 4      before we do that.  Members of the jury, we're going
 5      to go ahead and recess for lunch.  Remember my
 6      admonition not to discuss the case or allow it to be
 7      discussed in your presence.  I'm going to ask you to
 8      come back at 1:30 and wait outside the courtroom door.
 9      And shortly after that we should be able to resume the
10      trial.  And, again, be careful that you don't put
11      yourself in a position where you're overhearing any
12      conversations.  We'll see you back at 1:30.
13          (Thereupon, the jury exited the courtroom, after
14      which the following proceedings were had:)
15          THE COURT:  Ms. Butler, during the break in your
16      testimony you're not allowed to discuss your testimony
17      with anyone.  Do you understand?
18          THE WITNESS:  Yes.
19          THE COURT:  Okay.  And we'll ask you to come back
20      at 1:30.  We'll see you outside the courtroom door at
21      1:30.
22          THE WITNESS:  Okay.
23          MR. MILIAN:  Ms. Butler, would you wait for me in
24      the witness room?
25          THE WITNESS:  Yes.
```

1          MR. MILIAN:  All right.

2          MR. LASWELL:  Thank you, Judge.

3          THE COURT:  Just one thing before we recess.

4     Rather than inconveniencing Ms. Butler and making her

5     come back later on in the trial, maybe we should do

6     the Richardson inquiry at 1:30 because I'm trying --

7     I'm having a tough time figuring out what the

8     prejudice is going to be to the defense based on the

9     opening statement.  So why don't you talk --

10         MR. LASWELL:  Never having seen it, I would

11    hardly be in a position to make a response.  But my

12    tendency is to agree with you.

13         THE COURT:  All right.  We'll look at it and

14    we'll come back at 1:30.  We'll do the Richardson

15    inquiry and we'll see if I'll allow the State to

16    introduce it at that point.

17         MR. MILIAN:  The other thing I wanted to bring to

18    your attention, well, first of all, is that I need to

19    reopen my direct with her recalling her because

20    certain items of evidence are being brought over,

21    three items of evidence.  But the other thing is you

22    asked me yesterday, for planning purposes, I think

23    I'll be able to rest today.

24         THE COURT:  Okay.  I think we may be able to

25    finish the case today.

1            MR. LASWELL:  We might be.  I'd like the Court to

2       order a Juvonal Allen over from the jail, if you

3       would.  I've got a location here.

4            THE COURT:  All right.  Well give it to the

5       bailiffs.  And what time do you need him by?

6            MR. LASWELL:  Well, I don't know.  But the --

7            THE COURT:  Three thirty?

8            MR. LASWELL:  When Mr. Milian gets done.

9            MR. MILIAN:  I think that's about right.

10           THE DEFENDANT:  Excuse me, Your Honor?  Can I

11      return to my cell until that time I have to come back?

12           THE COURT:  You have to be back at 1:30.

13           THE DEFENDANT:  Right.  So --

14           BAILIFF DELONG:  They won't take him.

15           THE COURT:  That's up to the sheriff whether

16      they're to take you back to the cell.  I don't tell

17      them how to run that.

18           THE DEFENDANT:  No.

19           THE COURT:  So we'll be in recess until 1:15 on

20      other matters.

21           . (Thereupon, a luncheon recess was taken, after

22      which the following proceedings were had:)

23           THE COURT:  We're back on the record on Mr.

24      Richardson's case.  Both counsel are present.  Mr.

25      Richardson's present.  Do we have Mr. Russel present?

1          MR. CHARLES LEVY:  We do, Judge.

2          THE COURT:  Okay.  Where is Mr. Russsel at?

3          MR. RUSSEL:  Right here.

4          THE COURT:  Mr. Russel if Mr. Richardson called

5     you as a witness in this case are you going to

6     testify?

7          MR. LEVY:  Judge, Mr. -- under advice of counsel,

8     Mr. Russel will be invoking his Fifth Amendment right,

9     Judge.

10         THE COURT:  Is that right, Mr. Russel?

11         MR. RUSSEL:  Yes.

12         THE COURT:  Okay.  Anything further of Mr.

13    Russel?

14         MR. LASWELL:  Nothing, Judge.

15         THE COURT:  Okay.  You're excused.  Appreciate

16    you coming in.

17         THE DEFENDANT:  This what you want?  This what

18    you want to do?

19         THE COURT:  How about on the photo line up?  Do

20    we need to do a Richardson inquiry on that?

21         MR. LASWELL:  Judge, no, we don't.  But I'm very

22    leery of waiving it.  There's some big time involved

23    here.

24         THE COURT:  I understand that.  Mr. Richardson,

25    your lawyer argued in opening statement saying that

1      you were there but you didn't know what was going on.

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  That was your defense.

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Now the State wants to bring up some

6      evidence that they didn't mention to your lawyer

7      before.  That one of these witnesses, the girl that

8      didn't identify you in court identified you in a photo

9      line up outside of court, I don't know, a year ago or

10     something like.

11          THE DEFENDANT:  Uh-huh.

12          THE COURT:  Sometime ago, okay?

13          THE DEFENDANT:  Uh-huh.

14          THE COURT:  You could have a hearing where we can

15     decide whether or not that evidence comes in or you

16     can say it doesn't matter whether she identified me in

17     court or outside of court.  You're not contesting the

18     fact that you were there.  You're saying you didn't

19     know what was going on.  You want to talk to your

20     lawyer about whether you want to have the hearing or

21     not?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Go ahead.

24          MR. LASWELL:  After hearing the comments of the

25     Court and after having conferred, we will waive any

1    claim rights to a Richardson hearing.  However, I

2    think that perhaps young Ms. Butler has been cast in a

3    different role.  I'm not -- I'm not so sure that she

4    couldn't identify today.

5         THE COURT:  I don't know.  I don't know if she

6    couldn't, wouldn't, didn't want to.  I don't know what

7    the story was.

8         MR. LASWELL:  I don't either.

9         THE COURT:  She obviously had an opportunity to

10   identify Mr. Richardson.  For one reason or another

11   chose not to.  But wasn't able to.

12        MR. LASWELL:  Right.  And I would not like to

13   revisit that.  She's going to be recalled.

14        THE COURT:  Well, the way you can get around it,

15   I guess, if the State wants to introduce the photo

16   line up through the police officer, then you don't

17   object to hearsay, then we just let it come in through

18   the police officer.

19        MR. LASWELL:  That I never realized the Court's

20   proactive position.  That would certainly be one way

21   Mr. Milian could do it.

22        THE COURT:  All right.  Is that agreeable?

23        MR. LASWELL:  All I'm saying I don't want this

24   young lady to retestify and clear up this anomaly that

25   exists at this point.

1      THE COURT:  No, I mean, you haven't even

2   cross-examined her yet.  I mean, if you cross her and

3   then on redirect Mr. Milian may have the right to

4   clear that up anyway.

5      MR. LASWELL:  He may have.  That depends on

6   whether I do my job within narrow restrictions.

7      THE COURT:  Right.  So what I'm suggesting is, if

8   you're concerned about that then you can say to Mr.

9   Milian, if he doesn't recall her on that issue, then

10  you're not going to object to hearsay and he can get

11  in the photo line up through the police officer.

12      MR. LASWELL:  I thought I just said that.

13      THE COURT:  Okay.  Is that okay with you, Mr.

14  Milian?

15      MR. MILIAN:  Fine with me, Judge.  I don't have a

16  problem with that.

17      THE COURT:  Okay.  Anything further before we

18  bring in the jury?

19      MR. MILIAN:  No.  I do want to recall her though

20  for the items of evidence that were brought in by the

21  police.

22      THE COURT:  Didn't she identify it by the photo

23  line up?  This is the live jewelry.

24      MR. MILIAN:  Yes, sir.  I mean, I don't want to

25  ask you for any rulings.  I just want her to identify

 1          the items.

 2                  THE COURT:  That's fine.  Okay.  That's fine.

 3          Let's bring in the jury.

 4                  (Thereupon, the jury entered the courtroom, after

 5          which the following proceedings were had:)

 6                  THE COURT:  Okay.  Counsel concede the presence

 7          of the jury and waive its polling?

 8                  MR. LASWELL:  Yes, sir.

 9                  MR. MILIAN:  Yes, Your Honor.

10                  THE COURT:  And did everyone follow my admonition

11          not to discuss the case or allow it to be discussed in

12          your presence?  Okay.  We need to bring the witness

13          back in.

14                  Ms. Butler, if you would resume the stand.  And

15          you understand you're still under oath?

16                  THE WITNESS:  Uh-huh.

17                  THE COURT:  Okay.  Just have a seat.  And Mr.

18          Milian wanted to ask a couple of more questions.  You

19          may proceed, Mr. Milian, whenever you're ready.

20                  MR. MILIAN:  Thank you, Judge.  May I approach

21          the witness again, Judge?

22                          THE COURT:  Okay.

23                          CONTINUED DIRECT EXAMINATION

24      BY MR. MILIAN:

25          Q.   Let me show you what's been marked for

1    identification as State's GG.  Would you take a look at it

2    to yourself, please.

3         A.   It's the charm.

4         Q.   Okay.  What charm is that that you're looking at?

5         A.   The one that was on my neck.

6              MR. MILIAN:  Okay.  Judge, at this time I would

7         likes State's GG moved into evidence.

8              MR. LASWELL:  No objection.

9              THE COURT:  I'm sorry?

10             MR. LASWELL:  No objection.

11             THE COURT:  Okay.  That will be State's Exhibit

12        27 in Evidence.

13             (Thereupon, State's Exhibit Number 27 was

14        received in Evidence.)

15   BY MR. MILIAN:

16        Q.   Let me show you what's been marked as State's DD

17   for Identification.  Would you take a look at it?

18        A.   That's my handwriting.

19        Q.   Does your signature appear on State's DD?

20        A.   Yes.

21        Q.   Was that a document you executed with Detective

22   Wendt of the Plantation Police Department?

23        A.   Yes.

24             MR. MILIAN:  Judge, I'd like to have State's DD

25        admitted into evidence.

1           MR. LASWELL:  Assuming that it's for this

2      witness's signature, I have no objection to the

3      signature.  I would object to the rest of the

4      document.

5           THE COURT:  Can I see what it is?

6           MR. MILIAN:  Yes, sir.  I won't publish it until

7      Detective Wendt testifies.

8           THE COURT:  Okay.  DD will be Number 28 in

9      Evidence subject to a motion to strike if it's not in

10      evidence.

11           (Thereupon, State's Exhibit Number 28 was

12      received in Evidence.)

13   BY MR. MILIAN:

14      Q.    Linda, earlier today you were describing for the

15   jury that the driver of the car had a gun.

16      A.    Uh-huh.

17      Q.    If you see that gun again, would you be able to

18   identify it?

19      A.    Yes.

20           MR. LASWELL:  I'm going to object to this, Judge.

21      I don't think it's material and relevant to the case

22      of State of Florida versus Todd Richardson.

23           THE COURT:  Overruled.

24           MR. LASWELL:  That somebody held it.

25           THE COURT:  Overruled.

161

```
 1    BY MR. MILIAN:
 2        Q.   Let me show you what's been marked as State's BB
 3    for Identification.  Ask you to take a look at it for
 4    yourself.
 5        A.   Yes.
 6        Q.   Okay.  Do you recognize it?
 7        A.   (Witness nods head.)
 8        Q.   Okay.  Can you tell us what it is?
 9        A.   A gun.
10        Q.   Okay.  Have you seen that gun before?
11        A.   Yes.
12        Q.   Where?  Where was that?
13        A.   On the side of me.
14             MR. MILIAN:  Okay.  Judge, at this time I would
15    like State's BB moved into evidence.
16             MR. LASWELL:  Same objection.
17             THE COURT:  Relevance?
18             MR. LASWELL:  Relevance.  And materialality to
19    the case against my client.
20             THE COURT:  Well, I'll admit it subject to a
21    motion to strike if it's not tied up to the case.
22             MR. MILIAN:  So I'm not going to publish it at
23    this time.
24             THE COURT:  Right.  So it will be 29 in evidence.
25             (Thereupon, State's Exhibit Number 29 was
```

1       received in Evidence.)

2              MR. MILIAN:  Judge, at this time I would like

3       to publish the pendant that was already admitted into

4       evidence.

5              THE COURT:  Okay.

6   BY MR. MILIAN:

7       Q.   What was this particular pendant hanging from if

8   you can tell the jury?

9       A.   A necklace.

10      Q.   Did you ever get the necklace back?

11      A.   No.

12      Q.   Linda, could you tell the jury how much this

13  pendant cost you?

14      A.   I don't know.

15      Q.   What was it?  Do you know?  Was it silver, gold?

16      A.   Gold.

17             MR. MILIAN:  Nothing further, Judge.

18             THE COURT:  Cross-examination.

19                        CROSS-EXAMINATION

20  BY MR. LASWELL:

21      Q.   Good afternoon.

22      A.   Good afternoon.

23      Q.   Remember me?

24      A.   Yes.

25      Q.   How you doing?

163

1    A.    Fine.

2    Q.    Okay.  Ms. Butler, you've testified to a lot of

3 things that happened today.  As I think you probably know

4 I represent Todd Richardson and the other fellows aren't

5 too much of a concern at the moment.  But I don't want you

6 answering my questions by saying they did this and they

7 did that.  I just want you to tell me what Todd did.

8    A.    Okay.

9    Q.    And as I understand it, the most that Todd did

10 was strike up a conversation with Erica in the mall.

11    A.    Yes.

12    Q.    He never had a gun.

13    A.    No.

14    Q.    And he never threatened you.

15    A.    No.

16    Q.    And he never committed any acts of violence

17 against you.

18    A.    No.

19    Q.    And that he did not participate in the taking of

20 your possessions.

21    A.    No.

22    Q.    Is that correct?  Now I want to show you what Mr.

23 Milian's put into evidence here.  Incidentally, while I'm

24 looking for this, did you ever see all four of these

25 fellows together in the mall?

1    A.    Just -- not when we were talking, when Erica was

2    talking to him.  But then when we were walking away they

3    were together.

4    Q.    Okay.  And were they walking away?

5    A.    Not when we were walking away.

6    Q.    When you saw them together, where were they?

7    A.    Standing in one spot.

8    Q.    Okay.  Just standing in the mall talking?

9    A.    Yeah.

10    Q.    Okay.  These are in evidence thanks to Mr.

11    Milian, State's Exhibit 16 and 26.  And I think you've

12    identified them already.  Are those true and accurate

13    portrayals?

14    A.    Of the inside of the car?

15    Q.    Uh-huh.

16    A.    Yes.

17    Q.    As it looked when you saw it.

18    A.    Yes.

19    Q.    Can you -- let me see if I've got it better in

20    here.  While the clerk's doing that, is Erica dating now?

21    A.    Yes.

22    Q.    She wasn't then, was she?

23    A.    No.

24    Q.    And you and she are good friends, aren't you?

25    A.    Uh-huh.

165

1    Q.    The fact of the matter is she was a little boy

2  crazy at that time, right?

3    A.    Yes, she talked to guys.

4    Q.    Yeah.  And her folks wouldn't let her go out, but

5  she wanted to.

6    A.    Right.

7    Q.    And as a result of that, she sometimes talked to

8  people that she shouldn't.

9    A.    (Witness nods head.)

10    Q.    Right?

11    A.    Yeah.

12    Q.    And in this instance she and Todd had a

13  conversation.

14    A.    Yes.

15    Q.    And traded phone numbers.

16    A.    Yes.

17    Q.    Did she say anything to you about him after she

18  met him?

19    A.    No.

20    Q.    Did she tell you that he appeared to be nice?

21    A.    No.

22    Q.    No?  Or later?

23    A.    (Witness shakes head.)

24    Q.    Okay.  Did she have a conversation with him that

25  you could hear?

166

```
 1        A.    I wasn't paying no mind, but they had a
 2   conversation.
 3        Q.    Okay.  You just didn't hear what it was.
 4        A.    Right.
 5        Q.    And when you were at the bus stop and realized
 6   that you had missed your bus.
 7        A.    Right.
 8        Q.    And this Z car with Travis Russel driving it
 9   pulled up.  Did she have a conversation with these fellows
10   then?
11        A.    Travis wasn't driving.  I mean, no, my bad.
12   That's Todd.  My bad.  I'm sorry.  Yes.
13        Q.    Travis Russel is the fellow that held the gun on
14   you.
15        A.    Okay.  I got that confused.  She --
16        Q.    There was another fellow who's lap you were
17   sitting on.
18        A.    Right.
19        Q.    But Erica walked over to the car.
20        A.    And I walked with her.
21        Q.    And you walked with her.  And did she have a
22   conversation with someone in that car?
23        A.    She talked but not a lot.
24        Q.    Okay.  Who did she talk with?
25        A.    To Todd.
```

167

1    Q.   Todd.  Did you hear that conversation?

2    A.   No.  All I remember is that she said, let's go.

3    Q.   Okay.  To you?

4    A.   Yeah.

5    Q.   She said, let's go.

6    A.   And I didn't want to go.

7    Q.   And she started getting in the back of the car.

8    A.   Right.  And that's when I got in the front.

9    Q.   Now I'm going to show you a picture I've had

10   marked for identification.  It's Defendant's Exhibit C,

11   and another one that's Defendant's Exhibit B and another

12   one that's Defendant's Exhibit A.  And I'm going to ask

13   you to take a look at those.  And if you can tell me what

14   they are other than photographs.

15   A.   The back seat.  The back seat.  And the car.

16   Q.   Okay.  And that's the car in about the same

17   condition that you saw it that night..

18   A.   Yes.

19   Q.   And that's the back seat.

20   A.   Yeah.

21   Q.   Right?  Now with reference to this back seat, let

22   me back up one minute.  Let me finish one thing before I

23   start another.  Did you hear any of the conversation

24   between she and Todd?

25   A.   No.

1    Q.    Before she got in the car?

2    A.    (Witness shakes head.)

3    Q.    But she turned to you, and said, come on, let's

4    go.

5    A.    Yeah.

6    Q.    Did you have an understanding at some point that

7    you were getting a ride home?

8    A.    Yes, I thought we were going to get a ride home.

9    Q.    And how did that happen?

10   A.    Because he said he'll take us home.

11   Q.    Who said that?

12   A.    The driver.

13   Q.    That's Travis Russel.

14   A.    Right.

15   Q.    The guy with the gun.

16   A.    Right.

17   Q.    Did you ever hear Todd say anything?

18   A.    No.

19   Q.    Okay.  So you never heard him say anything at

20   all, my client.

21   A.    Right.

22   Q.    Now with reference to this car, could I ask this

23   witness to step down here for a minute, Judge?

24         THE COURT:  Okay.

25         MR. MILIAN:  Mr. Laswell, may I see the photos?

1          MR. LASWELL:  I'm sorry.  They're the ones you

2      gave me.

3  BY MR. LASWELL:

4      Q.   Come on down here for a minute.  If you were

5  comparing that car to this table.

6      A.   Uh-huh.

7          MR. MILIAN:  Excuse me, Mr. Laswell.  Judge, for

8      the record no objection from the State to those being

9      admitted into evidence.

10         MR. LASWELL:  I'll offer them as Defendant's 1,

11     2 and 3.

12         THE COURT:  Okay.  A will be 1.  B will be 2.  C

13     will be 3.  Defense exhibits.

14         (Thereupon, Defendant's Exhibits Numbers 1

15     through 3 were received in evidence.)

16  BY MR. LASWELL:

17     A.   Thank you.  With reference to that car, can you,

18  using this for a, how high was that car?

19     A.   How high was it?

20     Q.   Yeah.  Where is the roof?

21     A.   The roof.

22     Q.   Come on over a little closer to the table.  I'll

23  back up if it makes you --

24     A.   It wasn't high.  It was about --

25     Q.   About this high.

170

```
 1       A.    About this high.

 2       Q.    Okay.  And did the -- then the roof is sloped

 3  down in the back.

 4       A.    Yeah.

 5       Q.    Now the one picture is a good picture of the

 6  front seat.

 7       A.    Uh-huh.

 8       Q.    And you and another fellow.

 9       A.    Right.

10       Q.    Were in the front seat.

11       A.    (Witness nods head.)

12       Q.    Okay.  But tell the ladies and gentlemen of the

13  jury -- you can go and sit down.  Thank you.  Wait a

14  minute.  Maybe better not.  How wide was that car?

15       A.    How wide was it?

16       Q.    Yeah.

17       A.    I don't know.

18       Q.    When you looked in the back.

19       A.    The back was small.

20       Q.    Very small.

21       A.    (Witness nods head.)

22       Q.    And a sloping roof.

23       A.    Yeah.

24       Q.    How -- could anybody sit up back there?

25       A.    No.
```

1      Q.    Did they have to sit and lay down like this?

2      A.    Yeah.

3      Q.    Were those two boys including Todd laying back

4   like this?

5      A.    Yeah.  Not the one boy.

6      Q.    Uh-huh.

7      A.    One boy was leaning like onto the chair.

8      Q.    The front seat.

9      A.    Yeah.

10     Q.    One was leaning forward.

11     A.    Uh-huh.

12     Q.    And who was leaning back?

13     A.    Todd.

14     Q.    Todd.  And where was Erica?

15     A.    In the middle.

16     Q.    In the middle.  So she had gotten in which side?

17     A.    The passenger side.

18     Q.    That was where the fellow leaning up was.

19     A.    Yes.

20     Q.    So he let's her in, and she got in.  Next to, she

21   got in between the two of them.

22     A.    Yeah.

23     Q.    Was there room for all three of them there?

24     A.    To fit them was room.

25     Q.    Now is this the back seat that we were talking

1    about shown in Defendant's Exhibit 1 and Defendant's

2    Exhibit 2 as it was located in the car shown in that

3    photograph?

4        A.    Yes, it is the back seat.

5        Q.    And there were three people back there.

6        A.    Yes, it was.

7        Q.    Okay.  Nobody forced anybody to get in that car.

8        A.    No.

9        Q.    As a matter of fact, you got in it because Erica

10   said, come on, let's go, right?

11       A.    Yes.

12             MR. LASWELL:  May I show them this, Your Honor?

13             THE COURT:  Okay.

14   BY MR. LASWELL:

15       Q.    When you got in that car, Linda, you had no idea

16   that Travis Russel had a gun, did you?

17       A.    No.

18       Q.    You had no idea that the fellow whose lap you

19   were sitting on planned anything, did you?

20       A.    Unh-unh.

21       Q.    You had no idea that either fellows in the back

22   seat planned anything.

23       A.    No, I didn't.

24       Q.    And you do not know as we talk here today whether

25   or not anybody but Travis Russel knew about that gun,

173

```
 1    right?

 2        A.    Right.

 3        Q.    But Travis Russel pulled a gun on you.

 4        A.    That's right.

 5        Q.    And demanded your money or your jewelry.

 6        A.    Yes.

 7        Q.    In the back seat at that time where Todd and

 8    Erica and the fellow we know as Juvonal is sitting, did

 9    you hear anything unusual?

10        A.    They all -- they were talking about they needed

11    to bring keys to his cousin.

12        Q.    That was Travis that said that, right?

13        A.    Right.

14        Q.    But how about in the back?

15        A.    Nothing.

16        Q.    Did anybody do anything bad to Erica?

17        A.    No, because -- I don't know because I wasn't

18    paying attention.

19        Q.    Okay.  Well, if somebody had tried to fondle

20    Erica or do something you would have known that, right?

21        A.    Right.

22        Q.    And nobody did anything like that?

23        A.    (Witness shakes head.)

24        Q.    And, in fact, whatever was going on in the back

25    seat up until the time Travis pulled that gun on you was
```

```
 1   quite normal.
 2        A.   Right.
 3        Q.   Correct?  And then Todd was pleasant.
 4        A.   Right.
 5        Q.   Was he not?  So if I understand this, you and
 6   Erica in a burst of bad judgment.
 7        A.   Yeah.
 8        Q.   Got in that car.  When you got in that car it was
 9   after she had met him.
10        A.   Yes.
11        Q.   And she, in fact, had his name and telephone
12   number.
13        A.   (Witness nods head.)
14        Q.   And he, in fact, had her name and telephone
15   number.
16        A.   Yes.
17        Q.   Hardly the thing someone planning a robbery would
18   do, right?
19        A.   Right.
20        Q.   That whatever happened in the back seat was
21   normal.  As a matter of fact, the whole thing was normal
22   until Travis Russel robbed you.
23        A.   Yes.
24        Q.   And you jumped out of the car.
25        A.   Right.
```

175

1      Q.    That at no time did Todd Richardson have a gun

2   that you saw.

3      A.    Right.

4      Q.    There's no time did Todd Richardson threaten you.

5   There's no time that he used any force, any violence or

6   any threats of force or violence on you.

7      A.    Right.

8      Q.    This fellow here.

9      A.    No, he didn't.

10      Q.    He did not do any of that, did he?

11      A.    No.

12      Q.    There was some conversation in the car I believe

13   when Travis Russel said something about going to his

14   cousin's or whatever that resulted in Todd Richardson

15   saying no.

16      A.    No, take them home.

17      Q.    Take them home, right?

18      A.    Right.

19      Q.    He did say that.

20      A.    Yes.

21      Q.    And it was shortly after that that Russel began

22   to, to misbehave.

23      A.    Right.

24      Q.    Are you okay today?

25      A.    Yeah.

1    Q.   And you weren't -- the pictures that we've saw

2  they have a scratch on them.

3    A.   Yeah.

4    Q.   You weren't molested in any way.

5    A.   No.

6    Q.   Erica wasn't.  And you girls are wiser for this

7  now.

8    A.   Yes.

9        MR. LASWELL:  Thank you.

10       THE COURT:  Redirect.

11                  REDIRECT EXAMINATION

12  BY MR. MILIAN:

13   Q.   Yes, Judge.  Other than Todd Richardson, did you

14  know anyone else who was in that car?

15   A.   Do I know by name?

16   Q.   No, did you know them on the day that they drove

17  up to you and offered you to give you a ride or he offered

18  to give you a ride?

19   A.   Did I know them?

20       MR. LASWELL:  Objection to that, Judge.  I think

21    the evidence is clear that they didn't do anything.

22       THE COURT:  He rephased the question.

23       MR. LASWELL:  If I knew who he was I might be

24    more comfortable.

25       THE COURT:  Okay.  Rephrase the question.

```
 1   BY MR. MILIAN:

 2       Q.   Yes, sir.  Other than Todd Richardson offering

 3   Erica and you a ride in the automobile, did you know any

 4   of the people in that car at the time the car stopped at

 5   the bus stop?

 6       A.   Only time I know them is when we met them in the

 7   mall.

 8       Q.   But that was -- you had no conversations with any

 9   of them?

10       A.   No.

11       Q.   The only one that you had conversations with was

12   Todd Richardson.

13       A.   When Erica had the conversation with him, too.

14       Q.   Okay.  The interior that Mr. Laswell was asking

15   you to describe, it is a very small area?

16       A.   (Witnes nods head.)

17           MR. LASWELL:  Objection, leading.

18           THE COURT:  Sustained.

19           MR. MILIAN:  Was it a small area or was it a

20       large area?

21           MR. LASWELL:  Same objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  The car?

24           MR. MILIAN:  Yes, ma'am.  The interior.

25           THE WITNESS:  It's small.
```

1    BY MR. MILIAN:

2        Q.    And when Travis Russel -- let me direct you to

3    the point that Mr. Laswell's asking you about.   When

4    Travis Russel pulled out that gun --

5        A.    Yes.

6        Q.    -- did Todd Richardson say anything at that

7    point?

8        A.    Not that I -- I didn't hear him say anything.

9        Q.    Did he try to stop the robbery that was going on?

10       A.    No.  I don't know.   I didn't hear him say

11   anything.

12       Q.    At any time did he protest because Mr. Russel was

13   holding a gun to your side?

14       A.    Protest like?

15       Q.    Stop it, let these girls go, what are you doing,

16   are you crazy, anything like that?

17       A.    No, I didn't hear him say anything.

18       Q.    After Mr. Russel, the driver of the car, pulled

19   the gun back as you indicated earlier in your testimony,

20   did Mr. Richardson at that point say anything?

21       A.    Who is Mr. Rich --

22       Q.    Todd Richardson.

23       A.    No.

24       Q.    When Mr. Russel, I think you described earlier

25   today he said, this ain't no toy, or words to that effect.

179

```
 1        A.    Uh-huh.

 2        Q.    Did Todd Richardson at that point attempt to stop

 3    what was going on?

 4        A.    No.

 5        Q.    And the person that you described for Mr.

 6    Laswell, the one that was leaning forward towards the

 7    front seat, was that in the front or the back seat of the

 8    car if you could tell the jury?

 9        A.    The back.

10        Q.    All right.  And that guy Mr. Laswell referred to

11    as Juvonal Allen or Juvonal Allen.  Is that the guy that

12    tore the chain off your neck?

13        A.    Yes, it is.

14        Q.    And when he tore the chain off your neck, did

15    Todd Richardson try to stop what was going on?

16        A.    I was in the struggle.  I have no clue what he

17    was doing by then.

18        Q.    Did you hear him say anything about, stop what

19    you're doing to these girls?

20        A.    I didn't hear him stay anything.

21        Q.    Did you hear him say, stop stealing her property?

22        A.    I didn't hear him say anything.

23        MR. MILIAN:  Nothing further, Judge.

24        THE COURT:  Anything further, Mr. Laswell?

25        MR. LASWELL:  Just a couple of questions.
```

180

```
1                        RECROSS-EXAMINATION
2     BY MR. LASWELL:
3         A.    Make sure I got this right.   Todd Richardson's in
4     the back like this, right?
5         A.    He was leaning back.
6         Q.    And you're up here.   Now all those questions that
7     Mr. Milian asked you, see if an old fat man can get up
8     here.   All those questions that he asked you about this
9     and that and the other presume that Todd Richardson knew
10    what was going on.   Do you have any evidence to give this
11    jury that would indicate that that's the case?
12        A.    That he had something --
13        Q.    Yeah, he was -- that he knew what Travis was
14    doing?   I mean, that's a little bitty car.
15        A.    I don't -- I don't know if he knew anything that
16    was going on.
17              MR. LASWELL:   Thank you.   Nothing further.
18              THE COURT:   Anything further, Mr. Milian?
19              MR. MILIAN:   No, sir.
20              THE COURT:   Thank you, ma'am.   You may step
21        down.   You're excused.   Mr. Milian, you may call your
22        next witness.
23              MR. MILIAN:   Yes.   I would call Erica Outridge.
24    Thereupon,
25                        ERICA OUTRIDGE,
```

181

```
1    having been first duly sworn, was examined and testified

2    upon her oath as follows:

3              THE CLERK:  Please be seated.  State your full

4        name.  Spell your name for the record, please.

5              THE WITNESS:  Erica Louise Outridge,

6        O-U-T-R-I-D-G-E.

7                        DIRECT EXAMINATION

8    BY MR. MILIAN:

9        Q.   Erica, would you will tell the jury how old you

10   are.

11       A.   I'm sixteen years old.

12       Q.   Back on the 19th day of February, 1996, how old

13   were you?

14       A.   Fifteen.

15       Q.   On that day did you go to the Broward Mall with a

16   friend of yours, Linda Butler?

17       A.   Yes, I did.

18       Q.   You saw Ms. Butler in here earlier today?

19       A.   Yes, I did.

20       Q.   She just walked out of the courtroom.

21       A.   (Witness nods head.)

22       Q.   Are you two friends?

23       A.   Yes, we are.

24       Q.   Why did you go to the Broward Mall on that day?

25       A.   Just to look at clothes and hang out.
```

1      Q.   How long were you there approximately?

2      A.   I don't know.  About a few hours.

3      Q.   When you were there that day, did you have an

4  opportunity to meet a person by the name of Todd

5  Richardson?

6      A.   Yes, I did.

7      Q.   Okay.  Do you see Todd Richardson in the

8  courtroom today?

9      A.   Yeah, I do.

10     Q.   Okay.  Would you point to him and just describe

11  what he's wearing for the record?

12     A.   He's wearing a -- right there.  He's wearing a

13  blue shirt.  He has his hair faded.

14          MR. MILIAN:  Okay.  Judge, may the record reflect

15      she's identified the defendant.

16          THE COURT:  The record will so reflect.

17  BY MR. MILIAN:

18     Q.   Did he look different back on February the 19th,

19  1996?

20     A.   Yes, he did.

21     Q.   What was different about him at that time?

22     A.   He had his haired braided.

23     Q.   How did you meet Mr. Richardson at the Broward

24  Mall that day?

25     A.   Me and my friend, Linda, were walking and --

183

1    Q.    Erica, could you speak up a little bit so I can

2    hear?

3    A.    Me and my friend, Linda, we were walking and him

4    and his friend were calling us over.  And at first I

5    turned around.  I didn't really pay attention.  Then we

6    were walking back.  Then he called us over again.  So I

7    went up to him and I was like, yes, and he introduced

8    himself.  And we introduced each other.

9    Q.    Did he tell you what his name was?

10   A.    Yes, he told me his name was Todd when I asked

11   him.

12   Q.    Do you remember what you guys talked about?

13   A.    Not much.  I just told him my age.  I asked

14   him how old he was and so on.

15   Q.    At the time when you were talking to Mr.

16   Richardson, were you carrying a purse?

17   A.    Yes, I was.

18   Q.    Okay.  Were you wearing any jewelry on you?

19   A.    I was wearing a rope chain and I had a purse.  I

20   had a chain in my bag.

21   Q.    All right.  Approximately how long if you can

22   tell the jury were you talking to Mr. Richardson?

23   A.    Like between five to ten minutes.

24   Q.    And what was the general conversation about

25   during these five or ten minutes?

184

1     A.    Nothing.  Just if I had a boyfriend.  I said no.

2   And he asked me for my phone number, and I asked him why

3   doesn't he give me his phone number instead.  And he said

4   why don't we just exchange phone numbers.

5     Q.    Did you actually go to the point where you

6   actually exchanged phone numbers?

7     A.    Yes, we did.

8     Q.    How did you exchange phone numbers, if you can

9   tell the jury?

10    A.    I wrote my phone number down.  And he did, too.

11  He wrote his number.

12    Q.    Did there come a point where the conversation

13  ended?

14    A.    Yes, it did.

15    Q.    All right.  Was there a point now when you had to

16  leave the Broward Mall?

17    A.    Yes, it was.

18    Q.    Okay.  And how were you going to leave the

19  Broward Mall?

20    A.    By bus.

21    Q.    And did you go anywhere to try to catch a bus?

22    A.    Yes, we did.  While we were standing at the bus

23  stop we missed the bus.  We just missed it.

24    Q.    Did there come a point when you missed the bus

25  you saw Todd Richardson again?

185

1        A.    Yes, it was.   They pulled up in the car by the

2    entrance and he called us over.

3        Q.    Okay.   Who called you over?

4        A.    Todd called us over to the car.   And we went over

5    there.   And he asked us if -- where we were going.   We

6    said we were going home.   We just missed the bus.   He

7    asked us if we wanted a ride.   And at first we were

8    skeptical.   Then we said, we were like, yeah, okay.   We

9    said fine.   Because we were tired.   We missed the bus and

10   we just wanted to get home.

11       Q.    So you got inside the car.

12       A.    Yes.

13       Q.    How many people were inside the car if you

14   recall?

15       A.    From when I first saw, I thought there was only

16   like two or three.   But then when I looked in the back

17   there was four.

18       Q.    And did you and Linda Butler get inside that car?

19       A.    Yes, we did.

20       Q.    Once inside the car, where did you sit?

21       A.    I sat in the back between Todd and Juvonal.

22       Q.    The individuals in the car, other than Todd

23   Richardson, had you ever met any of those guys?

24       A.    Yes, I did.   I met the guy in the passenger seat

25   when I was first talking to Todd.   And then Travis and

186

1    Juvonal walked up after.

2        Q.    Now the guy you described as Travis, where was he

3    sitting?

4        A.    He was in the passenger -- he was in the driver's

5    seat.

6        Q.    And the guy who you described as Juvonal, where

7    was he sitting?

8        A.    He was sitting on my left side.  My right side,

9    sorry.

10       Q.    Now did you get in the car, and did the car start

11   moving towards what you thought was your home?

12       A.    Yes, it did.

13       Q.    Did you tell anybody inside the car where you

14   lived?

15       A.    I told them I lived -- I told them just by the

16   Dolphin training camp.

17       Q.    And did you guys start heading in that direction?

18       A.    Yes, we did.

19       Q.    Did there come a point where the car stopped?

20       A.    Yes, it did behind the IHOP.

21       Q.    And what happened when the car stopped behind the

22   IHOP?

23       A.    Well, what happened was that Juvonal was trying

24   to -- saying he was trying to get a key out of his pocket,

25   right.  And he opened the hatch.  And was trying to,

187

1    reaching for a key.  He said he was reaching for a key.

2    Q.    Let me stop you right there.  When you say he

3    opened the hatch, what hatch did he open if you can

4    tell --

5    A.    The hatch in the back of the car.  Like the trunk

6    like.  He opened that and he was like raised up slightly.

7    Q.    And when he opened the hatch of the car there is

8    more room inside the car or more room.

9    A.    There's more room.  Because the hood is up.  So I

10   could sit up straight.

11   Q.    All right.  And what happened when he was

12   searching for this key?

13   A.    Nothing.  He just like put his leg over me and

14   said he was just trying to reach for the key.

15   Q.    All right.

16   A.    Trying to make it easier.

17   Q.    What happened after that?

18   A.    Then -- then they -- the one that was like you're

19   holding up traffic.  And a lady stopped by and said, your

20   lights' on and Travis go like thank you.  He took his

21   lights off.  Let's go park.  Then he picked up -- they

22   closed back the hatch.  They parked.  And then what

23   happened?

24   Q.    Tell me what happened after the car was parked?

25   A.    What happened, it was one of the boys, the boy in

1    the passenger side seat was like, let me get out of the

2    car, let me get out of the car.

3        Q.    And that boy was in the passenger seat in the

4    front or the rear?

5        A.    The front.

6        Q.    And what happened?

7        A.    He said, let me get out of the car.  And he

8    opened the door and then Travis, the driver, was like

9    close back my door, close my door now.  So he closed back

10    the door.  And then after I heard -- all I heard was, let

11    me get your gold and your money.  Then I looked at Linda's

12    side and I saw a gun.

13        Q.    Did you see or hear who said, let me get your

14    gold and money?

15        A.    It was Travis.

16        Q.    All right.  And what happened when that occurred?

17        A.    Juvonal went to grab for my chain.  And --

18        Q.    Which would -- Juvonal was sitting on what side

19    of you?

20        A.    On my right side.  And he had his leg over me.

21    He said, let me get your chain.

22        A.    And I said, fine.  I'll take it off myself.

23        Q.    Let me stop you right there.  Why were you going

24    to give him your chain?

25        A.    Because I was scared that he might do something.

189

1    Q.   All right.  Did you see any weapons inside the

2  car?

3    A.   Yes.  There's a gun pointed in my front side.

4    Q.   Who was pointing that gun at you?

5    A.   Travis.

6    Q.   Your front side.  Okay.  What had happened when

7  you told him that you'd give him the chain yourself?

8    A.   He moved away.  And Todd was like, can I have

9  your chain?  And I gave it to him.  He says, can I have

10 your -- goes, can I have your bag?  And I gave it to him

11 and he just went away.

12   Q.   Why did you give Todd your chain or your bag?

13   A.   I didn't want anything to happen.  I was afraid.

14   Q.   All right.  You didn't voluntarily just donate it

15 to him as charity or anything, did you?

16   A.   No.

17   Q.   Now at this point could you move anywhere?

18   A.   No, I couldn't.

19   Q.   Why not?

20   A.   Juvonal had his foot over me and so did Todd.

21 They both had their foot like by me.  I couldn't get out.

22 And the hatch, because of the hatch I was down in a

23 stooping position so I couldn't get out.

24   Q.   Could you tell the jury, you gave him the chain.

25 What was inside your purse?

1      A.   Well, there was two dollars in my purse, a note,

2    one of my school papers and a chain with a charm on it

3    that said Friend.

4      Q.   All right.  Now Mr. Richardson, the individual

5    you've identified in the courtroom today took that away

6    from you by force?

7      A.   (Witness nods head.)

8           MR. LASWELL:   Objection, Your Honor.  It's

9      leading and conclusionary.

10          THE COURT:  It's leading.  Sustained.

11   BY MR. MILIAN:

12     Q.   All right.  Could you tell us how he took it from

13   you?

14     A.   He asked me for it.  Because of the, you know,

15   and I gave it to him.

16     Q.   All right.  Did you figure you had any other

17   choice?

18     A.   No, I didn't.

19          MR. LASWELL:   Objection, Your Honor.  States a

20     conclusion.

21          MR. MILIAN:   State of mind.

22          THE COURT:  Overruled.

23   BY MR. MILIAN:

24     Q.   Did you feel you had any other choice at that

25   point?

1       A.    No, I didn't.

2       Q.    Once you gave the defendant, Mr. Richardson, the

3   the purse and the chain what happened?

4       A.    Well, my friend, they were asking my friend

5   for -- they were tying to get my friend's stuff.  And my

6   friend was fighting them.  And I was like, stop fighting,

7   just give it to them, right.  And she's like, no, no.  And

8   she got out of the front and she got out of the car.  I

9   could --

10      Q.    Did you see where she went?

11      A.    Huh?

12      Q.    Did you see where she went?

13      A.    She got out of the car and she was just standing

14  there.  And she like -- she was trying, she was looking to

15  go over to the IHOP and then they drove off.

16      Q.    Where were you?

17      A.    I was in the back seat still.

18      Q.    Could you get out of the car at this point?

19      A.    No, I couldn't.

20      Q.    When they took you away from the IHOP --

21      A.    Uh-huh.

22      Q.    -- was it against your will?

23      A.    Yes, it was.

24      Q.    And what -- did you give them permission to drive

25  you away from the IHOP in that car?

192

1        A.    No, I didn't.

2              MR. LASWELL:  Object to the them and the they,

3        Judge.

4              THE COURT:  Overruled.

5   BY MR. MILIAN:

6        Q.    Did you give Juvonal Allen permission to keep you

7   back in the seat?

8        A.    No.

9        Q.    Did you give Todd Richardson permission to hold

10  you back in the seat?

11             MR. LASWELL:  I don't think there's evidence that

12       he was holding.  Mr. Richardson wasn't holding her.

13             THE COURT:  Leading question.  Sustained.

14             MR. MILIAN:  Was Mr. Richardson doing anything

15       in order to hold you in that back seat?

16             MR. LASWELL:  Objection, leading.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes, he was.  His leg was over me.

19             MR. MILIAN:  All right.

20             MR. LASWELL:  Excuse me.  I couldn't hear that

21       answer.  His what?

22             THE WITNESS:  I said his leg was over me.

23  BY MR. MILIAN:

24       Q.    And during the time when they drove away from

25  there, all the people inside the car, did Travis Russel

1    have the gun?

2        A.    Yes, he did.  He turned it on me and he's like,

3    you know, your friend did a stupid thing.  She could have

4    got shot.  And then he put the gun away.

5        Q.    How far away from the area of the IHOP did they

6    drive you?

7        A.    They drove me to the Westin.

8            MR. LASWELL:  Objection to the they, Judge.

9            THE COURT:  If there's a question.

10           MR. LASWELL:  Unless that car had three or four

11       steering wheels.

12   BY MR. MILIAN:

13       Q.    I'm rephrase the question.  When the car moved

14   away from the IHOP.

15       A.    Uh-huh.

16       Q.    How many people were in the car?

17       A.    Four.  Five including myself.

18       Q.    Was Todd Richardson among those five?

19       A.    Yes, he was.

20       Q.    Where was the car driven to?

21       A.    The Westin Motel.

22       Q.    What happened when you went to the hotel?

23       A.    They dropped me off and they said your friend

24   better not call the police or you better not call the

25   police.

194

1    Q.    What was your feeling at this point?  I mean,

2    were you scared?

3    A.    Yes.

4    Q.    Were you shocked?

5    A.    I was scared and shocked at the same time.

6    Q.    What did you do the minute you got there to the

7    hotel?

8    A.    Well, I tried -- I went in and I told the people,

9    I said, I need to get back up to my friend.  I just got

10   robbed.  And so on.  And then they called the police from

11   there.  And they found my friend.  She was there already.

12   Q.    And you were able to meet with the police

13   afterwards.

14   A.    Yeah, he came and picked me up there.

15   Q.    Erica, do you remember what your phone number was

16   at the time?

17   A.    Yes, I do.

18   Q.    Could you tell the jury what it was?

19   A.    472-1728.

20   Q.    Let me show you what's been marked as State's 6

21   in Evidence.  Will you take a look at it please?  Does

22   that accurately reflect your phone number at that time?

23   A.    Yes, it does.

24   Q.    Do you recognize what's depicted in that

25   photograph?

1        A.    Yes.

2        Q.    What is it, please?

3        A.    It's my phone number, my handwriting, piece of

4    paper.  There's my charm and that's a piece of my chain

5    right there.

6        Q.    Let me show you State's Number 9.  Would you take

7    a look at that?

8        A.    That's my two dollars.  That was my purse.  The

9    charm, the chain and my phone number on a piece of paper.

10       Q.    Did you give permission to Todd Richardson to

11   take any of that property from you on February the 19th?

12       A.    Just my phone number I gave.

13       Q.    Let me show you what's been marked as State's 11

14   in Evidence.  Would you take a look at that?

15       A.    That's my purse.  That was the note in my bag and

16   that's my school paper.

17       Q.    Did you give permission to Mr. Richardson or

18   anybody else who was in that automobile on the 19th of

19   February of 1996 to take any of that property from you?

20       A.    No, I didn't.

21       Q.    Let me show you what's been marked as State's 25

22   in Evidence.  Would you take a look at that photograph?

23   Tell me if you recognize it.

24       A.    Yes, this photograph was taken at the police

25   station.

196

1      Q.    And how about State's 18 in Evidence?

2      A.    Also at the police station.

3      Q.    Let me show you State's 26 in Evidence.  Do you

4   recognize that photograph?

5      A.    That's the back of the car.

6      Q.    And is that where you all -- where you described

7   previously you all were sitting?

8      A.    Yes.

9         MR. MILIAN:  Judge, with permission, I'd like to

10        republish to the jury.

11        THE COURT:  The jury's already seen them.

12        MR. MILIAN:  I don't think they've seen these,

13        Judge.  I'm positive of it.

14        THE COURT:  Okay.  Go ahead and publish them if

15        they haven't seen them already.  Again, as Mr.

16        Milian mentioned earlier, anything that's introduced

17        into evidence will be available for your consideration

18        during your deliberations.

19   BY MR. MILIAN:

20     Q.    At this time, Erica, I'd like you to take a look

21   at what's been marked as State's AA for Identification.

22   Would you take a look at it?

23     A.    Yes, this is my purse.

24     Q.    Okay.  When you got out of your car or when you

25   got out of the car at the hotel as you described earlier,

1    what happened to your purse?

2        A.    I had it in my hand and then they're like, give

3    me back the purse, right.  So I said, here.  I wouldn't

4    argue with them or put up a fight.

5        Q.    Who asked you for the purse back?

6        A.    Todd did.

7        Q.    That being Todd Richardson.

8        A.    Yes.

9            MR. MILIAN:  Okay.  Judge, at this time I would

10    like to have State's AA moved into evidence.

11            THE COURT:  Mr. Laswell.

12            MR. LASWELL:  I don't have any objection.

13            THE COURT:  Double A will be 30 in Evidence.

14            (Thereupon, State's Exhibit Number 30 was

15    received in Evidence.)

16            MR. LASWELL:  Is there something in the purse?

17            MR. MILIAN:  Yes, sir.

18            MR. LASWELL:  Just make a record.

19            MR. MILIAN:  I was going to do that.  What has it

20    been marked, Judge, in evidence?

21            THE COURT:  Thirty.

22    BY MR. MILIAN:

23        Q.    Now showing you the purse, when you examined this

24    purse today, was there anything inside the purse that you

25    recognized?

198

```
1        A.   No.

2        Q.   Well, take a look at the contents.

3        A.   Detention slip.

4        Q.   Detention slip made out to whom?

5        A.   To me.

6        Q.   Okay.

7        A.   I recognize this because you showed it to me.

8   It's Todd's phone number.  He gave it to me.

9            MR. LASWELL:  Erica, can you talk a little

10      louder?

11           THE WITNESS:  It's Todd's number.  I gave it to

12      him.  He gave it to me.

13  BY MR. MILIAN:

14      Q.   That's the phone number he had exchanged with you

15  at the mall?

16      A.   Yes.

17      Q.   What about the small piece of paper?

18      A.   Assignment that I wrote down.

19      Q.   A school assignment.

20      A.   Yes.

21      Q.   And what about the pen?

22      A.   This is my my pen without the ink in it.

23      Q.   Okay.  Were these all the items that were inside

24  your purse when Todd Richardson took it from you?

25      A.   Yes, it was.
```

199

1          Q.   Let me show you know what's been marked as

2     State's HH for Identification.  Would you take a look at

3     the items contained therein?

4          A.   That's my two dollars that I had.

5          Q.   That's all the money that you had in the purse.

6          A.   Yeah.  This is my chain and my friend charm.

7          Q.   Okay.

8          A.   And this is the phone number I gave him.

9          Q.   Okay.  Phone number you gave who?

10         A.   Todd.

11         Q.   The same Todd Richardson you've identified for

12    the jury today?

13         A.   Yes.

14         Q.   As having taken your purse?

15         A.   Yes.

16         Q.   Did you give Todd permission to take any of these

17    things?

18         A.   Just the phone number.

19         Q.   Besides your phone number?

20         A.   No.

21         MR. MILIAN:  Judge, I'd like to move this into

22    evidence and have permission to publish it to the

23    jury.

24         THE COURT:  Mr. Laswell.

25         MR. LASWELL:  I don't have any objection.

1          THE COURT:  HH will be 31.

2          (Thereupon, State's Exhibit Number 31 was

3     received in Evidence.)

4  BY MR. MILIAN:

5     Q.   Erica, at any time during the robbery when these

6  things were taken from you the night in February, did Todd

7  try to stop what was going on?

8     A.   Well, when Juvonal went to grab my chain he said,

9  he went like that.  He just asked me for the chain.

10    Q.   Okay.  And he took the chain instead of Juvonal.

11    A.   Yeah, I took it off when he asked me to take it

12 off.

13    Q.   And what about the purse?

14    A.   He told me, he was like, can I have your purse?

15 And I gave it to him.

16    Q.   And when you gave him that purse, were you in

17 fear?

18    A.   Yes, I was.

19         MR. MILIAN:  No further questions, Judge.

20         THE COURT:  Cross-examination.

21                    CROSS-EXAMINATION

22 BY MR. LASWELL:

23    Q.   You were pretty afraid of that gun, weren't you?

24    A.   Yeah.

25    Q.   You remember me?

1        A.    Yes, I remember you.

2        Q.    Okay.  The car that you got into, Erica.

3        A.    Uh-huh.

4        Q.    Was awful small, wasn't it?

5        A.    Yes, it was.

6        Q.    The exhibits here that the Court's received

7   called Defendant's 1, 2 and 3 I want you to look at those.

8   Okay.

9        A.    Yes.

10       Q.    Is that the car?

11       A.    Yes, it is.

12       Q.    Okay.  Is that the back seat?

13       A.    Yeah.

14       Q.    All right.  Where was Todd sitting?

15       A.    Todd was sitting on my left hand side.

16       Q.    Okay.  To help an old fellow out here, is that

17   the driver's side of the car?

18       A.    The driver's side.

19       Q.    You were sitting in the middle.

20       A.    Yeah.

21       Q.    Could you come down here and use this like it was

22   the back of that car.  And describe for the -- I'm not

23   going to ask you to lay down.  But just describe for the

24   jury.

25       A.    Uh-huh.

1          Q.    How these two fellows were sitting in the back of

2     the car.

3          A.    Okay.   I was sitting here and I was like this.

4     Todd was behind me and the window was down.   And Juvonal

5     was sitting here.   Sorry.   Todd was sitting over here.   He

6     was sitting over here with his legs like behind me and

7     Juvonal was sitting here.

8          Q.    That's the back.

9          A.    Uh-huh.

10         Q.    You couldn't sit up straight.

11         A.    Right.   My bun.   Because of my bun.

12         Q.    Nobody could sit up straight, right?   You can

13    have a seat up here.   Thank you.   Nobody could sit up

14    straight, could they?

15         A.    No.

16         Q.    Todd was laying back.

17         A.    Yeah.

18         Q.    Juvonal was sitting forward.   Could you see

19    clearly into the -- to the front seat?

20         A.    In the passenger side, yes.

21         Q.    On the passenger side.

22         A.    Yeah.

23         Q.    But not on the driver's side.

24         A.    Just the side of his face.

25         Q.    I'm going to show you what's been marked as

```
 1   State's Exhibit 25.
 2       A.   Uh-huh.
 3       Q.   See if you recognize that picture.
 4       A.   It was taken at the police station.
 5       Q.   Who is that pretty young lady?
 6       A.   That's me.
 7       Q.   Oh, okay.  And is that the way you had your hair?
 8       A.   Yeah.
 9       Q.   Okay.
10       A.   It got ruffled up from sitting.
11       Q.   From sitting in the car.
12       A.   (Witness nods head.)
13       Q.   Because the car was so small.
14       A.   Yeah, it pushed my bun back a little bit.
15       Q.   So you were wedged in there.
16       A.   Uh-huh.
17       Q.   The three of you, right?
18       A.   (Witness nods head.)
19       Q.   How wide is that car back there?
20       A.   Let me see, about, I'm not sure, like three of us
21   were squeezed in there, so.
22       Q.   You really had to squeeze in, didn't you?
23       A.   Yeah.
24       Q.   It's fair to say that Linda was pretty squeezed
25   in front, too.
```

```
 1        A.   She was in the guy's lap.

 2        Q.   Okay.  And you could only see the passenger side.

 3        A.   Uh-huh.

 4        Q.   So when did you first know that the driver of

 5   that car pulled a pistol on --

 6        A.   When he put it in the side of her.

 7        Q.   You saw it come into the side of her.

 8        A.   (Witness nods head.)

 9        Q.   Now was Todd laying down?

10        A.   Well --

11        Q.   Or leaning back?

12        A.   He was like, somewhat like slightly in and kind

13   of raised up a little bit.  Slightly.

14        Q.   But he was behind the driver.

15        A.   Uh-huh.

16        Q.   And you were sitting up.

17        A.   Kind of behind me a little bit.

18        Q.   Yeah.  And you were sitting up a little in front

19   of him.

20        A.   Uh-huh.

21        Q.   Do you know what he could see?

22        A.   No, I don't know what he could see.

23        Q.   Okay.  He was nice to you, wasn't he?

24        A.   Todd.  Yeah, when I met him in the mall.  Yeah.

25        Q.   Uh-huh.  In fact, he never did use any violence
```

```
 1    with you.
 2         A.    No.
 3         Q.    And he never used any force with you?
 4         A.    No.
 5         Q.    And he never used any threats or force or
 6    violence.
 7         A.    No, he didn't.
 8         Q.    And, in fact, he kept Juvonal from ripping the
 9    chain off of you.
10         A.    Yes, he did.
11         Q.    You were terrified at the time.
12         A.    Yeah.
13         Q.    Right?
14         A.    (Witness nods head.)
15         Q.    He didn't have a gun.  Did he try to molest you
16    in any way?
17         A.    No, he didn't.
18         Q.    Huh?
19         A.    No.
20         Q.    Okay.  Did Juvonal?
21         A.    When I was -- when -- after they took everything,
22    we drove off, he was kind of like searching me, right, and
23    I told, I was like, please, stop, you know.  And he kind
24    of like moved Juvonal's hand away from me.
25         Q.    As a matter of fact, when Travis said he was
```

1    going by his cousin's --

2        A.    Uh-huh.  He told them to take us home first.

3        Q.    Todd said take them home first, right?

4        A.    (Witness nods head.)

5        Q.    And if you were to tell this jury that Todd knew

6    what was going on with Travis Russell in the front seat,

7    it would just be a guess, wouldn't it?

8        A.    No, not really because in a way he was telling

9    them to take them home first.  Maybe he kind of suspect

10   what was going on if he had told him to take them home.

11       Q.    That's what I'm saying.  Maybe it would be this.

12   Maybe it would be that.  You don't know any more than what

13   you saw in that car.

14       A.    Yes.

15       Q.    And what you saw was Travis Russel sticking a gun

16   in Linda Butler's ribs.

17       A.    Uh-huh.

18       Q.    Until she fled terrified.  And then he stuck the

19   gun at you.

20       A.    Yeah, in my face.

21       Q.    And finally you were let out.

22       A.    Yeah.

23       Q.    Right?

24       A.    (Witness nods head.)

25       Q.    During the interim time, he went through your

```
 1   purse.

 2        A.   Yes.

 3        Q.   Kept your purse.  But he didn't do it by force or

 4   violence.

 5        A.   He asked me to -- he asked if he could have it.

 6        Q.   And you said okay.

 7        A.   Because of the gun.

 8        Q.   Huh?

 9        A.   Because of the gun.  I was afraid.

10        Q.   But he didn't have the gun.

11        A.   Yeah, but Travis did.

12        Q.   I understand that.  But my point is Todd

13   Richardson didn't have the gun and didn't threaten you or

14   threaten Linda Butler with it, right?

15        A.   Yes.

16        Q.   Okay.  And he asked for your chain.  And he

17   stopped Juvonal from taking it and then you voluntarily

18   took it off and gave it to him.

19        A.   Yes.

20        Q.   That was all because you were afraid of Russel

21   and the gun.

22        A.   I was afraid of all of them after what happened.

23        Q.   Okay.  But nobody had a gun but Russel.

24        A.   Yes.

25        Q.   Right?  And nobody was making demands.  He asked
```

```
 1    you, and you did it, right?
 2         A.   (Witness nods head.)
 3         Q.   I bet you haven't been in cars like that, have
 4    you?
 5         A.   I haven't been in anybody's car.
 6              MR. LASWELL:  Thank you, Erica.
 7              THE COURT:  Redirect.
 8              MR. MILIAN:  Yes, Judge.
 9                      REDIRECT EXAMINATION
10    BY MR. MILIAN:
11         Q.   You know at the time that this happened, back on
12    the 13th of February you were you in school, right?
13         A.   That day, no.
14         Q.   Okay.  But you were --
15         A.   If I was going to school?  If I was going to
16    school?
17         Q.   Yes.
18         A.   Yes, I was.
19         Q.   You're still going to school.
20         A.   Yes.
21         Q.   Erica, you don't -- do you normally go around and
22    give people your purse and your personal belongings?
23         A.   No, I don't.
24         Q.   All right.  And did you have a fear that that gun
25    that Travis had might be used against you if you didn't
```

1    give up your property?

2        A.    Yes.

3        Q.    I mean, as Mr. Laswell asked you, you said you

4    were terrified.

5        A.    Yes, I learned not to put up a fight because my

6    brother use to be a police officer.

7            MR. MILIAN:  Okay.  Thank you.  No further

8        questions.

9            THE COURT:  Anything further, Mr. Laswell?

10           MR. LASWELL:  Just two questions.

11                       RECROSS-EXAMINATION

12   BY MR. LASWELL:

13       Q.    Todd Richardson didn't use any force or violence,

14   right?

15       A.    No.

16       Q.    And Todd Richardson didn't threaten you with any

17   force or violence, right?

18       A.    No.

19           MR. LASWELL: Thank you.

20           THE COURT:  Anything further, Mr. Milian?

21           MR. MILIAN:  No, sir.

22           THE COURT:  Thank you, ma'am.  You may step

23       down.  You're excused.  Mr. Milian, you may call your

24       next witness.

25           MR. MILIAN:  Yes, sir.  I'd like to call Officer

```
 1        Hampton to the stand.
 2   Thereupon,
 3              OFFICER CURTIS HAMPTON,
 4   having been first duly sworn, was examined and testified
 5   upon his oath as follows:
 6              THE CLERK:  Please be seated.  State your full
 7        name.  Spell your last name for the record.
 8              THE WITNESS:  Curtis Hampton, H-A-M-P-T-O-N.
 9                   DIRECT EXAMINATION
10   BY MR. MILIAN:
11        Q.   I'm sorry, Officer Hampton.  I referred to you as
12   Officer Hartmon.  That was my mistake.  Tell the jury what
13   you do for a living.
14        A.   I'm a police officer employed by the City of
15   Plantation.
16        Q.   And how long have you been a police officer?
17        A.   Ten years.
18        Q.   And back on the 19th day of February of 1996 were
19   you working to the Plantation Police Department?
20        A.   Yes, I was.
21        Q.   And in what capacity at that time?
22        A.   I was assigned to the field operations bureau,
23   road patrol.
24        Q.   Now that day what shift were you working, if you
25   can tell the jury.
```

1      A.    Afternoon shift which would be three to eleven.

2      Q.    At some time that afternoon, approximately

3   sometime after five p.m. did you receive any information

4   regarding an armed robbery that had occurred in the City

5   of Plantation?

6      A.    Yes, I did.

7      Q.    And what kind of information was it that you

8   received?

9      A.    Basically, it came over the radio of an armed

10  robbery involving a stranger abduction from the Broward

11  Mall area.  And that one party had escaped and that there

12  was another party still in the vehicle with the suspects.

13     Q.    Now when you received that information, did they

14  provide any Be On the Lookout information?

15     A.    Yes.  It was -- the suspect vehicle involved was

16  an older model, 300ZX, Nissan, hatchback, gray in color.

17     Q.    And when you received that information, did you

18  have an opportunity at some subsequent time to run into a

19  vehicle that matched the description you received?

20     A.    Yes.  I had positioned myself on I-595 located at

21  the Turnpike for a probable escape route for the suspects.

22     Q.    Had you received any information where the

23  abduction had occurred?

24     A.    It came out as over the Broward Mall and that one

25  of the victims was now at International House of Pancakes

1    on University and Davie or Peters Road.

2        Q.    All right.  At that International House of

3    Pancakes is that in the City of Plantation, also?

4        A.    Yes, it is.

5        Q.    Is that in Broward County?

6        A.    Yes, it is.

7        Q.    State of Florida?

8        A.    Yes.

9        Q.    All right.  Let me take you back to the location

10    at I-595 that you mentioned.  Did you see the vehicle

11    drive by you?

12        A.    I saw a gray 300ZX occupied by four black

13    gentlemen which had matched with the initial broadcast

14    over the radio.

15        Q.    And when you saw this vehicle, what if any

16    actions did you take?

17        A.    I immediately got in behind the vehicle and put

18    my emergency lights on and pursued the vehicle.

3

19        Q.    Would you tell the jury what kind of a vehicle or

20    car you were driving on the 19th of February when you

21    started following this car?

22        A.    It's a marked police unit with red and blue

23    lights and it says police on it.

24        Q.    Is it clearly identifiable as a police vehicle?

25        A.    Yes.

1        Q.    What happened then?

2        A.    I pursued the vehicle east on 595 to US 441,

3    State Road 7 and the vehicle had proceeded northbound on

4    441.

5        Q.    And at any time did you turn on any signals or

6    anything of that nature?

7        A.    I had my lights and siren on the whole time.

8    Once I got on 595.

9        Q.    When you say your sirens, these are the sirens

10   that we hear out on the street that are loud.

11       A.    Yes.

12       Q.    Are these intended to assist in notifying

13   motorists that you're trying to stop them?

14       A.    That's correct.

15       Q.    Okay.  At some point did that car you were

16   following, the one that matched the Be On the Lookout or

17   BOLO actually stop?

18       A.    Yes, it had turned westbound off of State Road 7

19   onto Southwest 18th Street and pulled over.

20       Q.    What happened at that point?

21       A.    At that point Officer Martin from Fort Lauderdale

22   Police Department had pulled in behind me just by

23   coincidence because he saw my emergency lights activated

24   to back me up.  He had no idea what had happened.  So I

25   had pulled the car over and instructed all the occupants

1    inside to put their hands on top of the head and interlace

2    their fingers and not to move.

3        Q.    When you say you ordered them, how did you do

4    that?

5        A.    I did it over my PA system, my microphone.

6        Q.    All right.  Is this a system that magnifies your

7    voice, amplifies it?

8        A.    Yes.  Yes.

9        Q.    And what, if any, actions did the occupants

10    inside the automobile take?

11        A.    All of them put their hands on top of their head

12    and interlaced their fingers for a short time.

13        Q.    Okay.  What happened after that short time

14    period?

15        A.    As -- as this was being conducted I turned around

16    to the Fort Lauderdale officer to inform him what had

17    transpired and what I possibly had here.  And at that

18    point the vehicle took off and accelerated.

19        Q.    Can you tell us in what direction it was going?

20        A.    It went west on Southwest 18th Street and north

21    on Southwest 41st Avenue.

22        Q.    How long did you continue to pursue that car?

23        A.    For approximately a block and a half.  It's in

24    the residential neighborhood.

25        Q.    And then what happened after that?

1        A.    The vehicle abruptly came to a stop.

2        Q.    And once you came to a stop could you describe

3   what, if any, actions the occupants inside the car took?

4        A.    At -- at the point of stop, I pulled immediately

5   right behind the vehicle, and two gentlemen hopped out of

6   the hatchback, out the back, and one gentleman hopped out

7   of the passenger seat and ran and the driver's door was

8   opening.

9        Q.    What actions did you take upon that happening?

10       A.    Basically by the time I could get my car into

11  park, get out of my vehicle, both the subjects and the

12  hatchback had already cleared the vehicle and were running

13  northbound in a northerly direction, and I -- I engaged

14  with the driver of the vehicle.

15       Q.    All right.  And that individual later became

16  known to you as Travis Russel, is that correct?

17       A.    That is correct.

18       Q.    You described earlier two individuals who jumped

19  out of the hatchback in the back of the automobile, is

20  that right?

21       A.    Yes.

22       Q.    Did you have an opportunity to get a look at

23  them?

24       A.    Yes.

25       Q.    Okay.  Do you see either one of those individuals

```
 1    in the courtroom today?

 2         A.    This gentleman right here.

 3         Q.    Okay.  Could you describe what he's wearing for

 4    the record.  You were just pointing --

 5         A.    He's wearing a blue --

 6               MR. LASWELL:  We'll stipulate.

 7               THE COURT:  Okay.  The record will so reflect.

 8    BY MR. MILIAN:

 9         Q.    You've identified for the record right now the

10    defendant in this case, Todd Richardson.  You said he was

11    one of the two guys who exited the back?

12               MR. LASWELL:  Objection, Your Honor.  This

13         isn't direct examination.  This is repetition.

14               THE COURT:  Ask your next question, Mr. Milian.

15               MR. MILIAN:  Yes, sir.

16    BY MR. MILIAN:

17         Q.    Once you took Mr. Russel, placed him under

18    arrest, did there come a time -- first of all, let me stop

19    right there.  Let me show you what's been marked as

20    State's CC for Identification.  Do you recognize it?

21         A.    Yes.  That's the vehicle they were traveling in.

22               MR. MILIAN:  Okay.  Judge, I'd like to move it

23         into evidence and have permission to publish it to the

24         jury but not at this time.

25               MR. LASWELL:  I don't have any objection, Judge.
```

1          There's already one in evidence of the car.

2              THE COURT:  CC will be 32 in evidence.

3              (Thereupon, State's Exhibit Number 32 was

4          received in Evidence.)

5    BY MR. MILIAN:

6          Q.   All right.  My question to you was, did you have

7    an opportunity to go through the vehicle that you stopped,

8    the one Mr. Richardson got out of?

9          A.   Yes.  Yes, I did.

10         Q.   And inventory any contents that were inside?

11         A.   Yes.

12         Q.   And were you able to take that property into

13   evidence?

14         A.   Yes, I did.

15         Q.   First of all, did you find anything in the front

16   right side of the automobile?

17         A.   In the front right side of the automobile was a

18   small charm with I believe brown stones.

19         Q.   Okay.  Let me show you what's been marked as

20   State's 3 and State's 4 in Evidence.  I ask you to take a

21   look at it.

22         A.   Yes.

23         Q.   Is that the charm that you found?

24         A.   Yes.

25         Q.   Let me show you now State's 29 in Evidence.  Can

1    you take a look at it?  See if you recognize it.

2        A.   Yes, that's the same one.

3        Q.   Okay.  State's 29 in Evidence which has

4    previously been published to the jury was found inside the

5    automobile you stop, after the stop, correct?

6        A.   That's correct.

7             THE COURT:  Twenty-nine or twenty-seven, Mr.

8        Milian?

9             MR. MILIAN:  I'm sorry, Judge.  It looked like

10       29 to me.  I think it's 27.

11            THE COURT:  Okay.

12   BY MR. MILIAN:

13       Q.   In addition to that, did you find any weapons

14   inside the car?

15       A.   Yes, I did.

16       Q.   And would you tell the jury where you found that

17   weapon?

18       A.   I found an automatic handgun under the driver's

19   seat of the vehicle.

20       Q.   Let me show you what's been marked as State's 29

21   in Evidence.  Ask you to take a look at it.  Do you

22   recognize it?

23       A.   Yes, I do.

24       Q.   Okay.  Is this the weapon that you found --

25       A.   Yes, it is.

1    Q.   -- in the vehicle?  Did you find any lady's

2  belongings or anything else inside the car?

3    A.   There was a woman's purse and right in the center

4  console of the vehicle between the two bucket seats of the

5  front seat.

6    Q.   All right.  Let me show you what's been marked as

7  State's 30 in Evidence.  Ask you to take a look at it.

8    A.   Yes.

9    Q.   State's 30 in Evidence.  Does that look like the

10  same purse that you recovered?

11    A.   Yes.

12    Q.   In fact, was that placed into evidence by you?

13    A.   Yes, it was.

14    Q.   Okay.  And how did it get to the courthouse

15  today?

16    A.   I brought it.

17    Q.   Okay.  And the package that it was contained in

18  who opened that?

19    A.   You did.

20    Q.   And in whose presence?

21    A.   Mine.

22    Q.   All right.  And this bag and its contents were

23  place into evidence by you on the 19th of February as you

24  inventoried the belongings in the car.

25    A.   Yes, it was.

1      Q.    And was this done after Mr. Richardson ran out

2    the back of the car?

3      A.    This was done after, yes.

4      Q.    Now did there come a time when Mr. Richardson was

5    apprehended by Sergeant Massey of the Plantation Police

6    Department?

7      A.    Yes.

8      Q.    And Sergeant Springman, I believe, searched him

9    and recovered property that was found on him, is that

10   correct?

11     A.    To my knowledge, yes.

12     Q.    Was that property turned over to you?

13     A.    Yes, it was.

14     Q.    Let me show you what's been marked as State's 31

15   in Evidence.  Ask you to take a look at it.  Was State's

16   31 the items that were given to you by Sergeant Springman?

17     A.    Yes.

18     Q.    And did you place those into evidence?

19     A.    Yes, I did.

20     Q.    You bring them today from the Plantation Police

21   Department?

22     A.    Yes, I did.

23     Q.    What were they being held over there?

24     A.    Pardon me?

25     Q.    Where were they being held in the Plantation

```
 1    Police Department?

 2        A.    In the property division of the Plantation Police

 3    Department.

 4        Q.    I'm sorry.  And who opened up the evidence bag?

 5        A.    You did.

 6        Q.    Okay.  In whose presence?

 7        A.    Mine.

 8        Q.    Let me show you what's been marked as State's 9.

 9    Ask you to just take a look at it.  Was a photograph made

10    of the items that were recovered from Mr. Richardson?

11        A.    Yes.

12        Q.    State's 9, does that depict the items that were

13    taken from Mr. Richardson?

14        A.    Yes, it does.

15            MR. MILIAN:  Judge, at this time I'd like to

16        publish please State's 32, 3, 4, and 9.

17            THE COURT:  Okay.

18            MR. MILIAN:  Thank you, Officer.  I have no

19        further questions.

20            THE COURT:  Cross-examination.

21                    CROSS-EXAMINATION

22    BY MR. LASWELL:

23        Q.    What's your name again?

24        A.    Curtis Hampton.

25        Q.    H-A-M-P-T-O-N.
```

```
 1        A.    Yes, sir.

 2        Q.    Also, let me show you a small detour.  While

 3   we're doing this who's Entus?

 4        A.    Entus.

 5        Q.    Entus.

 6        A.    He's another officer.

 7        Q.    E-N-T-U-I-S?

 8        A.    E-N-T-U-S.

 9        Q.    Okay.  He's the guy that actually searched that

10   car, right?

11        A.    No.

12        Q.    No?

13        A.    No.

14        Q.    You searched the car.

15        A.    Yes, I did.

16        Q.    What happened to the rest of the stuff that you

17   haven't testified about?

18        A.    The contents of the vehicle itself?

19        Q.    Yeah.

20        A.    It was inventoried for towing.  I searched for

21   evidence and things of evidentiary nature.  And all the

22   other contents not related to this case were inventoried

23   by Officer Entus and placed into the property department

24   to be returned to the owner of the vehicle.

25        Q.    If you're the one that searched, then you found a
```

1    lot more than you've testified about, right?

2        A.    I testified to evidence that I found in the car.

3        Q.    Right.  And you found a lot more than that.

4        A.    I saw a lot more in the vehicle.

5        Q.    I don't want to dance semantics with you.  There

6    are a lot of other things in that car, right?

7              MR. MILIAN:  Judge, I'm going to object to the

8         argumentative nature of the question.

9              THE COURT:  Overruled.

10   BY MR. LASWELL:

11       Q.    There were a lot of other things in that car.

12       A.    Yes, it was.

13       Q.    You decide they didn't have any evidentiary value

14   as far as this prosecution is concerned, right?

15       A.    That's correct.

16       Q.    And one of the things that of course did have a

17   lot of evidentiary value was the firearm and the magazine,

18   is that correct?

19       A.    That's correct.

20       Q.    I'm going to show you what's been marked for

21   identification as Defendant's Exhibit D and ask you if you

22   can identify that.

23       A.    Yes.

24       Q.    It's a -- first of all, it's a photocopy, right?

25       A.    That's correct.

1      Q.    Is it a photocopy of a document that you

2   prepared?

3      A.    Yes, it is.

4      Q.    Is it a true and accurate reproduction of that

5   document?

6      A.    Yes.

7      Q.    Do you know where the original is?

8      A.    The original is right out here in the hallway in

9   my briefcase.

10      Q.    But this is a true and accurate copy, right?

11      A.    Yes.

12          MR. LASWELL:  Judge, we would offer State's D.

13      I've shown it to Mr. Milian.

14          THE COURT:  Mr. Milian.

15          MR. MILIAN:  Judge, I don't see the relevance of

16      that item.  Let me talk to Mr. Laswell.  Let me see if

17      he can tell me --

18          THE COURT:  Overruled.  D will be Defense

19      Exhibit 4 into Evidence.

20          (Thereupon, Defendant's Exhibit Number 4 was

21      received in Evidence.)

22   BY MR. LASWELL:

23      Q.    Is that the same document you showed me?  Yeah.

24   No bait and switch.  Two questions about that document.

25   Number one is, there's a box on it that you checked

1   requesting a fingerprint analysis, correct?

2      A.   That's correct.

3      Q.   Did you try to lift any prints off of that weapon

4   or the magazine?

5      A.   No, I did not.

6      Q.   Do you know whether or not in response to your

7   request on that box one of your technicians did?

8      A.   No.

9      Q.   Do you know whether or not any latent examiner or

10  fingerprint comparison expert ever did any work to try and

11  analyze any latent prints that came off of that?

12     A.   What happens is once -- once I send it down to

13  the lab, that's to be conducted by the lab technicians

14  down at the crime lab.  Whether they did it or not or

15  found any fingerprints I don't know.

16     Q.   Is that a long no?

17     A.   Well, it's an explanation with a no.

18     Q.   Okay.  Very good.  Now directing your attention

19  to this exhibit, I would ask you, sir, who at the time you

20  filled that form out did you attribute that firearm to?

21     A.   A Travis Russel.

22     Q.   Thank you.  Todd Richardson's name is not on

23  there.

24     A.   No, it is not.

25     Q.   Now did you check out the ownership of that car?

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

```
 1        A.    The ownership of the vehicle that was stopped?

 2        Q.    Uh-huh.

 3        A.    That was stopped.

 4        Q.    Yes.

 5        A.    Trav --

 6        Q.    Who?

 7        A.    Travis Russel.

 8        Q.    He was driving.

 9        A.    That's correct.

10        Q.    When you first saw the vehicle with the four

11   black males as you described, could you tell us where Mr.

12   Richardson was sitting?

13        A.    He was in the hatchback area on the left side.

14        Q.    Now sitting up straight?

15        A.    No, hunched over like this.  Because it was a

16   hatchback.

17        Q.    Okay.  As a matter of fact, both the fellows in

18   the back seat were hunched over like that.

19        A.    As far as I could tell, yes.

20        Q.    If I showed you a picture of that car, would it

21   help your -- refresh your recollection.

22        A.    I'll agree with you they were hunched over like

23   this.

24        Q.    Not much room in that car.

25        A.    No, not really.
```

```
1        Q.   Okay.  And you only saw four people there.

2        A.   That is correct.

3        Q.   Could there have been two other people?

4        A.   No.

5             MR. LASWELL:  All right.  Thank you very much.

6             THE COURT:  Redirect.

7             MR. MILIAN:  No, sir.

8             THE COURT:  Thank you, Officer.  You may

9        step down.  You're excused.  Call your next witness.

10             MR. MILIAN:  Yes.  Detective Wendt of the

11        Plantation Police Department.

12   Thereupon,

13                   DETECTIVE MARK WENDT,

14   having been first duly sworn, was examined and testified

15   upon his oath as follows:

16             THE CLERK:  Please state your full name.  Spell

17        your last name for the record, please.

18             THE WITNESS:  Mark A. Wendt, W-E-N-D-T.

19                   DIRECT EXAMINATION

20   BY MR. MILIAN:

21        Q.   Would you tell the jury what you do for a living,

22   please?

23        A.   I'm a detective currently assigned to the

24   criminal investigation division of the Plantation Police

25   Department.
```

```
 1        Q.    How long have you been a police officer?

 2        A.    Seven years.

 3        Q.    And before that did you do anything in law

 4   enforcement?

 5        A.    Yes, I was -- I was a service aid for two years.

 6        Q.    Let me refer you back to February 22nd, 1996.

 7   Were you working as a detective at that time?

 8        A.    Yes, sir, I was.

 9        Q.    Did you have an opportunity to conduct a

10   photographic line up with two ladies by the name of Linda

11   Butler and Erica Outridge?

12        A.    Yes, sir, I did.

13        Q.    Let me show you what's been marked as State's FF

14   for Identification.  And ask you to take take a look at

15   it.  See if you recognize it.

16        A.    Yes, I do.

17        Q.    And at that time back on February 22nd did you

18   prepare a photographic line up.

19        A.    Actually this line up was prepared by our ID unit

20   which is our crime scene unit.

21        Q.    Did you review the preparation and receive it

22   after it was put together?

23        A.    Yes, sir, I did.

24        Q.    Did that photographic line up show six

25   individuals of the same, similar racial background
```

1   features as far as identification?

2       A.   Yes, sir.

3       Q.   Okay.  Did you use that particular item FF for

4   identification with Ms. Outridge as well as with Ms.

5   Butler?

6       A.   Yes, sir, I did.

7       Q.   Did you conduct the identification process

8   independent of each other?

9       A.   Yes, sir.

10      Q.   In other words, Ms. Outridge was not sitting in

11  the room while Ms. Butler was there identifying someone.

12      A.   That's correct.

13      Q.   All right.  In addition to that, did you have

14  Linda Butler as well as Erica Outridge prepare an

15  affidavit of photographic identification?

16      A.   Yes, I did.

17      Q.   You had them sign it in your presence as well.

18      A.   Yes, I did.  And then I attested to it.

19      Q.   Okay.  Let me show you what's been marked as

20  State's 28 in Evidence and State's EE for Identification.

21  Have you take a look at them.  See if you recognize them.

22      A.   Yes, sir, I do.

23      Q.   Okay.  Are they the originals that were filled

24  out by Ms. Outridge and Ms. Butler in your presence on

25  February 22nd when you had them view the photographic line

7

```
 1    up?
 2         A.   Yes, sir.
 3              MR. MILIAN:  All right.  Judge, at this time I
 4         would like to move all three items, not 28, of course.
 5         But FF and EE, have them marked in evidence and have
 6         permission to have them published to the jury.
 7              MR. LASWELL:  May I voir dire?
 8              THE COURT:  Okay.
 9                      VOIR DIRE EXAMINATION
10    BY MR. LASWELL:
11         Q.   Hi, Detective.
12         A.   How are you, sir?
13         Q.   This photographic line up, I think you've
14    testified that you didn't prepare it.
15         A.   That's correct.
16         Q.   Okay.  Who did?
17         A.   It was prepared by our crime scene unit.
18         Q.   You don't know.
19         A.   Plantation.
20         Q.   If you don't that's all right.
21         A.   No, I don't know which ID technician actually
22    prepared it.
23         Q.   Okay.  That is pretty common, photo ID line up,
24    right?
25         A.   Yes, it is.
```

231

1     Q.    That's the way you prepared them.

2     A.    Yes, it is.

3     Q.    And it's only so that you can open that folder,

4   right?

5     A.    Yes, sir.

6     Q.    And those pictures are stapled in there, correct?

7     A.    Actually, I believe these are taped.

8     Q.    Taped in there.

9     A.    Yes, sir.

10     Q.    Okay.  They're affixed to the folder.

11     A.    Yes, sir, they are.

12     Q.    And the backs of the pictures are blank.

13     A.    Yes, sir.

14     Q.    Correct?  And there are no signatures on these

15   particular pictures are there?

16     A.    Not on these.  No, sir.

17     Q.    Okay.  So the affidavits that you have attested

18   to as being from these young ladies would identify someone

19   only by number.

20     A.    The individual in Position Number 5 according to

21   this affidavit.  Yes, sir.

22     Q.    Right.  But these can be changed around.

23     A.    Yes, they could.  If you wanted to change them

24   around they could be.

25     Q.    Okay.  I'm not suggesting that they were.  But

232

1    they could be.  By someone overzealous, right?

2        A.    Yes, sir.

3        Q.    And your testimony that all of these fellows

4    appear to be similar, that's merely your conclusion, is it

5    not?

6        A.    That's correct.

7            MR. LASWELL:  All right.  Thank you.  No

8        objection.

9            THE COURT:  Okay.  Double E will be 33 in

10       Evidence.  Double F will be 34.

11           (Thereupon, State's Exhibits Numbers 33 and 34

12       were received in Evidence.)

13                CONTINUED DIRECT EXAMINATION

14   BY MR. MILIAN:

15       Q.    Going to the matters of the photographic line up

16   to when you conducted this photographic line up, did you

17   have the witnesses review the admonition that is included

18   in the form?

19       A.    Yes, sir, I did.  I presented that to them and

20   and had them read it.

21       Q.    Okay.  First going to Ms. Outridge, once she had

22   read that admonition, did you have her take a look at the

23   photographic line up and see if she recognized anyone?

24           MR. LASWELL:  Hearsay, Judge.

25           THE COURT:  Overruled.

233

```
 1              THE WITNESS:  I'm sorry.  The question
 2      again.
 3   BY MR. MILIAN:
 4      Q.   Yes, sir.  The question was, did you have her
 5   look at the photographic line up by herself and see if she
 6   could identify anyone that was in it?
 7      A.   Yes, sir, I did.
 8      Q.   Okay.  And could you tell the jury who in the
 9   photograph did she identify?
10      A.   She identified the individual in Position Number
11   5.
12      Q.   And what's his name?
13      A.   Todd Richardson.
14           MR. MILIAN:  Thank you.  I'm publishing to the
15      jury now State's 34, Judge.
16           THE COURT:  Okay.
17           MR. MILIAN:  And State's 33.
18   BY MR. MILIAN:
19      Q.   Not to stop the jury from looking at that, did
20   you have Ms. Butler go through the same procedure?
21      A.   Yes, sir, I did.
22      Q.   And was she able to identify anybody in the
23   photographic line up?
24           MR. LASWELL:  Same objection.
25           THE COURT:  Overruled.
```

234

1                THE WITNESS:  Yes, sir.

2    BY MR. MILIAN:

3        Q.    And would you tell the jury who Ms. Butler was

4    able to identify?

5        A.    The individual in Position Number 5.

6        Q.    Now first going to the identification by Ms.

7    Outridge, was Ms. Outridge given any assistance whatsoever

8    in making an identification?

9        A.    No, sir.  She was not.

10       Q.    Did you advise her that you were investigating

11   the armed robbery and armed kidnapping that occurred on

12   the 19th of February 1996?

13       A.    Yes, sir, I did.

14       Q.    Did you tell her that if she recognized anybody

15   who participated in that crime on the 19th of February

16   that she should identify them?

17       A.    Yes, sir.  And I believe I added to that only if

18   she was absolutely certain.

19       Q.    Okay.  All right.  And when she made her

20   identification of the individual in Number 5, the person

21   identified as Todd Richardson, did she have any problems

22   making that identification?

23       A.    No, sir.  She did it without hesitation.

24       Q.    Now going on to Ms. Butler the same questions

25   apply.  First of all, was she given any assistance

235

1    whatsoever in making her identification of the -- one of

2    the perpetrators of the crime on the 19th of February?

3        A.    No, sir, she was not.

4        Q.    Was she able to identify one of the individuals

5    in the six photographs as having been a participant in the

6    armed robbery, armed kidnapping on the 19th of February?

7        A.    Yes, sir, she was.  Once again without hesitation

8    she pointed to the person and identified him.

9        Q.    When you conducted both of the line ups, were the

10   witnesses segregated from each other?

11       A.    Yes, sir.

12       Q.    Okay.  Was anybody else present while the

13   identification was being made?

14       A.    No, sir.  What I had done was I went to their

15   high school, called them into the office.  There was

16   actually a room in the clinic of the office of South

17   Plantation High School where we conducted the viewing of

18   the line up.

19       Q.    Uh-huh.

20       A.    There was no one else present.  Once I was done

21   with one of the victims then she returned to class and I

22   requested the other victim to come to the office.

23            MR. MILIAN:  Thank you very much.  No further

24       questions, Your Honor.

25            THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. LASWELL:

Q.    Where was Detective Barth during that procedure?

A.    Not with me, sir.

Q.    Where was Police officer Gella or Gelgala, Galla?

A.    He I believe was the SRO, and I, if I'm not mistaken, he may have been in the office at the time that this was conducted.

Q.    But not with you.

A.    Not -- but not with me.  He was contacting the, one of the office workers, requesting the people that I need.  I gave him the names.

Q.    That's fine.

A.    Well, I gave him the names and then he worked on getting the students out of class for me.

Q.    But he went with you.

A.    No, sir.

Q.    So you don't really know what he was doing.  But he was doing something else and he wasn't with you.

A.    Right.  I believe he was in the office.  But, I mean, I was -- within sight of me but not directly with me.

Q.    Were there other police officers there?

A.    Not that I recall.

Q.    Was Officer Galla in full uniform?  Galla?  It's

```
 1   Galla, isn't it?

 2        A.   It's Steve Galla, yes, sir.

 3        Q.   Galla.

 4        A.   Yes, sir.

 5        Q.   Was he in full uniform?

 6        A.   I don't recall if he was in uniform or not.

 7        Q.   He's a resource officer at the school, right?

 8        A.   Yes, sir, he is.

 9        Q.   And they normally do wear a uniform, don't they?

10        A.   They switch back and forth.  Some days they're in

11   uniform.  Some days they're not.

12        Q.   But you and he were the only two police officers

13   there.

14        A.   Once again, I don't recall if we were the only

15   two there.

16        Q.   Did you ask the girls to make any other

17   identifications?

18        A.   Yes, sir.  They were asked to view a line up.

19        Q.   Did they view a line up?

20        A.   Yes, sir.

21        Q.   And did they identify a man later known to you as

22   Travis Russel?

23        A.   Yes, sir.  I'd have to refer back to my notes,

24   but I believe that was the name of someone else that they

25   did identify.
```

1    Q.    And he was the fellow with the gun, right?

2    A.    My involvement was only showing the line up and

3    identifying the people involved.  I didn't take statements

4    from them.

5    Q.    Okay.  How about fingerprints on that gun?  Do

6    you know anything about that?

7    A.    No, sir, I don't.

8    Q.    Do you know whether or not a latent print

9    comparison was made?

10    A.    No, sir, I don't.

11    Q.    This is your sum total involvement.

12    A.    My involvement was showing the line ups.

13    MR. LASWELL:  Thank you, Detective.

14    THE COURT:  Redirect.

15    MR. MILIAN:  No, sir.

16    THE COURT:  Thank you, Officer.  You may step

17    down.  You're excused.

18    THE WITNESS:  Thank you, sir.

19    THE COURT:  Okay.  Members of the jury, let's go

20    ahead and take a ten minute recess.  Remember my

21    admonition not to discuss the case or allow it to be

22    discussed in your presence.  I'm going to ask you to

23    to meet outside the courtroom door in ten minutes.

24    Again be careful that you don't put yourself

25    in a position where you're overhearing any

1       conversations.  We'll see you back in ten minutes.

2              (Thereupon, the jury exited the courtroom, after

3       which the following proceedings were had:)

4              THE COURT:  How about Mr. Allen, are we going

5       to be able to get him up this afternoon?

6              BAILIFF BLACKER:  I think we got him downstairs

7       now.

8              THE COURT:  Why don't we go ahead and bring him

9       up now during the break, and we'll see if he's going

10      to testify or not or if he wants a lawyer.  And

11      we'll --

12             MR. LASWELL:  Judge, there's an imminently

13      qualified and bright lawyer in the courtroom as we

14      speak.

15             MR. MILIAN:  Thank you, Mr. Laswell.

16             MR. LASWELL:  There's another.  There's two.  The

17      one in the back row.

18             THE COURT:  Let's see first whether he wants to

19      see a lawyer, then we'll cross that bridge.  And we'll

20      see regarding a lawyer because the lawyer you're

21      talking to would be a member of your law firm and I

22      would have to clear it both with Mr. Richardson and

23      Mr.  Allen regarding a conflict.

24             MR. LASWELL:  Believe me, Mr. Allen and I have a

25      Chinese wall that's similar to the Great Wall in this

1   case.

2       THE COURT:  Let's go get Mr. Allen.  See if

3   we can get him up.  We'll be in recess.

4       (Thereupon, a recess was taken, after which the

5   following proceedings were had:)

6       THE COURT:  Okay.  We're back on the record.

7   Both counsel are present.  Mr. Richardson's present.

8   Is this Mr. Allen?

9       MR. ALLEN:  Yes, sir.

10      THE COURT:  Mr. Allen, Mr. Richardson wants to

11  call you as a witness to testify for him in this

12  trial.  Your lawyer is out of town I guess on a

13  vacation.  Do you know whether you want to testify or

14  do you need to talk to a lawyer or do you know what

15  you want to do?

16      MR. ALLEN:  Yeah, I rather have my lawyer

17  present.

18      THE COURT:  Okay.  Well, he's out of town.  So

19  understanding that he's out of town, what do you want

20  to do if Mr. Richardson calls you as a witness?

21      MR. ALLEN:  With my lawyer present, I -- yeah, I

22  wouldn't mind testifying.

23      THE COURT:  I'm sorry?

24      MR. ALLEN:  With my lawyer present.

25      THE COURT:  He's not here.  He's out of town.

1      MR. ALLEN:  I need my lawyer present, you know.

2   First time I'm going through this.  Make sure

3   everything --

4      THE COURT:  Well, understanding that your

5   lawyer's not here, do you want to testify or not?

6      MR. ALLEN:  No, sir.

7      THE COURT:  I'm sorry?

8      MR. ALLEN:  No, sir.

9      THE COURT:  Okay.  Anything further, Mr.

10  Laswell?

11     MR. LASWELL:  Even though this witness has not

12  used the magic words that he would take the Fifth

13  Amendment --

14     THE COURT:  You can ask him some questions if you

15  want.

16     MR. LASWELL:  May I call him as a witness in that

17  absence?

18     THE COURT:  Well, you understand, Mr. Allen,

19  you have a Fifth Amendment right to remain silent

20  because these charges are pending against you.

21     MR. ALLEN:  Uh-huh.  Yes, sir.

22     THE COURT:  And if you did testify anything you

23  said could be used against you.  Do you understand

24  that?

25     MR. ALLEN:  Yes, sir.

242

1      THE COURT:  And understanding that, do you want

2   to testify for Mr. Richardson or do you want to

3   exercise your Fifth Amendment right to remain

4   silent?

5      MR. ALLEN:  What is the Fifth Amendment right?

6      THE COURT:  It just means that you don't have to

7   testify.  That they can't make you testify because it

8   could be used against you.

9      MR. ALLEN:  Take the Fifth Amendment, right.

10     THE COURT:  Anything else we need to talk about

11  with Mr. Allen?

12     MR. LASWELL:  Not that I'm aware of, Judge.

13     THE COURT:  Okay.  I appreciate you coming up,

14  sir.  And we'll send you on back down.

15  Anything further before we bring in the jury?

16     MR. MILIAN:  Could I just have a second here,

17  Judge?

18     THE COURT:  Okay.

19     MR. LASWELL:  I think these three witnesses are

20  going to be fairly brief.

21     MR. MILIAN:  That's what I was going tell the

22  Court.

23     MR. LASWELL:  I need some time to talk to him

24  after the State rests.

25     THE COURT:  We'll give you time after the State

1      rests.  We'll send the jury out, and you'll have some

2      time.

3          MR. LASWELL:  Okay.  And then I'll be able to

4      tell the Court what I'm going to do.

5          THE COURT:  Okay.  Anything further before we

6      bring the jury in?

7          MR. MILIAN:  No, sir.

8          THE COURT:  All right.  Mr. Laswell, you're

9      ready?

10         MR. LASWELL:  Yes.

11         THE COURT:  Okay.  Let's bring in the jury.

12         (Thereupon, the jury entered the courtroom, after

13     which the following proceedings were had:)

14         THE COURT:  Counsel concede the presence of the

15     jury and waive its polling?

16         MR. LASWELL:  Yes, sir.

17         MR. MILIAN:  Yes, sir.

18         THE COURT:  And did everyone follow my admonition

19     not to discuss the case or allow it to be discussed

20     in your presence?

21         THE JURY:  Yes, sir.

22         THE COURT:  Okay.  Mr. Milian, you may call your

23     next witness.

24         MR. MILIAN:  Yes, sir.  I'm calling Dennis

25     Grey of the Broward Sheriff's Office.

244

```
 1    Thereupon,

 2                        DENNIS GREY,

 3    having first been duly sworn, was examined and testified

 4    upon his oath as follows:

 5              THE CLERK:  Please be seated.  State your

 6         full name.  Spell your last name for the record,

 7         please.

 8              THE WITNESS:  Dennis Thomas Grey, G-R-E-Y.

 9                        DIRECT EXAMINATION

10    BY MR. MILIAN:

11         Q.   Mr. Grey, would you tell the jury what you do you

12    for a living?

13         A.   I'm employed with the Broward County Sheriff's

14    Office.  I'm assigned to the crime laboratory, and I

15    specialize in firearms identification.

16         Q.   What special training have you had to perform

17    that job?

18         A.   I received a year's on the job training in the

19    Dade County Public Safety Department which entailed

20    learning the theories of firearms identification, reading

21    the various textbooks in the field, visiting arms

22    manufacturers and plants, ammunitions plants to see how

23    firearms and ammunition are manufactured.  And it was

24    basically on the job training.

25         Q.   How long have you been doing this job now?
```

245

1        A.    Over 24 years.

2        Q.    How many times have you testified in a court of

3    law?

4        A.    Over 550.

5        Q.    And how many times have you been declared an

6    expert in the field of firearms and ballistics?

7        A.    Over 550.

8            MR. MILIAN:  Judge, I tender the witness as

9        an expert in those fields.

10            MR. LASWELL:  I have known Dennis longer than

11        that.  No problem.

12            THE COURT:  Okay.  The Court will receive Mr.

13        Grey as an expert in the field of firearms

14        identification.  You may proceed, Mr. Milian.

15    BY MR. MILIAN:

16        Q.    Mr. Grey, what is a firearm if you can tell the

17    jury?

18        A.    Firearm is a device which expels a projectile by

19    means of an explosive.

20        Q.    I'm going to refer you to your laboratory case

21    number 3953G as in golf.  Is that correct?

22        A.    Correct.

23        Q.    Did you perform an examination of an item that

24    was submitted to you by the Plantation Police Department?

25        A.    Yes, sir, I did.

1      Q.    And what examination is it that you conducted on

2  that item?

3      A.    I examined the firearm and I actually test fired

4  the firearm to determine whether it was operable or not.

5      Q.    Mr. Grey, let me hand you what's been marked as

6  State's 29 in Evidence.  Ask you to take a look at it.

7  Tell me if you recognize it.

8      A.    Yes, sir.  It has my laboratory case number,

9  initials inscribed on the weapon as well as the magazine.

10     Q.    Okay.  Do you do that every time you test fire

11  and examine a firearm?

12     A.    On all evidence.

13     Q.    Okay.  Would you tell us about State's 29 in

14  Evidence.

15     A.    That it's a .380 auto Bersa, B-E-R-S-A Model 85,

16  autoloading pistol.

17     Q.    All right.  Did you test fire?

18     A.    Yes, sir, I did.

19     Q.    Is it able to expel a projectile when you fire

20  it?

21     A.    Correct.

22     Q.    When you say .380, what does .380 refer to?

23     A.    That's the caliber.

24     Q.    All right.  Let me ask you, if you don't mind,

25  Mr. Grey, can you stand in front of the jury and I'm going

247

1    to ask you to explain to them with the Court's permission,

2    of course.

3              THE COURT:  Okay.

4    BY MR. MILIAN:

5         Q.    To briefly explain to them how this firearm

6    actually operates.

7         A.    Yes, sir.  First, you load the cartridges in the

8    magazine.  Then you load the magazine in the magazine well

9    until it locks in place.  Then to load it you pull back on

10   the slide.  Let the slide go forward which strips the top

11   round in the magazine into the chamber.  It also cocks the

12   weapon so that all you have to do is squeeze the trigger

13   and the weapon fires.

14        Q.    Let me ask you, when you have an empty magazine

15   like you did right now, what happens to the slide on the

16   weapon when you pull the slide back?

17        A.    All right.  The slide will lock to let you know

18   you have no rounds.

19        Q.    If you had the round in the magazine what would

20   happen to the slide?

21        A.    It would go forward.

22        Q.    Now is this a double action or single action

23   weapon?

24        A.    It's both.

25        Q.    Could you explain to the jury what single and

248

1    double action are?

2        A.    Sure.    This weapon has a magazine safety so the

3    magazine has to be all the way seated.    Double action is

4    just squeezing the trigger.    Single action is where the

5    weapon is cocked and then squeezing the trigger.

6        Q.    Okay.    Did you perform any tests on this

7    particular weapon to see if all of the safeties that it

8    has were in working order?

9        A.    Yes, I did.

10       Q.    And what was your examination?

11       A.    That it was in good operating condition with all

12   its safeties working properly?

13       Q.    Okay.    Did you find any problems at all with the

14   weapon whatsoever during the course of your examination?

15       A.    No.

16       Q.    May I ask you one final question.    Did you test

17   the trigger pull on this weapon?

18       A.    Yes.

19       Q.    Could you tell the jury what a trigger pull is

20   and tell them what your findings were?

21       A.    The trigger pull is the amount of pressure

22   applied to the trigger to the weapon to fire.    I have to

23   go back and refer to my notes.    And the single action mode

24   which means with the hammer cocked it was four and-a-half

25   pounds of pressure.    And the double action mode where you

249

1    just squeeze the trigger it was ten pounds.

2        Q.    I see.  And the single action mode the hammer as

3    you've shown us previously is already in a cocked position

4    ready to fire.

5        A.    Yes.

6        Q.    That would reduce the actual trigger pull.

7        A.    Correct.

8        Q.    In your expert opinion, Mr. Grey, is this a

9    firearm?

10       A.    Yes.

11       Q.    All right.  Any other tests that you conducted on

12   this weapon?

13       A.    No.

14            MR. MILIAN:  Thank you very much.  No further

15       questions.

16            THE COURT:  Cross-examination.

17                   CROSS-EXAMINATION

18   BY MR. LASWELL:

19       Q.    Hi, Dennis.

20       A.    How you doing?

21       Q.    Did you get some paperwork with this?

22       A.    Excuse me?

23       Q.    Did you get this paperwork with this?

24       A.    Yes, a property receipt.

25       Q.    Can I see it?  While she's doing this, the

250

1    essence of your testimony I guess is that that gun is a

2    gun?

3        A.    It's operable, correct.

4        Q.    Let me show you what's been marked as Defendant's

5    Exhibit E for Identification.  And I'm going to ask you if

6    you can recognize that.

7        A.    Yes, sir, I did.

8        Q.    And what is that, sir?

9        A.    This is a property receipt that reflects the

10   items of evidence taken in this case and what was

11   submitted to the laboratory.

12       Q.    Okay.  And who submitted that to the lab?

13       A.    Plantation PD.  Of course, the actual individual

14   that submitted to the lab was J.M.  I'll spell the last

15   name, Q-U-A-R-E-G-N-A.

16       Q.    And did Mr. --

17       A.    Quaregna.

18       Q.    Did that fella ask you to do some examinations to

19   this?

20       A.    No, it's actually written on the property

21   receipt.  Test fire weapon after fingerprint comparison.

22       Q.    Okay.  When you got it, do you recall whether you

23   could determine if it had been previously fired recently?

24       A.    There's no reliable scientific method to

25   determine when a firearm was fired last.

251

1        Q.    How about the nose of Dennis Grey.  You can tell

2    when firearms have been recently fired.

3        A.    Well, not really.  Because the smoke or the smell

4    dissipates rather rapidly.  By the time I got the gun I

5    wouldn't be able to smell it.

6        Q.    Was it cleaned?  Barrel cleaned?

7        A.    Actually the barrel had moderate lint and dirt in

8    it which would tell me that it hadn't been fired recently.

9            MR. LASWELL:  All right.  There's one other

10        thing.  I would offer Defendant's E for ID as

11        Defendant's 5.

12            MR. MILIAN:  It's just a copy.

13            MR. LASWELL:  Yeah, I believe so.

14            MR. MILIAN:  I believe it's qualitative and not

15        relevant.  But it's up to the Court.

16            THE COURT:  E will be 5 in Evidence.

17            (Thereupon, Defendant's Exhibit Number 5 was

18        received in Evidence.)

19    BY MR. LASWELL:

20        Q.    Okay.  Thank you.  Directing your attention to

21    this portion of your document, there's a request on there

22    to process that firearm for fingerprints.

23        A.    Correct.

24        Q.    Is there not?

25        A.    Yes, sir.

1      Q.   And these -- the firearm that's identified as

2  belonging to Travis Russel, correct?

3      A.   Well, it just says the suspect or the individual

4  that the gun was taken from.

5      Q.   Is who?

6      A.   Travis Terrell Russel.

7      Q.   Right.  Travis Russel's gun, a request for

8  fingerprints.  In your work in the crime lab, you have

9  anything to do with fingerprints?

10     A.   No.

11     Q.   Do you know whether or not anybody ever did any

12  work processing this firearm for fingerprints?

13     A.   Yes.  According to my notes there was black

14  powder and super glue residue on the weapon.

15     Q.   Okay.  But you don't know how they got there

16  except you presume they were.

17     A.   I presume that was done with fingerprint --

18     Q.   Is there any indication in your notes who

19  attempted to pick up some latent prints?

20     A.   Not on my notes but on the property receipt if

21  you read down it says J. Krovet, K-R-O-V-E-T.  Reason,

22  process.  And a date and time.

23     Q.   Who's Krovet?

24     A.   She workd for Plantation PD.

25     Q.   Good enough.  Thank you.  Do you need this for

1    your records?

2        A.    Yes.  Or a copy.

3            MR. LASWELL:  Judge, may we substitute a copy?

4            THE COURT:  Yes.

5            MR. LASWELL:  Okay.

6            THE COURT:  Sheree.  We'll make a copy of it.

7            MR. LASWELL:  Thank you.  Nothing further.

8            THE COURT:  Redirect.

9            MR. MILIAN:  No, sir.

10           THE COURT:  Thank you, Mr. Grey.  If you want to

11       wait outside, Sheree will bring your copy back or the

12       original.

13           THE WITNESS:  Thank you, Your Honor.

14           THE COURT:  Mr. Milian, you may call your

15       next witness.

16           MR. MILIAN:  Yes, sir.  I'd call Sergeant

17       Springman from the Plantation Police Department.

18   Thereupon,

19                    SERGEANT JOHN SPRINGMAN,

20   having been first duly sworn, was examined and testified

21   upon his oath as follows:

22           THE CLERK:  Please be seated.  State your full

23       name.  Spell your name for the record.

24           THE WITNESS:  John Michael Springman,

25       S-P-R-I-N-G-M-A-N.

234

1                        DIRECT EXAMINATION

2     BY MR. MILIAN:

3         Q.  Sergeant Springman, would you tell the jury what

4     you do for a living?

5         A.    I'm a road patrol sergeant with the City of

6     Plantation.

7         Q.    And how long have you been so employed?

8         A.    Twenty-six years.

9         Q.    And during that time what kind of assignments

10    have you held in the department?

11        A.    Sixteen years, excuse me, six years as an

12    investigator.  Ten years as an investigative supervisor.

13    Two years as a supervisor of a narcotics unit.  One year

14    supervisor of a street crimes unit.  And two and-a-half

15    years road patrol supervisor.

16        Q.    Let me refer you back to the 19th of February,

17    1996.  Were you working for Plantation PD at that time?

18        A.    Yes, sir, I was.

19        Q.    Did you get involved in the arrest and

20    apprehension of some individuals that had allegedly

21    committed a robbery and kidnapping in the City of

22    Plantation?

23        A.    Yes, sir, I did.

24        Q.    At that time did Sergeant Massey of the

25    Plantation Police Department deliver to you a prisoner by

255

1    the name of Todd Richardson?

2        A.    Yes, sir, he did.

3        Q.    At that time did you remove some property from

4    Mr. Richardson?

5        A.    Yes, I did.

6        Q.    Let me just show -- this is State's 31 in

7    Evidence.  Let me ask you if these are some of the items

8    that you removed from Mr. Richardson.  If you can look at

9    them yourself.

10       A.    Yes, sir.  This is the property.

11       Q.    The property for the record.  Include, if you

12   could lay it out for the court reporter what they are.

13       A.    It's two one dollar bills.  It's a piece of

14   notebook paper with a phone number on it.  And then

15   there's a necklace, a gold necklace.  Broken one with

16   the -- it says Friend, a medallion on it.

17            MR. MILIAN:  Thank you, Sergeant Springman.  No

18        further questions.

19            THE COURT:  Cross-examination.

20                      CROSS-EXAMINATION

21   BY MR. LASWELL:

22       Q.    Hi.  Did you have any conversation with Erica

23   Outridge?

24       A.    I'm sorry, sir?

25       Q.    Did you have any conversation -- is this

1    everything you did?

2        A.    Yes, sir, it is.

3        Q.    Okay.  Where did you find that necklace?

4        A.    The necklace and the piece of paper were in the

5    pants pocket of Mr. Richardson.

6        Q.    And the --

7        A.    The two dollar bills, two one dollar bills

8    forgive me were clumped in his hand.

9            MR. LASWELL:  Okay.  Thank you.  Nothing further.

10           THE COURT:  Redirect.

11           MR. MILIAN:  No, sir.

12           THE COURT:  Thank you, sir.  You may step down.

13    You're excused.

14           THE WITNESS:  Thank you.

15           THE COURT:  State may call its next witness.

16           MR. MILIAN:  Yes.  Sergeant Massey of the

17    Plantation Police Department.

18    Thereupon,

19                    SERGEANT LARRY MASSEY,

20    having been first duly sworn, was examined and testified

21    upon his oath as follows:

22           THE CLERK:  Please be seated.  State your full

23    name.  Spell your name for the record, please.

24           THE WITNESS:  My name is Larry Lee Massey,

25    Jr.  Spelling is M-A-S-S-E-Y.

DIRECT EXAMINATION

BY MR. MILIAN:

Q.    Would you tell the jury what you do for a living?

A.    I'm a detective sergeant with the City of Plantation Police Department.

Q.    And how long have you been a police officer?

A.    For approximately 12 years.

Q.    Currently what is your assignment in the Plantation Police Department?

A.    I head a property crimes team of detectives in the criminal investigations division.

Q.    Let me refer you back to the 19th of February of 1996.  In what capacity were you working for Plantation at that time if you were working for them?

A.    I was a sergeant assigned to the Charlie shift road patrol which would be the two p.m. to ten p.m. shift.

Q.    All right.  And at that time did you receive or respond to a call in order to assist an officer by the name of Hampton in pursuing a felony vehicle occupied by some suspects?

A.    Yes, I did.

Q.    And what did you do?  I'm mean, I'm asking you what you did after you got the call.  Where did you go?

A.    I was listening to the locations that he was calling out and I was doing my best to get there as

1    quickly as I could.

2         Q.    All right.  Did you actually get to an area where

3    you ran into Officer Hampton or where Officer Hampton

4    reported being?

5         A.    Yes, I did.

6         Q.    Okay.  And what area was that if you recall?

7         A.    It was in the area of Southwest 18th Street and

8    Southwest 41st Avenue.

9         Q.    At that time did you see two individuals running

10   north on 41st Avenue?

11        A.    Yes, sir, I did.

12        Q.    And did you give pursuit?

13        A.    Yes, sir, I did.

14        Q.    Do you see any of the individuals you pursued on

15   that day in the courtroom today?

16        A.    Yes, sir, I do.

17        Q.    Okay.  And would you please point to him and

18   state for the record what that individual is wearing, if

19   you see him in the courtroom today.

20        A.    It would be the gentleman seated at the table

21   here in the blue sweat shirt.

22        Q.    All right.  At that time would you explain to the

23   jury how far you had to run after the individual you've

24   identified for the record.  Judge, as the Defendant, Mr.

25   Richardson.

1          THE COURT:  The record will so reflect.

2          THE WITNESS:  I don't know the exact distance,

3     but from the time that I first observed the

4     individuals running on 41st Avenue, I probably

5     followed for a good one hundred to two hundred

6     yards in my police car and hoping that they would get

7     tired before I did when I finally got out of it.

8          They cut back to the west in between several

9     homes.  That's when I exited my police car and started

10    literally chasing them on foot.  We zigzagged

11    through a residential area and we finally emerged at a

12    park.  I'm not sure of the name.  I believe it's

13    Sunset or Sunview Park.  Off of Peters Road.  I would

14    say to the best of my recollection or my estimation it

15    would be three eighths of a mile.  Perhaps.  It was

16    quite at distance.

17  BY MR. MILIAN:

18      Q.   Okay.  How did you manage to get Mr. Richardson,

19  if you could tell the jury?

20      A.   I think that he just tired before I did.   I

21  managed to tackle him to the ground.

22      Q.   Okay.  Once you got him to the ground, did you

23  notice if he was clutching anything in his hand?

24      A.   Yes, sir, I did.

25      Q.   What was he clutching in his right hand?

260

1          A.    He was clutching two one dollar bills.

2          Q.    All right.  Once you had taken Mr. Richardson,

3     the defendant, into custody, did you turn him over to

4     Sergeant Springman?

5          A.    Yes, sir, I did.

6              MR. MILIAN:  Thank you.  No further questions,

7     Your Honor.

8              THE COURT:  Cross-examination.

9              MR. LASWELL:  Nothing.

10              THE COURT:  Thank you, Officer.  You may step

11     down.  You're excused.

12              THE WITNESS:  Thank you, Your Honor.

13              THE COURT:  Mr. Milian, you may call your next

14     witness.

15              MR. MILIAN:  The State rests, Your Honor.

16              THE COURT:  Okay.  Members of the jury, let me

17     ask you to go in the jury room for a few minutes,

18     please.  Straight back in that room there.

19              (Thereupon, the jury exited the courtroom, after

20     which the following proceedings were had:)

21              MR. LASWELL:  Judge --

22              THE COURT:  Mr. Laswell, you have a motion?

23              MR. LASWELL:  Oh, yes, sir.  I move for a

24     directed verdict of acquittal for the reason that the

25     State has totally failed to prove their case on any

1    count of this.  Actually, I think it may lie well on

2    Linda Butler.  There's been no evidence that Todd

3    Richardson robbed Linda Butler.

4         THE COURT:  Okay.  Viewing the evidence in the

5    light most favorable to the State, I find that the

6    State has set forth a prima facie case, and I deny the

7    motion for judgment of acquittal.  You need a few

8    moments to talk to Mr. Richardson at this point as to

9    what he wants to do?

10        MR. LASWELL:  Yes, sir.  And this lady who's been

11   here throughout the trial is Mr. Richardson's mother.

12   With the Court's permission I'd like to include her in

13   this conversation.

14        THE COURT:  That's up to the bailiffs.

15        BAILIFF DELONG:  She can sit up in the first row.

16        THE COURT:  All right.  Let's take a five minute

17   recess, and Mr. Laswell can talk to Mr. Richardson and

18   then we'll come back and discuss -- first, we'll

19   discuss the defense strategy.  And, secondly, lesser

20   included offenses because we'll need to work on what

21   if any lessers you're going to be requesting.

22        MR. LASWELL:  Yeah, when did you want to close,

23   Judge?

24        THE COURT:  This evening if we can.

25        MR. LASWELL:  You're going to send the jury out,

262

1    too?

2         THE COURT:  Sure.

3         MR. LASWELL:  I'm obligated -- there's a

4    reception at Nova Law School 6:30 for Jerry Spinotz.

5    I'd like to attend.  I'd like to take your colleague.

6    We both are RSVP.  We both are invited.

7         THE COURT:  We'll see how late it is when the

8    jury's ready to go out.  If it's too late, then maybe

9    I'll send them out tomorrow morning.  If it's, you

10   know, after six o'clock, we only work if there's going

11   to -- if they all want to work.  You know, if they're

12   working past six and you want to go out, if you have a

13   beeper maybe you can go out there and they can beep

14   you back.  We'll play it by ear.  We'll see.

15        MR. LASWELL:  I don't know these things because

16   I'm not in your division.  As a matter of fact, I

17   haven't been in here for quite a while.

18        THE COURT:  Okay.  Well --

19        MR. LASWELL:  Next month are you going to try the

20   murder case?

21        THE COURT:  Why not.  I've got nothing else to

22   do.

23        MR. LASWELL:  It's a zoo in here.

24        THE COURT:  It is?  All right.  We'll take a five

25   minute recess.

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

263

1          (Thereupon, a recess was taken, after which the

2     following proceedings were had:)

3          THE COURT:  We're back on the record.  Both

4     counsel are present.  Mr. Richardson's present.  Does

5     the defense know what they're doing at this point?

6          MR. LASWELL:  Judge, we're going to elect to let

7     this matter go to the jury on the record as it sits.

8          THE COURT:  Mr. Richardson, do you understand you

9     have a constitutional right to testify?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Do you understand you have a

12     constitutional right not to testify?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  If you decided to testify and if your

15     lawyer asked me to, I'd tell the jury that they have

16     to listen to your testimony just like the testimony of

17     any other witness.  Do you understand that?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  If you decide not to testify, and if

20     your lawyer asked me to, I'll tell the jury they

21     couldn't hold that against you and I wouldn't allow

22     the prosecutor to argue that you were hiding something

23     by not testifying.  Do you understand that?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  And there may be strategy reasons for

```
1         or against your testifying.  Do you understand that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  For example, if you've been convicted

4         of felonies, and if you testified, the jury gets to

5         hear the fact that you've been convicted of felonies.

6         Not necessarily what they were for but how many

7         convictions you may have had for felonies.  Do you

8         understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  If you don't testify, then the jury

11        never hears that you have a criminal history.  Do you

12        understand that?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  And there may be other reasons for or

15        against your testifying.  Do you understand that?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Have you had enough time to think

18        about this and talk about it with your lawyer?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  And is it your decision that you do

21        not want to the testify?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  How about lesser included offenses?

24        What, if any, lessers is the defense asking for?

25             MR. LASWELL:  I haven't had a lot of thought
```

1   about this, Judge.  And I'll be guided by the Court's

2   but I think false imprisonment certainly is a lesser

3   of kidnapping under recent cases.  And I think that

4   the theft and petit theft will be a lesser of robbery.

5   Theft and robbery.  Theft and petit theft.

6        THE COURT:  Okay.  What kind of habitual offender

7   is the State going to be seeking if Mr. Richardson is

8   found guilty?

9        MR. MILIAN:  Violent habitual, Your Honor.

10       THE COURT:  All right.  On the armed robbery

11  charge on Count I and II the as charged is guilty of

12  armed robbery with a firearm which is a first degree

13  felony punishable by up to a maximum of life in

14  prison.  As a violent habitual offender I could give

15  Mr. Richardson life in prison with a fifteen year

16  mandatory minimum.  And I'm not saying that if he's

17  found guilty that I would find him to be a violent

18  habitual offender.  I'm just mentioning that in the

19  event that he's found guilty and in the event that the

20  State prevails and convinces me that he qualifies as a

21  violent habitual offender and it's the right thing to

22  do.

23       The next immediate lesser on armed robbery with a

24  firearm would be armed robbery with a weapon which is

25  a first degree felony punishable by up to a maximum of

1    30 years in prison.  As a violent habitual offender I

2    could give Mr. Richardson the same thing as charged

3    that would be life and a 15 year mandatory minimum.

4        The next lesser after that would be strong arm

5    robbery, a second degree felony punishable by up to a

6    maximum of 15 years in prison.  As a violent habitual

7    offender I could give him 30 years in prison with a 10

8    year mandatory minimum.  And I guess after that the

9    lesser would be petit theft and/or assault.

10       As to kidnapping, Mr. Richardson's charged with

11   kidnapping not armed kidnapping which would be a first

12   degree felony punishable by up to a maximum of life in

13   prison.  As a violent habitual offender it would carry

14   life in prison with a mandatory minimum 15 years.

15       False imprisonment is a third degree felony

16   punishable by up to a maximum of five years in prison.

17   As a habit -- violent habitual offender it would carry

18   ten years in prison with a five year mandatory

19   minimum.  And there may be other lesser included

20   offenses.

21       Mr. Richardson, you can go all or nothing on this

22   case or you can ask for lesser included offenses.  If

23   you go all or nothing, if the jury comes back guilty,

24   and if I give you a big sentence you can't complain

25   about the fact that the jury didn't have lesser

267

1    included offenses because you decided to go all or

2    nothing.  Do you understand that?

3         THE DEFENDANT:  A little, sir.

4         THE COURT:  If you decide to ask for a lesser

5    included offense and if the jury comes back guilty on

6    it, if I give you a sentence you don't like, you

7    couldn't complain about that because you asked for the

8    lesser included offense.  Do you understand that?

9         THE DEFENDANT:  I want you to instruct the jury

10   on it.

11        THE COURT:  I'm sorry?

12        THE DEFENDANT:  I would like for you to instruct

13   the jury.

14        THE COURT:  On the lesser included offenses.

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  And what Mr. Laswell's asking for is

17   false imprisonment on Count III which carries up to

18   five years in prison as a violent habitual offender.

19   It would be ten years with a five year mandatory

20   minimum.  Do you understand that?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  On Count I he's asking for petit

23   theft which would be a misdemeanor punishable by up to

24   a maximum of 60 days.  Are those the only two that

25   you're asking for, Mr. Laswell?

1          MR. LASWELL:  I think you ought to instruct on

2     grand theft, too.

3          THE COURT:  I don't think we have any testimony

4     it was over $300, do we?

5          MR. LASWELL:  Well, we don't have any testimony

6     he had a firearm either.

7          THE COURT:  I understand that.

8          MR. LASWELL:  You're going to instruct on that

9     so give him a break on another one.

10          THE COURT:  I'm not instructing he had a firearm.

11          MR. LASWELL:  Oh, you're not.

12          THE COURT:  No.  I'm not instructing the three

13     year mandatory minimum.  I'm instructing a principal

14     as to Count I, armed robbery with a firearm and that

15     he's vicariously libel.  Because if the jury believes

16     that one of the other people and he were principals

17     then he would have vicarious liability on the armed

18     robbery.  He would not have the same vicarious

19     liability on Count III, the armed kidnapping because

20     that's an enhancement.

21          MR. LASWELL:  But there's no evidence, Judge, for

22     him to be accused of having a firearm.

23          THE COURT:  No.  The codefendant.

24          MR. LASWELL:  And there's no evidence that

25     there's a principal agency relationship working here.

1    It would be speculation on they're part.

2        THE COURT:  Is the State going to ask for the

3    principal instruction?

4        MR. MILIAN:  Yes, sir.

5        THE COURT:  I'm going to give that.  That would

6    be over the defense objection.

7        MR. LASWELL:  That's not surprising, Judge.  But

8    nonetheless for the record my position is that there's

9    just an absolute zero amount of evidence that anybody

10   was a principal or anybody was an agent or that

11   anybody but Travis Russel was a robber.

12       THE COURT:  You can argue that to the jury and if

13   the jury doesn't buy that you can argue that to the

14   Fourth District Court of Appeal.

15       MR. LASWELL:  I know that, Judge.

16       THE COURT:  Okay.  So are those the only two

17   lessers, the defense is asking for petit theft as to

18   the Count I and II and false imprisonment as to Count

19   III?

20       MR. LASWELL:  And grand theft.

21       THE COURT:  And you want grand theft, Mr. Milian?

22       MR. MILIAN:  No, sir.

23       THE COURT:  All right.  So I'm going to deny the

24   request for grand theft unless somebody can refresh my

25   recollection that either Ms. Butler or Ms. Outridge

1    said what was taken from them was worth over $300.

2         MR. LASWELL: I don't think there's any value.

3         THE COURT: Okay.

4         MR. LASWELL: Testified.

5         MR. MILIAN: Judge, I'm going to request lessers

6    of armed robbery with a weapon and strong arm robbery.

7         THE COURT: I'm not going to give the armed

8    robbery. You don't want armed robbery with a weapon,

9    right?

10        MR. LASWELL: No.

11       THE COURT: The reason I'm not going to give

12   that, if the jury comes back guilty and if you

13   convince me that Mr. Richardson is a violent habitual

14   offender then it's the same sentence that he could get

15   as charged. But the strong arm robbery I'll give if

16   you want that.

17       MR. MILIAN: Yes, sir. I'm sorry. I ignored

18   that when you named it. I'm sorry, Judge. Can I call

19   in the verdict forms now, Judge?

20       THE COURT: Yes. Why don't you do that while

21   we're switching court reporters.

22       MR. MILIAN: And just for the record, I'm going

23   to say armed robbery with a firearm as charged in the

24   Information. Strong arm robbery, a lesser included

25   offense. Petit theft and not guilty. Same on Count

271

1      II.   And Count III is kidnapping as charged in the

2      Information.   And false imprisonment, a lesser

3      included offense and not guilty.

4            THE COURT:   That's correct.   Okay.   Switch court

5      reporters.

6            (Thereupon, a brief recess was taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

272

1
## COURT CERTIFICATE
2

3    STATE OF FLORIDA
     COUNTY OF BROWARD
4

5              I, Kimberli M. Kidd, Court Reporter, certify
     that I was authorized to and did stenographically
6    report the foregoing proceedings and that the
     transcript is a true record.
7

8    Dated this 21 day of April, 1997
9

10              Kimberli Kidd
11              Kimberli M. Kidd, Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE DISTRICT COURT OF APPEAL - FOURTH DISTRICT
WEST PALM BEACH, FLORIDA

CLOCK IN

| DIVISION: [X] CRIMINAL | RECORD ON APPEAL FROM THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA CRIMINAL DIVISION |

Appellant

TODD RICHARDSON
VS.
STATE OF FLORIDA

Appellee

CASE NUMBER
96-3122CF10C
APPEAL NUMBER
98-4323

VOLUME ___III___ PAGES ___273___ TO ___356___

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

FEB 01 1999

CRIMINAL DIVISION
WEST PALM BEACH

RICHARD L. JORANDBY, 15TH P.D.
ATTORNEY FOR APPELLANT

GEORGINA JIMENEZ OROSA
ASSISTANT ATTORNEY GENERAL

273

1                          IN THE CIRCUIT COURT OF THE
                           SEVENTEENTH JUDICIAL CIRCUIT, IN
2                          AND FOR BROWARD COUNTY, FLORIDA

3

4

5      ------------------)          ORIGINAL

6    STATE OF FLORIDA,    )

7         Plaintiff,      )

8    vs.                  )      Case No.   96-3122CF10C

9    TODD RICHARDSON,     )

10        Defendant.      )

11   ------------------)

12

13

14                   MOTION FOR APPEAL

15             ON BEHALF OF THE DEFENDANT

16

17                      VOLUME IV

18                   PAGES 273-339

19

20

21         The above-entitled cause came on for hearing

22   before the Honorable WILLIAM P. DIMITROULEAS, Circuit

23   Court Judge, at the Broward County Courthouse, on the

24   14th day of January, 1997, commencing at or about 4:00

25   p.m.



            LAUDERDALE REPORTING   (305)467-6671

274

```
1   APPEARANCES:

2

3

4        ·    MICHAEL J. SATZ, STATE ATTORNEY'S OFFICE,

5             BY: ALBERTO MILIAN, ESQUIRE,

6             ASSISTANT STATE ATTORNEY,

7             Appearing on behalf of the State of Florida.

8

9

10            ALAN H. SCHREIBER, PUBLIC DEFENDER'S OFFICE

11            BY: WILLIAM LASWELL, ESQUIRE,

12            ASSISTANT PUBLIC DEFENDER,

13            Appearing on behalf of the Defendant.

14

15

16                          I N D E X

17  DESCRIPTION                              PAGE

18  CHARGE CONFERENCE                        275

19

20  CLOSING ARGUMENT (By Mr. Laswell)        286

21  CLOSING ARGUMENT (By Mr. Milian)         292

22  REBUTTAL ARGUMENT (By Mr. Laswell)       308

23  CHARGE TO THE JURY                       315

24

25  COURT REPORTER'S CERTIFICATE             339
```

LAUDERDALE REPORTING    (305)467-6671

1          THE COURT: Okay, back on the record.  Both

2    counsel are present.  Mr. Richardson is present.

3          Mr. Laswell, it's my practice to tape record

4    the instructions and send back the tape and tape

5    player along with the evidence; any objection to

6    that?

7          MR. LASWELL: No objection to that.  Read

8    slow, will you, sir?

9          THE COURT: What's that?

10         MR. LASWELL: Read slow.  I'm not sure a jury

11   listens as it talks.

12         THE COURT: That's the beauty of the tape.

13   They have a tape of the instructions.  Understanding

14   that I'm going to give the Robbery instruction over

15   the defense objection, defense still wanted to request

16   lesser included offenses.

17         MR. LASWELL: Certainly.

18         THE COURT: You agree with that strategy, Mr.

19   Richardson, agree with the strategy of what lesser

20   included offenses, understanding I am going to give

21   the Robbery instruction the State is requesting

22   because of you are giving up the lessers, then there

23   would be no lessening.  Understanding I'm going to

24   give that Robbery instruction, do you agree with the

25   strategy that I'm going to give the two lessers that

LAUDERDALE REPORTING  (305)467-6671

1    I'm giving and the one I'm not giving, that being the

2    grand theft?

3              THE DEFENDANT: Yes, sir.

4              THE COURT: I guess the State has opening and

5    closing argument.  The defense is in the middle.  How

6    much time in the middle?

7              MR. LASWELL: I don't think so.  Why should

8    you think so?

9              THE COURT: You introduced evidence.

10             MR. LASWELL: I didn't put on a case,

11   though.  I would claim, for the record, I get to open,

12   the open and close, because I presented no case.

13             THE COURT: What is your position on that,

14   Mr. Milian?  Who should get opening and closing?

15             MR. MILIAN: Judge, I believe, I get opening

16   an closing because he introduced five items, at least.

17             THE COURT: I think State gets opening an

18   closing.  There is no cases on that for forty years.

19   You want to give Fourth District to break new ground

20   on closing ground.

21             MR. MILIAN: Yeah, I think I have given them

22   other grounds.  I'm not being super silly.  Could I

23   have a minute?

24             THE COURT: Sure. Well how much time for your

25   closing argument instruction, Mr. Laswell?  How much

                 LAUDERDALE REPORTING  (305)467-6671

1    time you want for it?

2            MR. LASWELL: Not long, approximately half

3    hour.

4            THE COURT: All right. All right, do you have

5    your instructions and we will go through the

6    instructions.

7            MR. LASWELL: I do not have mine with me.   I

8    did not anticipate this.  I didn't have time to go to

9    my office.

10           THE COURT: Mr. Milian has them over there.

11           MR. LASWELL: I have better than an

12   instruction, I have Mr. Halperin here.

13           THE COURT: You want to go over the

14   instructions by memory?

15           MR. LASWELL: Go ahead.

16           THE COURT: 2.01, Introduction to Final

17   Instructions, I'll give.  2.02, Statement of Charge

18   I'll give. Lesser Included Offenses, I'll give.  I'll

19   go to Robbery which is on page 155 in my book.

20           I'll give the four elements of Robbery.

21   I'll give, In the course of taking. I'll give, Title

22   of Property.  I'll give Force.  Victim Unconscious is

23   not applicable.  I'll give Taking.  Enhanced Penalty,

24   I'll give.  With a Firearm, I'll give.

25           MR. LASWELL: I just want the record to be


                LAUDERDALE REPORTING   (305)467-6671

278

1    complete, I object to all of these instructions about

2    a firearm because the evidence is certainly not there

3    that my client had anything to do with a firearm.

4            THE COURT: Okay, over your objection, I'll

5    give With a Firearm. I'll give With no Firearm or

6    Weapon. I'll define a firearm. I think that takes

7    care of Armed Robbery or Robbery.

8            I'll go to Petit Theft on page 137 in my

9    book. I'll give the two elements of Petit Theft.

10   I'll define endeavor. I'll define property. I'll

11   define property meaning-- actually, I don't think I

12   need to define property on Petit Theft.

13           MR. MILIAN: You don't need to define it.

14           THE COURT: That takes care of Petit Theft.

15           I'll go to Kidnapping which is on page 94

16   (C) in my book. I'll give the three elements of

17   Kidnapping. The third element will be to facilitate

18   the commission of a robbery.

19           I'll tell them Robbery has been previously

20   defined for them. I'll give the three exceptions to

21   kidnapping where it's considered slight,

22   inconsequential, those type of things.

23           I'll go to False Imprisonment on page 94

24   (E). I'll give the three elements of False

25   Imprisonment.


            LAUDERDALE REPORTING   (305)467-6671

1          Now on the third element, Mr. Laswell, you

2    want:  The defendant acted for any purpose other than

3    to commits or facilitate commission of any felony?  Or

4    robbery?

5          MR. LASWELL: Mr. Richardson's choice.

6          THE COURT: That's why I asked you.  I'll let

7    you pick.

8          MR. LASWELL: Do I have to?  I mean, I have

9    to pick one way or the other and I don't agree with

10   either.

11         THE COURT: The book has:  Commit or

12   facilitate the commission of any felony.  You want me

13   to read it as it is in the book?

14         MR. LASWELL: In sense, if he instructed on

15   Petit Theft, the only one possible would be robbery.

16         THE COURT: You want me to say robbery or

17   felony?

18         MR. LASWELL: What do you think, Maury?  Say,

19   felony.  Oh, Judge, over my objection.

20         THE COURT: It doesn't work that way.

21         MR. LASWELL: Then I'm not going to pick.

22   The court does this.  It's after- it's peril.  I'll be

23   surprised with what you say.

24         THE COURT: All right.  All right, then I'll

25   give the Principal instruction over objection, over

LAUDERDALE REPORTING  (305)467-6671

1  the defense, principal instruction over the defense

2  objection which is on page 32 (A) in my book.

3          I'll give 2.03, Plea of Not Guilty.  I'll

4  give all of that.  I'll go to 2.04, Weighing the

5  Evidence.  I'll give the first five.  Money or

6  Preferred Treatment, any evidence of that?

7          MR. LASWELL: None.

8          THE COURT: Pressure or Threats, any evidence

9  of that?

10          MR. LASWELL: None.

11          THE COURT: Prior or inconsistent statement

12  made prior, any evidence of that?

13          MR. LASWELL: None.

14          THE COURT: I don't know of any Convictions

15  of a Crime or Reputation, and I'll give the last

16  paragraph, agreed?

17          MR. MILIAN: Agreed.

18          THE COURT: Expert Witness an Accomplice is

19  not applicable.  Defendant Testifying is not

20  applicable.  Do you want both paragraphs of Defendant

21  Not Testifying?

22          MR. LASWELL: Yes.

23          THE COURT: Defendant's Statements is not

24  applicable.  I'll give all eight Rules for

25  Deliberation.


                    LAUDERDALE REPORTING   (305)467-6671

1          I'll give 2.07, Cautionary Instruction.

2  I'll give 2.08, Verdict Form.  I'm give 2.08(a),

3  Single Defendant, Multiple Counts; 2.09, I'll give.

4          Is anyone asking for Date of Crime or

5  Venue?

6          MR. LASWELL: No.

7          MR. MILIAN: No, sir.

8          THE COURT: Any special requested

9  instructions?

10         MR. LASWELL: I have none to tender.  As I

11 said, done by the book.  That, I don't think so.  I

12 think you got them covered.

13         THE COURT: How do you want to split your

14 thirty minutes, Mr. Laswell?

15         MR. MILIAN: Judge, you're not going to see

16 that point?  I talked to my boss, and, Mr. Springer,

17 and he said he thinks we are on solid ground.

18         THE COURT: Yeah.

19         MR. MILIAN: If you want to overrule that?

20 But that's my understanding of the rule.

21         THE COURT: I think you are on rule.  But in

22 abundance of caution, I'm going to give Mr. Laswell

23 opening and closing.

24         MR. LASWELL: It's nice that you will

25 overrule Mr. Springer.  I'll take it twenty and ten or


                    LAUDERDALE REPORTING  (305)467-6671

1    thereabouts.

2              THE COURT: The exhibits were introduced into

3    on State's side of the case.

4              MR. MILIAN: The bottom line, it's not fair

5    to the State.  Let me make it my objection if he gets

6    convicted.  Even though Fourth D.C.A. might agree with

7    you, it's not fair to the State.

8              We take strategy a particular way.  The rule

9    is made for particular reason and rules should be

10   followed.  It's a pathway that leads to anarchy.

11             It's not fair to hold the State to one

12   particular set of rules and allow the defense to play

13   a game getting evidence in.  I think you were very

14   liberal.

15             As a matter of fact, two items of evidence

16   forms come in, I think you did it probably in

17   abundance of caution, you give him the benefit of two

18   documents actually authenticated passing from a series

19   of witnesses.  Over my objection, one document was

20   accumulative and one was not properly authenticated,

21   and you allowed them into evidence.

22             Also, the photographs you allowed them in

23   during the State's case was to make their point.  I

24   think you were very fair and gave them a lot of

25   latitude.  You didn't force them to call witnesses.


                 LAUDERDALE REPORTING  (305)467-6671

```
 1              THE COURT: I'm going to give it to them.
 2   Mr. Laswell, how much warning do you want on the first
 3   twenty?
 4          MR. LASWELL: Couple.
 5          THE COURT: On your last ten?
 6          MR. LASWELL: Couple.
 7          THE COURT: And on your thirty, Mr. Milian?
 8          MR. MILIAN: If I have no choice, I have to
 9   do it.
10          THE COURT: I understand.  Any warning on
11   your thirty minutes?
12          MR. MILIAN: No, Judge.
13          MR. LASWELL: Just for the record, Judge, I
14   don't think we are on a path for anarchy.
15          MR. MILIAN: I think a confidence is
16   underlined in law because it's not applied to all
17   parties.  That's what I meant by that, Judge.
18          THE COURT: All right.  Anything further
19   before I bring the jury out?
20          MR. LASWELL: Like five minutes.  But, go
21   ahead, Judge.  Just to gather some thoughts.
22          THE COURT: Okay, go gather some thoughts.
23   I'll wait for you.
24          MR. LASWELL: Thanks, Judge.
25          (Whereupon at 4:15 p.m., a short pause in
```

LAUDERDALE REPORTING  (305)467-6671

1   the proceedings after which the following proceedings

2   were heard:)

3          MR. MILIAN: Judge, since the case is

4   concluded and I don't anticipate calling any

5   witnesses, unless the court will give me leave at some

6   point, I would ask that all my witnesses be allowed to

7   sit in?

8          THE COURT: That's fine.  I was particularly

9   moved by Mr. Milian's anarchy argument and did some

10  research.  I still think it's referring to Gary versus

11  State, G-A-R-Y, 364 So.2d 766, Second District Court

12  of Appeal's decision from 1978.

13         I think the case is on point, and I really

14  think that probably Mr. Milian is correct that Gary

15  cites cases back to 1948, 1925, and those cases are

16  cases where written documents were read to the jury

17  while State's witnesses were being cross-examined and

18  a diagram was introduced into evidence drawn by a

19  State witness during cross-examination.

20         In those cases they said the defendant had

21  lost his opening and closing argument.  In Gary which

22  followed a case called Little, L-I-T-T-L-E at 227

23  So.2d 324, Second District Court of Appeals in 1975.

24  The defense was just amplifying something that State

25  had already talked about.


                LAUDERDALE REPORTING   (305)467-6671

285

1              I really don't think that happened in this
2    case.  But in abundance of caution, I'll stick with my
3    prior ruling.  Anything further before I bring in the
4    jury?
5              MR. MILIAN: No, sir.
6              THE COURT: Mr. Laswell, you are going to
7    rest in front of the jury.  I'll give the closing
8    argument instruction, and then we will proceed to
9    closing.
10             MR. LASWELL: That's fine with me, Judge.
11             THE COURT: Okay, let's bring out the jury.
12             (Whereupon at 4:24 p.m., the jury enters the
13   courtroom after which the following proceedings were
14   heard:)
15             THE COURT: Counsel can see the presence of
16   the jury.
17             MR. LASWELL: Yes.
18             MR. MILIAN: Yes, Your Honor.
19             THE COURT: Anything further, Mr. Laswell?
20             MR. LASWELL: No, Judge.  We are going to
21   rest at this point and let the jury take the case the
22   way it is.
23             THE COURT: Okay, ladies and gentlemen of the
24   jury, both the state and the defendant have now rested
25   their cases.


                 LAUDERDALE REPORTING  (305)467-6671

1           The defendant is-- the attorneys will now

2    present their final argument.  Please remember what

3    the attorneys say is not evidence.  However, do listen

4    closely to their argument.

5           They are intended to aid you in

6    understanding the case.  Each side will have equal

7    time but the defendant is entitled to divide this time

8    between an opening argument and rebuttal argument

9    after Mr. Milian has spoken.  Mr. Laswell.

10          MR. LASWELL: Thank you, Your Honor.

11                CLOSING ARGUMENT

12                BY MR. LASWELL

13          It's getting late.  I'll try to be brief.

14    Thank you all for your attention. And I hope you

15    appreciate that he is neither O. J. Simpson, nor am I

16    Bob Schapiro.  We will get out of here at a timely

17    hour.

18          The question you have to ask yourselves as

19    jurors and obligations you take or undertake as jurors

20    is very serious as discussed in voir dire.  There is

21    no more serious crime before you than this except

22    murder.  The seriousness of this should not be

23    overlooked because the briefness of the trial.

24          This in essence was a two witness trial.

25    Mr. Milian put on a lot of evidence.  But the real

1  evidence is what you heard from Erica Outrage and

2  Linda Butler.  And this is a robbery case here, and

3  the Judge is going to instruct you, that the taking

4  must be by force, violence or a threat of force and

5  violence.

6          And I think there is absolutely no question

7  about it that he probably doesn't have any,

8  particularly, respect we would like to have someone

9  have for young ladies.  But he didn't have a pistol.

10 But he didn't rob anybody.

11         And both of these young ladies are sitting

12 here today, and have come foward and testified in I

13 think in truthful manner is that he didn't have

14 anything to do with the robbery.

15         What he was doing was he was in the back

16 seat.  What he was doing was taking advantage of the

17 situation of a disrespect for Erica.  And that's a

18 theft.  And I'll admit that's a theft.  But it's not a

19 robbery.  And he did not have anything to do with

20 that.

21         Now to become a robbery, what the State is

22 going to have to prove to you, and they can't do this,

23 and they haven't done this, they have to prove to you

24 that he knew what Travis Russel was going to do.

25         And you may think he knew what Travis Russel

1   was going to be doing, but you can't make a

2   determination on what you think he thought.

3          What you have to make a determination on is

4   what the evidence showed.  And the evidence showed

5   very clearly that Todd Richardson had no pistol and

6   used no force and he used no violence and he used no

7   threats of force and violence.

8          Of course, if he knew that Travis Russel was

9   going to do this and that was proved by the evidence

10  and was testified to by some witnesses, then, of

11  course, it would be a different story.  But that's not

12  the case here.

13         I'll tell you that Todd is a disrespectful

14  kid, and I'm not going to ask you to award him a good

15  citizenship award for anything.

16         But Linda Butler was asked right dead on

17  point, do you have any evidence to tell this jury tell

18  them that he knew, and her answer was clearly, as far

19  as she knew, he didn't know anything, and the same was

20  true of her.

21         What he started to do after Travis Russel

22  began his kidnapping and his robbery was not nice.

23  But it was a theft. As far as a kidnapping goes, you

24  are going to take somebody and against their will take

25  them away.


LAUDERDALE REPORTING   (305)467-6671

1              I would submit to you that the only person

2    that could do that was Travis Russel.  You take this

3    evidence, just as the Judge will tell you and lawyers

4    will tell you that you can.

5              Take all of this evidence back in the jury

6    room with you, and you can look at your leisure that

7    the back seat of this car denies the belief that

8    anybody could be responsible for driving this car away

9    except Travis Russel. Todd could not even reach to the

10   front seat.

11             So, unless, the State can prove he knew what

12   was happening, that he had the requisite knowledge and

13   that was his intent, their case must fail no matter

14   what you think might have happened.

15             No matter what you think probably was

16   happening, their case must fail because the evidence

17   is not there. Erica said the same thing.  Erica said

18   that he used no force.  That he used no violence.

19   That he did not use the threat of force or violence.

20             As a matter of fact, she testified that

21   Jouvonal Allen was going to rip off the necklace and

22   he stopped Jouvonal Allen, and told her to take it off

23   and she did, and give me your purse, and she did.

24   That's a theft.  That's disrespect.  That's showing no

25   regard for another person's property whether it's

1    20,000 dollars or two dollars.

2            It shouldn't have happened.  I'll admit that

3    to you.  But it's not a robbery.  Robbery happens in a

4    liquor store.  A robbery happens in a convenient store

5    where a fellow that points a pistol in your face and

6    says give me what you got.  An he didn't do that.

7            He is overcharged here.  This is just a

8    theft where zealous prosecution here has elevated to

9    the most serious of all crimes when it was not that

10   way.

11           The police officers that testified were

12   doing their job. Did it well. And the police officers

13   that I probably need to really talk to you about are

14   the police officers that testified that he got out of

15   the car and ran, which we can agree, when he ran, he

16   had the purse.  I'll admit that.

17           But the question is, did they prove a

18   robbery and a kidnapping on the part of this

19   youngster?  And the answer is, no.  He committed a

20   theft, and that is what he was running from.

21           We all, particularly all of us who live in

22   South Florida, sometimes are of the opinion that this

23   great country of ours is getting away from us.

24           What in the world is happening to the great

25   future?


LAUDERDALE REPORTING  (305)467-6671

1          What happened to- what in the world happened
2     to the government?  What happened to the passion?
3     What happened to the politicians?  What happened to
4     these youngsters that have them so far off course?
5               And one of those, and I think that.  But
6     this is not the case to right the wrongs that we
7     perceive in society today even if Todd Richardson is
8     the disrespectful part of society.
9               What I'm asking you to do is apply the law
10    as the judge gives them to you.  And he is going to
11    tell you about force, violence, threats of force and
12    violence.  Kidnapping is the taking and carrying
13    away.
14              This kid didn't do any of that.  This kid
15    was the dummy in the back seat who took advantage of
16    the situation by Travis Russel who owned the car.  Who
17    had the key.  Who had it under his control.  Who had
18    the firearm, who stuck it in the window, and it's a
19    simple case.
20              And I'm asking you to not get carried away.
21    Do not go above and beyond the evidence and
22    speculation and theory, and pay attention to what the
23    evidence showed, and convict my client of theft.
24              Because I'll admit to you that's what he is
25    guilty of, not guilty of robbery.


                    LAUDERDALE REPORTING   (305)467-6671

1           He didn't have a gun, didn't use any force,

2    didn't use any violence, didn't threaten anybody with

3    force and violence.

4           So make this State of Florida tow the line.

5    Examine the law.  Examine the facts.  Discuss the

6    evidence.  Come back with a verdict guilty to the

7    lesser included offense of theft.  Thank you.

8           THE COURT: Mr. Milian.

9                  CLOSING ARGUMENT

10                  BY MR. MILIAN

11          You know there is one very important jury

12   instruction, one very important jury instruction you

13   must consider.

14          And I think it's so important to this I

15   think I'm going to read it to you.  Because I think

16   you should have it in mind as you listen to these

17   arguments that are about to be made.

18          The Judge will tell you if a defendant helps

19   another person or persons commit a crime, the

20   defendant is a principal and must be treated as if he

21   had done all of the things the other person did if:

22          Number one, the defendant had a conscious

23   intent the criminal act at be done; and, number two,

24   the defendant did some act or said some word which is

25   intended to and did incite, cause, encourage, assist

                LAUDERDALE REPORTING   (305)467-6671

1    or advise the other person or persons to actually

2    commit the crime.

3         To be a principal the defendant does not

4    have to be present when the crime is committed.

5         Ladies and gentlemen, there is no reasonable

6    doubt that on February 19th, of 1996, Todd Richardson,

7    along with the other individuals who have been

8    described for you in this trial, committed the crimes

9    of Armed Robbery against Linda Butler, committed the

10   crimes of robbery against Erica Outridge and committed

11   the crime of Armed kidnapping.

12        I submit to you that it is not sincere to

13   tell you that while two young girls are trapped in a

14   car, confronted with a semiautomatic weapon held by a

15   friend of Todd Richardson, that there is no fear or

16   intimidation.

17        Those of you who saw that firearm here

18   today, consider the power of that weapon. Consider

19   being asked to attend a meeting and a firearm is

20   certainly placed before you before the meeting

21   commences that has the power of a deadly weapon.

22        Sometimes it does not even have to be

23   pointed. It is the mere insinuation and the threat,

24   and in this case you have more than that.  These two

25   young girls might be guilty of having poor judgment.

LAUDERDALE REPORTING  (305)467-6671

1           But nothing that you have heard from the

2    evidence in this trial justifies the actions of any of

3    the defendants in this case, especially Mr. Todd

4    Richardson.

5           Because like taking lambs to the slaughter,

6    he approached Erica Outridge, engaged in friendly

7    conversation, exchanged telephone numbers, and had it

8    not been for Todd Richardson's interference, those

9    girls would not have gotten in the automobile.

10           He was the only individual they knew in that

11    car, and they made a mistake.  They made the mistake

12    of putting themselves in a position where they were

13    terrified, and they were abused by these defendants,

14    including Todd Richardson.

15           Now, I do not have to show as an element of

16    in any crime in this case, what was inside Todd

17    Richardson's head.

18           But, you know, you don't have to ignore

19    common sense.  You do not have to ignore your

20    experience.  And as we talked about it yesterday in

21    jury selection, you let the circumstances show you

22    what happened on that day.

23           On that day there are four males in that

24    automobile.

25           And he tells you no force is being used when

LAUDERDALE REPORTING  (305)467-6671

1    Jouvonal Allen and Todd Richardson are taking that

2    chain from the girl in the back when Travis Russel is

3    pointing that firearm at Linda Butler to the point she

4    is terrified and runs from the car and sustains those

5    injuries. Who is he kidding?

6            Two young girls, and they had no right to do

7    that. And then he tells you that he didn't use any

8    force.  That's ridiculous. You go up to somebody and

9    you put a gun in their face and your accomplice comes

10   along and just picks their pockets, and you stand back

11   and say I didn't do anything.

12           Ladies and gentlemen, he was a direct

13   beneficiary of the terror created by Travis Russel.

14   Not once during this trial, not once any time during

15   this case have you heard that he said, wait a minute.

16   What's going on here? Stop it.  You're terrorizing

17   them. I'm not a participant in this.

18           All to the contrary.  He is a willing,

19   exuberant participant.  He takes the purse from Erica,

20   takes what little money she has, takes her chain, and

21   he proves it by the actions of Travis Russel.

22           There is know evidence in here that this

23   young lady goes around and hands out her property, her

24   purse to people out on the streets.

25           But the evidence does show that there was a

LAUDERDALE REPORTING  (305)467-6671

1   situation where Todd Richardson was a willing

2   participant.

3        And there is even more evidence when the

4   police officers react quickly to the information that

5   has been provided to them:  To be on the look out, and

6   they confront the guilty parties.

7        What does Todd Richardson do?  You know, Mr.

8   Laswell, would have you believe that somehow that he

9   is immobilized in the back of that Nissan automobile.

10       Well, he certainly has no trouble in

11   scurrying out of there, opening the hatchback and

12   making 100 yard dash.  And he doesn't even leave the

13   property behind as was testified to by the police

14   officers.

15       They find the property taken from these

16   girls not in Travis Russel's possession, not in Joe

17   Allen's possession or the other individual that was in

18   the car, but in the possession of this defendant, Todd

19   Richardson.

20       He talks about the wicked friend.  I don't

21   know about the wicked, but I know about a guilty

22   plea.  I know the guilty have guilty conscious, and

23   guilty mind.  They don't what to face the- they want

24   to evade the consequences of their guilt or actions.

25       They can't.  He ran.  They want to come into

LAUDERDALE REPORTING   (305)467-6671

1  court of law, and Mr. Laswell would argue, well, he is

2  just guilty of a theft.  Well, had it not been for the

3  intimidating factor, the bodily injury, the threat

4  that is created by Travis Russel, his friend, there

5  would have been no theft.

6          And when you take a theft together, ladies

7  and gentlemen, and put fear into that equation, that's

8  a robbery; and when there is a firearm involved,

9  that's a robbery with a firearm.

10         It's very easy and almost very tempting, he,

11 Mr. Laswell, comes in and uses the rhetorical device.

12 We will concede to this:  Well, the defendant is

13 guilty of theft.

14         But apparently he wants you to ignore the

15 physical evidence you have in this case. Look at the

16 photograph of Linda Butler. Was this a situation where

17 some kind of benevolence, some kind of niceties were

18 being exchanged as their property was being removed.

19         Look at the scratches on her neck when she

20 wants to get out of that situation.  What do they do

21 when Linda Butler flees from the automobile Todd

22 Richardson among them, they keep Erica trapped in that

23 car and take off with her. And there is no doubt,

24 there is no reasonable doubt about that crime having

25 been committed.

1          And remember, the burden of proof on me is

2     to prove the crime beyond a reasonable doubt.  Not

3     beyond a shadow of a doubt.  Not beyond a possible

4     doubt.

5          The reason you are not going to hear any

6     elements in this case that he had to hold the gun

7     because that Principal instruction that I read to you

8     says that if one or more or two or more individuals

9     commit a crime together, you don't wash your hands of

10    responsibility by simply not holding the gun.

11         And we know that for a fact in common

12    sense.  But more importantly you took that oath as

13    jurors you have to follow that law.

14         And he took advantage of a situation just as

15    somebody would take advantage of somebody that was

16    knocked down on the ground and beaten and comes along

17    and picked their pockets.

18         The law doesn't somehow say, boy, you are

19    not guilty now just because he was not holding this

20    firearm.  He doesn't acquire any immunity because his

21    actions speak louder than words.

22         Now, these young ladies came to you, and

23    they told you what the facts of this case are.  And

24    their testimony is uncontradicted in this case.

25         Ladies and gentlemen, uncontradicted, not


                    LAUDERDALE REPORTING   (305)467-6671

1    one inconsistency, not one miss identification.

2    Everything that they told the police and have told you

3    was corroborated by physical evidence gathered by

4    those Plantation police officers.

5              The property that was taken from them, the

6    purse that is found inside the automobile, the purse

7    that Todd Richardson took from Erica Outridge, the

8    pendant that was ripped off the neck of Linda Butler,

9    the evidence doesn't evaporate simply because it is

10   not favorable to the defendant.

11             The evidence doesn't change its form simply

12   because it shows he is guilty or because his lawyer

13   gets up right now and says he is guilty of theft but

14   forgets about the intimidation and fear and violence.

15             And, I'll tell you something about that.

16   The law will tell you, you don't have to put up any

17   resistance. You do don't have to fight back. You

18   don't have to punch anybody. Because, ladies and

19   gentlemen, not only is it the law, it's common sense.

20             At the end of a barrel-- There is no choice

21   at the end of barrel. There is only death or the

22   potential for dying, and these young ladies had no

23   choice. Had no choice. Unlike Todd Richardson who

24   decided to participate.

25             Who lured them into that automobile. Went on

LAUDERDALE REPORTING  (305)467-6671

1    with the crime and exploited for all the advantage
2    that he could get.  I don't have to prove anything
3    about what Travis Russel knew or didn't know.
4          But you follow your common sense in this
5    cases.  He is the man who makes the introductions.  He
6    makes the openings, and he puts those young girls in
7    that position.
8          And, if he doesn't know anything about it at
9    the time of the slaughter or robbery -- I would except
10   your common sense would tell you.
11         Some surprisement:
12         You mean you give somebody a ride.  You are
13   in the automobile, and then all of a sudden one of the
14   accomplices in there start committing a crime.
15         And you just-- not even stay silent, but you
16   indulge in all the lust and greed that you have by
17   pinning that young girl in the back of that automobile
18   and telling her to give up her property and take her
19   purse and take her money, to take a pathetic two
20   dollars that she had on her person.
21         And you know the law doesn't care, when you
22   do that, how much money is involved.  Obviously, you
23   all could tell there is value to all the things these
24   girls had.  The law doesn't even say that.
25         The law doesn't say it has some value.  Todd

LAUDERDALE REPORTING  (305)467-6671

1    Richardson thought it was some value because he went

2    in like a shark after the tongue.  The actions of the

3    individual speak loudest of all.

4            Ladies and gentlemen, that's what you have

5    to consider in this case.  And Mr. Laswell's talk

6    about our taking out on menace to society is

7    nonsense.

8            This is not about a total or giving a break

9    to anybody.  This is a case saying to Todd Richardson

10   you are a man, and you are held to the same standards

11   as every other citizen in our society.  And these laws

12   that apply to him, apply universally to all of us.

13           There is a, have attempted to have, some

14   code of decency out there for not to allow these type

15   of crimes could be done, and this is the time that you

16   must make that decision.

17           You must consider, along with your common

18   sense and life experiences, the crimes that were

19   committed in this case.

20           I only get one opportunity to speak to you.

21   Ladies and gentlemen, when you get either of the

22   verdict forms, you are going to have several

23   selections under each count to make -- you are going

24   to have a robbery with firearm, which is what the

25   evidence in this case is showing you.


LAUDERDALE REPORTING   (305)467-6671

1          You are going to have that Principal

2   instruction given to you by the judge.  You are also

3   going to have lesser included offense of a Strong

4   Armed Robbery.

5          That's if no weapon was involved in this

6   crime.

7          Well, ladies and gentlemen, you look to the

8   evidence in this case.  You take that firearm back and

9   you view that firearm, and you apply your common sense

10  to it.  These girls were confronted with that threat.

11  That's the crime that has been proved in this case.

12         A Strong Armed Robbery is when someone's

13  snatching something from someone's neck.  That's not

14  what happened here.  That's not what occurred here.

15  That's not what the evidence has shown.

16         The uncontradicted evidence in this case

17  shows how Todd Richardson participated and benefited

18  from the terror that Travis Russel created.

19         Then, you will have a Petit Theft under an

20  Armed Robbery.  What is Petit Theft?  You will hear

21  about it.  Petit theft is what the word tells you.

22  It's insignificant.  Its value is pennies.  That's not

23  what happened.  Todd Richardson didn't walk somewhere

24  and see some worthless item on the floor and take it.

25         Not when he pinned that young girl back


LAUDERDALE REPORTING   (305)467-6671

1  there with his leg.  Not when he kept that girl

2  against her will, obviously, when they drove away from

3  the initial manifestation.  Not when he took her

4  property and put it in his pocket and stole it.

5          It wasn't a Petit Theft.  It was an Armed

6  Robbery.  It was made possible by the use of force and

7  intimidation. That's the best words I think that

8  applies in this case.

9          Intimidation.  Because a lot of times we

10  take it for granted, we take for granted that someone

11  is going to come up to and say give me your money or

12  I'll shoot.

13          But, you know, we know as human beings that

14  signals that we send, and things that we do in our

15  lives carry a tremendous amount of force.  We know

16  that even by gestures we can communicate threats to

17  people.

18          But that's not even the case.  You had more

19  than that in this case.  You had two young girls held

20  against their will, placed in a position where they

21  didn't know if they were going to die. And you have

22  Todd Richardson benefiting, participating and

23  assisting on what was going on. Remember, when Erica

24  said that the other guy sitting next to her, Allen was

25  about to take the chain from her neck, rip it off her

LAUDERDALE REPORTING   (305)467-6671

1   neck, how Todd Richardson comes into the system.

2           He goes even beyond that.  He goes in and

3   says give me the necklace, give me the purse.  It's the

4   power of intimidation.

5           It's the power of letting someone know they

6   could hurt them.  It's the power of a gun.  As

7   powerful as anything that can be said or anything that

8   can be done.

9           What does Travis Russel do to Erica when

10  Linda bolts from the car:  You know, your friend was

11  awfully stupid for doing that.  She could have gotten

12  shot.

13          Do I need any clearer statement of Travis

14  Russel's intent of the message he intended to bring

15  out when he pointed that gun at those young girls?  A

16  point missed upon anybody in whoever is in our society

17  can any point be better made than was made by these

18  defendants when they had these girls in that car?

19          You also have the charge of Armed

20  Kidnapping, and the Judge will read the elements of

21  that crime to you.  I'm not going to go over them.

22          Ladies and gentlemen, there is a lesser

23  included offense in that:  False Imprisonment.  Common

24  sense tells you the crime committed here was Armed

25  Kidnapping.


                LAUDERDALE REPORTING   (305)467-6671

1         Why does it tell you that?  Because these

2   guys were trying to facilitate the commission of their

3   robbery.  And that's exactly what the crime of armed

4   kidnapping is.

5         I know it's easy from what we socialized it

6   to understand that kidnapping is grabbing somebody,

7   going somewhere with them, doing a ransom note asking

8   for money, that's what we have come to expect.

9         But it is no different under the law if you

10   take someone from force or intimidation like they took

11   Erica Outridge, keep her, held against her well as she

12   testified to in this case in order for to be able to

13   get away from murder.  That's the crime of armed

14   kidnapping.

15         Ask yourself when you listen to the

16   instruction on Kidnapping in this case, did Erica

17   Outridge against her will did she at any time after

18   they initiated that robbery did she willingly go with

19   them?

20         Or was this a young lady who was terrified?

21   Is a young lady who now had been left by herself

22   because her friend had been able to get out of the car

23   under desperate circumstances, is a Kidnapping taking

24   place or not?  I don't mean to talk to you about the

25   obvious in this case.



              LAUDERDALE REPORTING  (305)467-6671

1            But it's my job to point out to you how the

2    elements come together with the evidence in this

3    case.

4            I told you yesterday in jury selection that

5    I would prove to you, prove to you the elements of the

6    crime, and I think I have done that, and with evidence

7    that is uncontradicted in this case.

8            Now, the job that remains to be done, your

9    part, is to consider it all together.  To consider the

10   actions of the defendant, Todd Richardson, before,

11   during and after this crime.

12           You know, one point Mr. Laswell, I think,

13   made a statement to you about errors in judgement.

14   Well, I don't know of any crimes that could be

15   considered good judgement.  I don't know of any crimes

16   that would stand applauded having been well done when

17   you intimidate, terrorize and victimize people.

18           So, certainly he is guilty of that. But more

19   importantly, he is guilty of two Armed Robbery, and a

20   Kidnapping.

21           When that young man was stopped by the

22   police, when he has another opportunity to, again, his

23   actions spoke louder than any words.  In that

24   automobile, when these two girls, first, Linda Butler

25   then Erica, are being systematically stripped of their

1    property, his actions spoke louder than words.

2              Now, it's time for you to make a tough

3    decision.

4              I dealt with that yesterday when I asked you

5    about sympathy of the defendant. You know, it's not an

6    easy job that you have, except in one respect.

7              Ladies and gentlemen, a nation that is ruled

8    by the rules of law, and no one can be convicted of a

9    crime without the evidence being presented before

10   you.  You have had that evidence.

11             As has been said, the police did a great job

12   in this case in pursuing, identifying and capturing

13   the guilty parties.

14             These young ladies, the courage not only to

15   withstand what happened on the 19th of February, but

16   to come before you, submit themselves to

17   cross-examination without exaggeration, tell you

18   exactly what happened on that day.

19             Think about the power of a gun, ladies and

20   gentlemen. Think about the power of four men

21   intimidating two young girls. You know, sometimes even

22   physical size intimidates human beings.

23             This case is not only did you have four men,

24   but four men armed with a firearm. This was not is a

25   petit theft.


LAUDERDALE REPORTING  (305)467-6671

1          This was an easy situation that was created,

2   that was multiplied and final result of these two

3   young ladies being robbed at gun point, being held

4   against their will has the signature of Todd

5   Richardson.

6          Justice commands you to return a verdicts of

7   guilty as charged on every count.  I ask you right now

8   though to listen to the instructions of the Judge

9   carefully.

10          I, also, ask you it take that evidence with

11  you to the jury room and don't compromise because you

12  feel a need to be sympathetic or because you think

13  those girls used poor judgment when they got in that

14  car.

15          Apply the rule of law as you swore yesterday

16  when you were sworn to apply it equally to everyone.

17  Thank you very much for your attention.

18          THE COURT: Mr. Laswell.

19          MR. LASWELL: Thank you, Judge.

20                  REBUTTAL ARGUMENT

21                  BY MR. LASWELL

22          This crime had the signature of Todd

23  Richardson.  That must mean that his leg is a deadly

24  weapon.  I don't know whether Mr. Milian means he used

25  his leg or used a firearm.

LAUDERDALE REPORTING  (305)467-6671

1          But let me tell you, this case can't stand

2     the way he wants it to with him arguing with what Todd

3     Richardson did.  He has to take the position that they

4     had a gun, and they pointed a gun, and they did all of

5     these things.

6          And truth of the matter here is we are not

7     here to determine the guilt or innocence of them.  We

8     are here to determine, you are to determine, the guilt

9     or innocence of Todd Richardson.

10         And he is so compelled to do this that he is

11    going to give a big lecture.  He is going to tell you

12    how scared we are when we see a gun.

13         But I want to tell you that it's Travis

14    Russel who has the gun, and the evidence police

15    brought proves it's Travis Russel's gun.  What these

16    two young ladies told you, it's Travis' hand holding

17    the gun.

18         He would have you believe that my client has

19    a signature to this crime that consists of identifying

20    himself by name and telephone number to the intended

21    victim?  That's absurd.

22         Further, it's absurd he still had the stuff

23    when they got him. I'm not arguing those things Mr.

24    Milian and I can agree that at least that evidence is

25    uncontroverted.

LAUDERDALE REPORTING  (305)467-6671

1           What we can't agree on is his assertion, I

2    don't have to show what's in Todd's head.  Because

3    that's exactly what he has to show, what the State has

4    to prove beyond and to the exclusion of a reasonable

5    doubt and exactly what they cannot prove.

6           Mr. Milian didn't tell you about the

7    Principal instruction about that the Judge is going to

8    give you:  If the defendant helped another person or

9    persons commit a crime he must be treated as if he

10   done all the things the other person did.

11          If.  If.  If the evidence shows beyond a

12   reasonable doubts that the defendant, Todd Richardson,

13   had a conscious intent to that the criminal act be

14   done, conscious.

15          These fellows in the front row here, great

16   consciousness.  They know what they are doing all the

17   time.  They are aware, and they don't do anything they

18   don't intend to do.  They are conscious in their

19   intent to be good police officers.

20          The judge is conscious in his intent to be a

21   good judge.  He knows what he is going to do in five

22   minutes whenever I get done and sit down. He is aware

23   of that.

24          And it's not only does Mr. Milian have to

25   prove that Todd Richardson had a conscious intent.


                  LAUDERDALE REPORTING  (305)467-6671

1          But that he had a conscious intent that the

2    crime be done. Not that the crime continued, not that

3    the crime finish, not that crime be offered, but it be

4    done.

5          In other words, it's the State's obligation

6    under the law that Judge is going to give you to prove

7    that he had a conscious intent that this crime be

8    done. That's why Mr. Milian has to keep making these

9    arguments that they did this, and they did that.

10          And he can't concentrate on trial, lawsuits,

11    where his obligation and burden is to prove this man's

12    conscious intent that Travis Russel be done, commit

13    the crime in the future, know about it ahead of time.

14          I have told you and I have admitted that his

15    actions are disrespectful to these young ladies. They

16    have told you that he didn't use any force. That he

17    didn't use any violence. That he didn't use any

18    threats of force or violence. They have told you

19    individually and graphically how Travis Russel did.

20          If he can not prove that he knew what Travis

21    Russel had in mind and he knew that Travis Russel had

22    a gun and that he knew that Travis Russel was going to

23    commit a robbery, then his case has to fail and it

24    does fail. And he can't talk to you about that, the

25    elements of kidnapping because it's impossible for

LAUDERDALE REPORTING   (305)467-6671

1    this kid to be convicted of kidnapping.

2            Travis Russel had controlled that, Travis

3    controlled this will whole thing. Damn fool that he

4    is, he took advantage of that little girl and shame on

5    him for it and convict him for it, for it, because he

6    committed a theft.

7            Well, I'm not going to say that he saved her

8    from greater crimes, but he is, that's grovel, an he

9    is a fool.

10           The difference between Petit Theft and Grand

11   Theft are indelibly described in the law. They do

12   make a difference. It's not like stealing a purse.

13   He did a bad thing. But he didn't do the overcharged

14   zealous things that Mr. Milian wants you to believe

15   did he.

16           Save that for Travis Russel. Save that for

17   the man who owned the car. Save that for the man that

18   drove the car, and save that for the man that took the

19   gun and caused the fear and intimidation, and made the

20   threats.

21           What you have to do in this case, I want you

22   to apply the law in this case. We are not trying to

23   hide from anything. He didn't get up and lie to you.

24   This is what happened. These girls said it happened.

25   My cross-examination of them I thought was perhaps

LAUDERDALE REPORTING  (305)467-6671

1  kind.

2          I didn't try to trash them.  Couple of young

3  girls exercised some really poor judgment.  That kind

4  of thing that causes a lot of problems, and it caused

5  a lot of problems.  And it caused them, too, a lot of

6  problems to answer to Travis Russel.

7          The evidence didn't even show that Travis

8  Russel was his friend.  Mr. Milian will tell you that

9  and argue that.  But he didn't prove it.  And they

10  were in a car together.  Does that mean they are

11  friends?  They are cousins?  Brothers?

12          The absence of his evidence concerning Todd

13  Richardson is overwhelming.  The presence of his

14  evidence concerning Travis Russel is monumental, and

15  Travis Russell deserves to be convicted in this case.

16          This kid should be convicted of theft.

17  That's what he did, nothing more and nothing less.

18  And I think when you deliberate and study the law, the

19  Judge is going to instruct you on the law, and then he

20  is going to give you a tape of his instructions.

21          You take that tape and you listen and see if

22  I was right about this Principal instruction, that

23  he's got to have a conscious intent that the crime be

24  done.  You have to be aware that it's going to be

25  happen in the future, and see if Mr. Milian proved

LAUDERDALE REPORTING  (305)467-6671

1    it.

2              And then look at the evidence and take a

3    look, a good look for those of you who aren't familiar

4    with 300Z.  Take a good look at that car an see,

5    imagine what it would be like with six people in this

6    car.  Take your time, look over everything he has.

7              My dad would say a flapjack has two sides,

8    every opinion, every side has two sides.  This case

9    has two outrageous and different sides.

10             I don't think the State has maintained it's

11   burden of proof here, I don't think that the State's

12   case against Todd Richardson would withstand any kind

13   of scrutiny.

14             And I am telling you, I'm not presenting him

15   for any boy scouts.  What he did was bad.  What he did

16   was wrong.  But he wasn't a robber and he wasn't a

17   kidnapper.

18             So go back there, take a look at the

19   evidence, talk among yourselves, depending on your

20   collective memories, see if you don't think that the

21   more persuasive position here is exactly what I told

22   you it is, in candor, that my client is guilty of

23   Petit theft.

24             THE COURT: I changed the batteries on this,

25   I didn't change them right.


LAUDERDALE REPORTING   (305)467-6671

1              MR. LASWELL: Judge, I promised them a lot of

2    work.

3              THE COURT: Switched it around the other

4    way.  See if it works, left them the way they were.

5              Okay, members of the jury, I thank you for

6    your attention during this trial.

7              Please pay attention to the instructions I'm

8    about to give you.

9              Todd Richardson, the defendant in this case,

10   has been accused of the crimes of two counts of Armed

11   Robbery and one count of Kidnapping.

12             In a moment, I'll read you the definition of

13   the elements of those offenses.

14             In considering the evidence, you should

15   consider the possibility that although the evidence

16   may not convince you that the defendant committed the

17   main crimes of which he is accused, there may be

18   evidence that he committed other acts that would

19   constitute a lesser included crime.

20             Therefore, if you decide that the main

21   accusations have not been proved beyond a reasonable

22   doubt, you will next need to decide if the defendant

23   is guilty of any lesser included crime.

24             The lesser crimes indicated in the

25   definition of Armed Robbery are:

1          Strong Armed Robbery and Petit Theft.  A

2     lesser included offense in Kidnapping is False

3     Imprisonment.

4          And in a moment, I'll read you the

5     definitions of those lesser included offenses.

6          First, Robbery.

7          Before you can find the defendant guilty of

8     Robbery, the State must proof the following four

9     elements beyond a reasonable doubt:

10          1.  Todd Richardson took the jewelry as to

11     Count 1, and or jewelry and money as to Count 2, from

12     the person or custody of Linda Butler as to Count 1

13     and or Erica Outridge as to Count 2.

14          2. Force, violence, assault or putting in

15     fear was used in the course of the taking.

16          3. The property taken was of some value.

17          4. The taking was with the intent to

18     permanently or temporarily deprive Linda Butler as to

19     Count 1 or, and or Erica Outridge as to Count 2, of

20     her right to the property or any benefit from it.

21          "In the course of the taking" means that the

22     act occurred prior to, contemporaneous with, or

23     subsequent to the taking of the property and that he

24     act of the taking of the property constitute

25     continuous series of acts or events.

LAUDERDALE REPORTING  (305)467-6671

1            In order for a taking of robbery -- excuse

2    me, let me go over that.

3            In order for a taking of property to be

4    robbery, it is not necessary that the person robbed be

5    the actual owner of the property. It is sufficient if

6    the victim has the custody of the property at the time

7    of the offense.

8            The taking must be by the use of force or

9    violence or by assault so as to overcome the

10   resistance of the victim, or by putting the victim in

11   fear so the victim does not resist.

12           The law does not require the victim of

13   robbery resist to any particular extent or that the

14   victim ever offer any actual physical resistance if

15   the circumstances are such that the victim is placed

16   in fear of death or great bodily harm if she does

17   resist.  But unless prevented by fear there must be

18   some resistance to make the taking one done by force

19   or violence.

20           In orders for a taking by force, violence or

21   putting in fear to be robbery does not necessary that

22   the taking be from the person of the victim.

23           It is sufficient if the property taken is

24   under the actual control of the victim so that it

25   cannot be taken without the use of force, violence

LAUDERDALE REPORTING   (305)467-6671

1    intimidation directed against the victim.

2           The punishment provided by law for the crime

3    of robbery is greater if "in the course of committing

4    the robbery" the defendant carried some kind of

5    weapon. An act is "in the course of committing the

6    robbery" if it occurs in an attempt to commit robbery

7    or in flight after the attempt or commission.

8           Therefore, if you find the defendant guilty

9    of robbery, you must then consider whether the State

10   has further proved that aggravating circumstances and

11   reflected in your verdict.

12          If you find the defendant carried a firearm

13   in the course of committing the robbery, you should

14   find him guilty of robbery with a firearm.

15          If you find that the defendant carried no

16   firearm in the course of committing the robbery but

17   did commit the robbery, you should find him guilty

18   only of robbery.

19          A "firearm" means any weapon which will is

20   designed to, or may readily be converted to expel a

21   projectile by the action of an explosive; the frame or

22   receiver of any such weapon.

23          Okay, now I'll read you the law of the

24   lesser included offense of Petit Theft.  Before you

25   can find the defendant guilty of Petit Theft, the

LAUDERDALE REPORTING   (305)467-6671

1    State must prove the following two elements beyond a
2    reasonable doubt

3             1. Todd Richardson knowingly and unlawfully
4    obtained or endeavored to obtain the jewelry as to
5    Count 1, and or the jewelry and money as to Count 2,
6    of Linda Butler as to Count 1 and or Erica Outridge as
7    to Count 2.

8             2. He did so with the intent to permanently
9    or temporarily deprive Linda Butler as to Count 1, and
10   or Eric Outridge as to Count 2, as to her right of the
11   property or any benefit from it.

12            "Obtains" means any manner exercising or
13   taking control over property.

14            "Endeavor" means to attempt or try.

15            "Property" means anything of value.

16            Okay, I'll now read you the law as to Count
17   3, Kidnapping.

18            Before you can find the defendant guilty of
19   kidnapping the State must prove the following three
20   elements beyond a reasonable doubt:

21            1. Todd Richardson forcibly, secretly, by
22   threat confined, abducted or imprisoned Erica Outridge
23   against her will.

24            2. Todd Richardson had no lawful authority.

25            3. Todd Richardson, acted with intent to


             LAUDERDALE REPORTING   (305)467-6671

1  commit or facilitate the commission of the robbery.

2  And I previously defined robbery for you.

3         In order to be a kidnapping confinement,

4  abduction or imprisonment must not be slight,

5  inconsequential or merely incidental to the felony;

6  must not have been the kind inherent in the nature of

7  the felony; and must have some significance

8  independent of the felony in that it makes the felony

9  substantially easier of commission or substantially

10  lessens the risks of detection.

11         I'll now read you the law as to the lesser

12  included offense of False Imprisonment.

13         Before you can find the defendant guilty of

14  false imprisonment, the State must prove the following

15  three elements beyond a reasonable doubt:

16         1. Todd Richardson forcibly, secretly, by

17  threat confined, abducted or imprisoned Erica Outridge

18  against her will.

19         2. Todd Richardson had no lawful authority.

20         3. Todd Richardson acted for any purpose

21  other than to commit or facilitate the commission of

22  any felony.

23         Now, if the defendant helped another person

24  or persons commit a crime, the defendant is a

25  principal and must be treated as if he done all the

LAUDERDALE REPORTING   (305)467-6671

1    things other person or persons did if:

2              1. The defendant had the conscious intent

3    that the criminal act be done; and

4              2. The defendant did some act or said some

5    word which was intended to and which did incite,

6    cause, encourage, assist or advise the other person or

7    persons to actually commit the crime.

8              The defendant has entered a plea of not

9    guilty. This means you must presume or believe the

10   defendant is innocent.

11             The presumption stays with the defendant as

12   to each material allegation in the information through

13   each stage of the trial until it's been overcome by

14   the evidence to the exclusion of and beyond a

15   reasonable doubt.

16             To overcome the defendant's presumption of

17   innocence the State has the burden of proving the

18   following two elements:

19             1. The crime with which the defendant is

20   charged was committed, and

21             2. The defendant is the person who committed

22   the crime.

23             The defendant is not required to prove

24   anything. Whenever the words"reasonable doubt" are

25   used you must consider the following:

LAUDERDALE REPORTING  (305)467-6671

1          A reasonable doubt is not a possible doubt,

2    a speculative, imaginary or forced doubt. Such a doubt

3    must not influence you to return a verdict of not

4    guilty if have an abiding conviction of guilt.  On the

5    other hand, if, after carefully considering, comparing

6    an weighing all the evidence, there is not an abiding

7    conviction of guilt, or, if, having a conviction, it

8    is one which is not stable but one which wavers and

9    vacillates, then the charge is not proved beyond and

10    to the exclusion of every reasonable doubt and you

11    must find the defendant not guilty because the doubt

12    is reasonable.

13          It is to the evidence introduced into this

14    trial an to it alone that you are to look for that

15    proof. A reasonable doubt is as to the guilt of the

16    defendant may arise from the evidence, conflict in the

17    evidence or lack of the evidence.

18          If you have a reasonable doubt, you should

19    find the defendant not guilty.  If you have no

20    reasonable doubt, you should find the defendant

21    guilty.

22          It is up to you to decide what evidence is

23    reliable.  You should use your common sense in

24    deciding which is the best evidence and which evidence

25    should not be relied upon in considering your

LAUDERDALE REPORTING  (305)467-6671

1 verdicts.

2          You may find some of the evidence not

3 reliable for less reliable than other evidence.  You

4 should consider how the witnesses acted as well as

5 what they said.  Some things you should consider are:

6          1. Did the witness seem to have an

7 opportunity to see and know the things about which the

8 witnesses testified?

9          2. Did the witness seem to have an accurate

10 memory?

11          3. Was the witness honest and

12 straightforward forward in answering the attorneys

13 questions?

14          4. Did the witness have some interest in how

15 the case should be decided?  And,

16          5. Does the witness' testimony agree with

17 other testimony and other evidence in the case?

18          You may rely upon your own conclusion about

19 the witness.  A juror may believe or disbelieve all or

20 any part of the evidence or testimony of any witness.

21          Expert Witnesses are like other witnesses

22 with one exception- the law permits an expert witness

23 to give his opinion.  However, an expert's opinion is

24 only reliable when given on a subject which you

25 believe him to be an expert.


LAUDERDALE REPORTING   (305)467-6671

1          Like other witnesses, you may believe or

2  disbelieve all or any part of an expert's testimony.

3          The constitution requires the State to prove

4  its accusations against the defendant. It is not

5  necessary for defendant to disprove anything.  Nor is

6  the defendant required to prove his innocence.

7          It is up to the State to prove the

8  defendant's guilt by evidence.

9          The defendant exercised a fundamental right

10  by choosing not to be a witness in this case.  You

11  must not view this as an admission of guilt or be

12  influenced in any way by his decision.  No juror

13  should ever be concerned that the defendant did or did

14  not take the witness stand to give testimony in the

15  case.

16          These are some general rules that apply to

17  your discussion.  You must follow these rules in order

18  to return a lawful verdict:

19          1. You must follow the law as it is set out

20  in these instructions.  If you fail to follow the law

21  your verdict will be a miscarriage of justice.  There

22  is no reason for failing to follow the law in this

23  case. All of us are depending upon you to make a wise

24  an legal decision in this matter.

25          2. This case must be decided only upon the

LAUDERDALE REPORTING   (305)467-6671

1    evidence that you have heard from testimony of the

2    witnesses, and have seen in the form of the exhibits

3    in evidence, and these instructions.

4        3. This case must not be decided for or

5    against anyone because you feel sorry for anyone or

6    are angry at anyone.

7        4. Remember, the lawyers are not on trial.

8    Your feelings about them should not influence your

9    decision in this case.

10       5. Your duty is to determine if the

11    defendant has been proven guilty or not guilty in

12    accord with the law.  It's the judge's job to

13    determine what a proper sentence would be if the

14    defendant is found guilty.

15       6. Whatever verdict you render must be

16    unanimous, that is, each juror must agree to the same

17    verdict.

18       7. It is entirely proper for a lawyer to

19    talk to a witness about what testimony a witness would

20    give if called to the courtroom.  The witness should

21    not be discredited by talking with a lawyer about his

22    testimony, and

23       8. Your verdict should not be influenced by

24    personal feelings of prejudice, bias or sympathies.

25    Your verdict must based on your view of the evidence


LAUDERDALE REPORTING  (305)467-6671

326

1    and the law contained in these instructions.

2             Deciding a verdict is exclusively your job.

3    I can not participate in this decision in any, in any

4    way.  Please disregard anything I may have said or

5    done that made you think I preferred one verdict over

6    another.

7             You may find the defendant guilty as charged

8    in the information or guilty of such lesser included

9    crimes that the evidence may justify or not guilty.

10            If you return a verdict of guilty, it should

11   be for the highest offense that has been proven beyond

12   a reasonable doubt, if you find no offense has been

13   proven beyond a reasonable doubt, then, of course,

14   your verdict must be not guilty.

15            Only one verdict must be returned as to each

16   crime charged.  This verdict must be unanimous, that

17   is, all of you must agree to the same verdict.  The

18   verdict must be in writing and for convenience the

19   necessary forms of verdict have been prepared for

20   you.  They are as follows:

21            In Circuit Court of the Seventeenth Judicial

22   Court in and for Broward County, Florida.  Case number

23   96-3122CFC.  State of Florida versus Todd Richardson.

24   Verdict:  Count 1:

25            We the jury finds as follows as to the

LAUDERDALE REPORTING  (305)467-6671

1    defendant in this case.

2            And you would pick one of these four options

3    and they are the same four options as to Count 2,

4    either:

5            A. The defendant is guilty of Armed Robbery

6    with Firearm as charged in the information, or

7            B. The defendant is guilty of Strong Armed

8    Robber a lesser included offense, or

9            C. The defendant is guilty of Petit Theft a

10   lesser included offense, or

11           D. The defendant is not guilty.

12           And as to Count 2, the options are the

13   same.  As to Count 3, you would pick one of these

14   three options either:

15           A. The defendant is guilty of Kidnapping as

16   charged in the information, or

17           B. The defendant is guilty of False

18   Imprisonment a lesser included offense, or

19           C. The defendant is not guilty.

20           So say we all.

21           And if you return your verdict this evening,

22   the foreperson would write in this 14th day of January

23   A. D. 1997, Broward County, Florida.  There are lines

24   for the foreperson to sign and date the verdict when

25   all of you have agreed on a verdict in the case.


                LAUDERDALE REPORTING  (305)467-6671

1          Now, a separate crime is charged in each

2     count of the information, and while they have been

3     tried together each crime and the evidence applicable

4     to it must be considered separately and a separate

5     verdict returned as to each.  A finding of guilty or

6     not guilty as to one crime must not affect your

7     verdict as to the other crimes charged.

8          Now in just is a few moments you will be

9     taken to the jury by the bailiff.  The first you

10    should do is select a foreman.  The foreman presides

11    over your deliberations, like a chairman of a

12    meeting.

13         It's the foreman's job to sign and date the

14    verdict when all of you have agreed on a verdict in

15    this case.  The foreman will bring the verdicts back

16    to the courtroom when the jury returns, and either a

17    man or a woman can be the foreman of the jury.

18         Your verdict find the either defendant

19    guilty or not guilty must unanimous, that is, the

20    verdict must be the verdict of each juror as well as

21    the  jury as a whole.

22         In closing, let me remind you that it is

23    important that you follow the law spelled out in these

24    instructions in deciding your verdict.

25         There are no other laws that apply to this

1   case.  Even if you do not like the laws that must be

2   applied, you must use them.

3           For two centuries we have agreed to a

4   constitution and to live by the law.  No one of us

5   have a right to violate the rules we all share.

6           Counsel, approach the bench.

7           (Whereupon a side-bar conference was had

8   outside the hearing of the jury as follows:)

9           THE COURT: Any exception or objection to the

10  content or the manner in which the instructions were

11  given?

12          MR. LASWELL: None.

13          MR. MILIAN: No, Judge.

14          THE COURT: What I did was I Xeroxed just the

15  front page of the information deleting Count 4, and

16  I'm going to send back just that front page; any

17  objection to the verdict forms?

18          MR. LASWELL: Yeah, I don't like them.  I

19  don't think this is an objection, Judge.  But I think

20  armed robbery with firearm and strong armed robbery

21  are little confusing.  I think that term should be

22  robbery with a firearm, robbery without a firearm, and

23  think that court should instruct them so that they,

24  they know.

25          THE COURT: Let me write out strong armed.


                LAUDERDALE REPORTING  (305)467-6671

1          MR. LASWELL: I just want them to know

2    remember there are two victims here, and to return a

3    verdicts on Count 1, they have to know which victim.

4          THE COURT: That's why I am sending back the

5    information.

6          MR. LASWELL: And I don't think you would

7    have a problem with jury understanding for guidance.

8    I'm asking the court to give them that guidance.

9          THE COURT: I told them that separate

10   verdicts returned as to each count.  A verdict of not

11   guilty shouldn't affect their verdict as to other

12   crimes charged.

13          MR. LASWELL: I just asked you, don't want to

14   start an argument with you, Judge.

15          THE COURT: You want me to write out strong

16   arm?

17          MR. LASWELL: Don't care about that.  As

18   without a firearm for one count is with a firearm and

19   one count is without a firearm.  That's a big

20   difference.

21          THE COURT: I explained to them that

22   instruction.

23          MR. LASWELL: I don't think so.  But go

24   ahead.

25          THE COURT: If you would check all of the


                LAUDERDALE REPORTING  (305)467-6671

1    items of evidence, make sure everything is there that

2    is suppose to be there and nothing is there that's not

3    suppose to be there.

4              (Whereupon the side-bar conference was

5    concluded after which, in the hearing of the jury, the

6    following proceedings were heard:)

7              THE COURT: Are we in agreement on the

8    evidence?

9              MR. MILIAN: Yes.

10             MR. LASWELL: Looks like it is all there,

11   Judge.

12             THE COURT: Miss Myers, did you leave

13   anything in the jury room, ma'am.

14             JUROR MYERS: (indicating no).

15             THE COURT: I am going to ask you to remain

16   in your seat, if you would, an as referred to

17   earlier.  I recorded the instructions.  I am going to

18   send back the tape player and the tape of the in

19   instructions, all physical evidence and a copy of the

20   information.

21             Now, the six remaining jurors may retire to

22   consider your verdict.

23             (Whereupon at 5:24 p.m., the jury exits the

24   courtroom into the jury room to begin their

25   deliberations after which the following proceedings

LAUDERDALE REPORTING  (305)467-6671

332

1  were heard:)

2           THE COURT: Mrs. Myers, I want to take this

3  opportunity to thank you for being with us yesterday

4  and today, I think I speak for all court personnel

5  when I say we appreciate the fact you were here paying

6  attention.

7           I know if someone would have gotten sick

8  today, you would have been able to jump right in there

9  and perform your duty as a juror in this case.  As a

10  small token of the court's appreciation, I had

11  prepared this certificate of appreciation.

12          We are going to have to get that jury button

13  back from you at this time.  The jury assembly room is

14  closed on the a third floor, so I'm going to excuse

15  you from jury duty.

16          You are welcome to wait and see what jury

17  comes up with as a verdict or you can call my office

18  tomorrow and my secretary would be happy to tell you

19  what the verdict was.  And if you have no questions,

20  you are excused with court's thanks.

21          JUROR MYERS: Thank you very much

22          (Whereupon the alternate juror, Mrs. Myers,

23  exited the courtroom after which the following

24  proceedings were heard:)

25          THE COURT: Okay, I want to take this


                LAUDERDALE REPORTING   (305)467-6671

1   opportunity to commend both counsel for the

2   professional manner and expeditious manner which they

3   tried their cases and represented their clients.  Mr.

4   Richardson, I hope you are happy with Mr. Laswell's

5   representation.  I think did he a fine job for you.

6           We are going to be in recess until we hear

7   further from the jury.  If you are going to wonder too

8   far from courtroom, and in the event we need to have

9   you come back about five minutes to 6:00, if they

10  haven't reached a verdict.  So I can explain to them

11  they have an option to continue their deliberations.

12          Another option, Mr. Laswell, if you want to

13  talk to Mr. Richardson, whether or not he would want

14  Mr. Cotrone to take a verdict for you since he will be

15  here for the motion to suppress.  Then we would only

16  bring you back if there is a question from the jury,

17  or if you had is a beeper or something.  I'll leave

18  that between you and Mr. Richardson.

19          MR. LASWELL: We will see what happens,

20  Judge.

21          THE COURT: Let's take a five minute recess

22  so the bailiffs can get up the other IC's.  Then we

23  will start on theirs.

24          (Whereupon the above-styled cause was in

25  recess waiting to hear further from the jury after

LAUDERDALE REPORTING  (305)467-6671

334

1  which the following proceedings were heard:)

2          THE COURT: I have everybody back on Mr.

3  Richardson's case.  Both counsel are present.  Mr.

4  Richardson is present.  It's about 6:30.  The jury is

5  still deliberating.

6          Normally, I would bring out the jury and let

7  them know they can recess for the evening at this

8  point or they can continue deliberating.  But if one

9  of the people are tired or hungry and wants to go

10  home, that we would recess for the evening.

11          What is your all's position on what I should

12  say to the jury?

13          MR. MILIAN: That's fine with me, Judge.

14          MR. LASWELL: Of course, I have an obligation

15  to coincide.  I would like you to send them home.  But

16  please make the inquiry.

17          THE COURT: Okay, I can send them home.

18          I cannot make the inquiry and send them

19  home.  Obviously, they come back not guilty, if Mr.

20  Richardson doesn't have any other charges, he goes

21  home tonight, I guess.  Does he have other charges

22  pending against him?

23          THE BAILIFF: Yes, sir.

24          THE COURT: Okay, he does.

25          So he wouldn't go home anyway.  We can send

LAUDERDALE REPORTING  (305)467-6671

1  them home or ask them if they want to continue

2  deliberating.  I'm going to be here doing this motion

3  to suppress. Maury, you can take the verdict for you.

4          MR. LASWELL: I know all, Judge, Mr. Halperin

5  has agreed to take the verdict.  Mr. Richardson has

6  agreed.

7          THE COURT: And you will be on your beeper.

8  In case they have a question, we can bring you back or

9  if they have a question, I'll recess until tomorrow

10 and answer the question.

11         MR. LASWELL: I would prefer to wait until

12 tomorrow.  I'll be out all the way out in Davie.

13         MR. HALPERIN: I agree to wait for the

14 verdict as long as I have to be here.  If I don't have

15 to be here, I don't want to wait for the verdict.

16         THE COURT: I understand.  Then we will send

17 the jury home.  Okay, what I'll do is bring the jury

18 out and tell them they can continue deliberating for a

19 while.  But if someone is tired and hungry and wants

20 to go home, I can't pay for dinner, and if one person

21 is tired and wants to go home, then we have to recess.

22         MR. LASWELL: Fine.

23         THE COURT: Okay, let's bring the jury out.

24         (Whereupon at 6:34 p.m., the jury enters the

25 courtroom after which the following proceedings were


                LAUDERDALE REPORTING  (305)467-6671

1  heard:)

2          THE COURT: Ladies and gentlemen, I apologize

3  for interrupting your deliberations.

4          I think I eluded to yesterday when we picked

5  the jury that we have a rule that we don't work past

6  six o'clock unless everybody want to work past six

7  o'clock.

8          I'm a little tardy in reminding you about

9  that. But I just wanted to le you know that you can

10  work as late as you want to within a reasonable hour.

11          But I can't feed you because we don't have

12  any funds to feed you or anything like that. But you

13  can work as late as you like to. If anyone gets tired

14  and hungry and wants to recess for the evening, I can

15  give you the instruction and have you come back

16  tomorrow.

17          But if one person wants to go home, then I

18  will send the jury home. With that, unless someone

19  wants to raise their hand, he wants to go home, I'll

20  ask you to retire and continue your deliberations.

21          JUROR FARRINGTON: I need to go home.

22          JUROR RUIZ: I need to go.

23          THE COURT: Okay, so we are going to go ahead

24  and recess for the evening.

25          Remember my admonition not to discuss the

LAUDERDALE REPORTING  (305)467-6671

1   case or allow it to be discussed in your presence, and

2   you can't start discussing the case again until

3   tomorrow morning when you are all back together back

4   in the jury room.

5           So I am going to ask you to come back

6   tomorrow.  Let's gets back together at ten o'clock.

7   I'm going to ask you to wait outside the courtroom

8   door.

9           And, again, don't get involved overhearing

10  conversations.  Stay away from people that may be

11  outside talking about this case or other cases.  And

12  once we get everyone back together, we will bring you

13  back in.

14          I'll make sure you didn't discuss the case

15  and follow my instructions, then I'll put you back in

16  the jury room.  At that point you can resume your

17  deliberations.  So have a nice evening.  See you back

18  at 10:00.

19          If you need to get your coat or anything, go

20  ahead and get that, and the clerk will get the

21  evidence and verdict form and the information, and

22  that will be brought back to you tomorrow.  I guess the

23  tape and tape player, too.

24          (Whereupon at 6:35 p.m., the jury is excused

25  for the evening after which the following proceedings

LAUDERDALE REPORTING   (305)467-6671

338

1    were heard:)

2              THE COURT: If you all can leave the evidence

3    and everything there, the clerk will gather it up.  We

4    will gather it up.

5              Okay, if there is nothing else to come

6    before the court, we will be in recess in Mr.

7    Richardson's case until 10:00 tomorrow morning.

8              (Whereupon the above-styled cause

9    proceedings were concluded for the evening.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAUDERDALE REPORTING   (305)467-6671

```
1                        CERTIFICATE

2

3

4    STATE OF FLORIDA

5    COUNTY OF BROWARD

6

7

8

9

10           I, DONNA VASSELLO, Certified Professional

11   Reporter, certify that I was authorized to and did

12   stenographically report the foregoing proceedings and

13   that the transcript is a true and complete record of

14   my stenographic notes.

15

16

17

18

19        DATED this 21 day of APRIL , 1997.

20

21

22         _____
           Donna Vassello, Certified Reporter
23

24

25
```

DONNA L VASSELLO
My Commission CC401439
Expires Sep. 18, 1998
Bonded by NFNU
800-324-6388

LAUDERDALE REPORTING    (305)467-6671

340

                    IN THE CIRCUIT COURT OF THE
                    SEVENTEENTH JUDICIAL CIRCUIT,
                    IN AND FOR BROWARD COUNTY, FLORIDA

                                        )
TODD RICHARDSON,                        )
                                        )          **ORIGINAL**
        Appellant/Defendant,            )
                                        ) Case
vs.                                     ) No. 96-3122CF10C
                                        )
STATE OF FLORIDA,                       )
                                        )
        Appellee/Plaintiff.             )
---------------------------------X

                        Broward County
                        Fort Lauderdale, Florida


            ------------------------------------
            APPEAL ON BEHALF OF THE DEFENDANT
            ------------------------------------




                        VOLUME V (5)
                        Pages 340 to 356

1

2                                    I-N-D-E-X

3

            <u>Date</u>                    <u>Proceedings</u>                  <u>Page</u>
4    January 15, 1997            Jury deliberations            340-356
                                 Questions
5                                Verdict

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

342

```
 1                          IN THE CIRCUIT COURT OF THE
                            SEVENTEENTH JUDICIAL CIRCUIT IN
 2                          AND FOR BROWARD COUNTY, FLORIDA

 3    STATE OF FLORIDA,              )
                                     )
 4                   Plaintiff,      )
                                     ) Case no. 96-3122CF10C
 5    vs.                            )
                                     )
 6    TODD RICHARDSON,               )
                                     )
 7                   Defendant.      )
                                     )
 8    ------------------------------X

 9                          Fort Lauderdale, Florida
                            January 17, 1997
10                          10:30 o'clock a.m.

11    APPEARANCES:

12          OFFICE OF THE STATE ATTORNEY
            By:  ALBERTO MILIAN, ESQ.
13          Appearing on behalf of the Plaintiff

14          OFFICE OF THE PUBLIC DEFENDER
            By:  WILLIAM LASWELL, ESQ.
15          Appearing on behalf of the Defendant

16    ALSO PRESENT:  Carlos Rebollo, Assistant State Attorney

17                       ----------------

18          The above-styled cause came on for jury trial,

19    before the Honorable WILLIAM P. DIMITROULEAS, Presiding

20    Judge, at the Broward County Courthouse, Fort

21    Lauderdale, Broward County, Florida, on the 15th day

22    of January, 1997, commencing at 10:30 o'clock a.m.

23

24

25
```

4

1          (Thereupon, the following proceedings were had:)

2          THE COURT:  We're back on the record.  Both

3    counsel are present.  Mr. Richardson's present.

4    Anything to come -- for the record we checked all the

5    evidence and everything.  And we're in agreement it's

6    back in the jury room.

7          MR. LASWELL:  That's correct.

8          MR. MILIAN:  Yes.

9          THE COURT:  Okay.  Let's bring in the jury.

10          THE DEFENDANT:  Good morning, Your Honor.

11    Good morning.

12          THE COURT:  Good morning.

13          BAILIFF DELONG:  Jurors coming in.

14          (Thereupon, the jury entered the courtroom, after

15    which the following proceedings were had:)

16          THE COURT:  Counsel concede the presence of the

17    jury and waive its polling?

18          MR. LASWELL:  Yes, sir.

19          MR. MILIAN:  Yes, sir.

20          THE COURT:  And did everyone follow my admonition

21    not to discuss the case or allow it to be discussed in

22    your presence?

23          THE JURY:  (Nod heads.)

24          THE COURT:  Okay.  With that I'll ask you to

25    retire and continue your deliberations and everything

1      should be back in the room for you.

2           (Thereupon, the jury exited the courtroom, after

3      which the following proceedings were had:)

4           THE COURT:  Okay.  We'll be in recess until we

5      hear further from the jury.

6           (Thereupon, a recess was taken, after which the

7      following proceedings were had:)

8           THE COURT:  We're back on the record with Mr.

9      Richardson's case.  Both counsel are present.  Mr.

10     Richardson's present.  I have a question from the

11     jury.  Was Todd's phone number verified?  What I would

12     propose telling the jury, they're going to rely on

13     their collective recollection of what the testimony

14     was.  It would be improper for me to supplement any

15     testimony at this point.  With that I'll ask them to

16     retire and continue their deliberations.  Or do you

17     want me to say no?

18          MR. LASWELL:  I didn't hear the question.  I'm

19     sorry.

20          THE COURT:  The question was, was Todd's phone

21     number verified.  I don't think there was testimony

22     about that.

23          MR. LASWELL:  There was never any testimony about

24     that.

25          THE COURT:  I can answer the question in any one

1          of a number of ways.  One way I can answer it is no.

2          The second way I could say, no, there was no testimony

3          about that.  Or I can say you'll have to rely on your

4          collective recollection of what --

5                    MR. LASWELL:  I would prefer the classic.  I

6          would prefer the classic instruction.  Rely upon your

7          collective memories.

8                    THE COURT:  Well, all right.

9                    MR. LASWELL:  Rather than the Court answering the

10         question.

11                   THE COURT:  Right.  So what I would tell them,

12         what I would propose telling them is that they have to

13         rely on their collective recollection of what the

14         testimony was.  In any event, it would be improper for

15         me to supplement the evidence at this point.  And with

16         that I'll ask them to retire and continue their

17         deliberations.  Is that what you want me to do?

18                   MR. LASWELL:  You want to talk to the judge?  You

19         want to tell the judge just what you told me?

20                   THE COURT:  Is that what you want me to tell

21         them?

22                   MR. LASWELL:  Well, that's what I stand by my

23         position.  Mr. Richardson and I have been discussing

24         it.  And he says, well, it's my number.  I said, well,

25         I don't think you ought to have the judge tell them

1          that in any way, shape or form.

2                  THE COURT:  I can tell them that Mr. Milian's

3          agreeing and Mr. Richardson wanted me to tell them

4          that.  I don't think it's fundamental.  I think the

5          defendant can waive anything.  I'm not comfortable

6          with substituting evidence in to the jury that wasn't

7          introduced.  But, you know, I don't know how it helps

8          or hurts.  It cuts both ways.

9                  MR. LASWELL:  Tell him what you want done.

10                 THE DEFENDANT:  No.

11                 THE COURT:  Just go along with what your lawyer

12         said?

13                 THE DEFENDANT:  Yes.

14                 THE COURT:  Is that okay with you, Mr. Milian?

15                 MR. MILIAN:  I tend to agree with Mr. Laswell

16         that you should tell them to rely on the evidence

17         that's been presented in the case.

18                 THE COURT:  That's what I'm going to tell them.

19         I'm going to tell them in any event it would be

20         improper for me to supplement the evidence at this

21         point.

22                 MR. MILIAN:  I don't think you should tell them

23         about supplementing the evidence at this point.  I

24         think you should just limit your remark to you should

25         rely on your collective recollection.

1    THE COURT:  You want me to do that, Mr. Laswell?

2    You want me to say both of them?

3        MR. LASWELL:  Whatever you want, Judge.  This

4    could go either way for Mr. Richardson.

5        THE COURT:  I'll let you pick then.

6        MR. LASWELL:  Just give them the classic

7    instruction, you're to rely on your collective memory.

8        THE COURT:  All right.  Let's bring the jury out.

9        (Thereupon, the jury entered the courtroom, after

10    which the following proceedings were had:)

11        THE COURT: Okay.  Counsel concede the presence of

12    the jury?

13        MR. LASWELL:  Yes, sir.

14        MR. MILIAN:  Yes, Judge.

15        THE COURT:  And have you all selected a

16    foreperson?  And who is that?  Okay.  Is that Mr.

17    Perez, right?

18        MR. PEREZ:  Yes.

19        THE COURT:  Mr. Perez, I have a note from you

20    all, and it says, was Todd's phone number verified?  I

21    have to ask you to rely on your collective

22    recollection of what the testimony was or wasn't.  And

23    with that I'll ask you to retire and continue your

24    deliberations.  Thank you.

25        (Thereupon, the jury exited the courtroom, after

1    which the following proceedings were had:)

2         THE COURT:  Any exception or objection to the

3    content or the manner in which the Court responded to

4    the question?

5         MR. LASWELL:  None from me.

6         MR. MILIAN:  No.

7         THE COURT:  Okay.  The note will be received and

8    filed, and we'll be in recess until we hear further

9    from the jury.

10        (Thereupon, a recess was taken, after which the

11   following proceedings were had:)

12        BAILIFF DELONG:  Judge, they indicated they need

13   a marker for the board.  They said there's none.  And

14   I have none but one red one that doesn't work.  That's

15   why we took it out.  I don't know where the other two

16   are.

17        THE CLERK:  What about behind the marker thing?

18        BAILIFF DELONG:  That's not for that type of

19   board.  That's a permanent magic marker.

20        THE COURT:  Those are markers over there.

21        BAILIFF DELONG:  But I don't know if they're --

22        THE COURT:  Permanent.

23        BAILIFF DELONG:  These are highlighters.

24        THE COURT:  Well, let's do this.  Both counsel

25   are present.  Mr. Richardson's here.  The jury wants a

LAUDERDALE REPORTING

1    marker for the board in the jury room.  Any
2    objection to the bailiff sending back the marker and
3    saying this is the only one we have, I don't know if
4    it works?  Or can you get one from another courtroom?
5            BAILIFF DELONG:  I can send this back for right
6    now and try to get another one.  But it didn't work
7    the greatest.  It worked but it's like really --
8            MR. LASWELL:  Why don't I go get a new one,
9    Judge?  Then we don't have --
10           THE COURT:  It's got to be one that works on
11   these boards here.  That's not a permanent.
12           BAILIFF DELONG:  You know, the white boards.
13           THE COURT:  Why don't we do this.  Why don't we
14   have the bailiff give them the pen that they have and
15   see if it works.  If it doesn't, then they can buzz
16   again.  Any objection to the bailiff giving the pen
17   and giving that information without the necessity of
18   our reconvening in the courtroom?
19           MR. LASWELL:  I guess they'd find out soon enough
20   if it worked, but, no, I don't have any objection.
21           THE COURT:  Okay with you, Mr. Richardson?  Or we
22   can bring the jury out and she can hand them the pen
23   and tell them to try this and see if it works.
24           MR. LASWELL:  That's not necessary.
25           THE COURT:  That's okay with you, Mr. Richardson?

350

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Okay, Sheree.  Go ahead.

3              (Thereupon, a recess was taken, after which the

4      following proceedings were had:)

5              THE COURT:  What I'm thinking on Mr. Richardson

6      we may not need to wait for Mr. Milian.  Maybe one of

7      the other prosecutors can stand in.  We have Mr.

8      Laswell here.

9              MR. LASWELL:  Yes.

10             THE COURT:  We have Mr. Richardson here.  We have

11     a lot of state attorneys here.  The question I have

12     from the jury, we're missing the verdict papers.

13     Apparently the verdict form and the Information was

14     not sent in with the rest of the documents this

15     morning.  Any objection to the clerk just sending in

16     the Information and the three verdict forms without

17     the necessity of our reconvening court?

18             THE DEFENDANT:  No, Your Honor.

19             MR. REBOLLO:  Judge, what was the question?

20             THE COURT:  We're missing the verdict papers.

21             MR. REBOLLO:  No objection.

22             THE COURT:  That's okay with you, Mr. Laswell?

23             MR. LASWELL:  Sure, Judge.

24             THE COURT:  Okay with you, Mr. Richardson, that

25     the bailiff just hand it to them?

1          THE DEFENDANT:  Yes, sir.

2          MR. LASWELL:  Sure, Judge.

3          THE COURT:  Okay.  Go ahead and do that, Sheree.

4   And the note will be received and filed.

5          (Thereupon, a recess was taken, after which the

6   following proceedings were had:)

7          THE COURT:  We're back on the record on Mr.

8   Richardson's case.  Both counsel are present.  Mr.

9   Richardson's present.  I understand the jury's arrived

10  at a verdict.  Anything to come before the Court

11  before we bring the jury in?

12         MR. LASWELL:  No, sir.

13         THE COURT:  Whenever you're ready, Sheree.  Let's

14  bring in the jury.

15         (Thereupon, the jury entered the courtroom, after

16  which the following proceedings were had:)

17         THE COURT:  Mr. Perez, has the jury arrived at

18  verdicts concurred in by all?

19         MR. PEREZ:  Yes, sir.

20         THE COURT:  If you can pass your verdict to the

21  court clerk, please, sir.

22         Madame clerk, please publish the verdict.

23         THE CLERK:  In the Circuit Court of the 17th

24  Judicial Circuit in and for Broward County, Florida.

25  Case number 96-3122C10C.  Judge William P.

1    Dimitrouleas.  State of Florida, Plaintiff versus Todd

2    D. Richardson, Defendant.  Verdict, Count I, we the

3    jury find as follows as to the defendant in this case,

4    the defendant is guilty of strong arm robbery a lesser

5    included offense.  So say we all this 15th day of

6    January, A.D., 1997.  Fort Lauderdale, Broward County,

7    Florida.  Richard Perez, foreperson.

8         Verdict, Count II, we the jury find as follows as

9    to the defendant in this case, the defendant is guilty

10   of armed robbery with a firearm as charged in the

11   Information.  So say we all this 15th day of January,

12   A.D., Fort Lauderdale, Broward County, Florida.

13   Richard Perez, foreperson.

14        Verdict, Count III, we the jury find as follows

15   as to the defendant in this case.  The defendant is

16   not guilty.  So say we all this 15th day of January,

17   A.D., 1997.  Fort Lauderdale, Broward County, Florida.

18   Richard Perez, foreperson.

19        THE COURT:  Either party wish the jury polled?

20        MR. MILIAN:  No, Judge.

21        MR. LASWELL:  Yes, sir.

22        THE COURT:  Madame clerk, please poll the jury.

23        THE CLERK:  Richard Perez, are these your

24   verdicts?

25        MR. PEREZ:  Yes, ma'am.

LAUDERDALE REPORTING

1        THE CLERK:  Sherry Ruiz, are these your verdicts?

2        MS. RUIZ:  Yes, they are.

3        THE CLERK:  Jill Farrington, are these your

4    verdicts?

5        MS. FARRINGTON:  Yes, they are.

6        THE CLERK:  Deborah Dhue, are these your

7    verdicts?

8        MS. DHUE:  (Nods head.)

9        THE CLERK:  Tracy Lee, are these your verdicts?

10        MS. LEE:  Yes, ma'am.

11        THE CLERK:  Walter Sartwell, are these your

12    verdicts?

13        MR. SARTWELL:  Yes, ma'am.

14        THE COURT:  Ms. Dhue, I didn't hear your answer.

15    Are these your verdicts?

16        MS. DHUE:  Yes.

17        THE COURT:  Okay.  I'm sorry.  The verdict will

18    be received and filed.

19        Ladies and gentlemen, I wish to thank you for

20    your time and consideration of this case.  I also wish

21    to advise you of some very special privileges enjoyed

22    by jurors.  No juror can ever be required to talk

23    about the discussions that occur in the jury room,

24    except by court order.

25        For many centuries our society has relied upon

LAUDERDALE REPORTING

1    juries for consideration of difficult cases.  We have

2    recognized for hundreds of years that a jury's

3    deliberations, discussions and votes should remain

4    their private affair as long as they wish it.

5    Therefore, the law gives you a unique privilege not to

6    speak about the jury's work.

7         Although you are at liberty to speak with anyone

8    about your deliberations, you are also at liberty to

9    refuse to speak to anyone.  A request may come from

10   those who are simply curious or from those who might

11   seek to find fault with you.  It will be up to you to

12   decide whether to preserve your privacy as a juror.

13        This will conclude your jury service for the

14   week.  And as a small token of the Court's

15   appreciation, I've had prepared those certificates of

16   appreciation.  I'll ask Pat to give them to you at

17   this time.  We are going to need to get those juror

18   buttons back from you at this time.  If you check with

19   the jury assembly room over on the third floor, I'm

20   sure they'll excuse you from jury duty.  And if you

21   don't have any questions, you're excused with the

22   Court's thanks.  Just wait a second.  Pat will give

23   you the certificates in a second.

24        THE CLERK:  If you can put your buttons in the

25   chair.

1    BAILIFF DELONG:  He already collected them.

2    THE COURT:  Again with the Court's thanks you're

3    excused.  Have a nice afternoon.

4    (Thereupon, the jury exited the courtroom, after

5    which the following proceedings were had:)

6    THE COURT:  Mr. Richardson, if you would approach

7    the bench, please, sir.  Mr. Richardson, the jury

8    having found you not guilty of kidnapping, I hereby

9    adjudge you to be not guilty.  The jury having found

10    you guilty of robbery and armed robbery, I adjudge you

11    to be guilty of those two felonies.  I'm going to

12    defer sentencing, order a presentence investigation

13    returnable on February the 21st at 10:30 in the

14    morning in this courtroom.

15    Someone from the Department of Corrections will

16    be coming over to the jail to interview you. I need

17    you to be open and honest with them so that I can find

18    out as much as I can about you so that I can make a

19    fair decision.  You need to go with the bailiff now

20    who will fingerprint you.  We'll see you back here

21    February 21st at 10:30 in the morning.

22    THE DEFENDANT:  Thank you, sir.

23    THE COURT:  And we'll be in recess until 1:15.

24    (Thereupon, the proceedings were concluded.)

25

356

1

## COURT CERTIFICATE

2

3    STATE OF FLORIDA
     COUNTY OF BROWARD

4

5        I, Kimberli M. Kidd, Court Reporter, certify
     that I was authorized to and did stenographically
6    report the foregoing proceedings and that the
     transcript is a true record.

7

8    Dated this 21st day of April        , 1997

9

10

11   Kimberli M. Kidd, Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE DISTRICT COURT OF APPEAL - FOURTH DISTRICT
WEST PALM BEACH, FLORIDA

| | | CLOCK IN |
|---|---|---|
| **DIVISION:**<br>[x] CRIMINAL | **RECORD ON APPEAL FROM THE CIRCUIT COURT<br>OF THE SEVENTEENTH JUDICIAL CIRCUIT<br>IN AND FOR BROWARD COUNTY, FLORIDA<br>CRIMINAL DIVISION** | |

| | |
|---|---|
| TODD RICHARDSON                      **Appellant**<br>VS.<br>STATE OF FLORIDA<br>                                        **Appellee** | **CASE NUMBER**<br>96-3122CF10C<br>**APPEAL NUMBER**<br>98-4323 |

RECEIVED
OFFICE OF THE ATTORNEY GENERAL

FEB 01 1999

CRIMINAL DIVISION
WEST PALM BEACH

VOLUME ____ IV ____ PAGES ____ 1 ____ TO ____ 14 ____

RICHARD L. JORANDBY, 15TH P.D.
ATTORNEY FOR APPELLANT

GEORGINA JIMENEZ OROSA
ASSISTANT ATTORNEY GENERAL

```
                    IN THE CIRCUIT COURT OF THE
                    SEVENTEENTH JUDICIAL CIRCUIT,
                    IN AND FOR BROWARD COUNTY, FLORIDA

                                    )
TODD RICHARDSON,                    )
                                    )       ORIGINAL
          Appellant/Defendant,      )
                                    ) Case
vs.                                 ) No. 96-3122CF10C
                                    )
STATE OF FLORIDA,                   )
                                    )
          Appellee/Plaintiff.       )
------------------------------------X

                         Broward County
                         Fort Lauderdale, Florida



                 ---------------------------------
                 APPEAL ON BEHALF OF THE DEFENDANT
                 ---------------------------------
```

# SUPPLEMENTAL RECORD

VOLUME I (1)
Pages 1 to 14



FILED

JUN 2 3 1997

CLERK DISTRICT COURT OF APPEAL
FOURTH DISTRICT

'97 JUN 23 RECEIVED

1996 /box 14

LAUDERDALE REPORTING SERVICE, INC. (305) 467-6671

2

1

2                          I-N-D-E-X

3
              <u>Date</u>           <u>Proceedings</u>            <u>Page</u>
4       February 25th, 1997     Sentencing hearing       1-14

5

6       E-X-H-I-B-I-T-S                                   <u>PAGE</u>
        State's 1                                          9
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          IN THE CIRCUIT COURT OF THE
                           SEVENTEENTH JUDICIAL CIRCUIT IN
2                          AND FOR BROWARD COUNTY, FLORIDA

3    STATE OF FLORIDA,              )
                                    )
4                 Plaintiff,        )
                                    ) Case no. 96-3122CF10C
5    vs.                            )
                                    )
6    TODD RICHARDSON,               )
                                    )
7                 Defendant.        )
                                    )
8    ------------------------------X

9                          Fort Lauderdale, Florida
                           February 25th, 1997
10                         8:30 o'clock a.m.

11   APPEARANCES:

12         OFFICE OF THE STATE ATTORNEY
           By:  AL MILIAN, ESQ.
13         Appearing on behalf of the Plaintiff

14         OFFICE OF THE PUBLIC DEFENDER
           By:  WILLIAM LASWELL, ESQ.
15         Appearing on behalf of the Defendant

16                 ----------------

17         The above-styled cause came on for hearing,

18   before the Honorable WILLIAM P. DIMITROULEAS, Presiding

19   Judge, at the Broward County Courthouse, Fort

20   Lauderdale, Broward County, Florida, on the 25th day

21   of February, 1997, commencing at 8:30 o'clock a.m.

22

23

24

25

4

```
1              (Thereupon, the following proceedings were had:)

2              THE COURT:  Todd Richardson.

3              MR. LASWELL:  He's not up yet.

4              THE COURT:  We need to get --

5              MR. LASWELL:  It's not 8:30 yet.

6              Here is Mr. Richardson.

7              THE COURT:  Okay.  Just have a seat, Mr.

8      Richardson.

9              THE DEFENDANT:  How you doing, Your Honor?

10             THE COURT:  I'm doing good.  Can you hear okay

11     over there, Mr. Richardson?

12             THE DEFENDANT:  Yes, sir.  It's just, you know,

13     problems with the changing the clothes and stuff.

14     They get it all mixed up.

15             THE COURT:  Okay.  Well, you don't need to change

16     your clothes for today.  Mr. Richardson is before the

17     Court having pled -- having been found guilty by a

18     jury of robbery and armed robbery back on January the

19     15th of this year.  At that time I adjudicated him

20     guilty, deferred sentencing until last Friday.

21     Ordered a presentence investigation that I have

22     received.  Why did we reset this till today?

23             MR. MILIAN:  Because they had a problem with the

24     adjudication that occurred March 13th, 1995, and you

25     asked that both court files be brought up to review
```

1    them yourself.  I did provide the Court with the

2    certified copy of the conviction.

3         THE COURT:  Did we get those court files, Pat?

4         THE CLERK:  We'll see.  I'll ask Leah.  I ordered

5    them.  That was a '90 case?

6         MR. MILIAN:  No, 93-12809CF10B.

7         MR. LASWELL:  That's the one.

8         THE COURT:  That makes a difference on whether it

9    was a withheld or not, right?  Whether the withhold --

10        MR. MILIAN:  I don't see what difference it

11    makes.  I have the adjudication of guilt here.

12        THE COURT:  I understand the certified copy of

13    conviction indicates the adjudication was earlier.

14        MR. MILIAN:  No, it indicates 13 March '95.

15        THE COURT:  Right.  But then again Mr. Laswell is

16    saying he's got another adjudication that indicates

17    after that.

18        MR. MILIAN:  Yes, sir.  I think it's right on the

19    back of that.  Included in the package it's 12809

20    and it's an adjudication of 10/15/96.  That's when he

21    was sentenced on the violation.

22        THE COURT:  I understand that.

23        MR. MILIAN:  Okay.

24        THE COURT:  So the question is, was he

25    adjudicated guilty in '95 and then vacate the

1    adjudication so that he was adjudicated again in '96.

2    If that's the case, then he wouldn't have the

3    aggravated battery conviction.

4         If he was adjudicated guilty in '95 and then they

5    just erroneously fingerprinted him in '96, then he was

6    a convicted felon on aggravated battery when this

7    crime -- and he would have a conviction.  So that's

8    why we need to look at the file to see if there is

9    some indication in the file that after the

10   adjudication in '95 that it was vacated or whether or

11   not it was just a scrivener's error fingerprinting him

12   when he didn't have to be in '96.  So we'll put it on

13   recall until they bring up the file.

14        MR. LASWELL:  This guy is no thoroughbred as

15   you're used to seeing.  So I would be happy to spend

16   whatever time is necessary for the Court to consider

17   this.

18        THE COURT:  Okay.  Put it on recall.

19        (Thereupon, matters unrelated to this case were

20   heard, after which the following proceedings were

21   had:)

22        THE COURT:  Let's recall Mr. Richardson's case.

23   Mr. Richardson, can you hear okay over there?

24        THE DEFENDANT:  A little.

25        THE COURT:  Something you can't hear, you let me

1      know, okay?

2              THE DEFENDANT:  Okay.

3              THE COURT:  Mr. Richardson's before the Court

4      having been found guilty by a jury of robbery and

5      armed robbery.  I ordered a presentence investigation

6      returnable on today's date that I have received and

7      reviewed.  We reset the sentencing from last Friday so

8      I could get a copy of the court files on Mr.

9      Richardson.

10             I have both court files in front of me.

11     93-12809CFB which is an aggravated battery conviction

12     which is really the relevant conviction and

13     92-21343CF.  In both situations was adjudicated guilty

14     on March 13th of '95, put on community control.  And

15     then his community control was revoked October 15th of

16     '96 and he was given two years in prison.

17             In both situations the adjudication of guilt

18     according to the court file happened on March 13th of

19     '95.  And, in fact, on the aggravated battery

20     disposition sheet for the sentencing on October 15th

21     of '96, the disposition sheet indicates previously

22     adjudicated guilty March 13th of '95.  You want to see

23     that, Mr. Laswell?

24             MR. LASWELL:  Certainly not.  I have great trust

25     in this Court.

1      THE COURT:  Okay.  So I'm convinced that Mr.

2  Richardson was adjudicated guilty of the aggravated

3  battery March 13th of '95.  I take judicial notice of

4  the court records in 93-12809CF10B.

5      MR. LASWELL:  I will correct the notation on the

6  PSI to conform with the facts as recited by the Court.

7      MR. MILIAN:  Judge, let me go forward now on

8  State's A and B that I had moved in last time.  They

9  didn't have any objection to it.  The only issue was

10  that about the adjudication.

11      THE COURT:  Any objection to these certified

12  copies of convictions?

13      MR. LASWELL:  No, they both occurred in my

14  presence October of last year.

15      THE COURT:  Well, the sentencing occurred October

16  of'96, but the adjudications would have occurred March

17  13th of '95 according to the court records.

18      MR. LASWELL:  That's correct.  And I'm sure that

19  they printed him on October the 15th of '96 and

20  determined that he was the same person who had

21  previously been before the Court.

22      MR. MILIAN:  Right.

23      THE COURT:  Mr. Richardson, do you agree that you

24  got community control on March 13th of '95 on the

25  grand theft and on the aggravated battery?

LAUDERDALE REPORTING SERVICE, INC.  (305) 467-6671

1      THE DEFENDANT:  Yes, sir.

2      THE COURT:  Okay.  And I've determined there was

3  an adjudication of guilty at that time so I'll

4  introduce or I'll accept into evidence those two

5  certified copies of conviction as State's Exhibit

6  Number 1.

7      Do we have a sentencing guideline score sheet on

8  Mr. Richardson?

9      (Thereupon, State's Exhibit Number 1 was received

10  in Evidence.)

11      MR. MILIAN:  Yes, sir.

12      THE COURT:  Any objection to the sentencing

13  guideline score sheet?

14      MR. LASWELL:  No, sir.

15      THE COURT:  There being none they will be

16  received and filed.  Any legal cause to show why

17  sentence should not be imposed?

18      MR. LASWELL:  There's no legal cause or reason,

19  Judge.  I think Mr. Richardson would like to address

20  the Court.

21      THE COURT:  Okay.  Anything you want to say, Mr.

22  Richardson, before I impose sentence?

23      THE DEFENDANT:  Yes, Your Honor.

24      THE COURT:  Go ahead.

25      THE DEFENDANT:  Well, Your Honor, I've been down

1    about a year.  I've lost -- I lost my son back in '96,

2    Your Honor.  And I would like to say if I can get some

3    more probation, you know what I'm saying, Your Honor.

4    I'd gladly take how much, whatever you would give me

5    now.  And if I violate, you give me the max, whatever,

6    Your Honor.

7        'Cause I feel I've learned my lesson.  I took a

8    few classes while I was incarcerated, while I'm

9    incarcerated, Your Honor.  I would like to know if I

10   can get any kind of probation so I can go home and

11   raise a family.

12       THE COURT:  You have 372 days credit for time

13   served, Mr. Richardson?  Does that sound right to you?

14       THE DEFENDANT:  Yes, sir.  Five days, six days.

15   Five or six days.

16       MR. LASWELL:  Judge, I just want you to know this

17   is Todd's mother, Glenda McAfee, you have seen in

18   attendance at every meeting.

19       THE COURT:  Appreciate you being here today,

20   ma'am.  I'm sure your son appreciates the support that

21   you're giving him.  So 372 sounds right or is that not

22   right on your credit for time served, Mr. Richardson?

23       THE DEFENDANT:  Three seventy-two?

24       THE COURT:  Right.

25       THE DEFENDANT:  Yes, sir.

```
1            THE COURT:  That sounds right?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Okay.  Anything further before I

4      impose sentence?

5            MR. LASWELL:  Just as I indicated to the Court

6      earlier, you know, this kid is not a thoroughbred,

7      yet.  You know, racked up the two priors that are

8      necessary.  But I would -- I would just simply say,

9      you know, I understand we tried the case and

10     everything, but I think a guideline sentence would

11     either get the job done with this young man or it

12     wouldn't.  The imposition of Draconian numbers or life

13     I don't think it would serve him, or our community,

14     with anybody.  Thank you, Judge.

15           THE DEFENDANT:  One other thing may I add, Your

16     Honor?

17           THE COURT:  Go ahead.

18           THE DEFENDANT:  I feel that if I go to prison,

19     Your Honor, it won't help me none just keep me in the

20     same mentality, sir.  You know, I need some kind of

21     special help or something.

22           MS. MCAFEE:  I would like to say something.

23           THE COURT:  Okay.  Go ahead.

24           MS. MCAFEE:  I work for the county school board

25     and I work with mainly handicapped kids.  Todd's been
```

1    emotionally handicapped sine he's been brought in the

2    world.  He's not really a bad kid.  Todd has always

3    been in the wrong place at the wrong time and even in

4    this incident now.

5         Like these young men he haven't seen since he was

6    like about ten years old.  And he's not really a bad

7    child.  And I just hope, you know, you decide to have

8    mercy on Todd today because I've been taking care of

9    Todd and Todd really never had a father figure.  I

10   have been there for him and a mother and the father

11   since he been in this world.

12        And I just -- he just need to learn, you know,

13   stop being in the wrong place at the wrong time.  And

14   basically every incident that he's been in, this is

15   what have happened to him.  As far as a bad child, I

16   never really had no problem out of Todd.  Todd --

17   because I have brought Todd up in a Christian church.

18   Todd goes to church.  Todd knows God.

19        THE COURT:  Appreciate you coming in today,

20   ma'am.  You can have a seat.

21        MS. MCAFEE:  Thank you.

22        THE COURT:  Anything further before I impose

23   sentence?

24        MR. LASWELL:  Nothing.

25        THE COURT:  Okay.  It will be the judgment of the

1    Court and sentence of the law that Mr. Richardson be

2    declared to be a violent habitual offender.  I find he

3    has a prior violent conviction.  This is an aggravated

4    battery within five years of the commission of this

5    offense.  That it hasn't been set aside by any

6    postconviction relief or by a pardon.  And that it's

7    necessary for the protection of the public to impose

8    an enhanced sentence.  And I enter a written order to

9    that effect.

10        I sentence Mr. Richardson to 30 years in prison

11   as a violent habitual offender on Counts I and II to

12   run concurrent with each other.  With credit for time

13   served in the amount of 372 days.  I impose a 10 year

14   mandatory minimum on Count I.  A 15 year mandatory

15   minimum on Count II.  I run the sentences consecutive

16   to 93-138029FM and 94-21634CF.

17        I order that he pay $255 court costs when he gets

18   out of jail and he can afford to pay it.  You have 30

19   days to appeal this judgment and sentence.  And if you

20   can't afford an attorney, one will be appointed for

21   you.  Good luck to you, Mr Richardson.

22        MR. LASWELL:  Thank you, Judge.

23        (Thereupon, the proceedings were concluded.)

24

25

14

1                        COURT CERTIFICATE

2

3    STATE OF FLORIDA
     COUNTY OF BROWARD
4

5              I, Kimberli M. Kidd, Court Reporter, certify
     that I was authorized to and did stenographically
6    report the foregoing proceedings and that the
     transcript is a true record.
7

8    Dated this ____ day of _____, 1997

9

10

11              Kimberli M. Kidd, Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25